UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                :

In re:                              :        Chapter 11
                                :

MSR RESORT GOLF COURSE LLC, *et al.*,  :        Case No. 11-10372 (SHL)
                                :

           Debtors.            :        Jointly Administered
                                :

------------------------------------------------------------------x

## FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN SECURED, SUPERPRIORITY POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(e), (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362 AND (III) PROVIDING FOR RELATED RELIEF

Upon the motion (the "**Motion**")[1] of MSR Resort Golf Course LLC and each of its

affiliated debtors, each as debtor and debtor-in-possession (collectively, the "**Debtors**") in the

above captioned chapter 11 cases (collectively, the "**Cases**") pursuant to sections 105, 361, 362,

364(c)(1), 364(c)(2), 364(c)(3) and 364(e) of title 11, United States Code, 11 U.S.C. §§ 101, *et*

*seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), seeking entry of

a final order (this "**Final Order**"), among other things:

      (a)     authorizing the Debtors identified on **Exhibit B** annexed hereto (the "**DIP**

**Facility Debtors**") to obtain secured, postpetition financing (the "**Financing**") and incur debt on

a superpriority basis, pursuant to sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy

Code, up to the aggregate committed amount of $30 million (the "**DIP Facility**"), pursuant to

(i) the Secured, Superpriority Debtor-in-Possession Credit Agreement among the DIP Facility

---

[1]   A list of the Debtors submitting this Motion, along with the last four digits of such Debtor's federal tax
identification number, is attached hereto as **Exhibit A**.

Debtors, as borrowers, CNL DIP Recovery Acquisition, LLC, successor to Paulson Real Estate Recovery Fund LP ("**Paulson**") and Five Mile Capital II CNL DIP Administrative Agent LLC ("**Five Mile**"), as co-agents, (together, the "**DIP Agent**") and the lenders thereto (the "**DIP Lenders**") substantially in the form attached as <u>**Exhibit C**</u> to the Interim Order (as defined herein and together with this Final Order, the "**Borrowing Orders**"), and (ii) all other agreements, documents and instruments executed and/or delivered with, to or in favor of the DIP Agent and/or the DIP Lenders (as may be amended, modified or supplemented and in effect from time to time, collectively with the DIP Credit Agreement (as defined herein), the "**DIP Documents**");

(b)        granting, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Facility, and all obligations owing thereunder and under the DIP Documents to the DIP Agent and the DIP Lenders (collectively, including all "Obligations," as defined in the DIP Credit Agreement, the "**DIP Obligations**") an allowed superpriority administrative expense claim in each of the DIP Facility Debtors' respective Cases, which superpriority claim shall be subject only to the Carve-Out and the Adequate Protection Obligations (as defined herein), if any, and will otherwise be accorded superpriority status having priority over any and all other claims and administrative expenses in the Cases;

(c)        granting to the DIP Agent, for the benefit of itself and the DIP Lenders, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, automatically perfected security interests and liens in and on all of the DIP Collateral (as defined and limited herein), including, without limitation, all property constituting "**Cash Collateral**," as defined in section 363(a) of the Bankruptcy Code), senior and superior in priority to all other liens on the DIP Facility Debtors' assets except as otherwise provided in this Final Order;

(d)     authorizing the use of the proceeds of the DIP Facility in each case in a manner consistent with the terms and conditions of this Final Order, the DIP Documents, solely for (i) working capital and general corporate purposes, and (ii) payment of fees, costs, administrative expenses and other expenses associated with the DIP Facility and the Cases (including professional fees and expenses); and

(e)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order.

The Bankruptcy Court having considered the Motion, the exhibits thereto, the *Declaration of Saul Burian in Support of the Debtors' Revised Proposed Form of Fourth Interim Cash Collateral Order* [Docket No. 128], the *Declaration of Daniel Kamensky of MSR Resort Golf Course LLC (A) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (B) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 3], the exhibits attached thereto, the DIP Credit Agreement, and the evidence submitted and the record made at the hearing on the Interim Order (the "**Interim Hearing**") and the hearing on this Final Order (the "**Final Hearing**"), respectively; and the Final Hearing having been held and concluded on April 13, 2011; and it appearing that approval of the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE SUBMISSIONS OF THE PARTIES AND THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY FINDS THAT:**

A.     **Petition Date**.    On February 1, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York.    The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.    No trustee or examiner has been appointed in the Cases.

B.     **Jurisdiction and Venue**.    This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     **Committee Formation**.    A statutory committee of unsecured creditors has not yet been appointed in the Cases (any such committee appointed pursuant to section 1102(a) of the Bankruptcy Code, the "**Committee**").

D.     **Interim Hearing, Entry of Interim Order and Execution of and Draw Under DIP Credit Agreement**.    This Court conducted the Interim Hearing on March 15, 2011 and entered its *Interim Order (I) Authorizing Debtors to Obtain Secured, Superpriority Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), (II) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c)* [Docket No. 140] (the "**Interim Order**") on March 16, 2011.    Pursuant to the Interim Order and that certain Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of March 21, 2011 (together with the exhibits and schedules annexed thereto, the "**DIP Credit Agreement**"), among the DIP

Facility Debtors, as Borrowers, MSR Resort Golf Course, LLC, as Administrative Borrower, the DIP Lenders and the DIP Agent, a copy of which is annexed hereto as Exhibit C, on or about March 21, 2011, the Administrative Borrower requested, and the DIP Lenders funded, a Loan (as defined in the DIP Credit Agreement) in the principal amount of $5,000,000 (the "**Interim Loan**").

E.     **Notice**.     The Final Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001(c)(2), Local Bankruptcy Rule 4001-2 and the Interim Order.     Notice of entry of the Interim Order and the scheduling of the Final Hearing, as well as a copy of the Interim Order and a copy of the Motion were served timely upon the parties having been given notice of the Interim Hearing in accordance with the provisions of paragraph 22 of the Interim Order.     In addition, notice of the proposed form of this Final Order has been served upon: (i) the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the creditors holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iii) counsel to the Servicer; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) the Office of the Attorney General in each of the states in which the Debtors operate; and (vii) any applicable state public utilities commissions required to receive notice under the Bankruptcy Rules or Local Rules.     Under the circumstances, such notice of the Interim Order, the Final Hearing and the relief requested in the Motion constitutes due, proper and sufficient notice.

F.     **Debtors' Acknowledgements and Stipulations**.

a.    **Debtors' Five Mile SPE Stipulations**.    The Debtors admit, stipulate, acknowledge and agree as follows (collectively, the following sub-paragraphs (i) - (vii) hereof, the "**Debtors' Five Mile SPE Stipulations**"):

(i)    Five Mile Capital SPE B LLC ("**Five Mile SPE**") is the owner and holder of that certain Mezzanine Note (Fourth Mezzanine) (the "**Fourth Mezz Note**"), dated January 9, 2006, made by CNL Resort Sub Intermediate Mezz, LP (now know as MSR Resort Sub Intermediate Mezz, LP (a Debtor) (the "**MSR LP Fourth Mezz Debtor**") in favor of German American Capital Corporation ("**GACC**") in the principal amount of $50,000,000;

(ii)    The Fourth Mezz Note evidences a loan (the "**Fourth Mezz Loan**") that was made pursuant to that certain Mezzanine Loan and Security Agreement (Fourth Mezzanine) (the "**Fourth Mezz Loan Agreement**"), dated as of January 9, 2006, between MSR LP Fourth Mezz Debtor, as borrower, and GACC, as lender.    The Debtors have been informed that GACC has assigned its rights under the Fourth Mezz Loan Agreement to Five Mile SPE;

(iii)    The obligations of MSR LP Fourth Mezz Debtor under the Fourth Mezz Note and the Fourth Mezz Loan Agreement are secured by, among other things, a pledge by MSR LP Fourth Mezz Debtor to GACC of MSR LP Fourth Mezz Debtor's right, title and interest in (x) CNL Resort Intermediate Mezz, LP (now known as MSR Resort Intermediate Mezz, LP (a Debtor) (the "**MSR LP Third Mezz Debtor**") and (y) CNL Resort Intermediate Mezz GP (now known as MSR Resort Intermediate Mezz GP) (a Debtor) ("**MSR LP Third Mezz GP Debtor**"), which pledge was made pursuant to that certain Pledge and Security Agreement (Fourth Mezzanine) (the "**LP Fourth Mezz Pledge Agreement**" and together with the Fourth Mezz Note, the Fourth Mezz Loan Agreement and any and all other agreements, instruments and documents executed by or in favor of MSR LP Fourth Mezz Debtor, GACC

and/or Five Mile SPE in connection with the Fourth Mezz Loan, the "**Loan Documents (Fourth Mezz)**"), dated as of January 9, 2006, made by MSR LP Fourth Mezz Debtor, as pledgor, in favor of GACC, as pledgee.   The Debtors have been informed that GACC has assigned its rights under the Fourth Mezz Pledge Agreement to Five Mile SPE;

(iv)    Pursuant to that certain Consent, Acknowledgement, Reaffirmation and Modification Agreement, dated as of December 29, 2006 (the "**2006 Consent**"), and/or that certain Omnibus Consent, Acknowledgement, Joinder, Reaffirmation and Modification Agreement dated as of April 11, 2007 (the "**Omnibus Consent**"), among Five Mile SPE, MSR LP Fourth Mezz Debtor, MSR Resort Sub Intermediate Mezz LLC (a Debtor) ("**MSR LLC Fourth Mezz Debtor**"), MSR Resort Sub Intermediate MREP, LLC (a Debtor) ("**MSR MREP Fourth Mezz Debtor**") and other parties, among other things, each of MSR LLC Fourth Mezz Debtor and MSR MREP Fourth Mezz Debtor joined in the Loan Documents (Fourth Mezz) and assumed all obligations of MSR LP Fourth Mezz Debtor thereunder, jointly and severally with MSR LP Fourth Mezz Debtor, and agreed to be bound by the terms and provisions thereof with the same effect as if it had been an original party thereto.   In connection therewith, each of MSR LLC Fourth Mezz Debtor and MSR MREP Fourth Mezz Debtor executed and delivered to Five Mile SPE a pledge agreement (together, the "**LLC/MREP Fourth Mezz Pledge Agreements**" and collectively with the Loan Documents (Fourth Mezz), the Omnibus Consent, the 2006 Consent, and any other and all other agreements, instruments and documents executed by or in favor of MSR LP Fourth Mezz Debtor, MSR LLC Fourth Mezz Debtor, MSR MREP Fourth Mezz Debtor and/or Five Mile SPE in connection with the Fourth Mezz Loan, the 2006 Consent, and the Omnibus Consent, respectively, the "**Fourth Mezz Transaction Documents**")

pursuant to which such Debtor pledged to Five Mile SPE, among other things, all of its right, title and interest in its wholly-owned subsidiary (each such subsidiary being a Debtor);

(v)　　Subject to the provisions of paragraph 19 hereof, pursuant to the Fourth Mezz Transaction Documents, as of the Petition Date, Five Mile SPE holds a valid claim (the "**Five Mile SPE Claim**") against each of each of MSR LP Fourth Mezz Debtor, MSR LLC Fourth Mezz Debtor and MSR MREP Fourth Mezz Debtor and MSR Resort Sub Intermediate Mezz GP, LLC (as general partner of MSR LP Fourth Mezz Debtor) in the outstanding principal amount of $50,000,000, plus (x) accrued and unpaid interest thereon and (y) all fees, costs and expenses, including, without limitation, attorneys' fees, incurred by Five Mile SPE that are chargeable or reimbursable under the Fourth Mezz Transaction Documents;

(vi)　　Subject to the provisions of paragraph 19 hereof, the Five Mile SPE Claim is not, and shall not be, subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the Five Mile SPE Claim in the nature of, avoidance, recovery, reduction, recovery, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the Five Mile SPE Claim, whether asserted by any Debtor, the Committee, if any, or any other person or entity;

(vii)　　The Five Mile SPE Claim is secured by the respective pledges made pursuant to the LP Fourth Mezz Pledge Agreement and the LLC/MREP Fourth Mezz Pledge Agreements (collectively, the "**Fourth Mezz Pledge Agreements**" and, collectively, the pledges,

liens and security interests granted to Five Mile SPE pursuant to the Fourth Mezz Pledge Agreements, the "**Fourth Mezz Pledges**"), and, subject to the provisions of paragraph 19 hereof, the Fourth Mezz Pledges constitute valid, binding, enforceable, properly perfected, first-priority liens on and security interests in the Pledged Collateral (as defined in each of the respective Fourth Mezz Pledge Agreements) and shall not be subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the Fourth Mezz Pledges in the nature of, avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the Fourth Mezz Pledges or any other rights, claims, Liens, security interests, collateral or other interests held or asserted by or on behalf of Five Mile SPE, whether asserted by any Debtor, the Committee, if any, or any other person or entity.

b.     **Debtors' GIC RE Stipulations**.    The Debtors admit, stipulate, acknowledge and agree as follows (collectively, the following sub-paragraphs (i) - (xiv) hereof, the "**Debtors' GIC RE Stipulations**")

(i)     450 Lex Private Limited ("**450 Lex**") is the owner and holder of that certain Mezzanine Note (Second Mezzanine) (the "**Second Mezz Note**"), dated January 9, 2006, made by CNL Resort Sub Senior Mezz, LP (now know as MSR Resort Sub Senior Mezz, LP (a Debtor) (the "**MSR LP Second Mezz Debtor**") in favor of GACC in the principal amount of $110,000,000;

(ii)    The Second Mezz Note evidences a loan (the "**Second Mezz Loan**") that was made pursuant to that certain Mezzanine Loan and Security Agreement (Second Mezzanine) (the "**Second Mezz Loan Agreement**"), dated as of January 9, 2006, between MSR LP Second Mezz Debtor, as borrower, and GACC, as lender.    The Debtors have been informed that GACC assigned its rights under the Second Mezz Loan Agreement to Hypo Real Estate Capital Corporation ("**Hypo**"), and Hypo has assigned its rights under the Second Mezz Loan to 450 Lex;

(iii)    The obligations of MSR LP Second Mezz Debtor under the Second Mezz Note and the Second Mezz Loan Agreement are secured by, among other things, a pledge by MSR LP Second Mezz Debtor to GACC of MSR LP Second Mezz Debtor's right, title and interest in (x) CNL Resort Senior Mezz, LP (now known as MSR Resort Senior Mezz, LP (a Debtor) (the "**MSR LP First Mezz Debtor**") and (y) CNL Resort Senior Mezz GP, LLC (now known as MSR Resort Senior Mezz GP, LLC) (a Debtor) ("**MSR LP First Mezz GP Debtor**"), which pledge was made pursuant to that certain Pledge and Security Agreement (Second Mezzanine) (the "**LP Second Mezz Pledge Agreement**" and together with the Second Mezz Note, the Second Mezz Loan Agreement and any and all other agreements, instruments and documents executed by or in favor of MSR LP Second Mezz Debtor in connection with the Second Mezz Loan, the "**Loan Documents (Second Mezz)**"), dated as of January 9, 2006, made by MSR LP Second Mezz Debtor, as pledgor, in favor of GACC, as pledgee.    The Debtors have been informed that GACC assigned its rights under the Second Mezz Pledge Agreement to Hypo, and Hypo has assigned its rights under the LP Second Mezz Pledge Agreement to 450 Lex.

(iv)    Pursuant to that certain Consent, Acknowledgement, Reaffirmation and Modification Agreement dated as of    December 29, 2006 (the "**Consent**"), among Hypo, MSR

LP Second Mezz Debtor, MSR Resort Sub Senior MREP, LLC (a Debtor) ("**MSR MREP Second Mezz Debtor**") and other parties, among other things, MSR MREP Second Mezz Debtor executed and delivered to Hypo a pledge agreement (the "**MREP Second Mezz Pledge Agreement**") pursuant to which such Debtor pledged to Hypo, among other things, all of its right, title and interest in its wholly-owned subsidiary (such subsidiary being a Debtor).    The Debtors have been informed that Hypo has assigned its rights under the MREP Second Mezz Pledge Agreement to 450 Lex.    Pursuant to that certain Omnibus Consent, Acknowledgement, Joinder, Reaffirmation and Modification Agreement dated as of April 11, 2007 (the "**Omnibus Consent**"), among Hypo, MSR LP Second Mezz Debtor, MSR Resort Sub Senior Mezz LLC (a Debtor) ("**MSR LLC Second Mezz Debtor**"), MSR MREP Second Mezz Debtor and other parties, among other things, each of MSR LLC Second Mezz Debtor and MSR MREP Second Mezz Debtor joined in the Loan Documents (Second Mezz) and assumed all obligations of MSR LP Second Mezz Debtor thereunder, jointly and severally with MSR LP Second Mezz Debtor, and agreed to be bound by the terms and provisions thereof with the same effect as if it had been an original party thereto.    In connection therewith, MSR LLC Second Mezz Debtor executed and delivered to Hypo a pledge agreement (the "**LLC Second Mezz Pledge Agreement**" and collectively with the Loan Documents (Second Mezz), the Consent, the Omnibus Consent and any other and all other agreements, instruments and documents executed by or in favor of MSR LP Second Mezz Debtor, MSR LLC Second Mezz Debtor and MSR MREP Second Mezz Debtor in connection with the Second Mezz Loan, the Consent and the Omnibus Consent, respectively, the "**Second Mezz Transaction Documents**") pursuant to which MSR LLC Second Mezz Debtor pledged to Hypo, among other things, all of its right, title and interest in its

wholly-owned subsidiary (such subsidiary being a Debtor). The Debtors have been informed that Hypo has assigned its rights under the LLC Second Mezz Pledge Agreement to 450 Lex.

(v)     Subject to the provisions of paragraph 19 hereof, pursuant to the Second Mezz Transaction Documents, as of the Petition Date, 450 Lex holds a valid claim (the "**450 Lex Claim**") against each of each of MSR LP Second Mezz Debtor, MSR LLC Second Mezz Debtor, MSR MREP Second Mezz Debtor and MSR Resort Sub Senior Mezz GP, LLC (as general partner of MSR LP Second Mezz Debtor) in the outstanding principal amount of $110,000,000, plus (x) accrued and unpaid interest thereon and (y) all fees, costs and expenses, including, without limitation, attorneys' fees, incurred by 450 Lex that are chargeable or reimbursable under the Second Mezz Transaction Documents;

(vi)     Subject to the provisions of paragraph 19 hereof, the 450 Lex Claim is not, and shall not be, subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the 450 Lex Claim in the nature of, avoidance, recovery, reduction, recovery, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the 450 Lex Claim, whether asserted by any Debtor, the Committee, if any, or any other person or entity;

(vii)     The 450 Lex Claim is secured by the respective pledges made pursuant to the LP Second Mezz Pledge Agreement, the LLC Second Mezz Pledge Agreement and the MREP Second Mezz Pledge Agreement (collectively, the "**Second Mezz Pledge Agreements**"

and, collectively, the pledges, liens and security interests granted to 450 Lex pursuant to the Second Mezz Pledge Agreements, the "**Second Mezz Pledges**"), and, subject to the provisions of paragraph 19 hereof, the Second Mezz Pledges constitute valid, binding, enforceable, properly perfected, first-priority liens on and security interests in the Pledged Collateral (as defined in each of the respective Second Mezz Pledge Agreements) and shall not be subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the Second Mezz Pledges in the nature of, avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the Second Mezz Pledges or any other rights, claims, Liens, security interests, collateral or other interests held or asserted by or on behalf of 450 Lex, whether asserted by any Debtor, the Committee, if any, or any other person or entity.

(viii)  RE NA Investments Private Limited (now known as C Hotel Mezz Private Limited, "**C Hotel Mezz**") is the owner and holder of that certain Mezzanine Note (Third Mezzanine) (the "**Third Mezz Note**"), dated January 9, 2006, made by CNL Resort Intermediate Mezz, LP (now know as MSR Resort Intermediate Mezz, LP (a Debtor) (the "**MSR LP Third Mezz Debtor**") in favor of GACC in the principal amount of $250,000,000;

(ix)  The Third Mezz Note evidences a loan (the "**Third Mezz Loan**") that was made pursuant to that certain Mezzanine Loan and Security Agreement (Third Mezzanine) (the "**Third Mezz Loan Agreement**"), dated as of January 9, 2006, between MSR LP Third Mezz

Debtor, as borrower, and GACC, as lender. The Debtors have been informed that GACC has assigned its rights under the Third Mezz Loan Agreement to C Hotel Mezz;

(x)     The obligations of MSR LP Third Mezz Debtor under the Third Mezz Note and the Third Mezz Loan Agreement are secured by, among other things, a pledge by MSR LP Third Mezz Debtor to GACC of MSR LP Third Mezz Debtor's right, title and interest in (x) CNL Resort Sub Senior Mezz, LP (now known as MSR Resort Sub Senior Mezz, LP (a Debtor) (the "**MSR LP Second Mezz Debtor**") and (y) CNL Resort Sub Senior Mezz GP, LLC (now known as MSR Resort Sub Senior Mezz GP, LLC) (a Debtor) ("**MSR LP Second Mezz GP Debtor**"), which pledge was made pursuant to that certain Pledge and Security Agreement (Third Mezzanine) (the "**LP Third Mezz Pledge Agreement**" and together with the Third Mezz Note, the Third Mezz Loan Agreement and any and all other agreements, instruments and documents executed by or in favor of MSR LP Third Mezz Debtor in connection with the Third Mezz Loan, the "**Loan Documents (Third Mezz)**"), dated as of January 9, 2006, made by MSR LP Third Mezz Debtor, as pledgor, in favor of GACC, as pledgee. The Debtors have been informed that GACC has assigned its rights under the LP Third Mezz Pledge Agreement to C Hotel Mezz;

(xi)     Pursuant to that certain Consent, Acknowledgement, Reaffirmation and Modification Agreement dated as of   December 29, 2006 (the "**Consent**"), among C Hotel Mezz, MSR LP Third Mezz Debtor, MSR Resort Intermediate MREP, LLC (a Debtor) ("**MSR MREP Third Mezz Debtor**") and other parties, among other things, MSR MREP Third Mezz Debtor executed and delivered to C Hotel Mezz a pledge agreement (the "**MREP Third Mezz Pledge Agreement**") pursuant to which such Debtor pledged to C Hotel Mezz, among other things, all of its right, title and interest in its wholly-owned subsidiary (such subsidiary being a

Debtor). Pursuant to that certain Omnibus Consent, Acknowledgement, Joinder, Reaffirmation and Modification Agreement dated as of April 11, 2007 (the "**Omnibus Consent**"), among C Hotel Mezz, MSR LP Third Mezz Debtor, MSR Resort Intermediate Mezz LLC (a Debtor) ("**MSR LLC Intermediate Mezz Debtor**"), MSR MREP Third Mezz Debtor and other parties, among other things, each of MSR LLC Third Mezz Debtor and MSR MREP Third Mezz Debtor joined in the Loan Documents (Third Mezz) and assumed all obligations of MSR LP Third Mezz Debtor thereunder, jointly and severally with MSR LP Third Mezz Debtor, and agreed to be bound by the terms and provisions thereof with the same effect as if it had been an original party thereto. In connection therewith, MSR LLC Third Mezz Debtor executed and delivered to C Hotel Mezz a pledge agreement (the "**LLC Third Mezz Pledge Agreements**" and collectively with the Loan Documents (Third Mezz), the Consent, the Omnibus Consent and any other and all other agreements, instruments and documents executed by or in favor of MSR LP Third Mezz Debtor, MSR LLC Third Mezz Debtor and MSR MREP Third Mezz Debtor in connection with the Third Mezz Loan, the Consent and the Omnibus Consent, respectively, the "**Third Mezz Transaction Documents**") pursuant to which MSR LLC Third Mezz Debtor pledged to C Hotel Mezz, among other things, all of its right, title and interest in its wholly-owned subsidiary (such subsidiary being a Debtor);

(xii) Subject to the provisions of paragraph 19 hereof, pursuant to the Third Mezz Transaction Documents, as of the Petition Date, C Hotel Mezz holds a valid claim (the "**C Hotel Mezz Claim**") against each of each of MSR LP Third Mezz Debtor, MSR LLC Third Mezz Debtor, MSR MREP Third Mezz Debtor and MSR Resort Intermediate Mezz GP, LLC (as general partner of MSR LP Third Mezz Debtor) in the outstanding principal amount of $250,000,000, plus (x) accrued and unpaid interest thereon and (y) all fees, costs and expenses,

including, without limitation, attorneys' fees, incurred by C Hotel Mezz that are chargeable or reimbursable under the Third Mezz Transaction Documents;

(xiii)    Subject to the provisions of paragraph 19 hereof, the C Hotel Mezz Claim is not, and shall not be, subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the C Hotel Mezz Claim in the nature of, avoidance, recovery, reduction, recovery, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the C Hotel Mezz Claim, whether asserted by any Debtor, the Committee, if any, or any other person or entity;

(xiv)    The C Hotel Mezz Claim is secured by the respective pledges made pursuant to the LP Third Mezz Pledge Agreement, the LLC Third Mezz Pledge Agreement and the MREP Third Mezz Pledge Agreement (collectively, the "**Third Mezz Pledge Agreements**" and, collectively, the pledges, liens and security interests granted to C Hotel Mezz pursuant to the Third Mezz Pledge Agreements, the "**Third Mezz Pledges**"), and, subject to the provisions of paragraph 19 hereof, the Third Mezz Pledges constitute valid, binding, enforceable, properly perfected, first-priority liens on and security interests in the Pledged Collateral (as defined in each of the respective Third Mezz Pledge Agreements) and shall not be subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the Third Mezz Pledges in the nature of, avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section

510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the Third Mezz Pledges or any other rights, claims, Liens, security interests, collateral or other interests held or asserted by or on behalf of C Hotel Mezz, whether asserted by any Debtor, the Committee, if any, or any other person or entity.

c.    **Debtors' MetLife Stipulations**.    The Debtors admit, stipulate, acknowledge and agree as follows (collectively, the following sub-paragraphs (i) - (viii) hereof, the "**Debtors' MetLife    Stipulations**")

(i)    Metropolitan Life Insurance Company ("**MetLife**") is the owner and holder of that certain Mezzanine Note (First Mezzanine) (the "**First Mezz Note**"), dated January 9, 2006, made by CNL Resort Senior Mezz, LP (now know as MSR Resort Senior Mezz, LP) (a Debtor) (the "**MSR LP First Mezz Debtor**") in favor of German American Capital Corporation ("**GACC**") in the principal amount of $115,000,000;

(ii)    The First Mezz Note evidences a loan (the "**First Mezz Loan**") that was made pursuant to that certain Mezzanine Loan and Security Agreement (First Mezzanine) (the "**First Mezz Loan Agreement**"), dated as of January 9, 2006, between MSR LP First Mezz Debtor, as borrower, and GACC, as lender.    The Debtors have been informed that GACC has assigned its rights under the First Mezz Loan Agreement to MetLife;

(iii)    The obligations of MSR LP First Mezz Debtor under the First Mezz Note and the First Mezz Loan Agreement (collectively, the "**Obligations (First Mezzanine)**") are secured by, among other things, a pledge by MSR LP First Mezz Debtor to GACC of MSR LP

First Mezz Debtor's right, title and interest in (t) CNL Resort SPE GP, LLC (now known as MSR Resort SPE GP II, LLC) (a Debtor), (u) CNL Grand Wailea Resort, LP (now known as MSR Grand Wailea Resort, LP) (a Debtor), (v) CNL Desert Resort, LP (now known as MSR Desert Resort, LP) (a Debtor), (w) CNL Claremont Resort, LP (now known as MSR Claremont Resort, LP) (a Debtor), (x) CNL Biltmore Resort, LP (now known as MSR Biltmore Resort, LP) (a Debtor) and (y) CNL Resort Hotel, LP (now known as MSR Resort Hotel, LP) (a Debtor), which pledge was made pursuant to that certain Pledge and Security Agreement (First Mezzanine) (the "**LP First Mezz Pledge Agreement**" and together with the First Mezz Note, the First Mezz Loan Agreement and any and all other agreements, instruments and documents executed by or in favor of MSR LP First Mezz Debtor in connection with the First Mezz Loan, the "**Loan Documents (First Mezz)**"), dated as of January 9, 2006, made by MSR LP First Mezz Debtor, as pledgor, in favor of GACC, as pledgee. The Debtors have been informed that GACC has assigned its rights under the LP First Mezz Pledge Agreement to MetLife;

(iv) Pursuant to that certain Consent, Acknowledgement, Reaffirmation and Modification Agreement, dated as of December 29, 2006 (the "**MREP Consent**"), among MetLife, MSR LP First Mezz Debtor, CNL Resort Senior MREP, LLC (now known as MSR Resort Senior MREP, LLC) (a Debtor) ("**MSR MREP First Mezz Pledgor**"), and other parties, MSR MREP First Mezz Pledgor executed a delivered that certain Pledge and Security Agreement (First Mezzanine), dated as of December 29, 2006, made by MSR MREP First Mezz Pledgor, as pledgor, in favor of MetLife, as pledgee (the "**MREP First Mezz Pledge Agreement**"), pursuant to which, among other things, MSR MREP First Mezz Pledgor pledged to MetLife all of its right, title and interest in CNL Resort REP, LLC (now known as MSR Resort REP, LLC) (a Debtor) as additional security for all the Obligations (First Mezzanine);

(v)     Pursuant to the Omnibus Consent, Acknowledgement, Joinder, Reaffirmation and Modification Agreement, dated as of April 11, 2007 (the "**Omnibus Consent**"), among MetLife, MSR LP First Mezz Debtor, MSR Resort Senior Mezz LLC (a Debtor) ("**MSR LLC First Mezz Debtor**"), MSR Resort Senior MREP, LLC and other parties, among other things, MSR LLC First Mezz Debtor joined in the Loan Documents (First Mezz) and assumed all obligations of MSR LP First Mezz Debtor thereunder, jointly and severally with MSR LP First Mezz Debtor, and agreed to be bound by the terms and provisions thereof with the same effect as if it had been an original party thereto.   In connection therewith, MSR LLC First Mezz Debtor executed and delivered to MetLife that certain Pledge and Security Agreement (First Mezzanine), dated as of April 11, 2007, made by MSR LLC First Mezz Pledgor, as pledgor, in favor of MetLife, as pledgee (the "**LLC First Mezz Pledge Agreement**" and collectively with the Loan Documents (First Mezz), the MREP Consent, the MREP First Mezz Pledge Agreement, the Omnibus Consent and any other and all other agreements, instruments and documents executed by or in favor of MSR LP First Mezz Debtor, MSR LLC First Mezz Debtor and MSR MREP First Mezz Pledgor in connection with the First Mezz Loan, the MREP Consent and the Omnibus Consent, respectively, the "**Transaction Documents (First Mezz)**"), pursuant to which MSR LLC First Mezz Debtor pledged to MetLife, among other things, all of its right, title and interest in (w) MSR Resort SPE GP LLC (a Debtor), (x) CNL Resort Hotel, LP (now known as MSR Resort Hotel, LP) (a Debtor), and (y) CNL Resort Hotel, LP (now known as MSR Resort Hotel, LP) (a Debtor);

(vi)     Subject to the provisions of paragraph 19 hereof, pursuant to the Transaction Documents (First Mezz), as of the Petition Date, MetLife holds a valid claim (the "**MetLife Claim**") against each of MSR LP First Mezz Debtor, MSR LLC First Mezz Debtor

and MSR Resort Senior Mezz GP, LLC (as general partner of MSR LP First Mezz Debtor) in the outstanding principal amount of $115,000,000, plus (x) accrued and unpaid interest thereon and (y) all fees, costs and expenses, including, without limitation, attorneys' fees, incurred by MetLife that are chargeable or reimbursable under the Transaction Documents (First Mezz);

(vii)    Subject to the provisions of paragraph 19 hereof, the MetLife Claim is not, and shall not be, subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to the MetLife Claim in the nature of, avoidance, recovery, reduction, recovery, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the MetLife Claim, whether asserted by any Debtor, the Committee, if any, or any other person or entity;

(viii)    The MetLife Claim is secured by the respective pledges made pursuant to the LP First Mezz Pledge Agreement, the MREP First Mezz Pledge Agreement, and the LLC First Mezz Pledge Agreement (collectively, the "**First Mezz Pledge Agreements**" and, collectively, the pledges, liens and security interests granted to MetLife pursuant to the First Mezz Pledge Agreements, the "**First Mezz Pledges**"), and, subject to the provisions of paragraph 19 hereof, the First Mezz Pledges constitute valid, binding, enforceable, properly perfected, first-priority liens on and security interests in the Pledged Collateral (as defined in each of the respective First Mezz Pledge Agreements) and shall not be subject to, and the Debtors are hereby deemed to have waived and released any right to contest or assert any objection or challenge to

the First Mezz Pledges in the nature of, avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaims, cross-claims, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the First Mezz Pledges or any other rights, claims, Liens, security interests, collateral or other interests held or asserted by or on behalf of MetLife, whether asserted by any Debtor, the Committee, if any, or any other person or entity.

       G.      **Findings Regarding the Post-Petition Financing**.

       (i)      **Good Cause.**    Good cause has been shown for the entry of this Final Order.

       (ii)      **Need for Post-Petition Financing**.   An immediate need exists for the Debtors party to the DIP Facility (the "**DIP Facility Debtors**") to obtain funds from the DIP Facility to continue the orderly operation of their and certain of the other Debtors' businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and satisfy other working capital needs, and administer and preserve the value of their estates.   The ability of the DIP Facility Debtors to finance their operations, to preserve and maintain the value of their assets and maximize value for all parties in interest requires the availability of working capital from the DIP Facility in the amount authorized by this Final Order, the absence of which would cause significant harm the Debtors, their estates, and other parties in interest and undermine and impair the Debtors' prospects for a successful reorganization.

(iii)  **No Credit Available on More Favorable Terms**.   The Debtors have not been able to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.   The Debtors also have been unable to obtain credit having priority over that of administrative expenses of the kind specified in sections 503(b) and 507(a) and (b) of the Bankruptcy Code.   The Debtors also have been unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d), on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Final Order.   Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain credit for borrowed money on more favorable terms without granting to the DIP Lenders the DIP Protections (as defined below).

(iv)  **DIP Facility Is Fair and Reasonable**.   The terms of the DIP Facility are fair and reasonable, reflect the DIP Facility Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)  **Business Judgment**.   The terms and provisions of the DIP Documents and this Final Order are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(vi)  **Good Faith Pursuant to Section 364(e)**.   The DIP Facility, and the extension of credit contemplated thereunder and hereunder, was negotiated in good faith and at arms'-length between the DIP Facility Debtors and the DIP Lenders, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith and for valid business purposes and uses.   The DIP Lenders have acted fairly, reasonably and in good faith in

connection with all aspects of the DIP Facility, including, without limitation, the negotiation of the economic terms of the DIP Facility and the negotiation and preparation of the DIP Documents and the provisions of this Order. The economic terms of the DIP Facility were superior, by a wide margin, to the economic terms of every other debtor-in-possession facility that the DIP Facility Debtors solicited and considered. Accordingly, any credit extended, loans made or funds advanced to the DIP Facility Debtors pursuant to this Final Order and the DIP Documents, including, without limitation, all DIP Obligations incurred as a result thereof, shall be deemed to have been extended in "good faith," as such term is used in section 364(e) of the Bankruptcy Code, and the DIP Lenders are entitled to all of the protection and benefits of section 364(e) of the Bankruptcy Code.

H. **Use of Proceeds of the DIP Facility**. Proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement and this Final Order, solely for (a) working capital and general corporate purposes, (b) payment of fees, costs, administration expenses and other expenses associated with the DIP Facility and the Cases (including professional fees and expenses), and (c) the interest payments to the Mortgage Lender provided for in paragraph 6(a) of the final cash collateral order entered by this Court concurrently herewith (the "**Cash Collateral Order**") and the "Servicer's Fees and Expense Reimbursement" provided for (and defined in) paragraph 6(c) of the Cash Collateral Order.

I. **Extension of Financing**. The DIP Lenders have indicated a willingness to provide financing to the DIP Facility Debtors in accordance with the DIP Credit Agreement and the other DIP Documents and subject to (a) the entry of the Interim Order (in the case of the Interim Loan) and this Final Order (in the case of the balance of DIP Facility), (b) approval of the terms and

conditions of the DIP Documents and (c) findings by the Bankruptcy Court that, among other things, such financing is essential to the Debtors' estates, that the DIP Lenders are good faith financiers, and that the DIP Lenders' claims, the DIP Superpriority Claim, the DIP Liens and the other DIP Protections granted pursuant to the Interim Order and this Final Order, respectively, and the DIP Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order or this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

J.     **Relief Essential; Best Interest**.   The relief requested in the Motion is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and personal property and, is in the best interests of the Debtors, their respective estates and their respective creditors.

**NOW, THEREFORE**, on the Motion and the record before this Court with respect to the Motion, and with the consent of the Debtors to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted**.   The Motion is granted in accordance with the terms and conditions set forth in this Final Order.

2.     **DIP Facility**.

(a)     **Approval of Entry Into DIP Credit Agreement**.   The form and substance of the DIP Credit Agreement is approved.   The DIP Facility Debtors are hereby authorized and empowered to do and perform all acts, to make, execute and deliver all instruments, documents and agreements (including promissory notes, security agreements, mortgages and financing statements), and to pay all fees and expenses, that reasonably may be

necessary or required for the DIP Facility Debtors' performance of the DIP Facility and the creation and perfection of the DIP Liens (as defined herein), including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement substantially in the form attached hereto as **Exhibit C**;

(ii)    subject to the prior payment in full in cash of the allowed "**Prepetition Secured Obligations**" (as defined in the Cash Collateral Order) and the Adequate Protection Obligations, if any, the repayment of the principal described in this Final Order and the DIP Documents when due;

(iii)   the payment of the interest, fees, expenses, and other amounts other than principal, described in this Final Order and the DIP Documents, as such become due, including, without limitation, the fees, costs and expenses incurred and to be incurred by the DIP Agent and the DIP Lenders, as described more particularly in paragraph 18(a) hereof and as provided in the DIP Credit Agreement, which fees, costs and expenses shall not be subject to allowance by this Court and may be paid without the submission or filing of fee applications with this Court; provided, however, that unresolved disputes concerning the reasonableness of any such fees, costs and expenses may be determined by this Court; provided further, however, that such interest, fees, costs, expenses, and other amounts, other than principal, shall be paid for any given period, only after any interest payments to the Mortgage Lender, as provided for in paragraph 6(a) of the Cash Collateral Order, and the Servicer's Fees and Expense Reimbursement then due and payable have been paid; and

(iv)    the performance of any and all other acts required under or in connection with the DIP Documents.

(b)    **Validity of DIP Documents**.    The DIP Documents shall constitute and evidence the valid and binding obligations of the DIP Facility Debtors, which obligations shall be enforceable against the DIP Facility Debtors, their estates and any successors thereto, and their creditors, in accordance with their terms and the terms of this Final Order.

(c)    **Authorization to Borrow**.    To enable them to continue to operate their businesses during the term of the DIP Facility and subject to the terms and provisions of this Final Order and the DIP Credit Agreement, the DIP Facility Debtors are hereby authorized to enter into and perform under the DIP Facility, and the DIP Facility Debtors are authorized to draw up to an aggregate of $30 million (including the Interim Loan) under the DIP Facility.

(d)    **Application of DIP Proceeds**.    The proceeds of the DIP Facility shall be used, in each case in a manner consistent with the provisions of this Final Order and the terms and conditions of the DIP Documents solely for (i) working capital and general corporate purposes, (ii) payment of fees, costs, administration expenses and other expenses associated with the DIP Facility and the Cases (including professional fees and expenses), and (iii) to the extent the Debtors have insufficient Cash and Cash Equivalents (as such terms are defined in the "**Mortgage Loan and Servicing Documents**" (as defined in the Cash Collateral Order)), the interest payments to the Mortgage Lender provided for in paragraph 6(a) of the Cash Collateral Order and the Servicer's Fees and Expense Reimbursement; provided, however, that no portion of such proceeds, or any portion of the Carve-Out or any of the DIP Lenders' Cash Collateral shall be used, directly or indirectly, to (w) prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral (as defined herein) following the occurrence of an Event of Default (provided that proceeds of the Loans and/or the Carve-Out may be used to file and prosecute a "Default Contest" (as defined

herein) in accordance with the provisions of the Borrowing Orders), (x) object to, contest or challenge in any way any rights, remedies, claims, liens, security interests, collateral or other interests held or asserted by or on behalf of the DIP Agent, the DIP Lenders or Five Mile SPE, (y) assert any claim or cause of action, including, without limitation, any action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law, against the DIP Agent, the DIP Lenders or Five Mile SPE, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, members or employees, or (z) assert or prosecute an objection to, or contest or challenge in any manner, or raise any defenses to, the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the Five Mile SPE Claim, the Fourth Mezz Pledges and/or the Fourth Mezz Transaction Documents (whether such objection or challenge is in the nature of avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the DIP Obligations, the DIP Liens, the DIP Superpriority Claim, the Five Mile SPE Claim, the Fourth Mezz Pledges or the Fourth Mezz Transaction Documents or any other rights, claims, Liens, security interests, collateral or other interests held or asserted by or on behalf of the DIP Agent, the DIP Lenders or Five Mile SPE); provided, further, however, that such proceeds, the Carve-Out and the Lender's Cash Collateral may be used by the Committee, if any, to pay the allowed fees and expenses of the Committee's Professional Persons (as defined herein) incurred directly in connection with investigating and taking discovery, but not initiating or prosecuting any claim or cause of action, with respect to the validity, extent,

amount, perfection, priority, enforceability, allowability and/or avoidability of the Five Mile

SPE Claim, the Fourth Mezz Pledges and the Fourth Mezz Transaction Documents but only

during the sixty-(60) day period immediately following the date of entry of the order approving

the appointment of counsel for the Committee and only to the extent of a maximum aggregate

amount of $25,000; provided, further, however, that the Debtors may use the DIP Lender's

Cash Collateral to contest any action by the DIP Lenders that is not in accordance with this

Final Order.

(e)     **Conditions Precedent**.    The DIP Lenders shall have no obligation to

make any loan or advance under the DIP Credit Agreement unless the conditions precedent to

make such loan or advance under the DIP Credit Agreement have been satisfied in full or

waived by the DIP Lenders in their sole discretion.

(f)     **Post-Petition Liens**.    As security for the DIP Obligations, effective

immediately upon the entry of this Final Order, the DIP Agent is hereby granted, for its own

benefit and the benefit of the DIP Lenders, without the necessity of the execution by the DIP

Facility Debtors of mortgages, security agreements, pledge agreements, financing statements or

other similar documents and instruments, the following liens and security interests pursuant to

sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (collectively, the "**DIP Liens**") (all

property and interests in property identified in clauses (i) and (ii) of this subparagraph (f),

subject to the proviso in this sentence, being collectively referred to as the "**DIP Collateral**");

provided, however, that the DIP Collateral shall not include any asset, property or interest in

property the granting of a lien on which would trigger liability under the 5-Pack Guarantee (as

defined in the DIP Credit Agreement); and, provided, further, however, that nothing herein shall

impair or otherwise affect the validity, priority or perfection of the DIP Liens granted to the DIP

Agent, for its own benefit and the benefit of the DIP Lenders, under the Interim DIP Order.

(i)      **Liens on Unencumbered Property**.    Pursuant to section 364(c)(2) of the

Bankruptcy Code, and subject to paragraph 2(g) of this Final Order, the Agent is hereby granted

(for its own benefit and the benefit of the DIP Lenders) a perfected, first-priority security interest

in and lien upon all pre- and post-petition property of the DIP Facility Debtors, whether existing

on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible

or intangible, wherever located, that, on or as of the Petition Date, was not subject to valid,

perfected and non-avoidable liens or was not subject to valid, non-avoidable liens perfected

subsequent to the Petition Date the priority and perfection of which relates back to a date prior to

the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent

applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash

and Cash Collateral of the DIP Facility Debtors, (b) all personal property of the DIP Facility

Debtors, whether tangible or intangible, including, without limitation, all accounts receivable,

books and records, contract rights, inventory, deposit accounts, equipment, fixtures, patents,

copyrights, trademarks, trade names and other intellectual property, good, general intangibles,

chattel paper, instruments, promissory notes, drafts and documents, investments, investment

property, the DIP Facility Debtors' equity interest in any other entities (including, without

limitation, subsidiaries and/or affiliates), securities, commercial tort claims, instruments, letters

of credit and rights under letters of credit, and life insurance policies, together with the income,

products and proceeds thereof, and (c) all of the DIP Facility Debtors' interest in any real

property, including, without limitation, the buildings, improvements, fixtures and structures

thereon, leasehold interests and the income, products and proceeds of the foregoing.    For the

avoidance of doubt, the DIP Collateral shall not include any Avoidance Actions (as defined in the DIP Credit Agreement) or the proceeds therefrom unless permitted in accordance with the Final Order;

(ii) **Liens Junior to Certain Other Liens**.   Pursuant to section 364(c)(3) of the Bankruptcy Code, and subject to paragraph 2(g) of this Final Order, the Agent is hereby granted (for its own benefit and the benefit of the DIP Lenders) a perfected security interest in and lien upon all pre- and post-petition property of the DIP Facility Debtors (other than the unencumbered property described in clause (i) of this paragraph 2(f), as to which property the liens and security interests granted to the DIP Agent are as described in such clause (i)), together with the income, products and proceeds thereof, whether existing on the Petition Date or thereafter, created, acquired or arising, that, on or as of the Petition Date, is subject to valid, perfected and non-avoidable liens in existence immediately prior to the Petition Date or to valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash and Cash Collateral of the DIP Facility Debtors, (b) all personal property of the DIP Facility Debtors, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, inventory, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, good, general intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the DIP Facility Debtors' equity interest in any other entities (including, without limitation, subsidiaries and/or affiliates), securities, commercial tort claims, instruments,

letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the DIP Facility Debtors' interest in any real property, including, without limitation, the buildings, improvements, fixtures and structures thereon, leasehold interests and the income, products and proceeds of the foregoing, which security interests and liens granted to the DIP Agent pursuant to this subparagraph (ii) shall be junior in priority to such valid, perfected and non-avoidable liens.

       (g)    **DIP Lien Priority**.    Notwithstanding anything to the contrary set forth in this Final Order or the DIP Documents, the DIP Liens shall be junior, subject and subordinate in all respects only to the following:    (i) the valid, perfected and non-avoidable liens, security interests and mortgages securing the Mortgage Loan (as defined in the Motion) (the "**Mortgage Lender Prepetition Liens**"), (ii) the liens granted to the Mortgage Lender, pursuant to the Cash Collateral Order, as adequate protection of the Mortgage Lender's interest in its Cash Collateral (the "**Mortgage Lender A/P Liens**"), (iii) the Prior Liens (as defined in the DIP Credit Agreement) (the "**Prior Liens**") and (iv) the Carve-Out (as defined herein).    Subject to the foregoing priorities, the DIP Liens shall secure all DIP Obligations.    Except as expressly set forth herein, the DIP Liens shall not be subordinated or made subject to or *pari passu* with any lien or security interest by any order of this Court heretofore or hereafter entered in the Cases, whether pursuant to sections 105, 364(d) or 510 of the Bankruptcy Code, or otherwise, and shall be valid, perfected and enforceable against the DIP Facility Debtors, their estates, the DIP Collateral, any trustee appointed in the Cases, and any trustee appointed upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings superseding the Cases or such chapter 7 cases (any such chapter 7 cases or superseding proceedings, "**Successor Cases**"), and/or upon the dismissal of any of the Cases.    The DIP

Facility Debtors agree, on behalf of themselves and their respective bankruptcy estates, that, for so long as any DIP Obligations shall be outstanding, other than as expressly set forth in this Final Order or the DIP Credit Agreement, they shall not, and they irrevocably waive any right (whether pursuant to sections 105, 364(c) or 364(d) of the Bankruptcy Code or otherwise) to, (i) grant or confer, or request the Court to grant or confer, any Lien on all or any portion of the DIP Collateral that is *pari passu* with or senior in priority to the DIP Liens securing the Obligations or (ii) grant or confer, or request the Court to grant or confer, any claim that is *pari passu* with or senior in priority to the DIP Superpriority Claim. The DIP Facility Debtors agree that, except as expressly set forth in this Final Order, they shall take no action in the Cases to cause the DIP Liens or the DIP Superpriority Claim to be subordinated or made subject to or *pari passu* with any Lien, security interest or claim by any order of the Court heretofore or hereafter entered in the Cases, whether pursuant to sections 105, 364(c), 364(d) or 510 of the Bankruptcy Code, or otherwise.

(h) **Section 551 Protection**. The DIP Liens shall not be subject or junior to any lien or security interest that is avoided under section 522, 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, or any lien void under section 506(d) of the Bankruptcy Code, that is preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(i) **Enforceable Obligations**. The DIP Obligations shall be valid and binding obligations of the DIP Facility Debtors, jointly and severally, enforceable against the DIP Facility Debtors in accordance with the terms of this Final Order and the DIP Documents.

(j) **Superpriority Administrative Claim Status**. Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens

and all other benefits, protections, privileges, claims and liens granted or provided hereunder to or for the benefit of the DIP Agent and/or the DIP Lenders, the "**DIP Protections**") against each of the DIP Facility Debtors with priority in the DIP Facility Debtors' respective Cases over any and all administrative expense claims and unsecured claims against the DIP Facility Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114 and section 506(c), subject only to (x) the Carve-Out, (y) the superpriority administrative expense claim granted to the Mortgage Lender, pursuant to the Cash Collateral Order, as adequate protection of the Mortgage Lender's interest in its Cash Collateral (the "**Adequate Protection Obligations**"), and (z) the allowed claim of the Mortgage Lenders arising under the Mortgage Loan Agreement.    Other than the Carve-Out and the Adequate Protection Obligations, if any, no claim or cost or expense of administration under sections 105, 503, 364(c) or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of any one or more of the Cases to a case under chapter 7 of the Bankruptcy Code, shall have a priority senior to or *pari passu* with the priority granted to the DIP Superpriority Claim hereunder, and no order of this Court granting any such claim, cost or expense shall be entered, while any portion of the DIP Obligations or any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement remains outstanding.

       **3.**      **Authorization to Use Proceeds of DIP Facility**.    Pursuant to the terms and conditions of this Final Order and the DIP Credit Agreement, the Debtors are authorized to use

the advances under the DIP Facility during the period commencing immediately after the entry of this Final Order and terminating on the Termination Date (as defined herein).

4. **Carve-Out**.

(a) As used in this Final Order, "**Carve-Out**" means: (i) unpaid fees of the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) and 11 U.S.C. § 726(b); (ii) in the event of a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, fees and expenses incurred by any trustee and any professionals retained by such trustee, in an aggregate amount not exceeding $100,000; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327 or 328 of the Bankruptcy Code and incurred by persons or firms retained by the Committee, if any, pursuant to section 1103 of the Bankruptcy Code (such persons and firms, collectively, the "**Professional Persons**") for services performed at any time on or before the first Business Day (as defined in the DIP Credit Agreement) following the date of delivery of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (such fees and expenses, collectively, the "**Pre-Carve-Out Trigger Notice Fees**"); (iv) to the extent allowed at any time, the reasonable expenses of the members of the Committee, if any, incurred on or before the date of delivery of the Carve-Out Trigger Notice in connection with their service on the Committee, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the "**Pre-Carve-Out Trigger Notice Committee Expenses**") and (v) after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees incurred by Professional Persons, in an aggregate amount not to

exceed $5,000,000 (the "**Post-Trigger Notice Carve-Out Amount**"), in respect of services performed after the first Business Day following the date of delivery of the Carve-Out Trigger Notice. The Carve-Out shall be senior to the DIP Liens, the Mortgage Lender Prepetition Liens, the Mortgage Lender A/P Liens, the Adequate Protection Obligations, if any, and the DIP Superpriority Claim, and any other adequate protection, pre-petition or post-petition liens or claims. For purposes of calculating the amount of Professional Fees permitted to be paid to a Professional Person as part of the Carve-Out under subsection (v) above, such amount shall reflect the application by such Professional Person of any and all retainers held by such Professional Person and permitted to be applied by such Professional Person on account of Professional Fees. Following the delivery of a Carve-Out Trigger Notice, any payments actually made to any Professional Person in respect of allowed Pre-Carve-Out Trigger Notice Fees or to a member of the Committee in respect of allowed Pre-Carve-Out Trigger Notice Committee Expenses shall not reduce the Post-Trigger Notice Carve-Out Amount.

(b) As used herein, "**Carve-Out Trigger Notice**" means a written notice delivered by the DIP Agent to the (i) counsel for the Administrative Borrower and the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Edward O. Sassower (edward.sassower@kirkland.com) and Leonard Klingbaum (leonard.klingbaum@kirkland.com), (ii) counsel for Midland Loan Services, Inc., as master servicer and special servicer, respectively (in such capacities, the "**Master Servicer**" and the "**Special Servicer**," respectively), Milbank, Tweed, Hadley & McCloy LLP, 601 Figueroa St., 30th Floor, Los Angeles, CA 90017, Attn.: Mark Shinderman (mshinderman@milbank.com) and David B. Zolkin (dzolkin@milbank.com); (iii) counsel to 450 Lex and C Hotel Mezz, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn.: Michael J.

Sage (michael.sage@dechert.com) and Brian E. Greer (brian.greer@dechert.com), and (iv)

counsel for MetLife, Sidley Austin LLP, 555 West Fifth Street, Suite 4000 Los Angeles, CA

90013, Attn: Richard W. Havel (rhavel@sidley.com) and Gabriel R. MacConaill

(gmacconaill@sidley.com), and 787 Seventh Avenue New York, New York 10019, Attn: Lee S.

Attanasio (lattanasio@sidley.com) (collectively, the "**Notice Parties**"), declaring that an Event

of Default has occurred under this Final Order or under the DIP Credit Agreement and further

declaring that such notice also constitutes a Carve-Out Trigger Notice.

        (c)      None of the Carve-Out, or any proceeds of the DIP Facility or any of the

DIP Lenders' Cash Collateral may be used to (a) prevent, hinder or delay any of the DIP

Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral

following the occurrence of an Event of Default (as defined herein), (b) object to, contest or

challenge in any way any rights, claims, liens, security interests, collateral or other interests held

or asserted by or on behalf of the DIP Agent, the DIP Lenders or Five Mile SPE, (c) assert any

claim or cause of action, including, without limitation, any claim or action under chapter 5 of

the Bankruptcy Code, against the DIP Agent, the DIP Lenders or Five Mile SPE, or any of their

respective affiliates, agents, attorneys, advisors, professionals, officers, directors, members or

employees, or (d) assert or prosecute an objection to, or contest or challenge in any manner, or

raise any defenses to, the DIP Obligations, the DIP Liens, the Five Mile SPE Claim, the Fourth

Mezz Pledges and/or the Fourth Mezz Transaction Documents (whether such objection or

challenge is in the nature of avoidance, recovery, reduction, setoff, recoupment, disallowance,

recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or

otherwise), counterclaim, cross-claim, defenses, impairment or any other objections or

challenges of any kind under the Bankruptcy Code or any other applicable law, including,

without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority, perfection or avoidability of the DIP Obligations, the DIP Liens, the Five Mile SPE Claim, the Fourth Mezz Pledges, the Fourth Mezz Transaction Documents or any other rights, claims, liens, security interests, collateral or other interests held or asserted by or on behalf of the DIP Agent, the DIP Lenders or Five Mile SPE); provided, however, that the Carve-Out, the proceeds of the DIP Facility and the DIP Lenders' Cash Collateral may be used by the Committee, if any, to investigate the validity, extent, amount, perfection, priority, enforceability, allowability and/or avoidability of the Five Mile SPE Claim and the Fourth Mezz Pledges but only during the sixty (60)-day period immediately following the date of entry of the order approving the appointment of counsel for the Committee and only to the extent of a maximum aggregate amount of $25,000; and provided further, however, that the Carve-Out may be used to file and prosecute a Default Contest (as defined herein).

5. **Reservation Concerning Allowance of Compensation**. Nothing herein (a) shall be construed as consent by the DIP Agent or the DIP Lenders to the allowance of any professional fees or expenses of any of the DIP Facility Debtors, the Committee (if appointed) or of any person or entity or (b) shall impair or affect the right of the DIP Agent or the DIP Lenders to object to the allowance and payment of such fees and expenses.

6. **Perfection of DIP Liens**. This Final Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the DIP Liens, without the necessity of filing or recording any mortgage, financing statement or other instrument or document, or the taking of any other act that otherwise may be required under federal, state or local law, rule or regulation to validate or perfect the DIP Liens or to entitle any of the DIP Agent or the DIP Lenders to the priorities granted herein. The DIP Facility Debtors may execute, and the DIP Agent is

authorized to file or record, mortgages, financing statements or other instruments to evidence the DIP Liens, and the DIP Facility Debtors are hereby authorized and directed, promptly upon demand by the DIP Agent, to execute and file or record any such mortgages, financing statements or instruments as the DIP Agent may request.   However, no such execution, filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.   If the DIP Agent, in its sole discretion, shall choose to file such mortgages, financing statements or instruments or otherwise confirm perfection of the DIP Liens, all such documents and instruments shall be deemed to have been filed or recorded as of March 16, 2011, the date on which the Interim Order was entered.   The DIP Agent, in its sole discretion, may file or record a true and complete copy of this Final Order in the filing or recording offices of the relevant jurisdictions in addition to, or in lieu of, such mortgages, financing statements or instruments, and all filing and recording offices, and the officials responsible for administering such offices, are hereby directed to accept such copy of this Final Order for filing or recording.

7.     **Section 506(c) Claims**.   Except to the extent of the Carve-Out, no expenses of administration incurred in any of the Cases or any Successor Cases shall be charged against or recovered from the DIP Collateral, the DIP Lenders or the DIP Agent pursuant to section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Lenders and the DIP Agent, and nothing contained in this Final Order shall be deemed to constitute consent by the DIP Agent or the DIP Lenders to any charge, lien, assessment, or claim against, or recovery from, the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise on account of any expenses of administration incurred in the Cases or in any Successor Cases, nor shall any such consent be implied from any action, inaction or acquiescence by the DIP Agent or the DIP Lenders.

**8.** **Preservation of Rights Granted under this Final Order**. Except as otherwise permitted by the DIP Documents or this Final Order, unless the DIP Agent has provided its prior written consent, which consent may be withheld or denied in the DIP Agent's sole discretion, or all DIP Obligations have been indefeasibly paid in full in cash (or will be indefeasibly paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below) and all Commitments have terminated, the DIP Facility Debtors shall not seek the entry of, and there shall not be entered, in the Cases, or in any Successor Case, any order that authorizes or provides for any of the following:

(a) the obtaining of credit or the incurring of indebtedness by the DIP Facility Debtors that is (i) secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or is entitled to priority status that is senior or junior to or *pari passu* with the priority of the DIP Liens (ii) granted priority status that is senior to or *pari passu* with the priority of the DIP Superpriority Claim, in each instance, except to the extent such indebtedness is used to repay all or any portion of the Prepetition Secured Obligations and Adequate Protection Obligations, if any;

(b) any sale of other disposition of all or substantially all of the DIP Collateral; provided, however, until such time as all allowed Prepetition Secured Obligations and Adequate Protection Obligations, if any, have been indefeasibly paid in full in cash, the prohibition against the sale or disposition of assets set forth in this Paragraph 8(b) shall have no effect, except to the extent that the Special Servicer agrees in writing otherwise; provided further, however, that nothing in this Final Order is intended to preclude the Debtors from electing in accordance with their business judgment to market the DIP Collateral for sale; or

(c)  dismissal of any of the DIP Facility Debtors' Cases; provided, however, that, if an order dismissing any of the DIP Facility Debtors' Cases under section 1112 of the Bankruptcy Code or otherwise is entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Superpriority Claims and the DIP Liens granted to the DIP Agent pursuant to the Interim Order and this Final Order shall continue in full force and effect and shall maintain their priorities as provided in the Interim Order and this Final Order, respectively, until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Superpriority Claim and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim and the DIP Liens.

9.  **Proceeds of Subsequent Financing**.  Without limiting or impairing the provisions and protections of paragraph 8 of this Final Order, if, notwithstanding such provisions and protections, at any time prior to the repayment in full in cash of all DIP Obligations and the termination of the Commitment, the DIP Facility Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement, then, subject to prior indefeasible repayment in full in cash of the allowed Prepetition Secured Obligations and Adequate Protection Obligations, if any, all of the cash proceeds derived from such financial accommodations shall immediately be turned over to the DIP Agent and applied to satisfy *pro tanto* the DIP Obligations.

10.  **Termination Date**.  Without the need for further application or motion to, or further order of, this Court, all DIP Obligations shall be immediately due and payable on the date

(the "**Termination Date**") that is the earliest to occur of: (i) March 21, 2012 (the "**Calendar Maturity Date**"), (ii) the occurrence of the maturity of the DIP Obligations upon acceleration of the DIP Obligations and termination of the Commitment in accordance with the DIP Credit Agreement, (iii) the closing date of a sale of all or substantially all of the assets or businesses of the Debtors' following entry by this Court of an order authorizing and approving such sale pursuant to section 363 of the Bankruptcy Code (other than a sale that will result in the repayment in full of all DIP Obligations), (iv) the effective date of a plan of reorganization or liquidation in the Cases confirmed by this Court, (v) the date on which an order is entered pursuant to section 1112 of the Bankruptcy Code dismissing any one or more of the Cases or converting any one or more of the Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date on which a trustee or examiner with expanded powers under section 1104(c) of the Bankruptcy Code is appointed in any of the Cases and (vii) the sixth (6th) Business Day following the termination by the Mortgage Lender and/or the Special Servicer of the DIP Facility Debtors' right to use Cash Collateral under the Cash Collateral Order if, as a result of such termination, (x) the DIP Facility Debtors did not have the right to use Cash Collateral during the immediately preceding five (5) Business Days or (y) if the DIP Facility Debtors did have the right to use Cash Collateral during such five (5) Business Days, the DIP Facility Debtors did not have the right to use Cash Collateral on the sixth (6th) Business Day following such termination. Immediately upon the occurrence of the Termination Date, the DIP Agent may declare all DIP Obligations to be immediately due and payable and may terminate the Commitment to the extent, if any, that such Commitment remains outstanding. The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified so that, (x) five (5) Business Days following notice to the DIP Facility Debtors, their counsel, counsel for any Committee, counsel for the Notice

Parties, and the U.S. Trustee of the occurrence of the Termination Date by reason of the maturity of the DIP Obligations upon acceleration of the DIP Obligations and termination of the Commitment in accordance with the DIP Credit Agreement or (y) upon the occurrence of the Termination Date pursuant to clauses (i), (iii), (iv), (v), (vi) or (vii) of this paragraph 10, as applicable, the DIP Agent and the DIP Lenders shall be entitled to exercise and enforce their rights and remedies under the DIP Documents and applicable law without further order of or application or motion to this Court and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the DIP Liens and any other rights and remedies available to the DIP Agent hereunder, under the DIP Documents or applicable law.   Notwithstanding anything to the contrary in this Final Order, until the allowed claim of the Mortgage Lender under the Mortgage Loan and Servicing Documents has been repaid indefeasibly in full in cash, the DIP Agent and the DIP Lenders shall not exercise or enforce any remedies with respect to DIP Collateral absent the written consent of the Special Servicer.

    **10.1   Post-Termination Reserve**.   In the event of a termination of the Commitment (other than (x) upon the Calendar Maturity Date, (y) due to the conversion of any of the Cases to cases under chapter 7 of the Bankruptcy Code, or (z) due to the effective date of a sale of all or substantially all of the assets or businesses of the DIP Facility Debtors in accordance with section 363 of the Bankruptcy Code or otherwise (including a sale resulting from a credit bid of any claim or claims against the DIP Facility Debtors), the DIP Lenders shall deposit into a segregated account (the "**Reserve Account**") the lesser of (i) $5 million and (ii) the remaining undrawn Commitment under the DIP Facility as of the time of such termination.   Until the Calendar Maturity Date, DIP Facility Debtors may draw from time to time on the Reserve

Account to pay monthly interest at the non-default rate due under the Mortgage Loan and Servicing Documents and the Servicer's Fees and Expense Reimbursement as such amounts become due, to the extent that the DIP Facility Debtors lack sufficient Cash and Cash Equivalents to pay such amounts. All amounts drawn under the preceding sentence shall become part of the DIP Obligations to the same extent as if they were loaned prior to such termination of the Commitment. Funds in the Reserve Account shall remain the sole property of the DIP Lenders, and not property of the DIP Facility Debtors, their estates or any party claiming by or through any of them. Upon the Calendar Maturity Date, any amounts remaining in the Reserve Account shall be released to the DIP Agent for the benefit of the DIP Lenders.

11. **Financial Reporting**. The DIP Facility Debtors shall provide the DIP Agent, 450 Lex, C Hotel Mezz, and MetLife with any and all reports, studies, analyses, accountings, budgets (including, without limitation, any Budget, Proposed Cash Budget, Cash Budget, Proposed Accrual Budget and Accrual Budget (as each of those terms is defined in the Cash Collateral Order)), projections, financial statements and other information and data (collectively, "**Reports**") that the DIP Facility Debtors or their agents or Professional Persons (a) provide or are required to provide to the Mortgage Lender and/or the Special Servicer pursuant to any Cash Collateral Order entered in the Cases, (b) file with the Court or (c) submit to the U.S. Trustee, including, without limitation, any and all Reports concerning the DIP Facility Debtors' financial condition, their businesses, their actual and projected cash flow and their property (including, without limitation, the DIP Collateral). Such Reports shall be provided to the DIP Agent, 450 Lex, C Hotel Mezz, and MetLife at the same time as such Reports are provided to the Mortgage

Lender and/or the Special Servicer, filed with the Court, or submitted to the U.S. Trustee, as applicable.

12. **Disposition of DIP Collateral**.   In addition to the Events of Default listed in paragraph 13 of this Final Order, it shall be an additional Event of Default if the Debtors (a) sell, transfer, lease, encumber or otherwise dispose of any material portion of the DIP Collateral without the prior written consent of the DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lenders), which consent may be withheld or denied by the DIP Lenders in their sole discretion, except for sales in the ordinary course of business and except (i) as otherwise provided for in the DIP Credit Agreement or this Final Order and (ii) as approved by this Court, or (b) assume, reject or assign any material executory contract or lease without consulting in advance and in good faith with the DIP Agent, except as otherwise provided for in the DIP Credit Agreement.

13. **Events of Default**.   The occurrence of any of the following events, and any of the events or acts described in paragraph 12 hereof, shall constitute an "**Event of Default**" under this Final Order:

(a)     the filing by the Debtors of a motion seeking entry by this Court of an order providing for dismissal of any of the Cases;

(b)     (i) the entry of an order in the Cases granting relief from the automatic stay under section 362 of the Bankruptcy Code to the Mortgage Lender or any other holder of any security interest in or lien upon any material part of the DIP Collateral in order to permit such holder to exercise and enforce its rights and remedies with respect to such property under applicable agreements or applicable law, or (ii) the entry of an order granting relief from the

automatic stay under section 362 of the Bankruptcy Code to the holder of a Mezzanine Loan (as defined in the Motion);

(c)    the filing of a plan of reorganization or liquidation by the Debtors that does not provide for the indefeasible payment in full, in cash, of the DIP Obligations on the effective date of such plan;

(d)    actual invalidity of any liens or security interests securing the DIP Obligations;

(e)    the filing or commencement of an adversary proceeding, contested matter or other proceeding in the Cases challenging, contesting or objecting to the extent, validity, priority, amount, enforceability or non-avoidability of the DIP Liens and/or the DIP Superpriority Claim;

(f)    the failure by any of the Debtors to comply in any material respect with any term of this Final Order;

(g)    the entry by this Court of an order amending, modifying, staying, revoking or reversing this Final Order without the express written consent of the DIP Lenders, which consent may be withheld or denied in the DIP Lenders' sole discretion;

(h)    the delivery by the DIP Agent to the DIP Facility Debtors of a notice that a default or Event of Default has occurred and is continuing under the DIP Credit Agreement;

(i)    the entry by this Court of an order granting a security interest, lien, claim, or encumbrance that is senior to, or *pari passu* with, the DIP Liens and/or the DIP Superpriority Claim (other than such security interests, liens, claims or encumbrances expressly permitted by the terms hereof to be senior to or *pari passu* with the DIP Liens and/or the DIP Superpriority Claim (including the Carve-Out)).

**14.** **Rights and Remedies Upon Event of Default**.

(a)      Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Agent may declare all DIP Obligations to be immediately due and payable and, subject only to the Post-Termination Reserve requirements set forth in paragraph 10.1, may terminate the Commitment to the extent, if any, that such Commitment remains outstanding. The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified so that, after the occurrence and during the continuance of any Event of Default, upon the expiration of five (5) Business Days following the delivery by the DIP Agent to the DIP Facility Debtors and the other Notice Parties of written notice (a "**Default Notice**") of such occurrence (such five (5)-Business Day period, the "**Remedies Notice Period**"), in each case given by the DIP Agent, *via* facsimile or electronic transmission, to counsel for the Notice Parties, counsel for the Committee, if any, and the U.S. Trustee, the DIP Lenders shall be entitled, except as otherwise provided in this paragraph 14, to exercise and enforce their rights and remedies under the DIP Documents and applicable law without further order of or application or motion to this Court and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the DIP Liens and any other rights and remedies available to the DIP Agent hereunder, under the DIP Documents or applicable law. Immediately following the giving of a Default Notice, except for Post-Termination Reserve Requirements set forth in paragraph 10.1 hereof, any obligation otherwise imposed on the DIP Agent or the DIP Lenders to provide any loan or advance to the DIP Facility Debtors pursuant to the DIP Facility shall be suspended.   Following the giving of a Default Notice by the DIP Agent and during the Remedies Notice Period, the DIP Facility Debtors and the Notice Parties shall be entitled to request an emergency hearing before this Court, upon no less than forty-eight

(48) hours notice *via* electronic transmission to counsel to the DIP Agent, which hearing shall be conducted by this Court within the Remedies Notice Period for the sole purpose of permitting the DIP Facility Debtors to contest whether an Event of Default has occurred (a "**Default Contest**").   If the Debtors fail timely to request such an emergency hearing during the Remedies Notice Period, or if the Debtors timely request such a hearing and this Court does not determine that an Event of Default has not occurred, the automatic stay, as to the DIP Lenders and the DIP Collateral, automatically and irrevocably shall terminate at the end of the Remedies Notice Period.   Notwithstanding anything to the contrary in this Final Order, until the allowed claim of the Mortgage Lender under the Mortgage Loan Agreement has been indefeasibly repaid in full in cash, the DIP Agent and DIP Lenders shall not exercise any remedies with respect to DIP Collateral absent the written consent of the Special Servicer.

(b)      Except to the extent expressly and unambiguously limited herein, nothing in this Final Order shall prejudice, impair or otherwise affect the DIP Lenders' rights to seek any other or supplemental relief in respect of the DIP Facility Debtors or the DIP Collateral or the DIP Lenders' rights, as provided in the DIP Credit Agreement, to suspend or terminate the Commitment.   In the event that the DIP Agent and/or the DIP Lenders exercise and enforce their rights and remedies in respect of the DIP Collateral pursuant to the provisions of this Final Order, the DIP Documents and applicable law, and, as a consequence thereof, reduce all or a portion of the DIP Collateral to cash (the "**Enforcement Recoveries**"), the DIP Agent shall deliver the Enforcement Recoveries to the Mortgage Lender or the Special Servicer, as applicable, to the extent necessary to satisfy the allowed claim of the Mortgage Lender, and the remaining balance of the Enforcement Recoveries shall be applied to satisfy the DIP Obligations.

(c)     If (i) an Event of Default occurs under the DIP Credit Agreement that is not waived by the Requisite Lenders within ten (10) Business Days, (ii) a Default Notice has been delivered to the Administrative Borrower, and (iii) outstanding Commitments under the DIP Credit Agreement are greater than $5,000,000, then, within five (5) Business Days after delivery of such Default Notice, 450 Lex, C Hotel Mezz or MetLife (the "**Incoming Lender**") may give a notice to the DIP Lenders (the "**Initial Notice**"), with a copy to the DIP Agent and the Administrative Borrower, requesting that the DIP Lenders sell all of their rights and obligations under the DIP Credit Agreement (including, without limitation, any outstanding loans under the DIP Credit Agreement and unfunded Commitments) to the Incoming Lender. Upon and for five (5) days following the delivery of the Initial Notice, the DIP Agent and/or DIP Lenders shall not exercise any rights or remedies pursuant to the DIP Documents, this Final Order, or applicable law against the DIP Collateral.    If the Event of Default is not waived by the Requisite Lenders and the Default Notice is not withdrawn within five (5) Business Days after delivery of the Initial Notice, the DIP Lenders and the Incoming Lender shall enter into a Standard Form Assignment Agreement issued by the LSTA (the "**LSTA Assignment Form**") for the sale of all of the DIP Obligations owing to, and the undrawn Commitments of, the DIP Lenders to the Incoming Lender.    Delivery of an Initial Notice shall constitute an irrevocable offer by the Incoming Lender to purchase all of the DIP Obligations owing to the DIP Lenders in accordance with this paragraph 14(c).    The purchase price payable to each DIP Lender shall equal its pro rata share of the full amount of all DIP Obligations owed to such DIP Lender as of the date of the execution and delivery of the LSTA Assignment Form, and shall be paid in cash via wire transfer of immediately available funds to an account designated by such DIP Lender in writing.    On the date the LSTA Assignment Form is executed and delivered, (x) the DIP

Lenders shall cease to be a party to the DIP Credit Agreement but shall continue to be entitled to the benefits of paragraphs 4.1, 7.1.2, 10.5 and 10.6 thereof in respect of matters which occurred prior to the execution and delivery of the LSTA Assignment Form, (y) the DIP Agent shall resign as Agent in accordance with Section 9.5 of the DIP Credit Agreement and (z) the Incoming Lender shall appoint a successor Agent for the DIP Credit Agreement (a "**Successor DIP Agent**").   With respect to such resignation, the DIP Agent shall have concurrently received, in cash, all amounts then due and owing to the DIP Agent under the DIP Credit Agreement or under any other DIP Document (in its capacity as DIP Agent only); <u>provided</u> that, upon the DIP Agent's resignation, the DIP Agent shall cease to be a DIP Agent but shall continue to be entitled to the benefits of Sections 4.1, 7.1.2, 10.5 and 10.6 and Article IX of the DIP Credit Agreement for matters which occurred prior to the resignation of the DIP Agent.

(d)      If 450 Lex, C Hotel Mezz, or MetLife purchases the DIP Obligations as an Incoming Lender (the "**First Incoming Lender**") pursuant to the procedures in the preceding paragraph 14(c) and, subsequently, (i) an Event of Default occurs under the DIP Credit Agreement that is not waived by the First Incoming Lender within ten (10) Business Days, (ii) a Default Notice has been delivered to the Administrative Borrower, and (iii) outstanding Commitments under the DIP Credit Agreement are greater than $5,000,000, then, within five (5) Business Days after delivery of such Default Notice, whichever of 450 Lex, C Hotel Mezz or MetLife is not the First Incoming Lender (the "**Second Incoming Lender**") may give a notice to the First Incoming Lender (the "**Second Initial Notice**"), with a copy to the Administrative Borrower, requesting that the First Incoming Lender sell all of its rights and obligations under the DIP Credit Agreement (including, without limitation, any outstanding loans under the DIP Credit Agreement and unfunded Commitments) to the Second Incoming Lender.   Upon and for

five (5) days following the delivery of the Second Initial Notice, the Successor DIP Agent and/or First Incoming Lender shall not exercise any rights or remedies pursuant to the DIP Documents, this Final Order, or applicable law against the DIP Collateral.   If the Event of Default is not waived by the First Incoming Lender and the Default Notice is not withdrawn within five (5) Business Days after delivery of the Second Initial Notice, the First Incoming Lender and the Second Incoming Lender shall enter into a LSTA Assignment Form (the "**Second LSTA Assignment Form**) for the sale of all of the DIP Obligations owing to, and the undrawn Commitments of, the First Incoming Lender to the Second Incoming Lender. Delivery of a Second Initial Notice shall constitute an irrevocable offer by the Second Incoming Lender to purchase all of the DIP Obligations owing to the First Incoming Lender in accordance with this paragraph 14(d).   The purchase price payable to the First Incoming Lender shall equal the full amount of all DIP Obligations owed to the First Incoming Lender as of the date of the execution and delivery of the LSTA Assignment Form, and shall be paid in cash via wire transfer of immediately available funds to an account designated by the First Incoming Lender in writing.   On the date the Second LSTA Assignment Form is executed and delivered, (x) the First Incoming Lender shall cease to be a party to the DIP Credit Agreement but shall continue to be entitled to the benefits of Sections 4.1, 7.1.2, 10.5 and 10.6 thereof in respect of matters which occurred prior to the execution and delivery of the Second LSTA Assignment Form, (y) the Successor DIP Agent shall resign as Agent in accordance with Section 9.5 of the DIP Credit Agreement and (z) the Second Incoming Lender shall appoint a successor Agent for the DIP Credit Agreement.   With respect to such resignation, the Successor DIP Agent shall have concurrently received, in cash, all amounts then due and owing to the Successor DIP Agent under the DIP Credit Agreement or under any other DIP Document (in its capacity as Successor

DIP Agent only); <u>provided</u> that, upon the Successor DIP Agent's resignation, the Successor DIP Agent shall cease to be an Agent but shall continue to be entitled to the benefits of Sections 4.1, 7.1.2, 10.5 and 10.6 and Article IX of the DIP Credit Agreement for matters which occurred prior to the resignation of the Successor DIP Agent.

15.    **<u>Automatic Stay</u>**.    The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified to the extent necessary to permit (a) the DIP Facility Debtors to grant the DIP Liens and to perform such acts as the DIP Agent may request to assure the perfection and   priority of the DIP Liens, (b) the DIP Facility Debtors to incur the DIP Obligations and all other liabilities and obligations to the DIP Agent and the DIP Lenders under the DIP Documents and this Final Order, (c) the DIP Facility Debtors to pay, and the DIP Agent and the DIP Lenders to receive and apply, the amounts referred to in paragraphs 2(a)(ii) and 18(a) hereof and (d) the DIP Agent to exercise and enforce its rights and remedies as provided herein.

16.    **<u>Proof of Claim</u>**.    The DIP Lenders will not be required to file a proof of claim or a request for payment of an administrative expense claim in any of the Cases in respect of the DIP Obligations.

17.    **<u>Good Faith Under Section 364(e)</u>**.    If any or all of the provisions of this Final Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court or any other court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code, and, accordingly, no such reversal, modification, amendment or vacation shall impair, limit or otherwise affect (a) the validity or enforceability of any debt or indebtedness, including, without limitation, the DIP Obligations, incurred hereunder or under the DIP Documents prior to the actual receipt of written notice by the DIP Agent of the effective date of such reversal, modification, amendment or vacation or (b) the validity or

enforceability of any lien or claim or the priority of such lien or claim authorized or created hereby, including, without limitation, the DIP Liens and the DIP Superpriority Claim. Notwithstanding any such reversal, modification, amendment or vacation, any debt or indebtedness, including, without limitation, the DIP Obligations, incurred hereunder or under the DIP Documents prior to the actual receipt of such notice by the DIP Agent, and any lien or priority authorized or created hereby, including, without limitation, the DIP Liens and the DIP Superpriority Claim, shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections, granted herein or pursuant to the DIP Documents, with respect to any such debt, indebtedness, priority or lien.

      **18.**     **Other Rights and Obligations**.

      (a)     **Fees and Expenses**.    As provided in the DIP Credit Agreement, all reasonable and documented out-of-pocket fees, costs and expenses of the DIP Agent and the DIP Lenders (solely in such capacities), including, without limitation, reasonable attorneys' fees, associated with or relating to (i) the DIP Documents and the transactions contemplated thereby and the preparation, negotiation, execution, delivery and consummation of the DIP Documents, the Motion, the Borrowing Orders and the transactions and court proceedings related thereto (the foregoing fees and expenses, including, without limitation, reasonable fees of the Lenders' and the Agent's respective counsel, the "**DIP Financing Origination Fees**"); *provided, however,* that the fees of counsel to Five Mile Capital II Equity Pooling LLC, as DIP Lender, and Five Mile Capital II CNL DIP Administrative Agent LLC, as co-DIP Agent, respectively, that constitute DIP Financing Origination Fees shall be subject to a cap of $150,000, and the fees of counsel to Paulson Real Estate Recovery Fund, LP, as DIP Lender, and Paulson Real

Estate Recovery Fund, LP, as co-DIP Agent, respectively, that constitute DIP Financing Origination Fees shall be subject to a cap of $300,000, (ii) any amendment, waiver, modification or restatement with respect thereto (including the reasonable fees, disbursements and other charges of the DIP Agent's and the DIP Lenders' respective counsel), (iii) (x) the protection, exercise and enforcement of the rights and remedies of the DIP Agent and/or the DIP Lenders under the DIP Credit Agreement and the other DIP Documents, this Final Order and applicable law, and (y) the assertion, prosecution, protection, exercise and enforcement of the rights and remedies of the DIP Agent and the DIP Lenders in the Cases, and (iv) accounting, collateral examination, monitoring, inspection, appraisal and financial advisory functions relating to the Borrowing Orders, the DIP Documents, the DIP Collateral and the assertion, prosecution, protection, exercise and enforcement of the rights and remedies of the DIP Agent and the DIP Lenders relating thereto shall be paid by the DIP Facility Debtors, whether or not the transactions contemplated hereby are consummated, within ten (10) Business Days of the DIP Facility Debtors' receipt of a written invoice therefor (which may be redacted to preserve privilege and work product protections); provided, however, that the payment or reimbursement by the DIP Facility Debtors of the fees, costs and expenses of any accounting, collateral examination, monitoring, inspection, appraisal and financial advisor of any Agent pursuant to the preceding clause (iv) (excluding legal counsel to each DIP Agent, but including any such advisors retained by such legal counsel), shall not be required unless the hiring of such advisor has been consented to by both DIP Agents or by the Requisite Lenders (as defined in the DIP Credit Agreement). Payment of the fees, costs and expenses described in this paragraph 18(a) shall not be subject to allowance by this Court, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court, but the

DIP Lenders and the co-DIP Agents shall provide copies of the invoices (which may be redacted to preserve privilege and work product protections) to the Notice Parties, any Committee, and the United States Trustee.   Invoices need not contain detailed descriptions of the services provided, but may consist of a general description of the services provided during the period covered by the invoice, unless a reasonably detailed invoice (which may be redacted to preserve privilege and work product protections) is reasonably requested by the Debtors or a Committee (if any) in order to ascertain the nature and scope of the services for which reimbursement is being sought.   If no Committee is appointed, each of the DIP Lenders and the co-DIP Agent, 450 Lex, C Hotel Mezz and MetLife may reasonably request from the others a reasonably detailed invoice (which may be redacted to preserve privilege and work product protections) to permit them to ascertain the nature and scope of services of any fees, costs and expenses for which such party seeks payment from the Debtors.   In the event that the Debtors, the U.S. Trustee or counsel to any Committee notifies counsel for the DIP Lenders and the co-DIP Agents in writing, of an objection to a particular invoice, and the parties are unable to resolve any dispute regarding the reasonableness of fees, costs and expenses, the Debtors, U.S. Trustee or counsel to any Committee may file with the Court and serve upon all counsel for the DIP Lenders and the co-DIP Agents a written objection to the reasonableness of such fees, costs and expenses.   Nothing in this Final Order shall limit the rights of the Notice Parties and other parties in interest under the Bankruptcy Code to contest the DIP Lenders' and co-DIP Agents' fees and expenses except as expressly set forth in this Final Order.

(b)     **<u>Indemnification</u>**.   The DIP Facility Debtors and their respective estates shall indemnify and hold harmless the DIP Agent and the DIP Lenders (and their respective affiliates and each of their respective officers, directors, partners, managers, trustees, employees,

shareholders, advisors, agents, attorneys and controlling persons and each of their respective successors and assigns) (collectively, the "**Indemnified Parties**") from and against, and the Indemnified Parties shall have no liability for, any loss, judgment, liability, fees (including attorneys' fees as set forth above), costs or expenses of every nature and character (an "**Indemnified Claim**") incurred or suffered by the Indemnified Parties in respect of the financing contemplated hereby and by the DIP Documents, or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the Indemnified Parties, or any of them, as determined by final non-appealable judgment of a court of competent jurisdiction); provided, however, that, for the avoidance of doubt, the foregoing indemnity shall not encompass claims and losses relating to the obligations and liens evidenced by the Fourth Mezz Transaction Documents; and provided further, however, that any payments to the DIP Agent and DIP Lenders in respect of an Indemnified Claim shall be subject to the prior indefeasible repayment in cash in full of the allowed claim of the Mortgage Lender under the Mortgage Loan Agreement. Any and all Indemnified Claims shall constitute a DIP Obligation and shall be entitled to the full benefit of the DIP Protections hereunder.

(c) **Waiver and Release**. Subject to the entry of the Final Order, each DIP Facility Debtor shall be deemed fully, forever and irrevocably to have waived and released any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff rights and recoupment rights against each of the DIP Agents and each of the DIP Lenders (solely in such capacities), whether arising at law or in equity, including, without limitation, any recharacterization, subordination, avoidance or other claim or defense arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, except to the extent any such claims,

counterclaims, causes of action, defenses, setoff rights or recoupment rights relate to the DIP Agent's and DIP Lenders' failure to comply with the terms of the DIP Documents.

(d) **Binding Effect**.   The provisions of this Final Order shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Agent, the DIP Lenders, the DIP Facility Debtors and the Committee, if any, and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the DIP Facility Debtors or with respect to the property of the estate of the DIP Facility Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of the Cases or any Successor Cases, and shall inure to the benefit of the DIP Agent, the DIP Lenders and their respective successors and assigns.

(e) **No Waiver**.   The failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Documents, this Final Order or applicable law shall not constitute a waiver of any of such rights and remedies hereunder, thereunder or under applicable law.   Notwithstanding anything contained herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the respective rights and remedies of the DIP Agent, the DIP Lenders or Five Mile SPE under the Bankruptcy Code or under non-bankruptcy law.

(f) **No Third Party Rights**.   Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, party in interest or any direct, indirect, or incidental beneficiary.

(g) **No Marshaling**.   The DIP Lenders shall be entitled to apply the payments received pursuant to the DIP Credit Agreement and the proceeds of the DIP Collateral

in accordance with the provisions of the DIP Documents and this Final Order, and in no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of such payments, proceeds or the DIP Collateral.

(h) **Section 552**.   The DIP Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, upon entry of this Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

(i) **Amendment**.   The DIP Facility Debtors and the DIP Agent may amend, modify or waive, from time to time, any provision of the DIP Documents without notice or a hearing, provided that (x) such amendment, modification or waiver, in the judgment of the DIP Facility Debtors and the DIP Agent, is either not prejudicial to the rights of third parties in any material respect or is not material, (y) a copy of such amendment, modification or waiver is provided to the Committee, if any, and the U.S. Trustee and (z) a copy of the amendment, modification or waiver is filed with the Court.   Except as otherwise provided herein, no amendment, modification or waiver, of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent and approved by this Court.

(j) **Survival of Final Order**.   Unless and until the DIP Obligations are irrevocably and indefeasibly repaid in full in cash and the Commitment irrevocably has been terminated, the rights, benefits and protections afforded to the DIP Agent and the DIP Lenders pursuant to this Final Order and under the DIP Documents, including, without limitation, the DIP Protections, and any actions taken pursuant thereto, shall survive the entry of any order that

may be entered (i) confirming any plan of reorganization or liquidation in the Cases,

(ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, (iii)

dismissing any of the Cases, (iv) withdrawing the reference of the Cases from this Court, or

(v) providing for abstention from handling or retaining of jurisdiction of the Cases in this Court,

and the terms and provisions of this Final Order and the DIP Documents shall continue in full

force and effect notwithstanding the entry of such order, and the DIP Liens and the DIP

Superpriority Claim shall maintain their respective priority as provided in this Final Order.

(k)     **No Discharge of DIP Obligations; Payment Under Plan**.    The DIP

Obligations shall not be discharged by the entry of an order confirming a plan of reorganization

or liquidation in the Cases, the Debtors being deemed hereby to have waived such discharge

pursuant to section 1141(d)(4) of the Bankruptcy Code.    The Debtors shall not propose,

sponsor, file, solicit acceptances of, seek confirmation of, support, endorse or consent to any

plan of reorganization or liquidation in the Cases that is not conditioned upon the irrevocable

and indefeasible payment in full, in cash, of all of the DIP Obligations on the effective date of

such plan.

(l)     **Inconsistency**.    In the event of any inconsistency between the terms and

conditions of the DIP Documents and this Final Order, the provisions of this Final Order shall

govern and control.    The Debtors, the DIP Agent, the DIP Lenders, the Mortgage Lender and

the Special Servicer intend for this Final Order to be consistent in all respects with the Cash

Collateral Order.    Any dispute that arises as a result of any inconsistency between the terms

and conditions of this Final Order and the Cash Collateral Order shall be resolved by the Court

pursuant to its inherent jurisdiction to interpret its own orders.

(m) **Enforceability**.   This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry hereof.

(n) **Objections Overruled**.   All objections to the Motion, to the extent not withdrawn or resolved, are hereby overruled.

19. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.

(a) **Limitation on Commencement of Challenge**.   Nothing in this Final Order shall prejudice the rights of a Committee, if any, and, solely in the event that no Committee is appointed, any other party in interest other than the Debtors (such party in interest, a "**Party in Interest**") to seek to object to or challenge the substance of Debtors' Five Mile SPE Stipulations, the Debtors' GIC RE Stipulations or the Debtors' MetLife Stipulations; provided, however, that, unless (a) the Committee commences an adversary proceeding pursuant to Bankruptcy Rule 7001 by the filing and service of a complaint raising such objection or challenge to the Debtors' Five Mile SPE Stipulations, the Debtors' GIC RE Stipulations or the Debtors' MetLife Stipulations (including, without limitation, any objection or challenge in any way relating to the Five Mile SPE Claim, the Fourth Mezz Pledges, the Fourth Mezz Transaction Documents, the 450 Lex Claim, the Second Mezz Pledges, the Second Mezz Transaction Documents, the C Hotel Mezz Claim, the Third Mezz Pledges, the Third Mezz Transaction Documents, the MetLife Claim, the First Mezz Pledges, and the Transaction Documents (First Mezz)), whether such objection or challenge is in the nature of avoidance, recovery, reduction, setoff, recoupment, disallowance, recharacterization, subordination (whether pursuant to section 510 of the Bankruptcy Code or otherwise), counterclaim,

cross-claim, defenses, impairment or any other objections or challenges of any kind under the Bankruptcy Code or any other applicable law, including, without limitation, any objections or challenges to the validity, amount, allowability, enforceability, extent, priority or perfection of the Five Mile SPE Claim, the Fourth Mezz Pledges, the Fourth Mezz Transaction Documents, the 450 Lex Claim, the Second Mezz Pledges, the Second Mezz Transaction Documents, the C Hotel Mezz Claim, the Third Mezz Pledges, the Third Mezz Transaction Documents, the MetLife Claim, the First Mezz Pledges, and the Transaction Documents (First Mezz) (any such adversary proceeding asserting such an objection or challenge, a "**Challenge**"), within sixty (60) days after the date of entry of the order approving the appointment of counsel for the Committee (the "**Committee Challenge Period**"), or (b) a Party in Interest files, within sixty (60) days after the date on which this Final Order is entered (the "**Challenge Standing Motion Period**"), a motion (a "**Challenge Standing Motion**") seeking standing and authority to commence and prosecute a Challenge, any and all Challenges shall be forever and irrevocably waived, released, barred and discharged, and the Debtors' Five Mile SPE Stipulations, the Debtors' GIC RE Stipulations and the Debtors MetLife Stipulations (each, respectively, to the extent it was not made subject to a timely Challenge) shall be deemed law of the case with respect to the matters so stipulated and shall be binding on all Parties in Interest and the Committee.

        (b)      **Failure to Commence Challenge or Challenge Standing Motion**.   If the Committee fails to commence a Challenge during the Committee Challenge Period, the Committee forever and irrevocably shall be barred from commencing a Challenge on behalf of itself, the Debtors and their estates, and the Committee shall be deemed forever and irrevocably to have waived, released and discharged any and all Challenges.   If the Committee commences a Challenge during the Committee Challenge Period, the Committee forever and irrevocably

shall be barred from asserting on behalf of itself, the Debtors and their estates any claim, objection, challenge or cause of action that is not asserted in such Challenge. If any Party in Interest fails to file a Challenge Standing Motion during the Challenge Standing Motion Period, such Party in Interest forever and irrevocably shall be barred from commencing a Challenge on behalf of the Debtors and their estates, and such Party in Interest shall be deemed forever and irrevocably to have waived, released and discharged any and all Challenges. If a Party in Interest files a Challenge Standing Motion during the Challenge Standing Motion Period, such Party in Interest forever and irrevocably shall be barred from asserting on behalf of itself, the Debtors and their estates any claim, objection, challenge or cause of action for which standing is not sought.

(c) **No Grant of Standing**. Nothing contained in this Final Order shall be deemed to constitute a grant of standing to the Committee or any Party in Interest to commence a Challenge on behalf of the Debtors or their estates, and any such grant of standing shall only be conferred pursuant to a further order of this Court.

20. **Subordination of the DIP Loan**. For the avoidance of doubt, notwithstanding anything in this Final Order or the DIP Credit Agreement to the contrary, other than paragraph 2(h) of this Final Order, the rights, claims and liens granted to the DIP Lenders pursuant to this Final Order are and shall remain junior and subordinate to the allowed claims and the valid, perfected and non-avoidable rights and liens of the Prepetition Secured Parties (as defined in the Cash Collateral Order) under the Mortgage Loan and Servicing Documents and under the Cash Collateral Order. The DIP Lenders and the co-DIP Agents waive their rights to challenge the validity, extent and priority of the Mortgage Lender Prepetition Liens and the validity, amount and priority of the claims of the Mortgage Lender under the Mortgage Loan and

Servicing Documents, and will not take any direct or indirect action to cause or induce any person or entity to raise such challenge.

21. **Waiver of Bankruptcy Rule 6006(h) Stay**.   This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry, notwithstanding the provisions of Bankruptcy Rule 6004(h), which, to the extent applicable, are waived and shall not apply to this Final Order.

22. **Retention of Jurisdiction**.   The Bankruptcy Court has and will retain jurisdiction to hear and adjudicate any dispute, action or proceeding with respect to the DIP Facility and this Final Order.

Dated: **April 15, 2011**
        New York, New York


                                        ***/s/ Sean H. Lane***
                                        THE HONORABLE SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE

## <u>EXHIBIT A</u>

### Debtors

The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include: MSR Resort Golf Course LLC (7388); MSR Biltmore Resort, LP (5736); MSR Claremont Resort, LP (5787); MSR Desert Resort, LP (5850); MSR Grand Wailea Resort, LP (5708); MSR Resort Ancillary Tenant, LLC (9698); MSR Resort Biltmore Real Estate, Inc. (8464); MSR Resort Desert Real Estate, Inc. (9265); MSR Resort Hotel, LP (5558); MSR Resort Intermediate Mezz GP, LLC (3864); MSR Resort Intermediate Mezz LLC (7342); MSR Resort Intermediate Mezz, LP (3865); MSR Resort Intermediate MREP, LLC (9703); MSR Resort Lodging Tenant, LLC (9699); MSR Resort REP, LLC (9708); MSR Resort Senior Mezz GP, LLC (9969); MSR Resort Senior Mezz LLC (7348); MSR Resort Senior Mezz, LP (9971); MSR Resort Senior MREP, LLC (9707); MSR Resort Silver Properties, LP (5674); MSR Resort SPE GP II LLC (5611); MSR Resort SPE GP LLC (7349); MSR Resort Sub Intermediate Mezz GP, LLC (1186); MSR Resort Sub Intermediate Mezz LLC (7341); MSR Resort Sub Intermediate Mezz, LP (1187); MSR Resort Sub Intermediate MREP, LLC (9701); MSR Resort Sub Senior Mezz GP, LLC (9966); MSR Resort Sub Senior Mezz LLC (7347); MSR Resort Sub Senior Mezz, LP (9968); and MSR Resort Sub Senior MREP, LLC (9705).

<u>**EXHIBIT B**</u>

**DIP Facility Debtors under DIP Credit Agreement**

MSR RESORT HOTEL, LP, a Delaware limited partnership

MSR RESORT SILVER PROPERTIES, LP, a Delaware limited partnership

MSR GRAND WAILEA RESORT, LP, a Delaware limited partnership

MSR BILTMORE RESORT, LP, a Delaware limited partnership

MSR DESERT RESORT, LP, a Delaware limited partnership

MSR CLAREMONT RESORT, LP, a Delaware limited partnership

MSR RESORT GOLF COURSE LLC, a Delaware limited liability company

## EXHIBIT C

## DIP Credit Agreement

SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of March 17, 2011

$30,000,000

among

THE BORROWERS LISTED ON SCHEDULE 1 HERETO,

as the Borrowers,

CERTAIN PARTIES LISTED HEREIN,

as the Lenders,

and

PAULSON REAL ESTATE RECOVERY FUND LP and FIVE MILE CAPITAL II CNL DIP
ADMINISTRATIVE AGENT LLC,

as the Agent

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ........................................................2
    SECTION 1.1.    Defined Terms ................................................................ 2
    SECTION 1.2.    Use of Defined Terms.................................................... 15
    SECTION 1.3.    Cross-References ........................................................... 16

ARTICLE II COMMITMENT, BORROWING PROCEDURES, NOTES AND COLLATERAL16
    SECTION 2.1.    Commitments................................................................. 16
    SECTION 2.2.    Notes ............................................................................. 16
    SECTION 2.3.    Borrowing Procedures ................................................... 16
    SECTION 2.4.    Use of Proceeds............................................................ 17
    SECTION 2.5.    Superpriority Nature of Obligations ............................. 17
    SECTION 2.6.    Joint and Several Liability; Payment Indemnifications..................... 17
    SECTION 2.7.    Collateral....................................................................... 18
    SECTION 2.8.    Lien Priority ................................................................. 19
    SECTION 2.9.    Commitment Fee............................................................ 20

ARTICLE III REPAYMENTS, PREPAYMENTS, INTEREST AND FEES .............................20
    SECTION 3.1.    Repayments and Prepayments ...................................... 20
    SECTION 3.2.    Interest Provisions......................................................... 21

ARTICLE IV TAXES, PAYMENTS AND LIBO RATE BREAKAGE COSTS .......................23
    SECTION 4.1.    Taxes............................................................................. 23
    SECTION 4.2.    Payments, Computations, etc......................................... 25
    SECTION 4.3.    Breakage Costs.............................................................. 25

ARTICLE V CONDITIONS TO THE BORROWINGS ..........................................................25
    SECTION 5.1.    Conditions to the Initial Borrowing .............................. 25
    SECTION 5.2.    Condition to Subsequent Borrowings ........................... 26
    SECTION 5.3.    Conditions to All Borrowings........................................ 27

ARTICLE VI REPRESENTATIONS AND WARRANTIES ....................................................28
    SECTION 6.1.    Corporate Existence and Power..................................... 28
    SECTION 6.2.    Corporate Authorization; No Contravention ................. 28
    SECTION 6.3.    Governmental Authorization ......................................... 29
    SECTION 6.4.    Binding Effect............................................................... 29
    SECTION 6.5.    No Material Adverse Effect............................................ 29
    SECTION 6.6.    Litigation....................................................................... 29
    SECTION 6.7.    Ownership of Properties ................................................ 29
    SECTION 6.8.    Taxes ............................................................................. 30
    SECTION 6.9.    Federal Regulations ...................................................... 30
    SECTION 6.10.   Ventures, Subsidiaries and Affiliates; Outstanding Stock................. 30
    SECTION 6.11.   Accuracy of Information................................................ 30
    SECTION 6.12.   No Default...................................................................... 30

SECTION 6.13.   Governmental Regulation ...................................................... 30

SECTION 6.14.   Entitlement to Payment and Exercise of Remedies upon Maturity of Obligations .................................................................................. 31

SECTION 6.15.   The Borrowing Orders ........................................................ 31

ARTICLE VII COVENANTS ........................................................................... 31

SECTION 7.1.   Affirmative Covenants.......................................................... 31

SECTION 7.2.   Negative Covenants ............................................................. 35

ARTICLE VIII EVENTS OF DEFAULT ......................................................... 40

SECTION 8.1.   Event of Default.................................................................... 40

SECTION 8.2.   Action Upon the Occurrence of an Event of Default............... 41

ARTICLE IX THE AGENT; ETC. ................................................................... 43

SECTION 9.1.   Appointment of Agent .......................................................... 43

SECTION 9.2.   Agents' Rights ..................................................................... 43

SECTION 9.3.   Reliance................................................................................ 44

SECTION 9.4.   Sub-Agents........................................................................... 44

SECTION 9.5.   Resignation of Agent ........................................................... 45

SECTION 9.6.   Independent Analysis ........................................................... 45

ARTICLE X MISCELLANEOUS PROVISIONS ............................................ 45

SECTION 10.1.   Waivers, Amendments, etc ................................................... 45

SECTION 10.2.   Intentionally Omitted ........................................................... 47

SECTION 10.3.   No Discharge; Survival of Claims ........................................ 47

SECTION 10.4.   Notices ................................................................................. 48

SECTION 10.5.   Payment of Costs and Expenses .......................................... 49

SECTION 10.6.   Indemnification .................................................................... 50

SECTION 10.7.   Survival ............................................................................... 50

SECTION 10.8.   Severability ......................................................................... 50

SECTION 10.9.   Headings .............................................................................. 50

SECTION 10.10.  Execution in Counterparts, etc ............................................. 51

SECTION 10.11.  Governing Law; Entire Agreement....................................... 51

SECTION 10.12.  Successors and Assigns........................................................ 51

SECTION 10.13.  Assignment of Lenders' Rights. ........................................... 51

SECTION 10.14.  Forum Selection and Consent to Jurisdiction ...................... 53

SECTION 10.15.  Waiver of Jury Trial............................................................. 54

SECTION 10.16.  MSR Resort Golf Course as the Agent for the Borrowers.................. 54

SECTION 10.17.  Ratable Sharing.................................................................... 54

[FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT] ........................................... 73

ASSIGNMENT AND ACCEPTANCE AGREEMENT ............................................... 73

Exhibit A – Form of Borrowing Request

Exhibit B – Form of Interim Borrowing Order

Exhibit C – Form of Note

Exhibit D – Form of Assignment and Acceptance

Schedule 1 - Borrowers

Schedule 2 – Commitments/Percentages

Schedule 6.4 - Litigation

SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is dated as of March 17, 2011 and entered into by and among the borrowers set forth on Schedule 1 hereto, each as debtor and debtor-in-possession (each individually referred to herein as a "Borrower" and, collectively, as "Borrowers"), MSR Resort Golf Course, LLC, a Delaware limited liability company, as the Administrative Borrower (as defined below), the lenders listed on the signature pages hereof (together with their respective successors and assigns, each individually referred to herein as a "Lender" and collectively as "Lenders"), and PAULSON REAL ESTATE RECOVERY FUND LP ("Paulson") and FIVE MILE CAPITAL II CNL DIP ADMINISTRATIVE AGENT LLC ("Five Mile"), as co-agents for the Lenders (Paulson and Five Mile, in such capacity, including their respective successors and assigns, being herein referred to together as the "Agent").

R E C I T A L S

WHEREAS, on February 1, 2011 (the "Petition Date"), the Borrowers and certain of their affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (such term and other capitalized terms used in these Recitals without being defined having the meanings set forth in Section 1.1 of this Agreement) with the United States Bankruptcy Court for the Southern District of New York (the "Court") (such proceedings being jointly administered under Case No. 11-10372 (SHL) are hereinafter referred to as the "Chapter 11 Cases"). Each Borrower continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

WHEREAS, the Borrowers have requested that the Lenders provide to them a super-priority debtor-in-possession term loan facility in the aggregate principal amount of up to $30,000,000, all on a post-petition basis and on the terms and conditions set forth herein.

WHEREAS, the Lenders are willing to provide such financing only if, among other things, (a) all of the Obligations hereunder and under the other Loan Documents (i) constitute an allowed super-priority, administrative expense claim in the Chapter 11 Cases pursuant to section 364(c)(1) of the Bankruptcy Code, as more particularly set forth herein and in the Borrowing Orders, as applicable, (ii) are secured by valid, perfected Liens on the Collateral to the extent set forth herein and in the Borrowing Orders; and (b) the financing and the Loan Documents are authorized and approved by interim and final orders to be entered by the Court that are acceptable in form and substance to the Lenders and the Agent in their sole discretion.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Borrowers, the Lenders and the Agent hereby agree as follows:

# ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1.     Defined Terms.  The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"5-Pack Guarantee" means any recourse guaranty executed by MS Resort Purchaser LLC and MSR Hotels & Resorts, Inc.

"Administrative Borrower" shall have the meaning ascribed to such term in Section 10.16.

"Affiliate" means, with respect to a specified Person, (a) each Person that Controls, is Controlled by or is under common Control with such Person, (b) each of such Person's officers, directors, joint venturers, control persons, shareholders, partners and members, and (c) the family members, spouses and lineal descendants of individuals who are Affiliates of any Borrower.  For the purposes of this definition, the term "Affiliate" as it relates to any Borrower or its Subsidiaries shall specifically exclude the Agent, and each Lender and its Affiliates (other than any such Affiliate which is a Subsidiary or a direct or indirect holding company of such specified Person), and, unless such Persons would otherwise be Affiliates as defined in the preceding sentence, any Persons holding a membership pursuant to any Membership Customer Program.

"Agent" shall have the meaning ascribed to such term in the Preamble to this Agreement.

"Agreement" means, on any date, this Secured, Superpriority Debtor-in-Possession Credit Agreement as originally in effect on the Closing Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified and in effect on such date.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%.  If the Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist.  Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"Assignment and Acceptance" means an Assignment and Acceptance substantially in the form of Exhibit D attached hereto and made a part hereof (with blanks appropriately completed) delivered to the Agent in connection with an assignment of a Lender's interest under this Agreement.

"Associated Agent" means (a) in the case of Paulson Real Estate Recovery Fund LP (in its capacity as a Lender),  Paulson Real Estate Recovery Fund LP (in its capacity as a co-Agent); and (b) in the case of Five Mile Capital II Equity Pooling LLC (in its capacity as a Lender), Five Mile Capital II CNL DIP Administrative Agent LLC (in its capacity as a co-Agent).

"Avoidance Actions" means any and all claims and causes of action of the Borrowers arising under chapter 5 of the Bankruptcy Code and any proceeds thereof.

"Bankruptcy Code" means Title 11 of the United States Code, as now and hereafter in effect, or any successor statute.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and any applicable local bankruptcy rule, including the Local Bankruptcy Rules, as the same may be in effect from time to time, and applicable to the Chapter 11 Cases.

"Borrowers" shall have the meaning ascribed to such term in the Preamble to this Agreement.

"Borrowing" means the making of Loans by the Lenders at the same time pursuant to the same Borrowing Request.

"Borrowing Orders" means, collectively, the Interim Borrowing Order and the Final Borrowing Order.

"Borrowing Request" means a Loan request and certificate in substantially the form of Exhibit A hereto.

"Budget" has the meaning set forth in Section 7.1.1(d) hereof.

"Business Day" means any day which is neither a Saturday or Sunday nor a legal holiday on which banks are authorized or required to be closed in New York City.

"Calendar Maturity Date" has the meaning set forth in Section 8.2.2 hereof.

"Capitalized Lease Liabilities" means all monetary obligations of the Borrowers under any leasing or similar arrangement which, in accordance with GAAP, would be classified as capitalized leases, and, for purposes of this Agreement and each other Loan Document, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"Carve Out" shall have the meaning ascribed to such term in the Interim Borrowing Order or the Final Borrowing Order, as applicable.

"Cash Collateral" shall have the meaning ascribed to such term in section 363(a) of the Bankruptcy Code.

"Cash Collateral Order" means any interim or final order of the Court, entered in the Chapter 11 Cases in accordance with Bankruptcy Rule 4001(b), (i) authorizing the Borrowers, among other things, to use Cash Collateral in which Mortgage Lender and/or any other Person has an interest and (ii) providing adequate protection to such parties pursuant to sections 361, 362, and 363 of the Bankruptcy Code.

"Cash Equivalents" means, as at any date of determination, (i) marketable securities (x) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (y) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within thirty days after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within thirty days after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either Standard & Poor's Ratings Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"); (iii) commercial paper maturing no more than thirty days from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-l from S&P or at least P-l from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within thirty days after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (b) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (v) shares of any money market mutual fund that (a) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $1,000,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"Casualty Event" means, with respect to any property of any Person, any loss of or damage to, or any condemnation or other taking of, such property for which such Person or any of its Subsidiaries receives insurance proceeds, or proceeds of a condemnation award or other compensation.

"Chapter 11 Cases" shall have the meaning ascribed to such term in the Recitals of this Agreement.

"Closing Date" means the first Business Day after the date on which the Interim Borrowing Order is entered.

"Collateral" shall have the meaning ascribed to such term in Section 2.7. For the avoidance of doubt, "Collateral" shall not include any Avoidance Actions.

"Commitment" means the obligations of the Lenders to make the Loans pursuant to Section 2.1.

"Commitment Amount" means, with respect to a Lender the amount set forth with respect to such Lender on Schedule 2, and with respect to all Lenders the aggregate amount of $30,000,000.

"Committee" means, collectively, any official committee of unsecured creditors and any other committee appointed by the U.S. Trustee or approved by the Court in any one or more of the Chapter 11 Cases, and each of such Committees shall be referred to herein as a "Committee."

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, obligation or any other liability of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Person. For the avoidance of doubt, the term "Contingent Liability" shall not include the liability of any Borrower as a result of any Membership Customer Program. The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount (or maximum principal amount, if larger) of the debt, obligation or other liability guaranteed thereby.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Court" has the meaning set forth in the Recitals to this Agreement.

"Debtors" means the debtors and debtors in possession in the Chapter 11 Cases.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"DIP Financing Motion" means the motion filed by the Debtors, reasonably acceptable, in form and substance, to the Lenders, seeking, among other things, (i) authorization for the Borrowers to enter into, and approval of, this Agreement, (ii) authorization for the Borrowers to incur the Obligations and grant the DIP Liens as provided in this Agreement and (iii) entry of the Interim Borrowing Order and the Final Borrowing Order.

"DIP Financing Origination Fees" shall have the meaning ascribed to such term in Section 10.5.

"DIP Liens" means the Liens granted to the Agent for the benefit of the Lenders pursuant to the Interim Borrowing Order and/or the Final Borrowing Order, as applicable, as more particularly described in Section 2.7.

"DIP Superpriority Claim" means the superpriority administrative expense claim granted by the Court in the Interim Borrowing Order and the Final Borrowing Order in respect of the Obligations, as described in Section 2.5.

"Disposition" means any sale, assignment, transfer or other disposition of any material property or asset (whether now owned or hereafter acquired) by the Borrowers or any of their respective Subsidiaries to any Person, including any sale, transfer or other disposition of any equity interest in any Subsidiary and any sale, transfer, set-off or forgiveness of any indebtedness or any receivables (other than receivables owed by an Operating Lessee or Management Agreement Affiliate) owed to any Borrower or any of their respective Subsidiaries, but excluding (a) any sale, assignment, transfer or other disposition of any property sold or disposed of in the ordinary course of business and on terms consistent with past practice, provided that the fair market value of such asset(s) being disposed of, when aggregated with the fair market values of all other asset(s) similarly disposed of, does not exceed $1,000,000, (b) any sale, assignment, transfer or other disposition of inventory and goods and services sold or disposed of in the ordinary course of business, (c) any sale of obsolete or worn-out equipment that is no longer used or useful in the ordinary course of business, (d) any sale, assignment, transfer or other disposition between or among the Borrowers, and (e) any granting of a Lien or claim which is otherwise permitted under Section 7.2.2 and under the Interim Borrowing Order or the Final Borrowing Order, as applicable.

"Dollar" and the sign "$" mean lawful money of the United States.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) any other Person (other than a natural person, any Borrower, any Affiliate of any Borrower or any other Person taking direction from, or working in concert with, any Borrower or any Borrower's Affiliates).

"Event of Default" shall have the meaning ascribed to such term in Section 8.1.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Agent from three Federal funds brokers of recognized standing selected by it.

"Final Borrowing Order" means the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as may be approved by the Court, which order shall be acceptable in all respects to the Lenders in their sole discretion, together with all extensions, modifications and amendments thereto acceptable in all respects to the Lenders in their sole discretion, which order, among other matters but not by way of limitation, (i) authorizes the Borrowers to (A) obtain credit and incur Indebtedness under this Agreement up to the aggregate principal amount of $30,000,000 and (B) grant Liens to the Agent for the benefit of the Lenders pursuant to this Agreement, (ii) approves this Agreement, the Loans and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to constitute allowed super-priority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code.

"Financial and Business Reports" shall have the meaning ascribed to such term in Section 7.1.1(a).

"First Day Orders" means those orders entered by the Court as a result of motions and applications filed by the Borrowers with the Court on the Petition Date.

"Funding Borrower" shall have the meaning ascribed to such term in Section 2.6(b).

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" means generally accepted accounting principles, as recognized by the American Institute of Certified Public Accountants and the Financial Accounting Standards Board.

"GACC" means German American Capital Corporation.

"GIC" means 450 Lex Private Limited.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, or any entity having the power of and exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular Section, paragraph or provision of this Agreement or such other Loan Document.

"including" means including without limiting the generality of any description preceding such term, and, for purposes of this Agreement and each other Loan Document, the parties hereto agree that the rule of *ejusdem generis* shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means, without duplication:

all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for the account of such Person;

all obligations of such Person as lessee under leases which have been or should be, in accordance with GAAP, recorded as Capitalized Lease Liabilities; and

all Contingent Liabilities of such Person in respect of any of the foregoing.

"Interest Payment Date" shall mean the fifteenth (15th) day of each calendar month, provided that if any Interest Payment Date would fall on a day which is not a Business Day, then such Interest Payment Date shall be extended to the next succeeding Business Day.

"Interest Period" shall mean, with respect to any Borrowing, (a) for the initial Interest Period for such Borrowing, the period commencing on the date of such Borrowing and ending on the Interest Payment Date immediately succeeding the date of such Borrowing and (b) for each subsequent Interest Period for such Borrowing, the period commencing on each Interest Payment Date and ending on the day immediately preceding the next Interest Payment Date, provided that no Interest Period shall end after the Maturity Date and any Interest Period which would, but for this clause, end after the Maturity Date shall instead end on the Maturity Date.

"Interim Borrowing Order" means the order of the Court entered in the Chapter 11 Cases after an interim hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as may be approved by the Court, which order shall be substantially in the form attached hereto as Exhibit B and otherwise acceptable in all respects to the Lenders in their sole discretion, which order, among other matters but not by way of limitation, (i) authorizes the Borrowers to (A) obtain credit and incur Indebtedness under this Agreement up to the aggregate principal amount of $5,000,000 and (B) grant Liens to the Agent for the benefit of the Lenders pursuant to this Agreement, (ii) approves this Agreement, the Loans and the other transactions and actions contemplated hereby and by the other Loan Documents, and (iii) provides for the Obligations to constitute allowed super-priority administrative expense claim status under section 364(c)(1) of the Bankruptcy Code.

"Investments" means, for any Person:  (a) the acquisition (whether for cash, property, services or securities or otherwise) of capital stock, bonds, notes, debentures, partnership, member or other ownership or equity interests or other securities of any other Person other than a Borrower or any agreement to make any such acquisition (including any "short sale" or any sale of any securities or such interests at a time when such securities or interests are not owned by the Person entering into such sale); (b) any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of a Person, or any business or division of a Person, or (ii) any Person becoming a Subsidiary of a Borrower, (c) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); and (d) the entering into of any guarantee of, or other contingent obligation with respect to, Indebtedness or any other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Lender" shall have the meaning ascribed to such term in the Preamble to this Agreement.

"LIBO Rate" means, with respect to any Borrowing for any Interest Period, the rate appearing on Page 3750 of the Dow Jones Market Service (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations

comparable to those currently provided on such page of such service, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of Barclays, in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, which in each case is to secure payment of a debt or performance of an obligation.

"Loan" shall have the meaning ascribed to such term in Section 2.1.

"Local Bankruptcy Rules" means the Local Bankruptcy Rules for the Southern District of New York, as the same may be in effect, from time to time, and applicable to the Chapter 11 Cases.

"Loan Document" means this Agreement, the Notes (if any), the Interim Borrowing Order, the Final Borrowing Order and each other agreement, document, certificate, or instrument delivered in connection with this Agreement and the Notes.

"Management Agreement Affiliate" means MSR Resort Desert Real Estate, Inc., a Delaware corporation, MSR Resort Biltmore Real Estate, Inc., a Delaware corporation, and MSR Resort Ancillary Tenant, LLC, a Delaware limited liability company, and each of their respective successors and assigns.

"Material Adverse Effect" means (i) an impairment of the ability of the Borrowers, taken as a whole, to satisfy fully and timely their payment Obligations hereunder in any respect, or to perform fully and timely any of their other Obligations under any Loan Document in any material respect, or (ii) a material adverse effect on the rights and/or remedies of the Lenders under the Loan Documents or upon the legality, validity, binding effect, enforceability against the Borrowers, or perfection of any Loan Document or the Liens granted to the Agent for the benefit of the Lenders thereunder or under one or both of the Borrowing Orders.

"Maturity Date" means the earliest of (a) March 17, 2012, (b) the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) the effective date of a sale of all or substantially all of the assets or businesses of the Borrowers in accordance with section 363 of the Bankruptcy Code or otherwise (including a sale resulting from a credit bid of any claim or claims against the Borrowers), (d) the date falling 45 days after entry of the Interim Borrowing Order unless the Final Borrowing Order is entered by the Court on or prior to such 45th day, (e) the acceleration of the Loans and the Obligations in accordance with the terms and conditions hereof, (f) the appointment of any trustee or examiner with expanded powers under

section 1104(c) of the Bankruptcy Code in any of the Chapter 11 Cases, and (g) the effective date of a plan of reorganization or liquidation filed in the Chapter 11 Cases and confirmed pursuant to an order entered by the Court.

"Membership Customer Program" means any club or membership program entered into with guests, patrons or other Persons for the use of Borrowers' properties or which grant other customary benefits offered by such programs.

"MetLife" means Metropolitan Life Insurance Company.

"Mortgage" means that certain Multi-State Amended, Restated and Consolidated Fee and Leasehold Mortgage, Deed of Trust, Security Agreement, Financing Statement, Fixture Filing, and Assignment of Leases, Rents, Hotel Revenue and Security Deposits, dated as of January 9, 2006, by and among the Borrowers, Lawyers Title Insurance Corporation, as trustee for the benefit of GACC, as lender, as may have been amended or supplemented from time to time.

"Mortgage Documents" means the Mortgage Loan Agreement, the Mortgage and all other documents, agreements and instruments executed, delivered, recorded or filed in connection with the transactions contemplated by the Mortgage Loan Agreement and the Mortgage.

"Mortgage Lender" means Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as trustee for the Certificate Holders of Deutsche Mortgage & Asset Receiving Corporation, COMM 2006-CNL2 Commercial Mortgage Backed Certificates (as successor in interest to GACC), together with its successors and assigns who may succeed as "Lender" under the Mortgage Loan Agreement.

"Mortgage Lender A/P Liens" means any Lien granted by the Court in favor of the Mortgage Lender pursuant to sections 361, 363(e), 364(c)(2) and 364(c)(3) of the Bankruptcy Code as a component of the Mortgage Lender's "adequate protection" under any Cash Collateral Order.

"Mortgage Lender Prepetition Liens" means any Lien granted to the Mortgage Lender pursuant to the Mortgage Documents prior to the Petition Date that is valid, perfected and not subject to an Avoidance Action or avoidance under non-bankruptcy law.

"Mortgage Lender Superpriority Claim" means the superpriority claim granted by the Court in favor of the Mortgage Lender pursuant to sections 363(e) and 507(b) of the Bankruptcy Code as a component of the Mortgage Lender's "adequate protection" under any Cash Collateral Order.

"Mortgage Loan Agreement" means that certain Loan and Security Agreement dated as of January 9, 2006, by and among the Borrowers and GACC, as may have been amended or supplemented from time to time.

"Net Cash Proceeds" means each of the following:

in the case of any Casualty Event, the aggregate amount of proceeds of insurance, condemnation awards and other compensation received by or paid at the direction of any Borrower and its Subsidiaries in respect of such Casualty Event net of (i) the fees and expenses paid or required to be paid by the Borrowers and their respective Subsidiaries in connection therewith and (ii) contractually required repayments of Indebtedness to the extent secured by a Lien on such property; provided such Lien is permitted under Section 7.2.2 and ranks senior to the Lien granted to the Agent for the benefit of the Lenders pursuant to the Interim Borrowing Order or the Final Borrowing Order, as applicable; and

in the case of any Disposition, the aggregate amount of all cash payments received by or paid at the direction of any Borrower and its Subsidiaries directly or indirectly in connection with such Disposition, whether at the time of such Disposition or after such Disposition under deferred payment arrangements or investments entered into or received in connection with such Disposition, in each case to be deemed to be so received or paid at the time of actual receipt of payment in cash; provided, that Net Cash Proceeds of any Disposition described in this clause (b) shall be net of (i) the fees and expenses paid or required to be paid by the Borrowers and their respective Subsidiaries in connection with such Disposition (including customary and reasonable out-of-pocket closing costs, sales commissions, transfer taxes, recording fees, broker fees, marketing agent fees, legal fees and other actual closing costs); and (ii) any repayments by the Borrowers and their respective Subsidiaries, with such cash so received or paid, of Indebtedness (other than the Loans) to the extent that such Indebtedness is secured by a Lien on the property that is the subject of such Disposition; provided such Lien is permitted under Section 7.2.2 and ranks senior to the Lien granted to the Agent for the benefit of the Lenders pursuant to the Interim Borrowing Order or the Final Borrowing Order, as applicable;

provided, that Net Cash Proceeds of any Casualty Event described in clause (a) above, and Net Cash Proceeds of any Disposition described in clause (b) above, in each case shall be further reduced by any Taxes paid or estimated to be payable directly by the Borrowers and their respective Subsidiaries as a result of such Casualty Event or Disposition (but only after taking into account all reasonably available tax credits and deductions, including net operating loss carry-forwards, and only to the extent that such estimated taxes are escrowed with an unaffiliated closing agent at closing or are in fact paid to the relevant taxing authority within ten Business Days of the date when required to be paid to the relevant authority pursuant to its rules and regulations).

"Note" means the promissory notes of the Borrowers payable to the Lenders, in the form of Exhibit C hereto (as such promissory notes may be amended, endorsed or otherwise modified from time to time), evidencing the Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Obligations" means all obligations (monetary or otherwise) of the Borrowers arising under or in connection with this Agreement, each Note and each other Loan Document, whether in respect of the due and punctual payment of principal, interest, fees, costs, expenses, indemnities, damages or other liabilities hereunder or thereunder, or the due and punctual

performance of all covenants, agreements and duties of the Borrowers hereunder or thereunder, or otherwise.

"Operating Lessees" means MSR Lodging Tenant, LLC, a Delaware limited liability company, MSR Resort Ancillary Tenant, LLC, a Delaware limited liability company, and each of their respective successors and assigns.

"Other Taxes" shall have the meaning ascribed to such term in Section 4.1(a).

"Original Lender" means each of Paulson Real Estate Recovery Fund LP and Five Mile Capital II Equity Pooling LLC.

"Percentage" means for any Lender the percentage set forth opposite its name on Schedule 2 hereto as such percentage may be adjusted from time to time.

"Permitted Liens" means:

(a)     Liens imposed by law for Taxes accrued after the Petition Date, real estate taxes, assessments and/or other similar governmental levies, fees or charges imposed with respect to real property, in each case, that are not yet due or are being contested in compliance with Section 6.8;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law or arising in the ordinary course of business and securing obligations that are not overdue by more than 90 days or are being diligently contested in good faith by appropriate proceedings;

(c)     pledges and deposits (including to secure one or more letters of credit) made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)     deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety or appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business (taking into account the existence of the Chapter 11 Cases);

(e)     judgment Liens in respect of judgments that do not constitute an Event of Default under Section 8.1.2;

(f)     easements, zoning restrictions, rights-of-way, building codes, covenants, conditions, restrictions and other similar matters affecting title to real property, title defects which do not secure Indebtedness and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any of the Subsidiaries, other land use laws regulating the use and occupancy of real property or the activities conducted thereon, and other similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not

materially detract from the value of the affected property or interfere with the ordinary conduct of business of any Borrower or any of the Subsidiaries;

(g)     any interest of a landlord in or to property of the tenant imposed by law or arising in the ordinary course of business and securing lease obligations that are not overdue by more than 90 days or are being diligently contested in good faith by appropriate proceedings, or any possessory rights of a lessee to the leased property under the provisions of any lease permitted by the terms of this Agreement;

(h)     matters that would be disclosed by an accurate survey or physical inspection of the real property owned by any Borrower or any of its Subsidiaries;

(i)     Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the Uniform Commercial Code in effect in the relevant jurisdiction;

(j)     pre-Petition Date Liens comprising netting or set-off arrangements entered into by any Borrower in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(k)     Liens in the form of deposits (including deposits to secure letters of credit) securing liability insurance carriers under insurance arrangements of any of the Borrowers;

(l)     Liens in the form of utility deposits securing utility providers of any of the Borrowers;

(m)     pre-Petition Date Liens to which the pre-Petition Date Liens of the Mortgage Lender are subject, provided that no additional assets become subject to such Lien;

provided, that the term "Permitted Liens" shall not include any Lien securing Indebtedness not permitted hereby.

"Permitted Reserve Funds Uses" has the meaning set forth in Section 8.2.2 hereof.

 "Person" means any natural person, corporation, partnership, limited liability company, firm, association, trust, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date" shall have the meaning ascribed to such term in the Recitals to this Agreement.

"Prepetition Indebtedness" means Indebtedness of any Borrower outstanding on the Petition Date.

"Prime Rate" shall mean the per annum interest rate published as being the "Prime Rate" in the Eastern Edition of The Wall Street Journal in effect on a given day on corporate loans posted by at least 75% of the nation's 30 largest banks, or in the event that The Wall Street Journal ceases for any reason to publish or announce such rate of interest, any other reasonably

similar and reliable source selected by the Agent. If more than one "Prime Rate" is so published for a given day, the highest such published rate shall be the Prime Rate for such date.

"Prior Liens" means any valid, duly perfected, non-avoidable Liens in existence as of the Petition Date (or valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code) including, without limitation, valid, duly perfected, non-avoidable pre-Petition Date Liens referred to on any schedule to any lender or owner title insurance policy of any of the property of the Borrowers.

"Register" shall have the meaning ascribed to such term in Section 10.13.2.

"Related Party" means, with respect to any specified Person, each of such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and each of such Person's Affiliates.

"Requirement of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Requisite Lenders" means at any time, Lenders having Loans and unused Commitments representing in aggregate more than 50% of the sum of the total outstanding Loans and unused Commitments at such time.

"Reserve Account" has the meaning set forth in Section 8.2.2 hereof.

"Reserve Draw Request" has the meaning set forth in Section 8.2.2 hereof.

"Restricted Payment" means, collectively, (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any stock, partnership interest, membership interest or other equity interest in or of the Borrowers or any of their respective Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such stock, partnership interest, membership interest or other equity interest in or of the Borrowers or any of their respective Subsidiaries or any option, warrant or other right to acquire any such stock, partnership interest, membership interest or other equity interest in or of the Borrower or any of their respective Subsidiaries, (b) any payment, loan, loan repayment, contribution, or other transfer of funds or property to any direct or indirect holder of any capital stock, partnership or member interest, or other equity interest in any Borrower or their respective Subsidiaries or to any direct or indirect holder of any such interest, and (c) any payment, advance, reimbursement, set-off, distribution or other remittance to or for the benefit of any Affiliate, or any holder of any stock, partnership interest, membership interest or other equity interest in or of the Borrower or any of their respective Subsidiaries.

"Special Servicer" means Midland Loan Services, Inc., together with its successors and assigns, in its capacity as special servicer of the Mortgage.

"Subsidiary" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests or, in the case of a limited liability company, more than 50% of the member interests, are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent. Unless otherwise specified, "Subsidiary" means a Subsidiary of a Borrower; and references in this Agreement and the other Loan Documents to any Borrower and "its Subsidiary" or "any of its Subsidiaries" shall be deemed to be a reference to such Borrower and its Subsidiaries or each Borrower and any of its Subsidiaries, respectively.

"Successor Cases" means a case or cases under chapter 7 of the Bankruptcy Code to which any one or more of the Chapter 11 Cases may be converted or any other proceedings superseding the Chapter 11 Cases or such chapter 7 cases.

"Taxes" shall have the meaning ascribed to such term in Section 4.1.

"Termination Date" shall have the meaning ascribed to such term in the Interim Borrowing Order or the Final Borrowing Order, as applicable.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any financing statement or by reason of any provisions of law, the perfection or the effect of perfection or non perfection of the security interests granted to the Lender pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any financing statement relating to such perfection or effect of perfection or non perfection.

"United States" or "U.S." means the United States of America, its fifty States and the District of Columbia.

"U.S. Trustee" means the office of the United States Trustee for the Southern District of New York.

SECTION 1.2. Use of Defined Terms. Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and in each notice and other

communication delivered from time to time in connection with this Agreement or any other Loan Document.

SECTION 1.3.    Cross-References.  Unless otherwise specified, references in this Agreement and in each other Loan Document to any Article or Section are references to such Article or Section of this Agreement or such other Loan Document, as the case may be, and, unless otherwise specified, references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.


# ARTICLE II

## COMMITMENT, BORROWING PROCEDURES, NOTES AND COLLATERAL

SECTION 2.1.    Commitments.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Borrowers contained herein, each Lender severally agrees that, in one or more Borrowings occurring prior to the Maturity Date, such Lender will make loans (each a "Loan") to the Borrowers in an aggregate amount not to exceed such Lender's Commitment Amount; provided, however, that, any term or provision of this Agreement to the contrary notwithstanding, (i) the initial Borrowing hereunder shall only be made upon the Closing Date, provided that all applicable conditions precedent set forth in Article V have been satisfied or waived, (ii) such initial Borrowing shall be in an aggregate principal amount of not more than $5,000,000, and (iii) each subsequent Borrowing shall be in a minimum amount of $2,000,000 and, in any event, an increment of $2,000,000.  The Commitments shall automatically and permanently terminate on the Maturity Date.  No amounts paid or prepaid with respect to the Loan may be reborrowed.

SECTION 2.2.    Notes.  The Borrowers agree that, upon the request of any Lender, the Borrowers will execute and deliver to such Lender a Note evidencing the Loans made by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Commitment Amount.  The Borrowers hereby irrevocably authorize the Lenders to make (or cause to be made) appropriate notations on the grid attached to the Notes (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of and the outstanding principal amount of the Loans and the applicable interest rate.  Such notations shall be prima facie evidence of the existence and amounts of the obligations so recorded; provided, however, that the failure of any Lender to make any such notations or any error in such notations shall not limit or otherwise affect any Obligations of any Borrower.

SECTION 2.3.    Borrowing Procedures.  Except in the case of the initial borrowing for which notice is deemed timely given, by the Administrative Borrower delivering a Borrowing Request to the Agent on or before 10:00 a.m. on a Business Day, the Borrowers may from time to time irrevocably request, on not less than three Business Days' notice, and not more than five Business Days' notice, that a Borrowing be made, in a minimum amount of $2,000,000 and an integral multiple of $2,000,000, or, in the unused amount of the aggregate Commitment Amount.  On the terms and subject to the conditions of this Agreement, each Borrowing shall be made on the Business Day specified in such Borrowing Request.  On or before 11:00 a.m. on

such Business Day each Lender that has a Commitment to make the Loans being requested shall deposit with the Agent same day funds in an amount equal to such Lender's Percentage of the requested Borrowing. Such deposit will be made by wire transfer to an account which the Agent shall specify from time to time by notice to the Lenders. To the extent funds are received from the Lenders, the Agent shall make such funds available to the Borrower by wire transfer to the accounts the Administrative Borrower shall have specified in its Borrowing Request. No Lender's obligation to make any Loan shall be affected by any other Lender's failure to make any Loan.

SECTION 2.4.     <u>Use of Proceeds</u>.  The proceeds of all Loans shall be applied to and to fund (i) working capital requirements and general corporate purposes relating to the Borrowers' operations during the pendency of the Chapter 11 Cases (including payments to Affiliates solely for such purposes), (ii) fees, costs, administrative expenses and other expenses associated with this Agreement and the Chapter 11 Cases (including professional fees and expenses), and (iii) to the extent the Borrowers have insufficient Cash and Cash Equivalents (as such terms are defined in the Mortgage Loan Agreement), the interest payments to the Mortgage Lender provided for in paragraph 6(a) of the Cash Collateral Order referred to in <u>Section 5.1(d)</u> and the Servicer's Fee and Expense Reimbursement provided for (and defined in) paragraph 6(c) of the Cash Collateral Order referred to in <u>Section 5.1(d)</u>; <u>provided</u>, <u>however</u>, that no portion of the Loans shall be used, directly or indirectly, to (i) make any payment or prepayment that is prohibited under this Agreement, including any payment or prepayment in respect of Prepetition Indebtedness to the extent prohibited hereunder or under applicable law; or (ii) make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body.

SECTION 2.5.     <u>Superpriority Nature of Obligations</u>.  Subject to the terms of the Borrowing Orders, as applicable, all Obligations hereunder and under the Loan Documents shall constitute an allowed superpriority administrative expense claim against each of the Borrowers with priority in the Borrowers' respective Chapter 11 Cases over any and all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, 1114, and, if approved in the Final Borrowing Order, section 506(c), respectively, of the Bankruptcy Code, subject only to: (i) the Carve-Out, (ii) the Mortgage Lender Superpriority Claim, (iii) the Mortgage Lender A/P Liens, and (iv) Prior Liens.

SECTION 2.6.     <u>Joint and Several Liability; Payment Indemnifications</u>.

(a)     All Obligations of the Borrowers under the Loan Documents shall be the joint and several Obligations of each Borrower. The Obligations of and the Liens granted by any such Borrower under the Loan Documents shall not be impaired or released by any action or inaction on the part of the Agent or any Lender with respect to any other Borrower, including any action or inaction which would otherwise release a surety.

(b)     In order to provide for just and equitable contribution between the Borrowers if any payment is made by a Borrower (a "<u>Funding Borrower</u>") in discharging any of the Obligations, that Funding Borrower shall be entitled to a contribution from the other Borrowers for all payments, damages and expenses incurred by that Funding Borrower in discharging the Obligations, in the manner and to the extent required to allocate liabilities in an equitable manner among the Borrowers on the basis of the relative benefits received by the Borrowers.  If and to the extent that a Funding Borrower makes any payment to any Lender or any other Person in respect of the Obligations, any claim which said Funding Borrower may have against any other Borrower by reason thereof shall be subject and subordinate to the prior cash payment in full of the Obligations.  The parties hereto acknowledge that the right to contribution hereunder shall constitute an asset of the party to which such contribution is owing.  Notwithstanding any of the foregoing to the contrary, such contribution arrangements shall not limit in any manner the joint and several nature of the Obligations, limit, release or otherwise impair any rights of the Agent or any Lender under the Loan Documents, or alter, limit or impair the obligation of each Borrower, which is absolute and unconditional, to repay the Obligations in full in cash.  The obligation of any Borrower to make any contribution to another Borrower under this <u>Section 2.6</u> shall be deemed an expense of administration of such Borrower arising under Section 503(b) of the Bankruptcy Code and shall be junior in priority to all Obligations of such Borrower under the Loan Documents and to the expenses of administration to which such Obligations are junior.

SECTION 2.7.     <u>Collateral</u>.  As security for the prompt and complete payment and performance of the Obligations when due (whether due because of stated maturity, acceleration, mandatory prepayment, or otherwise) and to induce the Lenders to make the Loans, the Borrowers hereby grant to the Agent for the benefit of the Lenders the following continuing Liens upon and security interests in the property and interests in property identified in clauses (a) and (b) of this <u>Section 2.7</u> (subject to the proviso in this sentence, all such property and interests in property, collectively, the "<u>Collateral</u>"); <u>provided</u>, <u>however;</u> that the Collateral shall not include any asset, property or interest in property the granting of a Lien on which would trigger liability under the 5-Pack Guarantee:

(a)     <u>First-Priority Lien on Unencumbered Property</u>.  To the extent set forth in the Borrowing Orders, as applicable, a first-priority, senior security interest in and Lien upon all pre- and post-petition property of the Borrowers, whether existing on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible or intangible, wherever located, that, on or as of the Petition Date, was not subject to valid, perfected and non-avoidable Liens or was not subject to Liens perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash and Cash Collateral of the Borrowers, (b) all personal property of the Borrowers, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, inventory, deposit accounts,

equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, goods, general intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the Borrowers' equity interest in any other Persons (including, without limitation, Subsidiaries and/or Affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the Borrowers' interest in any real property, including, without limitation, the buildings, improvements, fixtures and structures situated thereon, leasehold interests, and the income, products and proceeds of the foregoing, which security interest and Lien shall be granted, and have the priority established, pursuant to section 364(c)(2) of the Bankruptcy Code; and

(b)     <u>Junior Lien on Encumbered Property</u>.  To the extent set forth in the Borrowing Orders, as applicable, a security interest in and Lien upon all pre- and post-petition property of the Borrowers (other than the property described in clause (a) of this <u>Section 2.7</u>, as to which property the Liens and security interests granted to the Agent are as described in such clause (a)), together with the income, products and proceeds thereof, whether existing on the Petition Date or thereafter created, acquired or arising, whether real or personal, tangible or intangible, wherever located, that is subject to valid, perfected and non-avoidable Liens in existence immediately prior to the Petition Date or to valid and non-avoidable Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and, to the extent applicable, Section 362(b)(18) of the Bankruptcy Code, including, without limitation, (a) all cash and Cash Collateral of the Borrowers, (b) all personal property of the Borrowers, whether tangible or intangible, including, without limitation, all accounts receivable, books and records, contract rights, inventory, deposit accounts, equipment, fixtures, patents, copyrights, trademarks, trade names and other intellectual property, goods, general intangibles, chattel paper, instruments, promissory notes, drafts and documents, investments, investment property, the Borrowers' equity interest in any other Persons (including, without limitation, Subsidiaries and/or Affiliates), securities, commercial tort claims, instruments, letters of credit and rights under letters of credit, and life insurance policies, together with the income, products and proceeds thereof, and (c) all of the Borrowers' interest in any real property, including, without limitation, the buildings, improvements, fixtures and structures situated thereon, leasehold interests, and the income, products and proceeds of the foregoing, which security interests and Liens granted to the Agent shall be junior in priority to such valid, perfected and non-avoidable Liens and shall be granted, and have the priority established, pursuant to section 364(c)(3) of the Bankruptcy Code.

SECTION 2.8.     <u>Lien Priority</u>.  Notwithstanding anything to the contrary set forth herein, the Liens granted by the Borrowers pursuant to <u>Section 2.7</u> shall be junior, subject and subordinate in all respects to the following:  (i) the Mortgage Lender Prepetition Liens, (ii) the Mortgage Lender A/P Liens, (iii) the Prior Liens and (iv) the Carve-Out.

SECTION 2.9.    Commitment Fee.  The Borrowers agree to pay to the Agent, for the pro rata account of each Lender, a commitment fee in an amount equal to 1.00% of such Lender's Commitment Amount, which fee shall be deemed earned in full on the Closing Date and payable on the Closing Date.

ARTICLE III

REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1.    Repayments and Prepayments.

(a)    The Borrowers shall repay in full in cash the unpaid principal amount of the Loan on the Maturity Date, subject to the prior payment in full of the allowed claim of the Mortgage Lender under the Mortgage Documents.

(b)    Prior thereto, payments and prepayments of the Loan shall or may be made as set forth below, subject, in each case, to the rights of the Mortgage Lender.

(i)    On not less than five Business Days' prior written notice to the Agent, the Borrowers may make a voluntary prepayment at any time, in whole or in part, of the outstanding principal amount of the Loans; provided that each such prepayment shall be in a minimum amount of $1,000,000 or, if greater, an increment of $1,000,000.

(ii)    Without limiting the obligation of the Borrower to obtain the consent of the Requisite Lenders to any Disposition not otherwise permitted hereunder or under the Interim Borrowing Order or the Final Borrowing Order, as applicable, the Borrowers shall, on or prior to the occurrence of any Disposition, deliver to the Agent a statement certified by a financial or other appropriate officer of the Borrowers, in form and detail reasonably satisfactory to the Agent, setting forth the estimated amount of the Net Cash Proceeds of such Disposition that will, on the date of such Disposition, be received by or paid at the direction of any Borrower or any of their respective Subsidiaries in cash, and the Borrowers shall, to the extent the Borrowers are not required to prepay the loan evidenced by the Mortgage Loan Agreement as a result of the receipt of such Net Cash Proceeds, prepay the Loans in such amount.

(iii)    Not later than:

(1)    the date three Business Days following the date that the Borrowers or any of their respective Subsidiaries receive (or may direct) the proceeds of insurance (other than business interruption insurance), condemnation award or other compensation in respect of one or more Casualty Events affecting any property of the Borrowers or any of

their respective Subsidiaries in an aggregate amount exceeding $500,000, the Borrowers shall, at their option, either (x) notify the Agent of their intention to apply the Net Cash Proceeds from such Casualty Event to the repair, restoration or replacement of the affected property or (y) prepay the Loans in an amount equal to 100% of the Net Cash Proceeds of such Casualty Event (it being understood that if and to the extent that Net Cash Proceeds intended to be applied to such repair, restoration or replacement are not in fact applied to effect such repair, restoration or replacement as soon as practicable, but in any event within ninety (90) days after the date of the receipt of such Net Cash Proceeds (or such longer period as may be reasonably agreed to by the Agent and the Requisite Lenders acting in good faith considering the scope of such repair, restoration or replacement), then the Borrowers shall prepay the Loans in an amount equal to such unapplied portion of Net Cash Proceeds at the expiration of such period, as the case may be).

(2)     Nothing herein shall be deemed to limit any obligation of the Borrowers or any of their respective Subsidiaries pursuant to any of the Loan Documents to remit to a collateral or similar account maintained by the Agent pursuant to any of the Loan Documents the proceeds of insurance, condemnation award or other compensation received in respect of any Casualty Event, in each case subject to the return of such proceeds to the Borrowers in accordance with and subject to the disbursement conditions contained in such Loan Documents.

(iv)     The Borrowers shall pay to the Agent for the benefit of the Lenders as a prepayment of the principal of the Loans 100% of the proceeds from any incurrence or issuance of Indebtedness by any Borrower in connection with any refinancing of the Loans and related Obligations hereunder.

(v)     Subject to the Interim Borrowing Order and the Final Borrowing Order, as applicable, immediately upon any acceleration of the Maturity Date pursuant to <u>Section 8.2</u>, the Borrowers shall repay the Loans.

Subject to <u>Section 4.3</u> hereof, each prepayment of any Loan made pursuant to this <u>Section 3.1(b)</u> shall be without premium or penalty.

SECTION 3.2.     <u>Interest Provisions</u>.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with this <u>Section 3.2</u>.

SECTION 3.2.1.   <u>Rates</u>.  <u>Subject to Section 3.2.2, Section 3.2.5 and Section 3.2.6</u>, the Loans shall accrue interest at a rate per annum equal to the LIBO Rate plus 3.00%.

SECTION 3.2.2.   <u>Default Rate</u>.  Upon the occurrence and during the continuance of an Event of Default, including, without limitation, after the date any

principal amount of the Loan is due and payable (whether on the Maturity Date, upon acceleration or otherwise), or after any other monetary Obligation of the Borrowers shall have become due and payable, the Borrowers shall pay, but only to the extent permitted by law, interest (after as well as before judgment thereon) on all Obligations hereunder at a rate per annum equal to the rate of interest that otherwise would be applicable to the Loans plus a margin of 1.00%. All such interest shall be payable on demand of Agent or the Required Lenders.

SECTION 3.2.3.   Payment Dates.  Interest accrued on the Loan shall be payable, without duplication:

(a)      on the Maturity Date;

(b)      on the date of any payment or prepayment, in whole or in part, of principal outstanding on the Loan;

(c)      in arrears on each Interest Payment Date; and

(d)      on that portion of the Loan the Maturity Date of which is accelerated pursuant to Section 8.2, immediately upon such acceleration.

Interest accrued on the Loan or other monetary Obligations arising under this Agreement or any other Loan Document after the date such amount is due and payable (whether on the Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.2.4.   Application of Payments and Proceeds.  All payments received from the Borrowers, and all amounts received as a result of the exercise of remedies under the Loan Documents (including from the proceeds of Collateral securing the Obligations) or under applicable law, shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations owing to the Agent, in its capacity as Agent (including the fees and expenses of counsel to the Agent), (ii) second, after payment in full in cash of the amounts specified in clause (i), to the ratable payment of all interest and fees owing under the Loan Documents, and all costs and expenses owing to the Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (i) and (ii), to the ratable payment of the principal amount of the Loan then outstanding, (iv) fourth, after payment in full in cash of the amounts specified in clauses (i) through (iii), to the ratable payment of all other Obligations owing to the Lenders; and (v) fifth, after payment in full in cash of the amounts specified in clauses (i) through (iv), any excess to the Borrowers or as otherwise directed by the Court.

SECTION 3.2.5.   Alternate Rate of Interest.  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period with respect to a Borrowing the Agent shall have determined that deposits in dollars in the principal amounts of such Borrowing are not generally available in the London interbank market, or that the rates at which such dollar deposits are being offered

will not adequately and fairly reflect the cost to the Lenders of making or maintaining their share of such Borrowing during such Interest Period, or that reasonable means do not exist for ascertaining the LIBO Rate, the Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Administrative Borrower and the Lenders. In the event of any such determination, until the Agent shall have advised the Administrative Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any determination of interest under this Agreement or any Note by reference to the LIBO Rate shall instead be determined by reference to the Alternate Base Rate in lieu of the LIBO Rate. Each determination by the Agent under this Section 3.2.5 shall be conclusive absent manifest error.

SECTION 3.2.6. Maximum Lawful Rate of Interest. Anything herein to the contrary notwithstanding, the obligations of the Borrowers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the Borrowers shall pay such Lender interest at the highest rate permitted by applicable law (the "Maximum Lawful Rate"); provided; however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

ARTICLE IV

TAXES, PAYMENTS AND LIBO RATE BREAKAGE COSTS

SECTION 4.1. Taxes.

(a) Except as set forth in the next sentence, all payments by the Borrowers of principal of, and interest on, the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, sales, goods and services, value added or stamp taxes and other taxes, fees, duties, levies, withholdings or other charges of any nature whatsoever levied or imposed with respect to such payments by the United States (or any taxing authority or political subdivision thereof) and by any other jurisdiction as a result of a connection between the Borrowers and such jurisdiction, but excluding franchise taxes and taxes imposed on or measured by net income, net receipts or capital of the Lender (such non-excluded items being "Taxes"). In the event that any withholding or deduction from

any payment to be made by the Borrowers hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then the Borrowers shall:

> (i)     pay directly to the relevant authority the full amount required to be so withheld or deducted;

> (ii)     promptly forward to the Lenders an official receipt or other documentation reasonably satisfactory to the Lender evidencing such payment to such authority; and

> (iii)     pay to each Lender for its account, such additional amount or amounts as necessary to ensure that the net amount actually received by such Lender will equal the full amount such Lender would have received had no such withholding or deduction been required.

In addition, the Borrowers shall pay any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment being or being required to be made hereunder or under any Note or from the execution, delivery, registration, recording or enforcement of this Agreement or any Loans Document ("Other Taxes") imposed to the relevant authority imposing such Other Taxes in accordance with applicable law.

The Borrowers shall, jointly and severally, indemnify the Agent and each Lender for any Taxes or Other Taxes levied, imposed or assessed on (and whether or not paid directly by) such Lender (and whether or not such Taxes or Other Taxes are correctly or legally asserted by the relevant authority). Promptly upon having knowledge that any such Taxes or Other Taxes have been levied, imposed or assessed, and promptly upon notice thereof by the Agent and/or such Lender to the Administrative Borrower, the Borrowers shall pay such Taxes or Other Taxes directly to the relevant authority (provided, however, that the Agent and/or such Lender shall not be under any obligation to provide any such notice to the Administrative Borrower). With respect to indemnification for Taxes and Other Taxes actually paid by the Agent and/or such Lender (and for purposes of this Section 4.1 and the rights of the Agent and/or such Lender hereunder, a distribution by the Agent and/or such Lender to or for the account of the Agent and/or such Lender shall be deemed a payment by or on behalf of the Borrowers), such indemnification shall be made promptly by the Borrowers (including any penalties, interest or expenses with respect to such Taxes or Other Taxes together with interest on such Taxes or Other Taxes at a rate per annum equal to the highest rate per annum then in effect pursuant to Section 3.2 for the period from the date the Agent and/or such Lender paid such Taxes or Other Taxes through the date of reimbursement by the Borrowers) as is necessary in order that the total net amount received by the Agent and/or such Lender after the payment of such Taxes or Other Taxes (and any Taxes imposed on such additional amount) shall equal the amount such Lender would have received had no such Taxes or Other Taxes been asserted.

If the Borrowers fail to pay any Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Agent or any Lender the required receipts or other required documentary evidence, the Borrowers shall, jointly and severally, indemnify the Agent and/or such Lender, for any incremental Taxes or Other Taxes, interest or penalties that may become payable by the Agent and/or such Lender, as a result of any such failure.

(b)     The agreements in this <u>Section 4.1</u> shall survive the termination of this Agreement and the payment of all amounts payable hereunder.

SECTION 4.2.     <u>Payments, Computations, etc</u>.  Unless otherwise expressly provided, all payments by the Borrowers pursuant to this Agreement or any other Loan Document shall be made by the Borrowers to the Agent on behalf of the Lenders.  All such payments required to be made to the Agent shall be made, without setoff, deduction or counterclaim, not later than 2 p.m., New York City time, on the date due, by wire transfer in same day or immediately available funds, to such account as the Agent shall specify from time to time by notice to the Administrative Borrower.  Funds received after that time shall be deemed to have been received by the Agent on the next succeeding Business Day.  All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Whenever any payment to be made shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees, if any, in connection with such payment.

SECTION 4.3.     <u>Breakage Costs</u>.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan) as a result of (A) any repayment or prepayment of the principal amount of any Loan on a date other than the scheduled last day of the Interest Period applicable thereto; or (B) any Loans not being made in accordance with the Borrowing Request therefor; then, upon the written notice of such Lender to the Administrative Borrower (with a copy to the Agent), the Borrowers shall, within five days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

ARTICLE V

CONDITIONS TO THE BORROWINGS

SECTION 5.1.     <u>Conditions to the Initial Borrowing</u>.  The obligations of the Lenders to fund the initial Borrowing shall be subject to the prior or concurrent satisfaction of the following:

(a)     Interim Borrowing Order.  The Interim Borrowing Order shall have been entered by the Court, is in full force and effect, and no order amending or modifying (without the consent of the Agent, which consent may be withheld or denied in the Agent's sole discretion) or reversing, staying or vacating the Interim Borrowing Order shall have been entered, and, if the Interim Borrowing Order is the subject of a pending appeal in any respect, neither the making of any Loans nor the performance by any Borrower of its respective obligations hereunder or under the other Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)     Borrowing Request.  The delivery by the Administrative Borrower to Agent of a Borrowing Request concurrently with the execution hereof (which for the avoidance of doubt shall specify the Closing Date as the date of such Borrowing).  Delivery of a Borrowing Request to Agent and acceptance by any Borrower of the proceeds of Loans comprising the initial Borrowing shall constitute a certification by all Borrowers, as of the date of delivery of the Borrowing Request or receipt of such funds, as applicable, that all of the conditions set forth in Section 5.1(a), Section 5.1(d), Section 5.3(a) and Section 5.3(b) have been satisfied.

(c)     Final Documentation.  The Borrowers shall have executed and delivered to the Agent (or shall have caused to be executed and delivered to the Agent by the appropriate Person) definitive credit and other documentation evidencing, among other things, the Loans and the Obligations hereunder, the DIP Liens and the DIP Superpriority Claim, which may be reasonably requested by and are acceptable to the Lenders in their sole discretion, provided, that the terms and provisions of such documents do not materially modify or increase the obligations of the Borrowers hereunder.

(d)     Cash Collateral Order.  The Cash Collateral Order to be entered following the Fourth Interim Hearing (as defined in the Court's Third Interim Order Authorizing Cash Collateral Use, Granting Related Relief, and Scheduling a Fourth Interim Hearing, entered on February 28, 2011 in the Chapter 11 Cases), shall be (i) in full force and effect and (ii) acceptable in all respects to the Lenders in their sole discretion.

SECTION 5.2.     Condition to Subsequent Borrowings.  The obligations of the Lenders to fund any Borrowing following the initial Borrowing shall be subject to the prior or concurrent satisfaction of the following:

(a)     Final Borrowing Order.  The Final Borrowing Order shall have been entered by the Court, is in full force and effect, and no order amending or modifying (without the consent of the Agent, which consent may be withheld or denied in the Agent's sole discretion) or reversing, staying or vacating the Final Borrowing Order shall have been entered, and, if the Final Borrowing Order is the subject of a pending appeal in any respect, neither the making of any Loans nor the performance by

any Borrower of its respective obligations hereunder or under the other Loan Documents shall be the subject of a presently effective stay pending appeal.

(b)     Cash Collateral Order.   The Cash Collateral Order referred to in Section 5.1(d)) shall be in full force and effect or another Cash Collateral Order (i) shall have been entered by the Court, (ii) shall be in full force and effect and (iii) shall be acceptable in all respects to the Lenders in their sole discretion.

SECTION 5.3.     Conditions to All Borrowings.  The obligations of the Lenders to fund any Borrowing (including the initial Borrowing) shall be subject to the prior or concurrent satisfaction of the following, except to the extent that the Agent may elect (which election may be made without written or express notice of such waiver) to waive any such conditions:

(a)     Compliance with Warranties, No Default, etc.  Both before and after giving effect to any Borrowing of Loans, the following statements shall be true and correct:

(i)     the representations and warranties set forth in each Loan Document shall be true and correct with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date); and

(ii)     no Default shall have then occurred and be continuing and no Borrower shall then be in material violation of any law or governmental regulation or court order or decree.

(b)     No Material Adverse Effect.  There has been no development, event or circumstance (either alone or cumulatively) in the financial condition, results of operations, assets, business, properties or prospects of the Borrowers or any of their respective Subsidiaries (taken as a whole) since the Petition Date that has had or reasonably could be expected to have a Material Adverse Effect (provided that the commencement of the Chapter 11 Cases and the effects and events that typically result from the commencement of a chapter 11 case shall not be deemed to be a Material Adverse Effect).

(c)     Payment of Fees.  The Borrowers shall have paid all fees and expenses required to be paid thereby to the Agent and each of the Lenders.

(d)     Request for Borrowing.  Other than with respect to the initial Borrowing hereunder, the Agent shall have received a properly completed Borrowing Request in accordance with the requirements of this Agreement by 10:00 a.m. (New York time) on a Business Day to be effective as a notice received on such day. Other than with respect to the initial Borrowing hereunder, delivery of a Borrowing Request to Agent and acceptance by any Borrower of the proceeds of any Loans shall

constitute a certification by all Borrowers, as of the date of delivery of the Borrowing Request or receipt of such funds, as applicable, that all of the conditions set forth in Section 5.2(a), Section 5.2(b), Section 5.3(a) and Section 5.3(b) have been satisfied.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

In order to induce the Agent and the Lenders to enter into this Agreement and to make the Loans, each Borrower represents and warrants to the Agent and the Lenders as set forth in this Article VI.

SECTION 6.1. Corporate Existence and Power. Each Borrower and each of their respective Subsidiaries:

(a) is a corporation, limited liability company, limited partnership or general partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b) subject to the entry of the Interim Borrowing Order (or the Final Borrowing Order, when applicable) by the Court, has the power and authority and all governmental licenses, authorizations, permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c) is duly qualified as a foreign corporation, limited liability company, limited partnership or general partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification or license; and

(d) is in compliance with all applicable laws;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so would not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

SECTION 6.2. Corporate Authorization; No Contravention. Upon the entry by the Court of the Interim Borrowing Order (or the Final Borrowing Order, when applicable), the execution, delivery and performance by each of the Borrowers of this Agreement, and by each Borrower and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

(i) contravene the terms of any of that Person's organizational documents:

(ii)     conflict with or result in any breach or contravention of, or result in the creation of any Lien under, any document evidencing any material contractual obligation to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its property is subject except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect; or

(iii)     violate any Requirement of Law, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect.

SECTION 6.3.     <u>Governmental Authorization</u>.  No approval, consent, exemption, authorization, or other action, by or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Borrower or any Subsidiary of any Borrower of this Agreement or any other Loan Document except the Court.

SECTION 6.4.     <u>Binding Effect</u>.  Upon the entry by the Court of the Interim Borrowing Order (or the Final Borrowing Order, when applicable), this Agreement and each other Loan Document to which any Borrower or any Subsidiary of any Borrower is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by the Bankruptcy Code, the Court and/or by equitable principles regardless of whether considered in a proceeding in equity or at law.

SECTION 6.5.     <u>No Material Adverse Effect</u>.  Since the date of the filing of the Chapter 11 Cases, there has been no development, event or circumstance (either alone or cumulatively) which has had or could reasonably be expected to have a Material Adverse Effect (provided that the commencement of the Chapter 11 Cases and the effects and events that typically result from the commencement of a chapter 11 case shall not be deemed to be a Material Adverse Effect).

SECTION 6.6.     <u>Litigation</u>.  Except as set forth on <u>Schedule 6.6</u>, no litigation, action, investigation or proceeding is pending or, to the knowledge of such Borrower, threatened by or against such Borrower (i) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, (ii) with respect to any of the Collateral owned by such Borrower or (iii) which could reasonably be expected to have a Material Adverse Effect.

SECTION 6.7.     <u>Ownership of Properties</u>.  Such Borrower owns good and marketable title to all of the Collateral free and clear of (i) all Liens (other than Liens permitted under <u>Section 7.2.2</u>), and (ii) purchase options, rights of first refusal or other similar contractual rights created by, through or under any Borrower (other than, to the extent constituting Liens, Liens permitted under <u>Section 7.2.2</u>).

SECTION 6.8.     Taxes.  Such Borrower has filed all tax returns and reports required by law to have been filed by it and has paid all post-Petition Date taxes and governmental charges thereby shown to be owing, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves shall have been set aside on its books.

SECTION 6.9.     Federal Regulations.  No Borrower is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of the Loan will be used to purchase or carry margin stock in a way which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section 6.9 with such meanings.

SECTION 6.10.     Ventures, Subsidiaries and Affiliates; Outstanding Stock.  As of the Closing Date, no Borrower and no Subsidiary of any Borrower is engaged in any joint venture or partnership with any other Person (and any agreement for the management of Borrower's assets shall not be construed as a joint venture or partnership).  All issued and outstanding stock and equity interests of each of the Borrowers and each of their respective Subsidiaries, if any, are duly authorized and validly issued, fully paid, non-assessable.  All issued and outstanding stock and equity interests of each Subsidiary of Borrower, if any, are free and clear of all Liens other than Permitted Liens.  All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  Other than as evidenced by the Liens permitted under Section 7.2.2, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Borrower may be required to issue, sell, repurchase or redeem any stock or equity interests of its Subsidiaries.

SECTION 6.11.     Accuracy of Information.  None of the factual information contemporaneously furnished by or on behalf of such Borrower in writing to any Agent or any Lender for purposes of or in connection with this Agreement, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make any information not misleading, and no other such factual information hereafter furnished by or on behalf of such Borrower to any Agent or any Lender, when taken as a whole, will contain any untrue statement of a material fact or will omit to state any material fact necessary to make any information not misleading on the date as of which such information is dated or certified.

SECTION 6.12.     No Default.  No Borrower and no Subsidiary of any Borrower is in default under or with respect to any contractual obligation (other than Prepetition Indebtedness), in any respect which, individually or together with all such defaults, would reasonably be expected to have a Material Adverse Effect (other than with respect to the commencement of the Chapter 11 Cases).

SECTION 6.13.     Governmental Regulation.  No Borrower is subject to regulation under the Federal Power Act, the Interstate Commerce Act (to the extent applicable to

the transactions contemplated hereby) or the Investment Company Act of 1940 or under any other federal or state statute or regulation (other than the Bankruptcy Code) which in any case may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.

SECTION 6.14.     Entitlement to Payment and Exercise of Remedies upon Maturity of Obligations.  Notwithstanding the provisions of section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Borrowers hereunder and under the other Loan Documents, the Agent and the Lenders shall be entitled to immediate payment of such Obligations and shall be entitled to enforce the rights and remedies provided for hereunder and under applicable law without further application to or order by the Court other than as may be required in accordance with the terms of the Interim Borrowing Order or the Final Borrowing Order, as applicable.

SECTION 6.15.     The Borrowing Orders.  On the date of the making of the initial Loan hereunder, the Interim Borrowing Order will have been entered, will be in full force and effect, will not have been vacated or reversed and will not be subject to a stay or injunction issued by any court or tribunal (including, without limitation, a stay pending appeal) and no order amending or modifying (without the consent of the Agent, which consent may be withheld or denied in the Agent's sole discretion) the Interim Borrowing Order will have been entered. On the date of the making of all Loans after the initial Loan hereunder, the Final Borrowing Order will have been entered, will be in full force and effect, will not have been vacated or reversed and will not be subject to a stay or injunction issued by any court or tribunal (including, without limitation, a stay pending appeal) and no order amending or modifying (without the consent of the Agent, which consent may be withheld or denied in the Agent's sole discretion) the Final Borrowing Order will have been entered.

ARTICLE VII

COVENANTS

SECTION 7.1.     Affirmative Covenants.  The Borrowers, jointly and severally, covenant and agree that until the date on or after the Maturity Date on which all Obligations have been paid in full in cash, the Borrowers will perform the obligations set forth in this Section 7.1.

SECTION 7.1.1.   Financial Information, Reports, Notices, etc.  The Administrative Borrower will furnish, or will cause to be furnished, to the Agent and the Lenders copies of the following financial statements, reports, notices and information:

(a)     Financial Reporting.  The Borrowers shall deliver to the Agent any and all reports, studies, analyses, accountings, budgets, projections, financial statements and other information and data (collectively, the "Financial and Business Reports") that the Borrowers or their agents (i) provide or are required to provide to the Mortgage Lender and/or the Special Servicer pursuant to any Cash Collateral Order, (ii)

file with the Court or (iii) submit to the U.S. Trustee, including, without limitation, any and all Financial and Business Reports concerning the Borrowers' financial condition, their businesses and/or their property (including, without limitation, the Collateral). Such Financial and Business Reports shall be provided to the Agent at the same time as such reports are provided to the Mortgage Lender and/or the Special Servicer, filed with the Court or submitted to the U.S. Trustee, as applicable.

(b)     Cash Flow Statements.  The Borrowers shall deliver to the Agent consolidated and consolidating cash flow statements to the extent required to be provided under any Cash Collateral Order.

(c)     Bankruptcy Information.  Promptly after the same is available, the Borrowers shall furnish or cause to be furnished or made available to counsel for the Agent all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrowers with the Court or the U.S. Trustee in connection with the Chapter 11 Cases or, to the extent not privileged or subject to a requirement of non-disclosure, distributed by or on behalf of the Borrowers to any Committee, the Mortgage Lender and/or the Special Servicer, and without limiting the generality of the foregoing, the Borrowers shall promptly deliver to, and discuss with, the Agent and its counsel any and all information and developments in connection with any proposed sale or disposition of any assets or properties the sale or disposition of which would constitute a Disposition, including, without limitation, any letters of intent, commitment letters or engagement letters received by any Borrower, and any other event or condition which is reasonably likely to have a material effect on the Borrowers or the Chapter 11 Cases, including, without limitation, the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization.

(d)     Budget:  The Borrowers shall deliver a copy of each budget required under any Cash Collateral Order (the "Budget"), in each case concurrently with the delivery of the same to the Mortgage Lender.

(e)     Notices to and from Mortgage Lender:  The Borrowers shall deliver to Agent (i) simultaneous copies of all reports, notices, certificates or other information delivered by any Borrower to the Mortgage Lender, and (ii) as soon as practicable but in any event within one (1) Business Day after receipt thereof, copies of all reports, notices, certificates or other information received by any Borrower, under or in connection with the "Loan Documents" (as such term is defined in the Mortgage Loan Agreement).

All such financial statements and forms shall be complete and correct and shall be prepared in reasonable detail and, where applicable, in accordance with customary accounting standards applied consistently throughout the periods reflected therein.

SECTION 7.1.2.  Payment of Taxes; Obligations.  The Borrowers shall pay and discharge all taxes, assessments and/or other similar governmental charges or

levies, fees or charges, in each case relating to periods after the Petition Date, imposed in connection with the Collateral and the execution and delivery of the Loan Documents and any other agreements and instruments contemplated thereby (except any taxes, assessments and/or other similar governmental charges or levies, fees or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves shall have been set aside on its books), prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, would reasonably be expected to become a Lien upon any of the Collateral, and shall discharge or otherwise satisfy, at or before maturity or before they become delinquent, as the case may be, and shall hold the Lender harmless against any and all liabilities with respect to, all of the Borrowers' other obligations of whatever nature.

SECTION 7.1.3.   <u>Compliance with Contractual Obligations and Laws</u>. Each Borrower shall comply with all contractual obligations and requirements of law except to the extent that failure to comply therewith, in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 7.1.4.   <u>Notice</u>.  The Administrative Borrower shall promptly give written notice to the Lenders:

(a)      of the occurrence of any Default or Event of Default;

(b)      of any (i) default or event of default under any post-Petition Date contractual obligation of any Borrower or (ii) litigation, investigation or proceeding which may exist at any time between any Borrower and any other Person, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect; and

(c)      of any development or event which could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this <u>Section 7.1.4</u> shall be accompanied by a statement of the Administrative Borrower setting forth details of the occurrence referred to therein and stating what action the applicable Borrower proposes to take with respect thereto.

SECTION 7.1.5.   <u>Change of Location of the Borrowers</u>.  The Administrative Borrower shall give notice to the Lenders within 10 days following the date on which any Borrower is no longer located (as defined in the UCC) in the applicable jurisdiction following its legal name set forth in the <u>preamble,</u> which notice shall include the new location or situs of such Borrower, and shall provide the Lenders, within such 10-day period, of appropriate amendments to any UCC financing statements (Form UCC-1) or other similar financing statements filed in connection with the Loan Documents.

SECTION 7.1.6.   <u>Use of Proceeds</u>.  The Borrowers shall apply the proceeds of the Loan in accordance with <u>Section 2.4</u> hereof.

SECTION 7.1.7.  <u>Collateral</u>.  The Borrowers, at all times, will cause all of the Collateral to be subject to a first priority perfected security interest in favor of and to be pledged to the Lenders in accordance with the Interim Borrowing Order or the Final Borrowing Order, as applicable, subject only to (i) the Prior Liens, (ii) the Carve Out and (iii) the other Liens set forth in <u>Section 7.2.2(a)(i)</u> (with respect to each such Lien, only to the extent, if any, that such Lien is nonavoidable and has priority over the DIP Liens under applicable law), <u>Section 7.2.2(a)(iv)</u>, <u>Section 7.2.2(a)(v)</u> and <u>Section 7.2.2(a)(vi)</u>.

SECTION 7.1.8.  <u>Intentionally Omitted</u>.

SECTION 7.1.9.  <u>Further Assurances</u>.

(a)  <u>Assurances</u>.  Without expense or cost to the Agent or the Lenders, each Borrower shall from time to time hereafter execute, acknowledge, file, record, do and deliver all and any further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, security agreements, hypothecations, pledges, charges, assignments, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as the Agent may from time to time reasonably request and that do not involve a material expansion of the Borrowers' obligations or liabilities hereunder in order to carry out more effectively the purposes of this Agreement, the other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, including to subject any Collateral, intended to now or hereafter be covered, to the Liens created by the Interim Borrowing Order, to perfect and maintain such Liens, and to assure, convey, assign, transfer and confirm unto the Agent the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that any Borrower may be or may hereafter become bound to convey or to assign to the Agent or for carrying out the intention of or facilitating the performance of the terms of this Agreement, any other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, including registering or recording this Agreement or any other Loan Document.  Without limiting the generality of the foregoing, the Borrowers shall deliver to the Agent, promptly upon receipt thereof, all instruments received by the Borrowers after the Closing Date and take all actions and execute all documents necessary or reasonably requested by the Agent to perfect the Agent's Liens in any such instrument or any other Investment acquired by any Borrower.

(b)  <u>Filing and Recording Obligations</u>.  Subject to Court approval to the extent necessary or required, each Borrower shall jointly and severally pay all filing, registration and recording fees and all expenses incident to the execution and acknowledgement of any Loan Document, including any instrument of further assurance described in <u>clause (a)</u> above, and shall, if applicable, pay all mortgage recording taxes, transfer taxes, general intangibles taxes and governmental stamp and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution, delivery, filing, recording or registration of any Loan Document, including any instrument of further assurance described in <u>clause (a)</u> above, or by reason of its interest in, or measured by amounts payable under, this Agreement, the Notes or any other Loan Document, including any instrument of further assurance described in <u>clause</u>

(a) above (excluding income, franchise and doing business Taxes), and shall pay all stamp Taxes and other Taxes required to be paid on the Notes or any other Loan Document; provided, however, that such Borrower may contest in good faith and through appropriate proceedings, any such Taxes, duties, imposts, assessments and charges; provided further, however, that the applicable Borrower maintains adequate reserves for such amounts during the pendency of any such proceedings.  Subject to Court approval to the extent necessary or required, if any Borrower fails to make any of the payments described in the preceding sentence within 10 days after notice thereof to the Administrative Borrower from the Agent (or such shorter period as is necessary to protect the loss of or diminution in value of any Collateral by reason of tax foreclosure or otherwise, as determined by the Agent) accompanied by documentation verifying the nature and amount of such payments, the Agent may (but shall not be obligated to) pay the amount due and the Borrowers shall jointly and severally reimburse all amounts in accordance with the terms hereof.

(c)     Costs of Defending and Upholding the Liens.  Following the occurrence and during the continuance of any Event of Default, the Agent may, upon at least five Business Days' prior written notice to the Administrative Borrower, the U.S. Trustee, counsel for any Committee, counsel to the Mortgage Lender, counsel to GIC and counsel to MetLife, (i) appear in and defend any action or proceeding, in the name and on behalf of the Agent, the Lenders or any Borrower, in which the Agent or any Lender is named or which the Agent in its sole discretion determines is reasonably likely to materially adversely affect any Collateral, the Lien in respect thereof or any other Loan Document and (ii) institute any action or proceeding which the Agent reasonably determines should be instituted to protect the interest or rights of the Agent and the Lenders in any Collateral or under this Agreement or any other Loan Document.  The Borrowers, jointly and severally, agree that all reasonable costs and expenses expended or otherwise incurred pursuant to this subsection (including reasonable attorneys' fees and disbursements) by the Agent shall be paid pursuant to Section 10.5 and Section 10.6 hereof.

SECTION 7.2.     Negative Covenants.  The Borrowers, jointly and severally, covenant and agree that, until the date on or after the Maturity Date on which all Obligations have been paid in full in cash, the Borrowers will perform the obligations set forth in this Section 7.2.

SECTION 7.2.1.   Indebtedness.  The Borrowers shall not directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)     each Borrower may become and remain liable with respect to the Obligations;

(b)     each Borrower may remain liable with respect to Prepetition Indebtedness without giving effect to any extensions, renewals, refinancings, supplemental borrowings or other incurrences thereof;

(c)     the Borrowers may become and remain liable with respect to or in connection with Indebtedness incurred in connection with the rejection of Borrower's or any of their Affiliates' leases and/or executory contracts in the Chapter 11 Cases; provided, that the obligation of any Borrower in respect of such Indebtedness shall be determined by a final order of the Court entered at the time of such rejection, to be a general, unsecured, non-priority claim;

(d)     intercompany Indebtedness between or among the Borrowers or any Borrower and an Operating Lessee and/or Management Agreement Affiliate, to the extent such Indebtedness ranks junior to the Obligations of the Borrowers hereunder;

(e)     intercompany indebtedness between Borrowers or any Affiliate as set forth in, and limited by, those items in the Budget;

(f)     Indebtedness incurred or assumed to finance the acquisition, construction or improvement of any fixed or capital assets of the Borrowers, provided, that (i) such Indebtedness must be incurred prior to or within 90 days after the acquisition or the completion of the construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this paragraph (f) must not exceed $5,000,000, or its equivalent, at any time outstanding;

(g)     Indebtedness evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrowers or an Operating Lessee and/or Management Agreement Affiliate (pursuant to purchase money security interest or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrowers or its Affiliates, to the extent such Indebtedness ranks junior to the Obligations of the Borrowers hereunder;

(h)     other secured Indebtedness of the Borrowers in an aggregate principal amount not exceeding $1,000,000 at any time outstanding, to the extent such Indebtedness, and the Liens securing such Indebtedness, are junior to the Obligations of the Borrowers hereunder;

(i)     other unsecured Indebtedness of the Borrowers in an aggregate principal amount not exceeding $1,000,000 at any time outstanding, to the extent such Indebtedness is junior to the Obligations of the Borrowers hereunder; and

(j)     Indebtedness evidencing overdrafts in respect of the banking arrangements of any Borrower, to the extent such Indebtedness does not remain overdue for more than fifteen (15) Business Days.

SECTION 7.2.2.   Liens and Related Matters.

(a)   Prohibition on Liens.  The Borrowers shall not directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of any Borrower whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any State or under any similar recording or notice statute, or apply to the Court for the authority to do any of the foregoing, except:

(i)   Permitted Liens;

(ii)   Liens created in favor of the Agent (for the benefit of the Lenders) pursuant to the Interim Borrowing Order or authorized by the Interim Borrowing Order or the Final Borrowing Order;

(iii)   Prior Liens;

(iv)   the Mortgage Lender Superpriority Claim;

(v)   the Mortgage Lender A/P Liens;

(vi)   Liens securing Indebtedness permitted to be incurred under clause (f) of Section 7.2.1; provided, that (i) such Lien is granted within 60 days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed 80% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause; and

(vii)   Liens securing Indebtedness permitted to be incurred under clause (g) or (h) of Section 7.2.1.

SECTION 7.2.3.   Limitations on Investments.  The Borrowers will not, nor will they permit any of their respective Subsidiaries to, make or permit to remain outstanding any Investments except:

(a)   Investments in the form of a loan or other extension of credit in or to Persons which are not Affiliates of the Borrowers outstanding on the date hereof, but not any extensions, renewals or replacements of such Investments;

(b)   operating deposit accounts with banks;

(c)   Investments in Cash Equivalents;

(d)     Investments by any Borrower, Operating Lessee, Management Agreement Affiliate, or any Subsidiary in (i) another Borrower, (ii) any Operating Lessee and/or any Management Agreement Affiliate, (iii) any Subsidiary of any Borrower, or (iv) connection with Membership Customer Programs at Borrowers' applicable properties;

(e)     Investments by any Borrower to any Affiliate of Borrower as set forth in, and limited by, those items in the Budget; or

(f)     *provided* that no Event of Default shall have occurred and be continuing at the time of such Investment, additional Investments in the form of prepayments and deposits by the Borrowers or any of their respective Subsidiaries in an aggregate principal amount outstanding at any given time not to exceed $15,000,000 made in the ordinary course of business.

SECTION 7.2.4.   Restricted Payments.  The Borrowers will not, nor will they permit any of their respective Subsidiaries to, declare or pay or make, or agree to pay or make, directly or indirectly, any Restricted Payment, other than (i) any Restricted Payment by a Borrower to another Borrower, any Operating Lessee and/or any Management Agreement Affiliate or by any of their respective Subsidiaries to any Borrower, Operating Lessee and/or Management Agreement Affiliate, or (ii) any Restricted Payment to the extent permitted by the Budget.

SECTION 7.2.5.   Contingent Liabilities.  No Borrower shall directly or indirectly, create or become or remain liable with respect to any Contingent Liability, except:

(a)     the Borrower may become and remain liable with respect to Contingent Liabilities in respect of the Obligations; and

(b)     each Borrower may become and remain liable with respect to Contingent Liabilities in existence on the Petition Date guaranteeing Prepetition Indebtedness.

SECTION 7.2.6.   Chapter 11 Claims.  Other than with respect to the Mortgage Lender A/P Liens, the Mortgage Lender Superpriority Claim, the Permitted Liens (with respect to each such Lien, only to the extent, if any, that such Lien has priority over the DIP Liens under applicable law) and the Carve-Out, no Borrower shall incur, create, assume, suffer or permit any claim, Lien or encumbrance against it or any of its property or assets in any Chapter 11 Case that is *pari passu* with or senior in priority to (a) the claims of the Agent and the Lenders against any Borrower in respect of the Obligations hereunder, including, without limitation, the DIP Superpriority Claim, or (b) the DIP Liens, or apply to the Court for authority to do so.

SECTION 7.2.7.   Limitation on Repayments.  The Borrowers shall not (i) make any payment or prepayment on or redemption or acquisition for value (including,

without limitation, by way of depositing with the trustee with respect thereto money or securities before due for the purpose of paying when due) of any Prepetition Indebtedness or other pre-Petition Date obligations owing to any Person, (ii) pay any interest on any Prepetition Indebtedness of such Person (whether in cash, in kind, securities or otherwise), or (iii) make any payment or create or permit any Lien pursuant to any provision of the Bankruptcy Code, or apply to the Court for the authority to do any of the foregoing; provided that (a) the Borrowers may pay the allowed claim of the Mortgage Lender under the Mortgage Documents, subject to entry by the Bankruptcy Court of an order authorizing the Borrower to make such payment , (b) the Borrowers may pay any post-Petition Date expense incurred in the ordinary course of business including usual and customary post-Petition Date employee salaries and benefits; provided that any of the foregoing to the contrary notwithstanding, the Borrowers shall not implement or make any payments in respect of bonus, retention, severance or similar arrangements with respect to any of their respective officers, employees, directors or advisors, without the prior written consent of the Requisite Lenders, and (c) the Borrowers may make payments to such other claimants and in such amounts as may be consented to by the Requisite Lenders and approved by the Court.

SECTION 7.2.8.   Agreements.  The Borrowers shall not assume, reject, cancel, terminate, breach or modify (whether pursuant to Section 365 of the Bankruptcy Code, or any other applicable law), (i) any Prepetition Indebtedness, or (ii) any other agreement, contract, instrument or other document to which it is a party which assumption, rejection, cancellation, termination, breach or modification could reasonably be expected to result in a Material Adverse Effect.

SECTION 7.2.9.   Asset Dispositions, etc.  The Borrowers will not permit to occur any Disposition by a Borrower, or grant options, warrants or other rights with respect to any of the Collateral, in each case other than pursuant to and in accordance with the Loan Documents.

SECTION 7.2.10. Negative Pledges, Restrictive Agreements, etc.  The Borrowers will not enter into any agreement (excluding this Agreement or any other Loan Document) prohibiting the creation or assumption of any Lien upon the Collateral in favor of the Agent or the Lenders, or the ability of any Borrower to amend or otherwise modify this Agreement or any other Loan Document.

SECTION 7.2.11. Intentionally Omitted.

SECTION 7.2.12. Consolidations and Mergers.  No Borrower shall, and no Borrower shall permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except upon not less than five (5) Business Days prior written notice to Agent, provided that no notice shall be required in the event (a) any Subsidiary of a Borrower merges with, or dissolves or liquidates into, a Borrower, a wholly-owned Subsidiary of a Borrower, a Management Agreement Affiliate or an

Operating Lessee and (b) any Borrower merges or consolidates into another Borrower, a Management Agreement Affiliate or an Operating Lessee.

SECTION 7.2.13. <u>Plan Requirement</u>. The Borrowers agree that they shall not propose, sponsor, file, solicit acceptances of, seek confirmation of, support, endorse or consent to any plan or reorganization or liquidation in the Chapter 11 Cases that is not conditioned upon the irrevocable and indefeasible payment in full in cash of all of the Obligations on the effective date of such plan.

# ARTICLE VIII

# EVENTS OF DEFAULT

SECTION 8.1. <u>Event of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, the occurrence of any one or more of the following events, regardless of the reason therefore, shall constitute an "<u>Event of Default</u>" hereunder:

SECTION 8.1.1. <u>Bankruptcy Proceeding Events</u>. The occurrence of any of the following events shall constitute an Event of Default: (i) dismissal of any of the Chapter 11 Cases; (ii) the appointment of a trustee or an examiner with expanded powers under section 1104(c) of the Bankruptcy Code in any of the Chapter 11 Cases; (iii) the entry of an order granting relief from the automatic stay under section 362 of the Bankruptcy Code to the holder or holders of any security interest or Lien in any material part of the Collateral to permit the pursuit of any transfer or other remedy against any assets of the Borrowers, or the granting of relief from the automatic stay on a material portion of the Borrower's property (including any stay relief granted to the Mortgage Lender or any mezzanine lender); (iv) the filing of a plan of reorganization or liquidation by the Borrowers that does not provide for the indefeasible payment in full of the Obligations upon confirmation; (v) entry of any order of the Court dismissing any of the Chapter 11 Cases unless and until the Obligations are paid in cash, in full; (vi) actual invalidity of any Liens or security interests securing the Obligations; (vii) any challenge or objection by the Borrowers as to the extent, amount, validity, priority, perfection, enforceability or non-avoidability of (1) the Liens and security interests securing the Obligations or (2) the claims of the Agent and/or the Lenders in respect of the Obligations, including, without limitation, the DIP Superpriority Claim; (viii) any attempt by any Borrower to invalidate, avoid or otherwise impair the Liens or security interests of the Agent or the Lenders, or the Obligations; (ix) failure by any of the Borrowers to comply with any term of this Agreement or the Interim Borrowing Order or the Final Borrowing Order; (x) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (xi) the entry of an order amending, modifying, staying, revoking or reversing the Interim Borrowing Order or the Final Borrowing Order without the express written consent of the Lenders; (xii) the granting or existence of any other security interest, Lien, claim, or encumbrance that is *pari passu* with or senior to (1) the

claims of the Lenders in respect of the Obligations, including, without limitation, the DIP Superpriority Claim or (2) the DIP Liens (other than the Liens permitted under <u>Section 7.1.7</u>); (xiii) granting of any Liens in the Chapter 11 Cases other than the Liens permitted under <u>Section 7.2.2</u>; (xiv) any sale of other disposition of all or substantially all of the Collateral; (xv) any representation, warranty or certification by or on behalf of any Borrower or any of its Subsidiaries made or deemed made herein, in any other Loan Document, or which is contained in any certificate, document or financial or other written statement by any such Person, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; and (xvi) the Final Borrowing Order is not entered immediately following the expiration of the Interim Borrowing Order and in any event within 45 days after the Closing Date.

SECTION 8.1.2.    <u>Judgments</u>.  One or more judgments or orders as to post-Petition Date liability or debt shall be entered against any Borrower involving (i) in any individual case an amount in excess of $2,000,000 or (ii) in the aggregate at any time an amount in excess of $5,000,000 (in either case not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) and either (a) enforcement proceedings shall have been commenced and shall be continuing by any creditor upon such judgment or orders or (b) there shall be any period of 30 consecutive days during which a stay of enforcement of such judgments or orders, by reason of a pending appeal or otherwise, shall not be in effect; or (iii) any non-monetary judgment or order with respect to a post-Petition Date event shall be rendered against any Borrower which could reasonably be expected to result in a Material Adverse Effect and there shall be any period of 30 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

SECTION 8.2.    <u>Action Upon the Occurrence of an Event of Default</u>.

SECTION 8.2.1.    Upon the occurrence and during the continuance of any Event of Default, the Agent may and, upon written request of Requisite Lenders, shall (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court) by written notice to the Administrative Borrower and subject to the Interim Borrowing Order or the Final Borrowing Order, as applicable, declare (i) the unpaid principal amount of and accrued interest on the Loans and (ii) all other Obligations, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrowers, and the same shall forthwith become immediately due and payable, and the obligation of each Lender to make any Loan, and the Commitment, shall thereupon terminate; provided, however, that upon the occurrence of any of the events specified in clauses (ii), (v) and (x) of <u>Section 8.1.1</u> or upon the occurrence of the Termination Date, the unpaid principal amount of and accrued interest on the Loans and all other Obligations shall immediately become due and payable without further act of Agent or any Lender.

SECTION 8.2.2.   In the event of a termination of the Commitment (other than (x) upon March 17, 2012 (the "Calendar Maturity Date"), (y) due to the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (z) due to the effective date of a sale of all or substantially all of the assets or businesses of the Borrowers in accordance with section 363 of the Bankruptcy Code or otherwise (including a sale resulting from a credit bid of any claim or claims against the Borrowers)), the Lenders shall deposit into a segregated account (the "Reserve Account") an amount equal to the lesser of (i) $5,000,000 and (ii) the remaining undrawn Commitment as of the time of termination.  Until the Calendar Maturity Date, the Borrowers may draw from time to time on the Reserve Account to pay monthly interest at the non-default rate due under the Mortgage Loan Agreement and the Servicer's Fees and Expense Reimbursement (as such term is defined in the Cash Collateral Order referred to in Section 5.1(d)) as such amounts become due, to the extent that the Borrowers lack sufficient Cash and Cash Equivalents to pay such amounts (the "Permitted Reserve Funds Uses").  At least one (1) Business Day prior to the date of each draw from the Reserve Account, the Administrative Borrower shall deliver to Agent a written request for funds from the Reserve Account (a "Reserve Draw Request") which shall (i) set forth the amount of the funds to be drawn from the Reserve Account, (ii) include a calculation, in  reasonable detail, demonstrating the requirement for such funds and (iii) include a certification by all Borrowers as to the accuracy of such calculation. Delivery of the Reserve Draw Request shall constitute a covenant by the Borrowers that the funds being drawn will be utilized solely for Permitted Reserve Funds Uses.  Each Reserve Draw Request shall be a Loan Document and all amounts drawn from the Reserve Account shall become part of the Obligations to the same extent as if they were advanced to Borrowers prior to termination, and shall accrue interest at the interest rate set forth in Section 3.2.2).  Funds in the Reserve Account shall remain the sole property of the Lenders, and shall not become property of the Borrowers, their estates or any party claiming by or through any of them.  Upon the Calendar Maturity Date, any amounts remaining in the Reserve Account shall be released to the Agent for the benefit of the Lenders.

SECTION 8.2.3.   Further upon the occurrence and during the continuance of any Event of Default, the Agent may, subject to the Interim Borrowing Order or the Final Borrowing Order, as applicable, (i) exercise all rights and remedies of the Agent set forth in any of the Loan Documents, in addition to all rights and remedies allowed by the United States and any state thereof, including, but not limited to, the UCC, and (ii) revoke the Borrowers' rights to use Cash Collateral in which the Agent has an interest; provided, however, that, any other provision of this Agreement or any other Loan Document to the contrary notwithstanding, with respect to the foregoing, the Agent shall give the Administrative Borrower, counsel to any Committee, the U.S. Trustee, the Mortgage Lender, GIC and MetLife five (5) Business Days prior written notice (a "Default Notice") (which Default Notice shall be delivered by facsimile, electronic transmission or overnight courier) of the occurrence of such Event of Default and exercise and enforcement of the Agent's rights and remedies with respect to the Collateral and shall file a copy of such notice with the clerk of the Court concurrently

therewith.  Neither the Agent nor the Lenders shall have any obligation of any kind to make a motion or application to the Court to exercise their rights and remedies set forth or referred to in this Agreement or in the other Loan Documents.  The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

SECTION 8.2.4.   The Borrowers waive, (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by the Agent or the Lenders on which the Borrowers may in any way be liable and hereby ratify and confirm whatever the Agent and the Lenders may lawfully do in this regard, (ii) subject to the notice provisions of the preceding paragraph, all rights to notice and hearing prior to the Agent's taking possession or control of, or to the Agent or the Lenders reply, attachment or levy upon, the Collateral, or any bond or security which might be required by any court prior to allowing the Agent or the Lenders to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal and exemption laws.  The Borrowers acknowledge they have been advised by counsel of their choice with respect to the effect of the foregoing waivers and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

ARTICLE IX
THE AGENT; ETC.

SECTION 9.1.     Appointment of Agent.  Each Lender hereby irrevocably appoints each Agent as its agent and authorizes each Agent to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.  Without limiting the generality of the foregoing, each Agent is hereby expressly authorized to (i) execute any and all documents (including releases and subordination agreements) with respect to the Collateral and the rights of the secured parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Loan Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Requisite Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.  For the avoidance of doubt, all acts permitted to be taken by each Agent hereunder shall be taken by the co-Agents acting together and shall at all times be at the direction of the Requisite Lenders.

SECTION 9.2.     Agents' Rights.  The institutions serving as Agent hereunder shall have the same rights and powers in their respective capacities as Lenders as any other Lender, and each Agent may exercise the same as though it were not an Agent, and each such institution and its Affiliates may accept deposits from, lend money to and generally engage in

any kind of business with Borrowers or any Subsidiary or other affiliate thereof as if it were not an Agent hereunder. Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall either Agent be liable for the failure to disclose, any information relating to the Borrowers or any of the Subsidiaries that is communicated to or obtained by either bank serving as Agent or any of its affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1) or in the absence of its own gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by the Borrowers or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article V or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Agent.

SECTION 9.3.    Reliance.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 9.4.    Sub-Agents.  Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent.

SECTION 9.5.     Resignation of Agent.  Subject to the appointment and acceptance of a successor Agent as provided below, any Agent may resign at any time by notifying the Lenders and the Borrowers. Upon any such resignation, the Requisite Lenders shall have the right, in consultation with the Borrowers, to appoint a successor. If no successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent. If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Requisite Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Requisite Lenders appoint a successor Agent.  Upon the acceptance of its appointment as the Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrowers to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 10.5 and Section 10.6 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

SECTION 9.6.     Independent Analysis.  Each Lender acknowledges that it has, independently and without reliance upon either Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon either Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

ARTICLE X

MISCELLANEOUS PROVISIONS

SECTION 10.1.   Waivers, Amendments, etc.

SECTION 10.1.1. Unless otherwise expressly provided in this Agreement, no amendment or modification of any provision of this Agreement or any of the other Loan Documents shall be effective, and no waiver of any provision of this Agreement or of any of the other Loan Documents, or consent to any departure by any Borrower therefrom, shall be effective unless such amendment, modification, waiver or consent is in writing signed by the Requisite Lenders and the Agent and, in the case of an amendment, signed by the Administrative Borrower; provided, that, subject to Section 10.1.2, no amendment, modification, waiver or consent shall, without the consent of each

Lender affected thereby, (a) increase the amount of any Lender's Commitment Amount or extend the time of any obligation of any Lender to make Loans, (b) extend the originally scheduled time or times of payment of the principal of any Loan or other Obligation or the time or times for payment of interest or fees on any Loan, (c) reduce the rate of interest or fees payable on any Loan (other than as a result of waiving the applicability of any post-default increases in interest rates), (d) reduce the principal amount of any Loan or other Obligation, (e) release any Borrower from its Obligations, subordinate the DIP Liens, release all or any portion of the Collateral or permit or effect any assignment of any of the Borrowers' rights or Obligations hereunder or (f) amend the provisions of this <u>Section 10.1</u>, <u>Section 10.13</u> or the percentage set forth in the definition of Requisite Lenders.  No failure or delay on the part of any Agent or Lender in exercising any power or right under this Agreement or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or consent by the Lenders under this Agreement or under any other Loan Document shall, except as may be otherwise stated in such waiver or consent, be applicable to subsequent transactions.  No waiver or consent hereunder shall require any similar or dissimilar waiver or consent thereafter to be granted hereunder.

SECTION 10.1.2.

(a)     Any proposed amendment, modification or waiver shall be requested in writing by the Administrative Borrower (each, an "<u>Amendment Request</u>") and shall hereinafter be referred to as a "<u>Subject Amendment</u>", and collectively, the "<u>Subject Amendments</u>".  Each Lender has five (5) days from receipt of the Amendment Request to consent to any Subject Amendment.

The foregoing and <u>Section 10.1.1</u> notwithstanding, any amendment, modification, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lenders among themselves, and that does not affect the rights or obligations of Borrowers, shall not require consent by, or the agreement of, the Borrowers.

(b)     In the event that a Lender (a "<u>Non-Consenting Lender</u>") does not agree to a Subject Amendment, and one or more Lenders holding an aggregate of not less than 50% of the total outstanding Loans and unused Commitments have consented to such Subject Amendment (each, a "<u>Consenting Lender</u>"), then upon receipt of notice by the Administrative Borrower of the failure to obtain consent from a Non-Consenting Lender ("<u>Non-Consent Notice</u>"), one or more Consenting Lender(s) holding not less than 25.5% of the total outstanding Loans and unused Commitments may provide written notice (the "<u>Initial Notice</u>"), with a copy to the Agent and the Administrative Borrower, to the Non-Consenting Lender(s) within five (5) Business Days after receipt of the Non-Consent Notice, requesting that the Non-Consenting Lender(s) either (i) agree to the Subject Amendment within five (5) Business Days following the receipt of the Initial

Notice, or (ii) sell all of its/their rights and obligations hereunder (including, without limitation, any outstanding Loans and Commitments) to the Consenting Lender(s) that provided such Initial Notice.  If a Non-Consenting Lender fails to act in accordance with clause (b)(i), then such Non-Consenting Lender and such Consenting Lender(s) shall enter into a Standard Form Assignment Agreement issued by the LSTA (the "LSTA Assignment Form") for the sale of all of the Obligations owing to, and the undrawn Commitments of, such Non-Consenting Lender to such Consenting Lender(s).  Delivery of an Initial Notice shall constitute an irrevocable offer by the Consenting Lenders signatory thereto to purchase all of the Obligations owing to the Non-Consenting Lender in accordance with this Section 10.1.2. The purchase price payable to such Non-Consenting Lender shall equal the full amount of all Obligations owed to such Non-Consenting Lender as of the date of the Assignment and Acceptance, and shall be paid in cash via wire transfer of immediately available funds to an account designated by such Non-Consenting Lender in writing.

On the date the LSTA Assignment Form is executed and delivered pursuant to this clause (b), (x) such Non-Consenting Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 4.1, Section 7.1.2, Section 10.5 and Section 10.6 in respect of matters which occurred prior to the date of the LSTA Assignment Form and (y) the Associated Agent (if any) of the Non-Consenting Lender shall resign as Agent in accordance with Section 9.5; provided that, there shall at all times be at least one Agent acting on behalf of the Lenders; and provided further that, notwithstanding anything to the contrary contained in Section 9.5, the Lenders shall not appoint a successor Agent to replace such resigning Associated Agent.  With respect to such resignation, the Associated Agent shall have concurrently received, in cash, all amounts then due and owing to the Associated Agent hereunder or under any other Loan Document (in its capacity as Agent only); provided that, upon such Associated Agent's resignation, such Associated Agent shall cease to be an Agent but shall continue to be entitled to the benefits of Section 4.1, Section 7.1.2, Article IX, Section 10.5 and Section 10.6 for matters which occurred prior to the date the Associated Agent resigned.

Any notice provided pursuant to this Section 10.1.2 shall be provided pursuant to Section 10.4 hereof.

SECTION 10.2.    Intentionally Omitted.

SECTION 10.3.    No Discharge; Survival of Claims.  The Borrowers agree that (a) the Obligations shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in the Chapter 11 Cases, the Borrowers hereby agreeing to waive such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code, (b) unless and until the Obligations are irrevocably and indefeasibly repaid in full in cash and the Commitment irrevocably has been terminated, the rights, benefits and protections afforded to the Agent and the Lenders pursuant to the Borrowing Orders and under this Agreement, and any actions taken pursuant thereto, shall survive the entry of any order that may be entered by the Court (i) confirming any plan of reorganization or liquidation in the Chapter 11 Cases, (ii) converting any

of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases, (iv) withdrawing the reference of the Chapter 11 Cases from the Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in the Court, and the terms and provisions of the Interim Borrowing Order or the Final Borrowing Order, as applicable, and the Loan Documents shall continue in full force and effect notwithstanding the entry of such order, and, without limiting the generality of the foregoing, the DIP Superpriority Claim and the DIP Liens shall not be affected in any manner or to any degree by the entry of any such order.  The Debtors shall not propose or support any plan or reorganization or liquidation in the Chapter 11 Cases that is not conditioned upon the indefeasible payment in full in cash of all of the Obligations on the effective date of such plan.

SECTION 10.4.    <u>Notices</u>.  All notices and other communications provided to any party hereto under this Agreement or any other Loan Document shall be in writing or by facsimile (or other electronic transmission, including electronic mail) and addressed, delivered or transmitted to such party at its address, e-mail address or facsimile number set forth below or at such other address, e-mail address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile or other electronic transmission, shall be deemed given when transmitted.  Any notice under <u>Section 7.1.4</u> hereof must be given by facsimile (or other electronic transmission) in addition to any other method of notice selected as specified herein.

If to any Borrower, including the Administrative Borrower:

MSR Resort Golf Course, LLC
c/o Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York  10022
Attn:  Leonard Klingbaum, Esq.
E-mail:  Leonard.Klingbaum@kirkland.com


If to the Lenders:

c/o Allen & Overy LLP
1221 Avenue of the Americas
New York, NY, 10020
Attn:  Thomas Abbondante
E-mail:  Thomas.Abbondante@allenovery.com

c/o Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attn:  Richard F. Casher
E-mail:  RCasher@kasowitz.com

If to the Agent:

c/o Allen & Overy LLP
1221 Avenue of the Americas
New York, NY, 10020
Attn: Thomas Abbondante
E-mail: Thomas.Abbondante@allenovery.com

c/o Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attn: Richard F. Casher
E-mail: RCasher@kasowitz.com

SECTION 10.5.  Payment of Costs and Expenses.  The Borrowers agree to pay on demand all reasonable and documented out-of-pocket fees and expenses of the Agent and the Lenders (solely in their capacity as such), including, without limitation, reasonable attorneys' fees, associated with or relating to (a) this Agreement and the transactions contemplated hereby and the preparation, negotiation, execution, delivery and consummation of this Agreement and the other Loan Documents, the DIP Financing Motion, the Borrowing Orders and the transactions and court proceedings related thereto (the foregoing fees and expenses, including, without limitation, reasonable fees of the Lenders' and the Agent's respective counsel, the "DIP Financing Origination Fees"); provided, however, that (i) fees of counsel to Five Mile Capital II Equity Pooling LLC as a Lender, and Five Mile Capital II CNL DIP Administrative Agent LLC, as co-Agent, respectively, that constitute DIP Financing Origination Fees shall be subject to a cap of $150,000, and (ii) fees of counsel to Paulson Real Estate Recovery Fund LP as a Lender, and Paulson Real Estate Recovery Fund LP, as co-Agent, respectively, that constitute DIP Financing Origination Fees shall be subject to a cap of $300,000 (b) any amendment, waiver, modification or restatement with respect thereto (including the reasonable fees, disbursements and other charges of the Agent's and the Lenders' respective counsel), (c) (x) the protection, exercise and enforcement of the rights and remedies of the Agent and/or the Lenders under this Agreement and the other Loan Documents, the Interim Borrowing Order, the Final Borrowing Order and applicable law, and (y) the assertion, prosecution, protection, exercise and enforcement of the Lenders' rights and remedies in the Chapter 11 Cases and (d) accounting, collateral examination, monitoring, inspection, appraisal and financial advisory functions relating to this Agreement and the other Loan Documents, the Collateral and the assertion, prosecution, protection, exercise and enforcement of the rights and remedies of the Agent and the Lenders relating thereto, in each case whether or not the transactions contemplated hereby are consummated,  provided, however, that the payment or reimbursement by the Borrower of the fees, costs and expenses of any accounting, collateral examination, monitoring, inspection, appraisal and financial advisor of any Agent pursuant to this clause (d) (excluding legal counsel to each Agent, but including any such advisors retained by such legal counsel), shall not be required unless the hiring of such advisor has been consented to by both Agents or by the Requisite Lenders.

SECTION 10.6.    Indemnification.  The Agent and the Lenders (and their respective Affiliates and each of their respective officers, directors, partners, trustees, employees, shareholders, advisors, agents, attorneys and controlling persons and each of their respective heirs, successors and assigns) will have no liability for, and will be indemnified and held harmless by the Borrowers, jointly and severally, against, any loss, liability, fees (including attorneys' fees), cost or expense incurred in any matter relating to or arising out of, in connection with or as a result of the financing contemplated hereby or the use or the proposed use of proceeds hereof, including without limitation, (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Loan, (ii) the Borrowing Orders and the proceedings related thereto, (iii) any commitment letter, proposal letter or term sheet with any Person or any contractual obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Borrower or any Affiliate of any of them in connection with any of the foregoing, (iv) with respect to any act, event or transaction related, contemplated in or attendant to any of the foregoing, any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such indemnitee, any holders of securities or creditors (and including attorneys' fees in any case), whether or not any such indemnitee is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law, including common law, equity, contract, tort or otherwise or (v) any other act, event or transaction related, contemplated in or attendant to any of the foregoing, (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by final non-appealable judgment of a court of competent jurisdiction).  For the avoidance of doubt, the indemnity in this Section 10.6 does not apply to any claims relating to Prepetition Indebtedness owed to Five Mile Capital SPE B LLC.

SECTION 10.7.    Survival.  The obligations of the Borrowers under Section 4.1, Section 7.1.2, Section 10.5 and Section 10.6 shall in each case survive any termination of this Agreement, the payment in full of all Obligations and the termination of the Commitment.  The representations and warranties made by the Borrowers in this Agreement and in each other Loan Document shall survive the execution and delivery of this Agreement and each such other Loan Document.

SECTION 10.8.    Severability.  Any provision of this Agreement or any other Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.9.    Headings.  The various headings of this Agreement and of each other Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or such other Loan Document or any provisions hereof or thereof.

SECTION 10.10.  <u>Execution in Counterparts, etc</u>.  This Agreement may be executed by the parties hereto in several counterparts (including facsimile or electronic counterparts), each of which shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

SECTION 10.11.  <u>Governing Law; Entire Agreement</u>.  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE FEDERAL LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE) WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.  This Agreement and the other Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter hereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.12.  <u>Successors and Assigns</u>.  This Agreement and the other Loan Documents, all DIP Liens, the DIP Superpriority Claim and all other rights, benefits and privileges created hereby or pursuant hereto or pursuant to any other Loan Documents shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the Agent, the Lenders, the Borrowers, the Debtors, the Committee, if any, and their respective successors and assigns (including any trustee, estate representative or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the respective estates of the Debtors) whether in the Chapter 11 Cases, in any Successor Cases, or upon dismissal of the Chapter 11 Cases or any Successor Cases, and shall inure to the benefit of the Agent, the Lenders and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Borrowers may assign or transfer its rights, benefits, obligations or duties hereunder.

SECTION 10.13.  <u>Assignment of Lenders' Rights</u>.

SECTION 10.13.1.

(a)  Each Lender may assign its Loans and Commitments to one or more Eligible Assignees in accordance with the terms set forth below:

(i)  each partial assignment shall be in a minimum principal amount of five million Dollars ($5,000,000) and shall be an integral multiple of one hundred thousand Dollars ($100,000) except that such limitation shall not apply to a partial assignment by any Lender to another Lender;

(ii)  except as required pursuant to <u>Section 10.1.2</u>, no Original Lender (collectively with its Affiliates) may assign Loans and/or undrawn Commitments that in the aggregate exceed twenty-four and a half percent (24.5%) of the total amount of the Loans and undrawn Commitments; and

(iii)    the parties to each such assignment shall execute and deliver to the Agent, for its acceptance and recording in the Register, an Assignment and Acceptance, together with a processing and recordation fee of five thousand Dollars ($5,000) (unless such fee is waived by the Agent).

So long as no Event of Default shall have occurred and be continuing, any assignment proposed pursuant to this clause (a) to any Eligible Assignee (other than a Lender or an Affiliate of the assigning Lender) shall be subject to the prior written consent of the Administrative Borrower (such consent not to be unreasonably withheld).

(b)    Anything to the contrary herein notwithstanding, any Lender may assign any or all of its rights and obligations under this Agreement to any of its Affiliates with notice to the Agent or the Administrative Borrower and shall not be subject to clause (a) hereof.  After giving effect to the assignment, such Affiliate will be subject to the provisions of this Section 10.13.1 as if it were an Original Lender.

(c)    Upon the execution, delivery, acceptance of the Assignment and Acceptance and recording thereof in the Register, from and after the effective date specified therein (which effective date shall not be any earlier than the date on which the Agent so accepts and records the Assignment and Acceptance in the Register), (x) the Eligible Assignee thereunder shall, in addition to any rights and obligations hereunder held by it immediately prior to such effective date, if any, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and shall, to the fullest extent permitted by law, have the same rights and benefits hereunder as if it were an original Lender hereunder and (y) the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of such assigning Lender's rights and obligations under this Agreement, the assigning Lender shall cease to be a party hereto).

(d)    Upon an assignment by an Original Lender pursuant to clause (a) of this Section 10.13.1 (other than  solely to one or more Affiliates of such Original Lender), the Associated Agent (if any) of such Original Lender shall, concurrent with the execution and delivery of the Assignment and Acceptance, resign as Agent in accordance with Section 9.5; provided that, notwithstanding anything to the contrary contained in Section 9.5, the Lenders shall not appoint a successor Agent to replace such Associated Agent.  If the resignation of the Associated Agent would result in there being no Agent under this Agreement, the Requisite Lenders shall have the right to appoint a third party nationally recognized banking institution as the Agent, and such appointed Agent shall be subject to Section 9.5 hereof as if it were a successor Agent.  With respect to such resignation, the Associated Agent shall have concurrently received, in cash, all amounts then due and owing to the Associated Agent hereunder or under any other Loan Document (in its capacity as Agent only); provided that upon such Associated Agent's resignation, such Associated Agent shall cease to be an Agent but shall continue to be

entitled to the benefits of <u>Section 4.1</u>, <u>Section 7.1.2</u>, <u>Article IX</u>, <u>Section 10.5</u> and <u>Section 10.6</u> for matters which occurred prior to the date the Associated Agent resigned.

SECTION 10.13.2.  The Agent, acting for this purpose as an agent of the Borrowers, shall maintain a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive and the Borrowers, the Administrative Borrower, the Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Administrative Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

SECTION 10.14.  <u>Forum Selection and Consent to Jurisdiction</u>.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY LENDER OR ANY BORROWER SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR, IF SUCH COURT DENIES JURISDICTION, THEN IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. THE BORROWERS HEREBY EXPRESSLY AND IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREE TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.  THE BORROWERS FURTHER IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK.  THE BORROWERS HEREBY EXPRESSLY AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH ANY OF THEM MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OF FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWERS HEREBY IRREVOCABLY WAIVE SUCH IMMUNITY IN RESPECT OF THEIR RESPECTIVE OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

SECTION 10.15.  Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF THE LENDERS OR THE BORROWERS.  THE BORROWERS ACKNOWLEDGE AND AGREE THAT THEY HAVE RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH EACH IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDERS ENTERING INTO THIS AGREEMENT AND EACH SUCH OTHER LOAN DOCUMENT.

SECTION 10.16.  MSR Resort Golf Course as the Agent for the Borrowers.  Each Borrower hereby irrevocably appoints MSR Resort Golf Course, LLC, a Delaware limited liability company, as the borrowing agent and attorney-in-fact for all the Borrowers (the "Administrative Borrower") which appointment shall remain in full force and effect unless and until the Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide the Agent with all notices with respect to the Loan, (b) to provide and receive all other notices and instructions under any Loan Document and (c) to take such action as the Administrative Borrower deems appropriate on its behalf with respect to the Loan and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement or any Loan Document.  The Agent may regard any notice or other communication pursuant to any Loan Document from the Administrative Borrower as a notice or communication from all of the Borrowers, unless the context clearly indicates otherwise.

SECTION 10.17.  Ratable Sharing.  The Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment, by realization upon security, through the exercise of any right of set-off or banker's Lien, by counterclaim or cross action or by the enforcement of any right under the Loan Documents or otherwise, or as adequate protection of a deposit treated as Cash Collateral, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to that Lender hereunder or under the other Loan Documents (collectively, the "Aggregate Amounts Due" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (i) notify the Agent and each other Lender of the receipt of such payment and (ii) apply a portion of such payment to purchase participations without recourse except as provided below (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment in the Aggregate Amounts Due to the other Lenders) so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in proportion to the Aggregate Amounts Due to them; provided that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender pursuant to an order of the court or otherwise, those

purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Each Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's Lien, set-off or counterclaim with respect to any and all monies owing by such Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

[<em>Signature Pages Follow</em>]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**<u>AGENTS</u>**:

Paulson Real Estate Recovery Fund, LP
a Delaware limited partnership

By: Paulson Property Management, LLC
a Delaware limited liability company,
its manager


By: _____
Name:
Title:


Five Mile Capital II CNL DIP Administrative Agent LLC,
a Delaware limited liability company

By: Five Mile Capital II Equity Pooling LLC,
a Delaware limited liability company,
its sole member

By: Five Mile Capital Partners LLC,
a Delaware limited liability company,
its manager


By: _____
Name:
Title:

**LENDERS**:


Paulson Real Estate Recovery Fund, LP
a Delaware limited partnership

By: Paulson Property Management, LLC
a Delaware limited liability company,
its manager


By: _____
Name:
Title:


Five Mile Capital II Equity Pooling LLC,
a Delaware limited liability company

By: Five Mile Capital Partners LLC,
a Delaware limited liability company,
its manager


By: _____
Name:
Title:

**<u>ADMINISTRATIVE BORROWER</u>**:

**MSR RESORT GOLF COURSE LLC**
a Delaware limited liability company

By:     MSR RESORT SPE GP, LLC,
        a Delaware limited liability company

        By: _____
        Name:
        Title:

**<u>BORROWERS</u>**:

**MSR RESORT HOTEL, LP**,
a Delaware limited partnership

By:     MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR RESORT SILVER PROPERTIES, LP**,
a Delaware limited partnership

By:     MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR GRAND WAILEA RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR BILTMORE RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR DESERT RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR CLAREMONT RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR RESORT GOLF COURSE LLC**,
a Delaware limited liability company

By:    MSR RESORT SPE GP, LLC,
       a Delaware limited liability company

       By: _____
       Name:
       Title:

<u>**EXHIBIT A**</u>

**[FORM OF BORROWING REQUEST]**

**BORROWING REQUEST**

[Date]

PAULSON REAL ESTATE RECOVERY FUND LP and
FIVE MILE CAPITAL II CNL DIP ADMINISTRATIVE AGENT LLC
as the Agent under the below-referenced Credit Agreement

c/o Allen & Overy LLP
1221 Avenue of the Americas
New York, NY, 10020
Attn:  Thomas Abbondante
E-mail:  Thomas.Abbondante@allenovery.com

c/o Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attn:  Richard F. Casher
E-mail:  RCasher@kasowitz.com

Ladies and Gentlemen:

Reference is made to that certain Secured, Superpriority Debtor-in-Possession Credit Agreement, dated as of March 17, 2011 (the "<u>Credit Agreement</u>"), among MSR Resort Golf Course, LLC, a Delaware limited liability company, as the Administrative Borrower, (the "<u>Administrative Borrower</u>"), each borrower signatory thereto (collectively, "<u>Borrower</u>"), the lenders signatory thereto (collectively, the "<u>Lenders</u>"), and Paulson Real Estate Recovery Fund LP ("<u>Paulson</u>") and Five Mile Capital II CNL DIP Administrative Agent LLC ("<u>Five Mile</u>"), as co-agents for the Lenders (Paulson and Five Mile, in such capacity, including their respective successors and assigns, collectively, the "<u>Agent</u>").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

The Administrative Borrower hereby gives you notice pursuant to Section 2.3 of the Credit Amendment that the undersigned hereby requests a Loan under the Credit Agreement (the "<u>Requested Borrowing</u>"), and in that connection sets forth below the information relating to the Requested Borrowing.

The aggregate principal amount of the Requested Borrowing is $_____.[1]

Although the Borrowers will be jointly and severally liable for the Loan made pursuant to the

---

[1] See Section 2.3 of the Credit Agreement for minimum amounts and integral multiples of Borrowings.

Requested Borrowing, it is requested that the principal amount of the Requested Borrowing be disbursed to each Borrower listed below in the amount set forth opposite such Borrower's name below:

Name of Borrower:                                    Amount of Disbursement to that Borrower:

_____          $_____

_____          $_____

The proceeds of the Requested Borrowing will be used for the Borrowers' lawful and permitted purposes, consistent with the terms and conditions of the Credit Agreement.

The undersigned hereby irrevocably requests that the Requested Borrowing be made on _____ __, 201__, (the "Borrowing Date").

The respective proceeds of the Requested Borrowing should be made available to the above named Borrowers by wire transfer to the following accounts:

[insert wire transfer details]

The undersigned hereby certifies that:

(a)     both before and after giving effect to the Requested Borrowing, the representations and warranties of the Borrower set forth in each Loan Document are true and correct on and as of the Borrowing Date of the Requested Borrowing with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties are true and correct as of such earlier date);

(b)     both before and after giving effect to the Requested Borrowing, no Event of Default shall have occurred and be continuing and the Borrower is not in material violation of any law or governmental regulation or court order or decree; and

(c)     the other conditions set forth in Section 5.1(a), Section 5.1(c), Section 5.1(d), Section 5.2(a), Section 5.2(b), Section 5.3(a), Section 5.3(b) and Section 5.3(c) of the Credit Agreement applicable to the Requested Borrowing have been satisfied.

Very truly yours,

**MSR RESORT GOLF COURSE LLC**, a Delaware limited liability company**,** as Administrative Borrower for and on behalf of all the Borrowers

By: _____
Name:
Title:

## EXHIBIT B

**FORM OF INTERIM BORROWING ORDER**

[ATTACHED]

**EXHIBIT C**

**FORM OF NOTE**

[ATTACHED]

## PROMISSORY NOTE

$[●]

New York, New York
*[undated form]*

FOR VALUE RECEIVED, MSR RESORT HOTEL, LP, A DELAWARE LIMITED PARTNERSHIP, MSR RESORT SILVER PROPERTIES, LP, A DELAWARE LIMITED PARTNERSHIP, MSR GRAND WAILEA RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR BILTMORE RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR DESERT RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR CLAREMONT RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, and MSR RESORT GOLF COURSE LLC, A DELAWARE LIMITED LIABILITY COMPANY, each as debtor and debtor in possession under Chapter 11 of title 11 of the United States Code (together with their respective successors and assigns, collectively, the "Borrowers"), hereby, jointly and severally, unconditionally promise to pay to the order of _____ or its successors or registered assigns (the "Lender"), the aggregate unpaid principal amount of each Loan made by the Lender to the Borrowers pursuant to the Credit Agreement referred to below on the Maturity Date (as defined therein) or on such earlier date as may be required by the terms of the Credit Agreement. The Borrowers further promise to pay interest on the unpaid principal amount of each such Loan on the dates, at the rate and in the manner provided for in the Credit Agreement. All such payments of principal and interest shall be made in lawful money of the United States of America and in immediately available funds at the office specified from time to time by the Lender to the Administrative Borrower in accordance with the Credit Agreement, without set-off, defense or counterclaim.

This Promissory Note is one of the Notes referred to in the Secured, Superpriority Debtor-in-Possession Credit Agreement dated as of March 17, 2011 (as the same has been and may be modified and supplemented and in effect from time to time, the "Credit Agreement"), among MSR Resort Golf Course, LLC, a Delaware limited liability company, as Administrative Borrower, the Borrowers, the lenders party thereto, and Paulson Real Estate Recovery Fund LP and Five Mile Capital II CNL DIP Administrative Agent LLC, collectively, as Agent. Terms used but not otherwise defined herein have the respective meanings assigned to them in the Credit Agreement.

The Loans made in the aggregate principal amount of up to [$●] by the Lender and all repayments of the principal thereof, shall be recorded by the Lender and, prior to any transfer hereof, appropriate notations to evidence the foregoing information with respect to the Loans then outstanding shall be endorsed by the Lender on the schedule attached hereto, or on a continuation of such schedule attached to and made a part hereof, or in the Lender's own books and records; provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrowers hereunder or under the Credit Agreement or any other Loan Document. Absent manifest error, such notations shall be binding and conclusive

upon the Borrowers.

The obligations of each of the Borrowers hereunder shall be joint and several.

Reference is made to the Credit Agreement for provisions for the repayment and prepayment, the acceleration of the maturity and the limitations on the transferability of this Promissory Note.

Demand, presentment, protest and notice of nonpayment and protest or notice of any kind are hereby waived by the Borrowers.

Whenever in this Promissory Note reference is made to the Lender or the Borrowers, such reference shall be deemed to include, as applicable, a reference to their respective successors and permitted assigns. The provisions of this Promissory Note shall be binding upon and shall inure to the benefit of said successors and assigns. A Borrower's successors and assigns shall include, without limitation, a receiver or a trustee of or for that Borrower.

Failure or delay of the holder of this Promissory Note to enforce any provision of this Promissory Note shall not be deemed a waiver of any such provision, nor shall the holder of this Promissory Note be estopped from enforcing any such provision at a later time. Any waiver of any provision hereof must be in writing and signed by the holder of this Promissory Note.

The ownership of an interest in this Promissory Note shall be registered in the Register as a record of ownership maintained by the Agent, acting for this purpose as an agent of the Borrowers. Notwithstanding anything else in this Promissory Note to the contrary, the right to the principal of, and interest on, this Promissory Note may be transferred only in accordance with the terms and conditions set forth in the Credit Agreement and only if the transfer is registered in such Register. The entries in the Register shall be conclusive and the Borrowers, the Administrative Borrower, the Agent and the Lenders may treat each person whose name is recorded in the Register as the holder of this Promissory Note or an interest herein as the Lender hereunder for all purposes of this Promissory Note, the Credit Agreement and the other Loan Documents, notwithstanding notice to the contrary.

This Promissory Note shall be governed by, and construed in accordance with, the law of the State of New York.

For the avoidance of doubt, whether or not explicitly set forth in any particular provision of this Promissory Note, each undertaking, covenant and agreement of a Borrower under this Promissory Note shall be binding on, and shall be deemed an undertaking, covenant and agreement of, any trustee appointed under the Bankruptcy Code on behalf of such Borrower to the same extent as if references herein to such Borrower were references to such trustee acting on behalf of such Borrower.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each Borrower has caused this Promissory Note to be executed as of the day and year first written above.

**MSR RESORT HOTEL, LP**,
a Delaware limited partnership

By:     MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR RESORT SILVER PROPERTIES, LP**,
a Delaware limited partnership

By:     MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR GRAND WAILEA RESORT, LP**,
a Delaware limited partnership

By:     MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By: _____
        Name:
        Title:

**MSR BILTMORE RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By:  _____
        Name:
        Title:

**MSR DESERT RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP II, LLC,
        a Delaware limited liability company,
        its sole general partner

        By:  _____
        Name:
        Title:

**MSR CLAREMONT RESORT, LP**,
a Delaware limited partnership

By:    MSR RESORT SPE GP, LLC,
        a Delaware limited liability company,
        its sole general partner

        By:  _____
        Name:
        Title:

**MSR RESORT GOLF COURSE LLC**,
a Delaware limited liability company

By:    MSR RESORT SPE GP, LLC,
        a Delaware limited liability company

        By:  _____
        Name:
        Title:

Promissory Note (cont'd)

LOANS AND PAYMENTS OF PRINCIPAL

| Date | Outstanding Principal Amount of Loan | Applicable Interest Rate | Amount of Principal Prepaid or Repaid |
|------|--------------------------------------|--------------------------|----------------------------------------|
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |
|      |                                      |                          |                                        |

# EXHIBIT D

## FORM OF ASSIGNMENT AND ACCEPTANCE

[ATTACHED]

[FORM OF ASSIGNMENT AND ACCEPTANCE AGREEMENT]

## ASSIGNMENT AND ACCEPTANCE AGREEMENT

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("Assignment Agreement") is entered into as of _____ between _____ ("Assignor") and _____ ("Assignee"). Reference is made to the Agreement described in Annex I hereto (the "Credit Agreement"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

1. In accordance with the terms and conditions of Section 10.13.1 of the Credit Agreement, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents as of the date hereof with respect to the Obligations owing to the Assignor, and Assignor's portion of the Commitments, all to the extent specified on Annex I, which is attached hereto and by this reference made a part hereof.

2. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) it has power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to (i) any statements, representations or warranties made in or in connection with the Loan Documents, or (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its respective obligations under the Loan Documents or any other instrument or document furnished pursuant thereto, and (d) represents and warrants that the amount set forth as the Purchase Price on Annex I represents the amount owed by Borrowers to Assignor with respect to Assignor's share of the Loans assigned hereunder, as reflected on Assignor's books and records.

3. The Assignee (a) confirms that it has received copies of the Credit Agreement and the other Loan Documents, together with copies of the financial and other reporting information referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon the Assignor, the Agent or any Lender, based upon such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Loan Documents; (c) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (d) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender; and (f) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for

purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.

4.    Following the execution of this Assignment Agreement by the Assignor and Assignee, the Assignor will deliver this Assignment Agreement to the Agent for recording by the Agent.  The effective date of this Assignment (the "Settlement Date") shall be the later of (a) the date upon which all of the following conditions are met: (i) the execution and delivery hereof by the Assignor and the Assignee, (ii) so long as no Event of Default shall have occurred and was continuing as of the date of this Assignment Agreement, the acceptance and consent hereto by the Administrative Borrower, (iii) the acceptance and recording hereof in the Register by the Agent, and (iv) the receipt by the Agent for its sole and separate account a processing fee in the amount of $5,000 (if required by the Credit Agreement), or (b) the date specified in Annex I.

5.    As of the Settlement Date (a) the Assignee shall be a party to the Credit Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and have assumed all the obligations of a Lender thereunder and under the other Loan Documents and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents.

6.    Upon the Settlement Date, Assignee shall pay to Assignor the Purchase Price (as set forth in Annex I).  From and after the Settlement Date, the Agent shall make all payments that are due and payable to the holder of the interest assigned hereunder (including payments of principal, interest, fees and other amounts) to Assignor for amounts which have accrued up to but excluding the Settlement Date and to Assignee for amounts which have accrued from and after the Settlement Date.  On the Settlement Date, Assignor shall pay to Assignee an amount equal to the portion of any interest, fee, or any other charge that was paid to Assignor prior to the Settlement Date on account of the interest assigned hereunder and that are due and payable to Assignee with respect thereto, to the extent that such interest, fee or other charge relates to the period of time from and after the Settlement Date.

7.    This Assignment Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Assignment Agreement may be executed and delivered by telecopier or other electronic or facsimile transmission with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

8.    THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

[SIGNATURES FOLLOW]

75

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement and to be executed as of the first date written above.

[NAME OF ASSIGNOR]

as Assignor

By_____
  Name:
  Title:

[NAME OF ASSIGNEE]

as Assignee

By_____
  Name:
  Title:

[ACCEPTED THIS ____ DAY OF
_____

PAULSON REAL ESTATE RECOVERY FUND LP AND FIVE MILE CAPITAL II CNL DIP ADMINISTRATIVE AGENT LLC,
as the Agent

By_____
  Name:
  Title:

By_____
  Name:
  Title:

CONSENTED TO THIS _____ DAY OF
_____

MSR RESORT GOLF COURSE LLC,
a Delaware limited liability company,
as the Administrative Borrower

By_____
    Name:
    Title:

ANNEX FOR ASSIGNMENT AND ACCEPTANCE

ANNEX I

1.  Borrowers:  MSR RESORT HOTEL, LP, A DELAWARE LIMITED PARTNERSHIP, MSR RESORT SILVER PROPERTIES, LP, A DELAWARE LIMITED PARTNERSHIP, MSR GRAND WAILEA RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR BILTMORE RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR DESERT RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, MSR CLAREMONT RESORT, LP, A DELAWARE LIMITED PARTNERSHIP, and MSR RESORT GOLF COURSE LLC, A DELAWARE LIMITED LIABILITY COMPANY

2.  Name and Date of Credit Agreement:

    Secured, Superpriority Debtor-in-Possession Credit Agreement, dated as of March 17, 2011 (as amended, restated or otherwise modified from time to time, the "Credit Agreement"), among MSR Resort Golf Course, LLC, a Delaware limited liability company, as the Administrative Borrower, (the "Administrative Borrower"), each borrower signatory thereto (collectively, the "Borrower"), the lenders signatory thereto (collectively, and together with their respective successors and registered assigns, the "Lenders"), and Paulson Real Estate Recovery Fund LP ("Paulson") and Five Mile Capital II CNL DIP Administrative Agent LLC ("Five Mile"), as co-agents for the Lenders (Paulson and Five Mile, including their respective successors and assigns, collectively, the "Agent").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

3.  Date of Assignment Agreement:                        _____

4.  Amounts:[2]

    (A)     Assigned Amount of Commitment          $_____

    (B)     Assigned Amount of Loans               $_____

5.  Settlement Date:                                     _____

6.  Purchase Price                                 $_____

---

[2] See Section 10.13(a)(i) of the Credit Agreement for minimum amounts and integral multiples of partial assignments.

7.    Notice and Payment Instructions, etc.

       Assignee:                       Assignor:

       _____

       _____

## **SCHEDULE 1**

### **BORROWERS**

MSR RESORT HOTEL, LP, a Delaware limited partnership

MSR RESORT SILVER PROPERTIES, LP, a Delaware limited partnership

MSR GRAND WAILEA RESORT, LP, a Delaware limited partnership

MSR BILTMORE RESORT, LP, a Delaware limited partnership

MSR DESERT RESORT, LP, a Delaware limited partnership

MSR CLAREMONT RESORT, LP, a Delaware limited partnership

MSR RESORT GOLF COURSE LLC, a Delaware limited liability company

## SCHEDULE 2

## COMMITMENTS

| Lender | Commitment Amount | Percentage |
|---|---|---|
| Paulson Real Estate Recovery Fund LP | $15,000,000 | 50% |
| Five Mile Capital II Equity Pooling LLC | $15,000,000 | 50% |
| Total: | $30,000,000 | 100% |

NY:11001786.8

# SCHEDULE 6.6

# MATERIAL LITIGATION

## As of January 4, 2011

## ONGOING

### Doral

**Claimant:** CNL Resort Hotel, LP

**Owner/Defendant:** City of Doral

**Claim Description:** Department of Community Affairs filed a petition challenging Comprehensive Plan adopted by the City of Doral by Ordinance No. 2005-16 on April 26, 2006. On July 19, 2006, CNL filed a petition to intervene in the administrative appeal.

**Claim Amount:** Unspecified

**Additional Information:** A settlement agreement between the City of Doral, State of Florida and CNL (MS Resorts), including related entities, has been agreed to between the parties, and is being held in escrow pending final rezoning approval by the City of Doral. The City of Doral held a public hearing June 9, 2010, and voted in favor of the settlement. Based on the fact that the City of Doral, State of Florida and CNL (MSR Resorts) have reached an agreement the trial has been postponed indefinitely. The remaining steps involve rezoning of the subject parcels in accordance with the settlement terms, amendment of the Comprehensive Plan, and approval of the development guidelines for the Doral property. The entire process is scheduled for completion and final approval by the City in February 2011.

### Claremont

**Claimant:** CNL Hotels & Resorts, Inc.

**Owner/Defendant:** City of Oakland

**Claim Description:** Administrative Appeal of transfer taxes that the City of Oakland claims are due and owing as a result of the KSL transaction on April 2, 2004.

**Claim Amount:** $2,544,757.51

**Additional Information:** On July 28, 2006, the City of Oakland issued a final tax bill to CNL Hotels & Resorts, Inc. for transfer taxes due and owing as of April 2, 2004 for the Claremont in the amount of $1,594,959.52 plus penalties of $398,739.87 and interest of $551,058.12. The City has never formally put its theory of why transfer tax is due in writing, but presumably believes that CNL/KSL corporate

merger constituted a change in the ownership of real estate, thereby triggering the payment of transfer taxes. On December 7, 2006, CNL appealed the payment of the tax arguing that the merger did not trigger the payment of the taxes. On August 29, 2007 the City of Oakland requested information regarding CNL's FEIN number, which was provided. There has been no communication from the City of Oakland since August 2007.


**Claimant:** Jean Riker and Anna Allen

**Owner/Defendant:** MSR Claremont Resort, LP

**Claim Description:** Claimant Riker and Claimant Allen, who have restricted access, filed Complaints for multiple violations of the ADA law on February 20, 2009 and August 12, 2009, respectively.

**Claim Amount:** Unspecified

**Additional Information:** On November 23, 2010, the parties executed a Consent Decree specifying a detailed timeline for improvements totaling $1,552,660 to be made by no later than December 30, 2012.

## Arizona Biltmore Resort


**Claimant**: KerryWilliam Rose and Elizabeth Erene Evers-Rose

**Owner/Defendant**: MSR Biltmore Resort L.P.

**Claim Description:** In order to facilitate the Planned Unit Development (P U.D.) Ordinance for the Arizona Biltmore Resort, MSR Biltmore Resort L.P. executed a purchase agreement with the Claimant to purchase the Claimant's home. The agreement, entered into July 1, 2009, requires a closing date of January 8, 2011, and earnest money payments of $200,000 and $100,000 due by August 31, 2009 and August 1, 2010 respectively. The $200,000 earnest money payment was made timely and the $100,000 earnest money payment has not been made. The terms of the agreement values the purchase price of the Rose Unit at $1,500,000.

**Claim Amount:** Pending

**Additional Information:** Prior to August 1, 2010, discussions began to renegotiate the terms of the agreement including an extension of the closing date. The negotiation is on-going and to date a revised purchase agreement has not been finalized. On November 12, 2010, the Claimant filed a Summons and Complaint for Specific Performance of Contract seeking equitable relief in the form of the $100,000 earnest money payment due August 1, 2010, plus statutory interest of 10% per annum from August 2, 2010, until the date that the $100,000 is paid and an award of reasonable attorneys' fees and costs. The case, which has been removed to federal court, is not subject to the Uniform Rules of Procedure for Arbitration. A response has been filed and the defense to the lawsuit is currently under preparation. On December 10, 2010, a pre-trial scheduling conference was set for February 14, 2011, requiring all

parties to meet at least 21 days before the scheduling conference to facilitate possible settlement of the matter.

**Claimants:** The Arizona Biltmore Villas Condominium Association

**Owner/Defendant**: The Arizona Biltmore Hotel Master Association

**Claim Description:** On September 3. 2010, The Arizona Biltmore Hotel Villas Condominium Association filed a lawsuit against The Arizona Biltmore Hotel Master Association for control of a strip of land 50 feet north of the Salt River Project (SRP) canal for parking and landscaping.

**Claim Amount:** Unspecified

**Additional Information:** MSR Biltmore Resort LP represents 86% of the Arizona Biltmore Hotel Master Association membership. Arizona Biltmore Hotel Villas Condominium Association represents the remaining 14%. Given the sensitive relationship between the parties and possible conflicts of interest, the Arizona Biltmore Hotel Master Association created a Special Litigation Committee comprised of the non-Arizona Biltmore Hotel Villas Condominium Association members to oversee the litigation. The Special Litigation Committee has also hired counsel that is independent to both MSR Biltmore Resort LP and Arizona Biltmore Hotel Villas Condominium Association. A response has been filed and the litigation is underway.

## Grand Wailea

**Claimant:** Wadsworth

**Owner/Defendant**: KSL Grand Wailea Resort & Spa

**Claim Description:** In February 2009, Mr. Wadsworth and several other current employees of the Grand Wailea Resort and Spa filed a wage-hour lawsuit against the Hotel, its managers and owners, alleging violations of the Hawaii wage-hour statute asserting that the employees have not received the full portion of the banquet service charge fees in their tip pool distributions.

**Claim Amount:** Unspecified

**Additional Information:** For several months, the case was administratively closed pending a ruling from the Hawaii Supreme Court on another case as to whether the plaintiffs have standing to bring suit under the Hawaii statute. In April 2010, the Hawaii Supreme Court held that the employees did have standing but needed to amend their complaint to assert additional allegations related to competition as required by the statute. On June 28, 2010, the plaintiffs amended their complaint. On July 20, 2010, we filed a motion to dismiss the Complaint on the basis that, as owners of the Hotel, we are not the employer of the employees, and have no liability under the statute.

On December 10, 2010, the Court granted in part and denied in part our motion to dismiss. In particular, the Court denied our motion to dismiss the owners, instead saying that such a motion should be brought at summary judgment. In addition, the Court granted the motion to dismiss with respect to the Hawaii consumer protection claim, leaving only state common law claims remaining. We will be answering the Complaint and engaging in discovery on Plaintiffs' state law claims.

## PENDING

### Claremont

**Claimant:** David E. Nelson and Barbara J. Nelson

**Owner/Defendants**: Amcord, Inc et al including Morgan Stanley & Co., Incorporated

**Claim Amount:** Not Specified

**Claim Description:** On October 20, 2010, Claimant filed a complex litigation complaint for personal injury – asbestos (negligence; strict liability; premise liability; and loss of consortium), alleging Claimant developed malignant mesothelioma as a result of exposure to asbestos from defendant's products/products designed to be used in association with asbestos products.

**Additional Information:** Morgan Stanley & Co., Incorporated individually and as successor-in-interest to Claremont Hotel Corporation, Claremont Hotel Corporation and Claremont Resort & Spa Management Co. individually and as successor-in-interest to Claremont Hotel Corporation are incorrectly named as defendants. Morgan Stanley & Co has no direct ownership interest in the Claremont. The other two named defendants entities are either unknown or not active. To date we have not been formally served.