James H.M. Sprayregen, P.C.
Paul M. Basta
Eric F. Leon
Atif Khawaja
Ryan Morettini
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MSR RESORT GOLF COURSE LLC, *et al.*,[1] | ) | Case No. 11-10372 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**THE DEBTORS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE DEBTORS' MOTION FOR THE ENTRY OF AN ORDER AUTHORIZING REJECTION OF THE HILTON MANAGEMENT AGREEMENTS**

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include:  MSR Resort Golf Course LLC (7388); MSR Biltmore Resort, LP (5736); MSR Claremont Resort, LP (5787); MSR Desert Resort, LP (5850); MSR Grand Wailea Resort, LP (5708); MSR Resort Ancillary Tenant, LLC (9698); MSR Resort Biltmore Real Estate, Inc. (8464); MSR Resort Desert Real Estate, Inc. (9265); MSR Resort Hotel, LP (5558); MSR Resort Intermediate Mezz GP, LLC (3864); MSR Resort Intermediate Mezz LLC (7342); MSR Resort Intermediate Mezz, LP (3865); MSR Resort Intermediate MREP, LLC (9703); MSR Resort Lodging Tenant, LLC (9699); MSR Resort REP, LLC (9708); MSR Resort Senior Mezz GP, LLC (9969); MSR Resort Senior Mezz LLC (7348); MSR Resort Senior Mezz, LP (9971); MSR Resort Senior MREP, LLC (9707); MSR Resort Silver Properties, LP (5674); MSR Resort SPE GP II LLC (5611); MSR Resort SPE GP LLC (7349); MSR Resort Sub Intermediate Mezz GP, LLC (1186); MSR Resort Sub Intermediate Mezz LLC (7341); MSR Resort Sub Intermediate Mezz, LP (1187); MSR Resort Sub Intermediate MREP, LLC (9701); MSR Resort Sub Senior Mezz GP, LLC (9966); MSR Resort Sub Senior Mezz LLC (7347); MSR Resort Sub Senior Mezz, LP (9968); and MSR Resort Sub Senior MREP, LLC (9705).  The location of the debtors' service address is:  c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10020.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

PROPOSED FINDINGS OF FACT ...........................................................................................2

I.      HILTON'S ACQUISITION AND MANAGEMENT OF THE RESORTS. .....................2

II.     THE MATERIAL TERMS OF THE MANAGEMENT AGREEMENTS. ........................6

III.    HILTON WILL EARN $13,183,918,819 IN FUTURE FEES UNDER THE
        HMAS. .................................................................................................................10
        A.      The Debtors' Financial Projections For The Resorts And Hilton's
                Financial Projections For The Resorts Are Not Materially Different...................11
        B.      The Proper Inflation Factor Is 2.5%. ..................................................................15

IV.     HILTON'S PROFITS MUST BE OFFSET BY THE CORPORATE
        OVERHEAD EXPENSES THAT IT WILL NO LONGER INCUR
        FOLLOWING REJECTION. ...............................................................................15
        A.      Multiple Sources Confirm That The 1% Corporate Overhead Fee Should
                Be Treated As A Reimbursable Expense That Hilton Avoids Upon
                Rejection. ...............................................................................................18
        B.      Hilton Offers No Evidentiary Support For Its Claim That It Should Profit
                From The Corporate Overhead Fee. ..................................................................20

V.      HILTON'S LOST PROFITS MUST BE DISCOUNTED TO REFLECT THE
        SPECIFIC RISKS OF THE HMAS AT THE TIME THEY WERE EXECUTED..........24
        A.      Mr. Cline's Proposed Discount Rate Ignores Hilton's Expectations And
                The Risks Of The HMAs. ..................................................................................26
        B.      Mr. Hennessey's Proposed 7.5% Discount Rate Lacks Evidentiary Support
                And Again Ignores The Risks Of The HMAs. ....................................................34

VI.     HILTON'S DAMAGES MUST ACCOUNT FOR THE LIKELY
        TERMINATION OF THE GRAND WAILEA HMA IN 2014. ......................................36

VII.    HILTON'S LOST PROFITS SHOULD BE REDUCED TO REFLECT THE
        AMOUNT BY WHICH IT IS SUBSIDIZING ITS GROUP SERVICES
        EXPENSE. ..............................................................................................................37

VIII.   HILTON'S DAMAGES BROKEN DOWN BY INDIVIDUAL RESORT.....................37
        A.      The Grand Wailea. ..........................................................................................37
        B.      The Arizona Biltmore. .....................................................................................38
        C.      The La Quinta. .................................................................................................38

i

IX.   THERE IS NO EVIDENCE OF ANY DAMAGE TO THE
      WALDORF=ASTORIA BRAND. ....................................................................39
      A.   There Is No Evidence That The Waldorf=Astoria Brand Will Be Damaged
           By Rejection Of The HMAs. ....................................................................39
      B.   Mr. Cline's "Development Forecast" Analysis Is Speculative And
           Unreliable..................................................................................................42
      C.   Mr. Cline's Brand Impairment Analysis Is Speculative And Unreliable. ............44
      D.   Hilton's Alleged Brand Damages Were Not Reasonably Foreseeable At
           The Time Hilton Acquired The HMAs...................................................46

X.    HILTON CANNOT PROFIT FROM ITS $38 MILLION CLAIM FOR
      REIMBURSEMENT OF GROUP SERVICES IT WILL NO LONGER
      PROVIDE. .......................................................................................................48
      A.   The HMAs Do Not Permit Recovery Of Any Group Services Expenses
           Following Termination. .............................................................................49
      B.   Hilton Will Replace Any Lost Group Services Expenses By 2014......................50
      C.   Hilton Cannot Recover Damages For Loss Of Group Services Expenses
           Because It Can Choose To Avoid Incurring Any Such Damages. ........................51
      D.   Hilton's Claim That It Is Entitled To "Key Money" Damages Is
           Speculative And Unsubstantiated. .............................................................54

XI.   HILTON IS NOT ENTITLED TO $10 MILLION IN DAMAGES FOR A $250
      MILLION GRAND WAILEA EXPANSION THAT IS NEITHER REQUIRED
      NOR CONTEMPLATED....................................................................................56
      A.   The Debtors Have No Obligation To Undertake The Grand Wailea
           Expansion...................................................................................................56
      B.   Hilton's Contemplated Expansion Would Negatively Impact The Grand
           Wailea's Performance.................................................................................58

PROPOSED CONCLUSIONS OF LAW ..........................................................................60

I.    HILTON IS LIMITED TO THE CONTRACT DAMAGES IT CAN PROVE
      WITH REASONABLE CERTAINTY. ................................................................60

II.   HILTON CAN ONLY RECOVER DAMAGES OF $46,232,939 FOR THE
      DEBTORS' REJECTION OF THE HMAS. .........................................................62

III.  HILTON MUST OFFSET THE CORPORATE OVERHEAD EXPENSES THAT
      IT WILL NO LONGER INCUR FOLLOWING REJECTION. ............................63

IV.   THE DEBTORS' DISCOUNT RATE IS CORRECTLY DETERMINED
      UNDER APPLICABLE LAW. ............................................................................66

V.    HILTON'S DAMAGES MUST ACCOUNT FOR PAYMENTS IT WOULD
      MAKE IF IT CONTINUED TO PERFORM. ......................................................68

VI.   HILTON IS NOT ENTITLED TO ANY BRAND DAMAGES....................................69

VII.    HILTON IS NOT ENTITLED TO ANY FURTHER REIMBURSEMENT FOR
THE GROUP SERVICES EXPENSE. ............................................................................... 70

VIII.    HILTON IS ENTITLED TO NO DAMAGES FOR THE GRAND WAILEA
EXPANSION, WHICH IS NEITHER REQUIRED NOR CONTEMPLATED BY
THE GRAND WAILEA HMA. ........................................................................................ 72

CONCLUSION ............................................................................................................................. 73

APPENDIX A ............................................................................................................................... 74

APPENDIX B ............................................................................................................................... 79

APPENDIX C ............................................................................................................................... 82

APPENDIX D ............................................................................................................................... 85

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*,
 839 P.2d 10 (Haw. 1992) ............................................... 63

*Armored Grp., LLC v. Supreme Corp.*,
 No. CV09-414, 2010 WL 4736312 (D. Ariz. Nov. 16, 2010) ......................................... 65

*Armstrong v. Lassen Lumber & Box Co.*,
 269 P. 453 (Cal. 1928) ............................................... 63

*Avery v. Fredericksen & Westbrook*,
 154 P.2d 41 (Cal. Ct. App. 1944) ..................................... 65

*Blackburn v. Goettel-Blanton*,
 898 F.2d 95 (9th Cir. 1990) ........................................... 61

*Bouygues Telecom, S.A. v. Tekelec*,
 No. 4:05-CV-78-FL, 2007 WL 4699237 (E.D.N.C. Feb. 5, 2007).................................. 69

*Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*,
 221 Cal. Rptr. 171 (Ct. App. 1985) .......................................... 63, 72

*DeVore Const. v. Tirapelli*,
 No. C059240, 2009 WL 3246415 (Cal. Ct. App. Oct. 9, 2009) ...................................... 63

*Dillon Real Estate Co. v. Am. Nat. Ins. Co.*,
 No. CV-08-01508, 2010 WL 4682455 (D. Ariz. Nov. 10, 2010).............................. 61, 70

*Electro Lock, Inc. v. Core Indus., Inc.*,
 No. B13436, 2002 WL 1057468 (Cal Ct. App. May 28, 2002)....................................... 62

*Enyart v. Transamerica Ins. Co.*,
 985 P.2d 556 (Ariz. Ct. App.  1998)............................................... 61

*Francis v. Lee Enters.*,
 971 P.2d 707 (Haw. 1999) ............................................... 70

*Greenwich S.F., LLC v. Wong*,
 118 Cal. Rptr. 3d 531 (Ct. App. 2010).............................................. 72

*In re Chemtura Corp.*,
 448 B.R. 635 (Bankr. S.D.N.Y. 2011)............................................. 67

*In re Greater Se. Cmty. Hosp. Corp. I*,
 No. 02-02250, 2008 WL 2037592 (Bankr. D.D.C. May 12, 2008)................................ 66

*In re M Waikiki LLC*,
    No. 11-02371, 2012 WL 2062421 (D. Haw. June 7, 2012)............................ 66, 67, 68, 69

*In re Mirant Corp.*,
    332 B.R. 139 (Bankr. N.D. Tex. 2005)............................................................ 67

*In re Onecast Media, Inc.*,
    439 F.3d 558 (9th Cir. 2006) ........................................................................ 60

*In re Rock & Republic Enters.*,
    No. 10-11728, 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011) ............. 71

*In re Rudaw/Empirical Software Prods. Ltd.*,
    83 B.R. 241 (Bankr. S.D.N.Y. 1988)............................................................. 60

*In re Tobacco Cases I*,
    111 Cal. Rptr. 3d 313 (Ct. App. 2010)........................................................... 64

*In re WorldCom, Inc.*,
    361 B.R. 675 (Bankr. S.D.N.Y. 2007)........................................................... 60

*Indu Craft, Inc. v. Bank of Baroda*,
    47 F.3d 490 (2d Cir. 1995)............................................................................ 69

*Jones v. Johnson*,
    41 Haw. 389 (1956) ....................................................................................... 62

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
    102 P.3d 257 (Cal. 2004)............................................................................... 61

*Life Investors Ins. Co. of Am. v. Horizon Res. Bethany, Ltd.*,
    898 P.2d 478 (Ariz. Ct. App. 1995)............................................................... 71

*Lucente v. Int'l Bus. Machs. Corp.*,
    146 F. Supp. 2d 298 (S.D.N.Y. 2001)........................................................... 62

*Luquetta v. Regents of the Univ. of Cal.*,
    No. A128882, 2012 WL 1499040 (Cal. Ct. App. Apr. 30, 2012) ................... 62

*Martin v. U.S.*,
    649 F.2d 701 (9th Cir. 1981) ........................................................................ 61

*McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*,
    829 P.2d 1253 (Ariz. Ct. App. 1992)............................................................. 70

*McDevitt v. Guenther*,
    522 F. Supp. 2d 1272 (D. Haw. 2007)........................................................... 70

*N. Am. Specialty Ins. Co. v. Myers*,
    111 F.3d 1273 (6th Cir. 1997) ...................................................................... 64

*Olson v. Nieman's, Ltd.*
  579 N.W.2d 299 (Iowa 1998) ....................................................................... 66

*Omura v. Am. River Investors*,
  894 P.2d 113 (Haw. Ct. App. 1995) ....................................................... 61, 65

*Pet Food Express Ltd. v. Royal Canin USA, Inc.*,
  No. CV 09-01483, 2011 WL 1464874 (N.D. Cal. Apr. 18, 2011) ................... 68

*Pulawa v. GTE Hawaiian Tel*,
  143 P.3d 1205 (Haw. 2006) ...................................................................... 64

*S. Union Co. v. Sw. Gas Corp.*,
  180 F. Supp. 2d 1021 (D. Ariz. 2002) ......................................................... 70

*Saxton Commc'ns Grp., Ltd. v. Valassis Inserts, Inc.*,
  No. 93 Civ. 0388 (MBM), 1995 WL 679256 (S.D.N.Y. Nov. 15, 1995) ......... 69

*Scott v. Pac. Gas & Elec. Co.*,
  904 P.2d 834 (Cal. 1995) ..................................................................... 62, 71

*Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*,
  No. 02-8123, 2003 WL 22004888 (S.D.N.Y. Aug. 25, 2003) ......................... 71

*Tourelle Dev., Inc. v. Proffitt*,
  No. 1 CA-CV 09-0138, 2010 WL 1050316 (Ariz. Ct. App. Mar. 23, 2010) ....... 65

*Trustees of the PAMCAH-UA Local 675 Trust Funds v. Drain-N-Rooter Plumbing, Inc.*,
  Civ. No. 11-00565, 2012 WL 1203470 (D. Haw. Mar. 22, 2012) ................... 63

*Vestar Dev. II, LLC v. Gen. Dynamics Corp.*,
  249 F.3d 958 (9th Cir. 2001) ...................................................................... 72

*W W Leasing Unlimited v. Torok Exploration, Mining & Constr. Co.*,
  575 F.2d 1259 (9th Cir. 1978) ...................................................................... 72

*Walter v. Simmons*,
  818 P.2d 214 (Ariz. Ct. App. 1991) ....................................................... 61, 69

**Statutes**

U.S.C. § 365(g) ................................................................................................. 60

## PRELIMINARY STATEMENT

1.      The Debtors' post-trial briefing sets forth the record evidence and resulting legal conclusions regarding what plainly is the core issue -- and the Debtors contend the only real issue -- in this case: what are Hilton's lost profits under the specific terms of the three management agreements at issue.  The Debtors gave effect to the language of those agreements and arrived at a lost profits calculation of $46.2 million.  Hilton, by contrast, admittedly ignored the terms of the management agreements and, instead, engaged in speculation about what its damages might be if the agreements did not exist.

2.      The problem for Hilton, of course, is that the management agreements do exist and clearly define what damages were -- and were not -- within the contemplation of the parties. In direct contravention of those agreements, Hilton proffers a lost profits analysis that:  (1) assumes capital expenditures of more than twice the amount required under the agreements; (2) treats corporate overhead as a profit center notwithstanding that the agreements specifically define it as a reimbursement; (3) ignores the risk of early termination under the performance tests; and (4) seeks to profit from group service expense payments that the agreements specifically provide must be allocated by Hilton without profit.  What is more, while repeatedly acknowledging the "iconic" status of these world-class, luxury resorts, Hilton's lost profits claim is fundamentally premised on equating them, erroneously, with the less-complex roadside, limited-service motels that are the cornerstone of Hilton's portfolio.

3.      Hilton's additional claims for damages not grounded in the agreements --  related to the Waldorf=Astoria brand and the possible Grand Wailea Expansion -- likewise are premised upon wishful speculation directly contradicted by the evidence at trial.  Indeed, while Hilton speculates that dozens of hotels will leave, or refuse to join the Waldorf=Astoria brand as a result of rejection of the management agreements, there was no evidence at trial of this happening.

And while Hilton speculates about damages from an expansion of the Grand Wailea, there was no evidence at trial that this expansion will ever occur.

4.    Governing law does not allow for damages based upon speculation, let alone speculation fundamentally at odds with the terms of the management agreements.  As such, Hilton's damages analysis should be rejected as unreliable, and the Debtors' analysis adopted.

## **PROPOSED FINDINGS OF FACT**

## I.    **HILTON'S ACQUISITION AND MANAGEMENT OF THE RESORTS.**

5.    This dispute traces back to late 2005, when Hilton explored the acquisition of hotel management agreements for three iconic resorts -- the Arizona Biltmore Resort & Spa, the Grand Wailea Resort Hotel & Spa, and the La Quinta Resort & Club (collectively, the "Resorts").[2]  (Middleton 6/27 Tr. 119:19-24; Jacobs 6/29 Tr. 371:2-5.)

6.    Mr. Ted Middleton was Hilton's lead negotiator in acquiring management rights for the Resorts.  (Middleton 6/27 Tr. 100:21-101:9 (explaining that he was the "lead negotiator," "negotiated the contracts with KSL, and had interaction with the owner CNL regarding the deal also," and that "the nuts and bolts of it, I was the main guy.").)

7.    In acquiring management rights, Hilton negotiated certain changes from the pre-existing management agreements for these Resorts.  (Middleton 6/27 Tr. 140:19-24 (Q: "And in acquiring these contracts, Hilton chose to negotiate some is [sic] of the points from the existing contracts, correct?" A: "We tried to negotiate several points because -- for economic reasons, for change of brand reasons.  But we also tried very is [sic] hard to limit the number of items that we negotiated.").)

---

[2]    The term "Hilton" includes 90210 Management Company, LLC and Waldorf=Astoria Management, LLC.

8.      Hilton exercised its business judgment in choosing which terms from the pre-existing contracts to negotiate.  (Middleton 6/27 Tr. 140:25-141:9 (Q: "And in deciding, I guess, which of the items Hilton chose to negotiate, that was Hilton's business judgment that prevailed there.  You advised Hilton as to what it should negotiate and what not to, correct?"  A: "I did, in conjunction with Mr. Heart, who I mentioned previously I reported to."  Q: "Okay.  And that's like any negotiation.  You pick the points you want to argue and those are the ones that you then raise with the other side, correct?"  A: "Yes, sir."); *see also* Cline 7/3 Tr. 884:18-20 (Q: "So Hilton did not just wholesale adopt the management agreements that KSL had, correct?" A: "No, they didn't.").)

9.      As Mr. Middleton explained "there was a bag of items.  And I recall, as we were negotiating this, we had a list of -- of open issues.  It included things like the guarantee.  It included conversion costs.  It included the -- increasing the group services fee.  So it was a bag of items, and there was horse-trading."  (Middleton 6/27 Tr. 142:2-6.)

10.     For example, Hilton renegotiated the number of years that the management agreements would remain in effect, increasing the term from ten to twenty years. (Middleton 6/27 Tr. 141:10-15 (Q: "Now one of the things that Hilton negotiated was the term of the contract, correct?" A: "Yes, sir." Q: "You mentioned it went from a ten-year term to a twenty-year term, correct?" A: "Yes, sir.").)  Hilton paid consideration in order to extend the term of the management agreements.  (Middleton 6/27 Tr. 141:16-21.)

11.     On January 13, 2006, Hilton acquired rights to manage the Resorts by executing hotel management agreements for each of the Resorts.  (WAX 25 at 8; DX 1 at 3; DX 2 at 3; DX 3 at 3; *see also* JX 1-3, collectively, "the HMAs").[3]  The terms of those contracts govern.

---

[3]    The Debtors' list of exhibits admitted into evidence is attached hereto as Appendix A.

(Middleton 6/27 Tr. 142:14-16 (Q. "Any terms that Hilton didn't like, it is [sic] understands it's bound with today, correct?"  A. "Yes, sir.").)

12.     Hilton recognized that it was not acquiring management rights at a discounted price.  (Middleton 6/27 Tr. 146:14-19 (Q: "Now when Hilton entered the HMAs, Mr. Middleton, it knew it was paying a fair amount for the agreement, correct?" A: "Yes, sir." Q: "Hilton was not buying these contracts at a bargain basement price, fair to say?" A: "That's correct."); *see also* Middleton 6/27 Tr. 135:18-20.)

13.     According to a November 2005 investment memorandum that Hilton prepared in connection with the transaction (JX 4, "the 2005 Hilton Memo"), Hilton's then-present value of the future revenues from the HMAs was roughly $260 million.  (Middleton 6/27 Tr. 101:19-21, 135:14-17; JX 4 at Ex. 4.)

14.     Hilton's 2005 valuation of the HMAs was "predicated on realizing incentive fee[s]."  (JX 4 at 4, Ex. 4.)  Specifically, Hilton assumed that it would achieve incentive fees starting in 2006 and, the maximum contractual incentive fee starting in 2010.  (Middleton 6/27 Tr. 151:19-21, 152:8-11; *see also* JX 4 at 3.)  Hilton further assumed that it would continue to receive that three-percent maximum incentive fee stream through the end of the contractual term. (Middleton 6/27 Tr. 152:8-11 (Q: "And Hilton expected that it would continue to receive the maximum three percent incentive fee through the end of the contract term, correct?" A: "Yes, sir.").)  Of the $260 million valuation that Hilton placed on the HMAs, roughly $58 million (in 2005 dollars) consisted of incentive fees that Hilton expected to receive over the life of the HMAs.  (JX 4 at Ex. 4.)

4

15.     As it turned out, Hilton did not receive the incentive fee stream it anticipated, and it has not received any incentive fees since 2007.  (Jaskulske 6/27 Tr. 225:23-25 (Q: "[S]ince 2007, Hilton has not earned an incentive fee, right?" A: "We have not."); *see also* WAX 13.)

16.     Hilton's 2005 valuation was based on the full 30 year term, including the seven years from 2006-2012 for which it has already received payment. (*See* JX 4.)  To date, Hilton has received $79 million in fees under the HMAs.  (Jaskulske 6/27 Tr. 186:8-12; WAX 13.)

17.     Hilton's 2005 valuation was also predicated on revenue projections that have not come to pass:  during the six years Hilton has managed the Resorts, from the beginning of 2006 through the end of 2011, actual revenues at the Resorts were 30% below -- nearly one billion dollars less than -- what Hilton projected in 2005 ($2,299,756,000 in actual revenues versus $3,199,158,000 in projected revenues).  (DX 4 at 20.)

18.     Hilton's expert, Mr. Sean Hennessey, agreed that Hilton's performance to date is "well below" what Hilton actually expected when executing the HMAs.  (Hennessey 7/2 Tr. 578:23-579:3.)

19.     Because the Resorts have not performed at the level Hilton anticipated, Hilton had to fund a fifty million dollar performance guaranty to which it agreed when executing the HMAs.  (Middleton 6/27 Tr. 146:20-147:2 (agreeing that because Hilton's performance "has materially declined" Hilton paid the fifty million dollar guaranty).)

20.     Hilton admits that the HMAs do not permit it to recoup that fifty million dollar guaranty payment.  (*See* Middleton 6/27 Tr. 147:3-6.)  Nor do they permit Hilton to recover the capital expenditures and conversion costs it expended in connection with the HMAs.  (*Id.* at 148:16-18, 149:2-5.)

## II.    THE MATERIAL TERMS OF THE MANAGEMENT AGREEMENTS.

21.    Although specific terms vary for each resort, the HMAs contain similar provisions and a common compensation and reimbursement structure for Hilton.  (*See generally* JXs 1-3.)

22.    ***Management Fee (Article 5.1).***    Under the terms of the HMAs, "[i]n consideration of Manager's performance," Hilton receives a "Base Fee" and is also eligible for an "Incentive Fee."  (JXs 1-3 at Art. 5.1 ("In consideration of Manager's performance hereunder, Owner shall pay to Manager the Base Fee and the Incentive Fee … ."); DX 1 at 3-4; DX 2 at 4; DX 3 at 3-4; *see also* WAX 25 at 16.)[4]

23.    The HMAs define Hilton's Base Fee for management services as "an amount equal to two percent (2%) of Gross Revenues."  (JXs 1-3 at 2; Middleton 6/27 Tr. 103:9-11 (Q: "[W]hat is the base fee referenced under the hotel management agreement?" A: "Two percent."); *see also* Jacobs 6/29 Tr. 417:11-14; Cline 7/3 Tr. 883:22-23.)  The Incentive Fee, meanwhile, is triggered if Hilton satisfies certain performance thresholds, which are based on resort profitability and the level of investment at the Resorts.  (JXs 1-3 at 5.)  Should Hilton satisfy these incentive thresholds, it is eligible to earn Incentive Fees of up to 3% of resort revenue. (JXs 1-3 at Art. 5.1.)

24.    As Hilton acknowledges, the "Base Fee" and the "Incentive Fee" alone comprise the "Management Fee" as defined by the HMAs. (Cline 7/3 Tr. 883:19-884:2; Jaskulske 6/27 Tr. 226:18-20; *see also* JXs 1-3 at 6.)

25.    ***Group Services Expense (Article 5.2).***    Section 5.2 of the HMAs provides for Hilton to receive reimbursement for Group Services Expenses in an amount up to 2% of each of the Resorts' revenues.  (JXs 1-3 at Art. 5.2.)

---

[4]    All capitalized terms not defined herein shall have the meanings ascribed to them in the HMAs.

26.     The Group Services Expenses are used to fund marketing, advertising, reservations and other promotional services that Hilton provides in managing the Resorts.  (*See* Jaskulske 6/27 Tr. 179:17-25 (Q: "What is the purpose of the group services expense under these contracts; what's it intended to pay for?" A: "My understanding is that it replaces what we would typically call a program fee, which covers brand services like marketing and advertising.  And the second piece is Hilton HHonors.  When a guests [sic] stays at one of these resorts, there are folio points that they receive through the Hilton HHonors loyalty program, so that expense is also covered here.  And reservations expense.").)

27.     Although reimbursed at up to 2% of resort revenue, Hilton cannot "profit" from Group Services Expenses because the HMAs expressly provide that "[t]he cost of the Group Services shall be allocated among the Managed Hotels and other hotels … without profit or mark-up, in a fair and equitable manner as reasonably determined by Manager."  (JXs 1-3 at 5.2.)

28.     The HMAs specifically provide that the Group Services Expense will not be used to reimburse Hilton for its general corporate overhead:  "Manager acknowledges and agrees that the Group Services Expense shall not include any of the general corporate overhead of Manager or its Affiliates (e.g. compensation of the CEO, CFO, and President) or any profit to Manager or its Affiliates."  (JXs 1-3 at 5.2.)  Corporate overhead is addressed in the very next paragraph.

29.     ***Corporate Overhead Fee (Article 5.3).***  Pursuant to Article 5.3, Hilton receives a "Corporate Overhead Fee" for the corporate overhead expenses Hilton incurs in connection with managing the Resorts.  (JXs 1-3 at Art. 5.3.)  Specifically, Hilton is "reimbursed" for corporate overhead in an amount "equal to one percent (1%) of Gross Revenues (the 'Corporate Overhead Fee')."  (JXs 1-3 at Arts. 5.1, 5.3.)

7

30.     The HMAs limit Hilton's total compensation, as the "Management Fee **paid** to Manager and the Corporate Overhead Fee **reimbursed** to Manager shall not exceed six percent (6%) of Gross Revenues."[5]  (JXs 1-3 at Art. 5.1; *see also* Cline 7/3 Tr. 892:6-8 (Q: "Now, the contract also says that the manager shall be reimbursed for the corporate overhead fee, correct?" A: "That's the curiosity part.").)

31.     *Reimbursable Expenses (Article 5.4).*  In addition to the "Management Fee," Hilton is also reimbursed for specific expenses listed in Exhibit E to the HMAs.  These Reimbursable Expenses, which relate to providing Group Services, are capped at an annual aggregate total of $1.4 million for the three Resorts, which adjusts over time to account for inflation.  (JXs 1-3 at Art. 5.4(a).)  The HMAs state that these expenses shall be "reimbursed" to Hilton, just as they state that the Corporate Overhead Fee shall be "reimbursed to Manager." (*Compare* JXs 1-3 at Art. 5.4(a), *with* JXs 1-3 at Art. 5.1.)

32.     *Capital Expenditures (Article 6).*  The HMAs obligate the Debtors to contribute 4% of resort revenue to fund necessary capital expenditures, referred to as the "Reserve Fund" (or "FF&E") at each Resort.  (*See generally* JXs 1-3 at 9, Art. 6.)  To the extent that Hilton believes funding of additional capital expenditures is required, the HMAs require Hilton to seek approval from the Debtors.  (*See* JX 1-3 at Art. 6.4.)  Under the HMAs, Hilton cannot unilaterally compel the Debtors to invest in capital expenditures above and beyond 4% of resort revenue.  (*See* JX 1-3 at Art. 10.)  Should disagreement ensue over the necessity of specific capital expenditures, Hilton must put the Debtors on formal notice of a contractual conflict and pursue a dispute resolution procedure to resolve the matter.  (*See* JXs 1-3 at Art. 10.)

---

[5]    All emphasis has been added and all internal citations and quotations omitted unless noted otherwise.

33.     ***Term and Termination (Article 3).***  The HMAs have a remaining term of twelve years running through 2024.  (JXs 1-3 at Art. 3.1.)  The HMAs also include a ten-year extension option which, if exercised, could bring the maximum term to 2034.  (JXs 1-3 at Art. 3.1.)

34.     The HMAs give the Debtors the right to terminate the agreements "without payment of any additional fee or premium" based on Hilton's failure to satisfy certain performance requirements.  (JXs 1-3 at Art. 3.3.1.)  Specifically, the Debtors may terminate the HMAs without penalty if, after 2010 and for two consecutive Operating Years:

> (i) the GOP [Gross Operating Profit] achieved by the Hotel for each Operating Year is less than ninety percent (90%) of the GOP set forth in the approved Annual Operating Plan for such Operating Year ["Gross Operating Profit Test"], <u>and</u>

> (ii) the Annualized RevPAR [revenue per available room] for the Hotel for each of such Operating Years is less than ninety-five percent (95%) of the Annualized RevPAR for the Competitive Set for each respective Operating Year ["RevPAR Performance Test"].[6]

 (JX 2 and JX 3 at Art. 3.3.1 (the "Performance Test"); *see also* Jaskulske 6/27 Tr. 196:17-20; Bailey 7/2 Tr. 661:20-22; Cline 7/3 Tr. 907:5-8.)

35.     In the event that Hilton fails to satisfy the Performance Test and thus faces termination, it can make a "cure payment" to the Debtors to avoid termination and continue managing the Resorts.  (JXs 1-3 at Art. 3.3.4.)  Should Hilton elect to make a cure payment, it is not entitled under the HMAs to recover that payment from the Debtors.  (*Id.*)

36.     The HMAs also include a liquidated damages provision stating that if, after 2024, the Debtors sell the Resorts and terminate Hilton as Manager, Hilton is entitled to a "Termination Fee" in an amount "equal to the product of (a) the total Management Fee paid or payable to

---

[6]     The RevPAR index is a tool that allows for the comparison of a hotel's performance to the performance of its competitive set.  (Bailey 7/2 Tr. 628:13-16.)  Note that the RevPar Performance Test for the Arizona Biltmore is 85% of the Annualized RevPAR for the Competitive Set for each respective Operating Year.  (JX 1 at Art. 3.3.1.)

Manager for the twelve (12) month period prior to the effective date of termination … multiplied by (b) the applicable 'multiplier' set forth below." (JXs 1-3 at Art. 3.4.3.)

37.     Under this provision, Hilton is entitled to a multiple of its Management Fee -- meaning the 2% Base Fee and any Incentive Fee -- for the prior twelve months. (JXs 1-3 at Art. 3.4.3.) The specific multipliers applied to Hilton's 2011 Management Fee are as follows:

| JX 1-3 -- HMAs Article 3.4.3 -- Termination Fee Calculation | | |
| --- | --- | --- |
| Termination Occurring in the Following Periods | Multiple of Prior Year's Management Fee | Termination Fee Based on 2011 Management Fee |
| July 2024 through June 2026 | 5 | $35,400,195 |
| July 2026 through June 2028 | 4 | $28,320,156 |
| July 2028 through June 2030 | 3 | $21,240,117 |
| July 2030 through June 2032 | 2 | $14,160,078 |
| July 2032 through 2034 | 1 | $7,080,039 |

38.     Significantly, the parties expressly agreed that in the event of a termination on sale, Hilton would only be entitled to a 5 times multiple of the "Management Fee," defined as the Base Fee (2% of revenues) and Incentive Fee. (*See id.*) Critically, the liquidated damages provision of the HMAs does ***not*** provide for any damages based upon the Group Services Expense (2% of revenues) or the Corporate Overhead Fee (1% of revenues). (*See id.*)

## III.    HILTON WILL EARN $13,183,918,819 IN FUTURE FEES UNDER THE HMAS.

39.     The Debtors' expert, Mr. Thomas Morone, and Hilton's expert, Mr. Roger Cline, each calculated Hilton's rejection damages under the HMAs. (Morone 7/13 Tr. 1046:2-6, WAX 25 at 5.)

40.     To do so, each expert followed the same basic three-step process: (i) projecting the fees per year that Hilton would have earned under the HMAs; (ii) reducing the projected

profits by the expenses that Hilton would have incurred to earn those fees to arrive at Hilton's

profit margin; and (iii) applying a discount rate to determine the present value of Hilton's

projected net profits.  (*See* DXs 1-3; WAX 25.)

### A. The Debtors' Financial Projections For The Resorts And Hilton's Financial Projections For The Resorts Are Not Materially Different.

41.     As to the first step in the analysis, projecting future performance, Mr. Morone

reviewed the HMAs; analyzed the historical performance of each of the Resorts based on various

metrics (including average daily rate, revenue per available room ("RevPAR"), total revenue,

and Net Operating Income ("NOI")); analyzed local trends and industry data for the lodging

market within which each Resort is located; toured the Resorts; and interviewed persons

knowledgeable of the markets where the Resorts are located.  (*See* DXs 1-3 at 10.)  Mr. Morone

calculated that Hilton will earn $13,183,918,819 in future base fees and corporate overhead fees,

the latter of which, as discussed below, he appropriately deducted as an avoidable Hilton

expense.  (*See* Morone 7/13 Tr. 1060:22-1061:10 (explaining Slide 4 of DX 149).)

42.     Mr. Morone's and Mr. Cline's projections for the Resorts are, by Mr. Cline's own

admission, "quite close."  (Cline 7/3 Tr. 874:6-10 (Q: "Now am I correct that it turns out that

your financial projections for the resorts are not materially different than the ones arrived at by

Mr. Morone?" A: "No, to the contrary, they're quite close …."); *see also* Hilton Opening 6/27

Tr. 35:22-24 ("[A]ctually the two experts don't disagree a tremendous amount.  So I don't think

we're going to have a lot of argument over the projections.").)

43.     The only real difference between the Debtors' projections and Hilton's

projections is that Mr. Morone assumed the Resorts would receive the contractually-required 4%

FF&E capital expenditures under the HMAs (Morone 7/13 Tr. 1056:12-17), while Mr. Cline

assumed the Resorts would receive more than 8% of total revenues in capital expenditures over the next three years. (Cline 7/3 Tr. 874:11-15.)

44.     But the HMAs only require the Owner to invest capital expenditures equal to 4% of total revenues. (*See* JXs 1-3 at Art. 6; Cline 7/3 Tr. 877:18-20 (Q: "The contract requires the owners to set aside four percent of revenues for the FF&E reserve, right?" A: "That is correct."); Cline 7/3 Tr. 878:22-24 (Q: "And so the contractual requirement for the FF&E reserve is four percent, right? We can agree on that?" A: "We can definitely agree on that."); *see also* Jaskulske 6/27 Tr. 205:11-15.)

45.     Hilton admits that the Debtors have not committed to spending anything more. (Jaskulske 6/27 Tr. 242:1-4; Bailey 7/2 Tr. 711:23-25, 712:16-20, 712:12-15 (Q: "[T]he debtors and the owners, and their asset manager, they haven't told you that they were going to commit to anything beyond the four percent reserve fund?" A: "That's correct.").) Mr. Cline's assumption that double the FF&E requirement will be invested in the Resorts is therefore not supported by the evidence. Certainly, the Debtors have not agreed to fund capital expenditures at the 8% level Mr. Cline assumes. (Shumaker 7/13 Tr. 1020:5-8 (Q: "[H]ave the debtors agreed to spend eight percent on any capital expenditure budget plan over the next three years?" A: "No.").)

46.     To the extent Hilton believes capital expenditures beyond 4% of revenue are required, Hilton must formally request the additional expenditures under a process set forth in the HMAs. (JXs 1-3 at Art. 6.4; Cline 7/3 Tr. 878:1-5 (Q: "And if the manager wants any capital expenditures beyond the four percent FF&E, there's [a] process that the manager and the owners have to go through, right?" A: "If that need or request comes from the manager rather than the owner, yes.").) Specifically, Hilton must put the Debtors on notice of a conflict and pursue a contractual dispute resolution process to resolve the matter. (JXs 1-3 at Art. 10; Jaskulske 6/27

Tr. 240:15-18 (Q: "And the contract also lays out a very specific procedure for if there's a dispute over a major capital expenditure, and whether or not it's necessary, right?" A: "Yes."); *see also* Cline 7/3 Tr. 878:16-20; Bailey 7/2 Tr. 712:21-25.)

47.     Hilton has never invoked the HMAs' dispute resolution procedure to request additional capital expenditures from the Owner.  (Jaskulske 6/27 Tr. 240:24-241:2; Bailey 7/2 Tr. 713:1-4 (Q: "And as far as you know, Hilton has never commenced that dispute resolution process in connection with any outstanding capital expenditure need at the resort?" A: "That would be correct.").)

48.     That Hilton recently has requested capital expenditures above the contractually specified 4% FF&E Reserve is of little consequence.  It is not uncommon for managers to request more from owners than they receive.  (Bailey 7/2 Tr. 710:4-6 (Q: "It's not uncommon for managers to not get the full amount of capital expenditures that they request from an owner, right?" A: "No, that's not uncommon.").)  It is likewise "not uncommon for owners and managers like Hilton to disagree over what the amounts spent at the resort should be." (Jaskulske 6/27 Tr. 239:16-19.)  The question is whether additional capital expenditures make economic sense, and, here, when the Debtors previously spent more than 4% of revenue on capital expenditures, financial performance did not improve and "the results were a little disappointing."  (Shumaker 7/13 Tr. 1020:9-22.)

49.     Given that Hilton has never availed itself of the contractual procedures for obtaining capital expenditures beyond the contractually agreed-upon 4% FF&E Reserve, Mr. Morone correctly assumed that 4% of revenues would be spent on capital expenditures when calculating his projections.  (*See* DX 4 at 11-12.)

50.    Mr. Cline, by contrast, believes that what the HMAs require with respect to capital expenditures is "irrelevant."  (Cline 7/3 Tr. 881:21-25.)  Instead, he adopts Hilton's five-year capital plan for the Resorts and assumes that the Resorts will receive 8% of revenues in capital expenditures.  (Cline 7/3 Tr. 876:1-10 (Q: "Now, I know you testified on direct that you assumed eight percent in CapEx, right?" A: "I assumed the implementation of the five-year capital plan, which I believe is something like 8.2 percent or 8.3 percent of revenue." Q: "Correct.  And you based that assumption on your review of capital budgets prepared by Hilton, right?" A: "Prepared by -- I don't know whether they were prepared by Hilton.  Provided by Hilton, shall we say.").)

51.    Hilton believes that the Resorts warrant more than 4% of revenues in capital expenditures.  (*See e.g.*, Bailey 7/2 Tr. 724:13-18.)  But Hilton has not analyzed what performance at the Resorts would be if the Owners spent only the contractual minimum of 4% of revenues on capital expenditures.  (Cline 7/3 Tr. 876:18-20 & 877:2-4 (Q: "And you have not done a study showing what performance at the resorts would be if the owners spent only four percent on CAPEX as opposed to your assumed 8.2 percent, correct? … I didn't ask if you needed to or not.  I just asked if you did the analysis." A: "No, definitely not.").)

52.    Mr. Morone concluded that it would be economically irrational to undertake capital expenditures at the level proposed by Hilton.  (Morone 7/13 Tr. 1057:4-12.)  That is because Mr. Cline's performance projections, which assume capital expenditures of more than 8% of revenues, are not -- by all parties' accounts -- materially different than Mr. Morone's performance projections.  (*See* Findings of Fact ¶ 42, *supra*.)  Because the additional capital expenditures assumed by Mr. Cline are not projected to drive meaningful increases in the

Resorts' performance, there is no economically viable reason for the Debtors to undertake those additional capital expenditures.  (*See* Shumaker 7/13 Tr. 1019:9-23.)

53.     Hilton's lost profits claim is unjustifiably inflated by $5 million as a result of Mr. Cline's 8% capital expenditure assumption.  (*See* DX 4 at 11-13.)

**B.     The Proper Inflation Factor Is 2.5%.**

54.     Mr. Morone prepared projections of Base Fees for a ten-year period -- the longest period of time for which projections can be prepared without becoming speculative and unreliable.  (DXs 1-3 at 10 (any estimates of performance beyond a ten-year projection period "would be wholly speculative and unreliable, given the variability relating to the [Resorts'] historic performance, [their] age and condition, the [Comp Sets'] performance, the market performance, and the economy in general."); Morone 7/13 Tr. 1060:10-12.)

55.     Using his ten-year projections as a foundation, Mr. Morone then projected the Resorts' performance through the longest possible term of the HMAs -- 2034 -- using an inflation factor of 2.5%, the average of the annual national inflation rate between 2002 and 2011, through 2034.  (DXs 1-3 at 10.)

56.     An inflation factor of 2.5% is appropriate because it is based on guidance from the Bureau of Labor and Statistics.  (*See* Morone 7/13 Tr. 1060:16-21 (Q: "Why did you use two and a half percent as your inflation factor?" A: "It's a convention at our shop; it's what we've done since I got there.  But it's based on the Bureau of Labor and Statistics for ten and twenty years, respectively.  They say -- or they indicate 2.4 to 2.6 inflation; we use 2.5.").)

**IV.     HILTON'S PROFITS MUST BE OFFSET BY THE CORPORATE OVERHEAD EXPENSES THAT IT WILL NO LONGER INCUR FOLLOWING REJECTION.**

57.     With respect to the second step in the lost profits analysis, deducting expenses, the only major difference between the parties lies in how to treat the 1% Corporate Overhead Fee

defined by the HMAs.  The Debtors' expert, Mr. Morone, deducted the Corporate Overhead Fee

as a reimbursed expense (*see* DX 1 at 14-15; DX 2 at 19-20; DX 3 at 13-14), while Hilton's

expert, Mr. Cline, included the Corporate Overhead Fee in his calculation of lost profits and

deducted no expenses incurred by Hilton in managing the Resorts.  (*See* WAX 25 at 39.)

58.    The terms of the HMAs clearly establish that the Corporate Overhead Fee is a

reimbursement, rather than profit, to Hilton.  ***First***, Article 5.1 expressly states that the Corporate

Overhead Fee is "reimbursed" to the Manager.   (JXs. 1-3 at Art. 5.1 ("Management Fee paid to

Manager and the Corporate Overhead Fee ***reimbursed*** to Manager shall not exceed six percent

(6%) of Gross Revenues.").)

59.    ***Second***, the Corporate Overhead Fee is not included in the Management Fee that

Hilton receives for managing the Resorts.  Instead, the "Base Fee" and the "Incentive Fee" ***alone***

comprise the "Management Fee" as defined by the HMAs.  (JXs 1-3 at 6; Middleton 6/27 Tr.

159:9-11 (Q: "Well, we can agree that the management fee that's defined in the contract does not

include the corporate overhead fee."   A. "They are two separate line items, that's correct.");

Jacobs 6/29 Tr. 419:4-7 (Q: "We can agree that the definition of 'management fee' doesn't

include a corporate overhead fee, correct?" A: "The definition of 'management fee' in this

contract, yes, does not include the corporate overhead fee.").)

60.    ***Third,*** unlike the Management Fee, the Corporate Overhead Fee is never

described as "consideration" for Hilton's performance under the HMAs. (*See* JXs 1-3 at Art.

5.1.)

61.    ***Fourth***, the liquidated damages and termination provisions of the HMAs provide

further support for the conclusion that the Corporate Overhead Fee is an expense reimbursement.

As noted, under Article 3.4.3, in the event of a termination on sale, Hilton is entitled to a

multiple of its Management Fee -- meaning the Base Fee and any Incentive Fee -- for the prior twelve months, but is not entitled to any portion of the Corporate Overhead Fee.  (JXs 1-3 at Art. 3.4.3; Cline 7/3 Tr. 896:11-14 (Q: "And upon a termination of sale, Hilton does not receive damages based upon the one percent corporate overhead fee, correct?" A: "That is correct.").)

62.     Thus, as plainly written, the HMAs do not contemplate the Corporate Overhead Fee being incorporated into any damages Hilton may receive upon termination of the HMAs. Even Hilton's own expert admits as much.  (Cline 7/3 Tr. 896:15-18 (Q: "They only receive damages based upon a multiple of the base fee and any incentive fee, correct?"  A: "If you -- if you interpret the contract as given, not in the way that I did.").)

63.     Hilton does not dispute that, according to the express terms of the HMAs, the Corporate Overhead Fee is a reimbursement and not a profit center.  (Cline 7/3 Tr. 892:6-8; *see also* JXs 1-3 at Art. 5.1.)  Instead, Hilton takes the position that the HMAs' treatment of the Corporate Overhead Fee is merely a contractual anomaly that Hilton inherited when it acquired the HMAs from the Resorts' former manager, KSL.  (*See* Middleton 6/27 Tr. 103:12-21 (Q: "All right.  How did you, at the time, view that one percent fee?"  A: "Well, I -- I -- I think you have to step back in time, that basically we were buying an existing contract.  And this was the form of KSL that we assumed.  So why they did it that way, I don't know.  But I -- from our perspective, we viewed the corporate overhead fee to be analogous, the same, as the two percent base fee.  So when we looked at this contract, when we valued it, when we presented it to the board, in our view we were getting a three percent base fee.").)

64.     Hilton's expert Mr. Cline goes so far as to label the contractual provisions surrounding the Corporate Overhead Fee as "irrelevant."  (Cline 7/3 Tr. 888:7-10 (Q: "Does that refresh your recollection that you previously testified that what the HMAs say about the

17

corporate overhead fee is irrelevant?" A: "In this context, yes.").)  Unable to reconcile the plain
and unambiguous HMA terms with his damages analysis, Mr. Cline dismissed the Corporate
Overhead Fee as a "curiosity."  (Cline 7/3 Tr. 885:11-19.)

65.     Hilton concedes, however, that it had the opportunity to renegotiate terms of the
HMAs before it executed them; and, yet, Hilton did not renegotiate the "Corporate Overhead
Fee" provision.  (Middleton 6/27 Tr. 142:10-13 (Q: "Now when the negotiation was done, Hilton
took the contract as it was.  It didn't offer any amendments beyond what we see now in JTX, I
believe it's 2 through 4."  A: "I believe that's correct; yes, sir.").)  In other words, Hilton decided
"not to change that term to base fee."    (Jaskulske 6/27 Tr. 176:1-4 (Q: "What's your
understanding as to the origin of that term?" A: "My understanding as to the origin of the term is
that we adopted a KSL agreement, and in, and as a part of the negotiation, we decided not to
change that term to base fee.").)

66.     Hilton failed to renegotiate the Corporate Overhead Fee provisions in the HMAs,
even though they do not appear in other Hilton management agreements.  (*See* Jaskulske 6/27 Tr.
175:22-25; Jacobs 6/29 Tr. 398:17-21.)

67.     Hilton concedes, as it must, that it is now bound by all terms of the HMAs,
including the provisions surrounding reimbursement of the Corporate Overhead Fee.  (Middleton
6/27 Tr. 142:14-16 (Q: "Any terms that Hilton didn't like, it is [sic] understands it's bound with
today, correct?"  A: "Yes, sir.").)

A.     **Multiple Sources Confirm That The 1% Corporate Overhead Fee Should Be
Treated As A Reimbursable Expense That Hilton Avoids Upon Rejection.**

68.     The cost-burden reflected in the HMAs -- consisting of a Base Fee of 2% of
revenue and a reimbursable Corporate Overhead Fee of 1% of revenue -- is consistent with a
number of objective data points.  For example, Hilton's own 2006 SEC disclosures demonstrate

that Hilton's expense margin was 33.5%-35.5% of its revenue at the time it acquired these contracts.  (Morone 7/13 Tr. 1063:6-8, 1063:17-20, 1064:9-1065:23; DX 7.)

69.     Publicly-available market data concerning Hilton's closest competitors further indicates that significant corporate overhead is incurred in managing hotel properties, with Starwood reporting corporate overhead of 28.7% and Marriott reporting corporate overhead of 38.4%.  (*See* DX 1 at 15; DX 2 at 20; DX 3 at 13.)

70.     In the same vein, a leading hotel industry treatise relied upon by Hilton's expert, Mr. Sean Hennessey, entitled "Hotel Asset Management, Principles and Practices, American Hotel & Lodging Association (2004)," states:  "Indeed, operators estimate that one percent of the average three percent base management fee represents profit to the management company.  (One of the largest companies, however, places the estimate at two percent, which owners view as shifting more expense -- and risk -- onto their shoulders.)"  (DX 23 at p. 73.)

71.     Significantly, in a prior estimation proceeding involving another one of the Debtors' assets, the Doral, Mr. Hennessey used that authority to opine that the manager in that proceeding, Marriott, incurred "a cost of management services of 0.9% of total revenues, or approximately 30% of total management fees in the case of the Doral."  (*See* Hennessey 7/2 Tr. 586:12-17 (Q: "At the time that you did your consultation for Marriott, you concluded that one-third percent -- one-third of the three percent management fee that Marriott received was expense, correct?" A: "It sounds about right.  I don't recall the particulars, though."); Hennessey 7/2 Tr. 587:25-588:6 (Q: "Does this refresh your recollection as to the level of expense that Marriott incurred on a three percent management fee contract?" A: "Right. The level of expense that Marriott used in evaluating its management contracts." Q: "And that's roughly thirty percent or a third?" A: "Yes, sir.").)

**B.    Hilton Offers No Evidentiary Support For Its Claim That It Should Profit From The Corporate Overhead Fee.**

72.    In contrast with the Debtors' expert, Mr. Cline assumes that the Corporate Overhead Fee (1% of revenue) is pure profit for Hilton.  (*See* WAX 25 at 17.)

73.    As a threshold matter, Mr. Cline's treatment of the Corporate Overhead Fee as profit is inconsistent with his treatment of Reimbursable Expenses under Article 5.4.  Just as Article 5.1 of the HMAs provides that the Corporate Overhead Fee shall be "reimbursed to Manager," Article 5.4(a) provides that "Manager shall be reimbursed" for specified Reimbursable Expenses.  (JXs 1-3 at Art. 5.)  Yet, while Mr. Cline includes the Corporate Overhead Fee in his damages calculation, he does not include the Reimbursable Expenses.  He excuses this inconsistency as a product of the "faulty drafting" of the HMAs.  (Cline 7/3 Tr. 892:15-19 (Q: "I understand your argument, but they use the exact same term, 'reimbursed' in Section 5.4A that they do to describe the corporate overhead fee, correct?"  A: "Yes, *I think it's faulty drafting of the agreement, in my opinion*.").)

74.    Mr. Cline's assumption of zero corporate overhead is also inconsistent with Hilton's 2005 investment memorandum evaluating the potential acquisition of the HMAs, wherein Hilton assumed that the cost of managing the Resorts was 0.25% of revenues, or 8.33% of a 3% base management fee ($21.9 million).  (DX 4 at 15; JX 4 at Ex. 4.)  But that number had nothing to do with corporate overhead attributable to these three specific properties, which are significantly more complex than the typical Hilton hotel.  The record confirms these large, world-class Resorts, with unique facilities and services not found at most of Hilton's more traditional properties, require a disproportionate share of Hilton's corporate overhead.  (Morone 7/13 Tr. 1069:8-12 (Q: "Based on your experience in the industry, which of these types of hotels would require more corporate overhead and more corporate oversight from Hilton?" A: "In my

20

opinion, the big, complicated hotels; specifically, these resorts, would be resource hogs."), 1069:13-1070:13; DX 4 at 13-14.)  Hilton acknowledged as much in its 2005 Hilton Memo, noting, for example, its dearth of prior "resort expertise" and expressing concern about its ability to "properly market[]" the Resorts.  (JX 4 at 3-4.)

75.    Hilton's witnesses, in fact, admit that, at the time the HMAs were acquired, the Resorts were larger and more complex than typical Hilton hotels with limited food and beverage offerings; little or no meeting spaces; and no memberships, golf courses, or spas (*See* Middleton 6/27 Tr. 138:18-23; *see also* Jacobs 6/29 Tr. 446:14-21; Hennessey 7/2 Tr. 579:4-11; Cline 7/3 Tr. 769:4-770:2, 772:22-24, 774:5-12.)

76.    The Grand Wailea, in particular, has the highest tax rate applicable to hotels in the state of Hawaii, has higher utility costs than other hotels in Hawaii, and requires that items be shipped from the mainland to Hawaii.  (Bailey 7/2 Tr. 680:6-681:1.)

77.    Moreover, Hilton admits that it incurs general corporate overhead expenses not otherwise reimbursable under the HMAs.  (Jacobs 6/29 Tr. 411:16-412:2 (defining "corporate overhead" that Hilton incurs, including Mr. Jacobs's "salary as the treasurer of the company"); Middleton 6/27 Tr. 162:2-6 (Q: "So we can agree that there are certain general corporate overhead of manager that is excluded from the group services expense?"  A: "Yes, sir.  It says the compensation of the CEO, CFO and President."); Jaskulske 6/27 Tr. 228:18-22 (Q: "So Ms. Jaskulske, you'll agree with me that the corporate overhead fee is distinct from the fees that are captured by the group services and the reimbursable expenses, right?"  A: "Yes."); *see also* Jaskulske 6/27 Tr. 230:22-25 (agreeing that certain corporate overhead expenses are not reimbursable pursuant to Exhibit E of the HMAs), 243:12-20 (admitting that she testified at her deposition that Hilton incurs corporate overhead to manage its hotels.).)

78.    In fact, Hilton's corporate overhead for 2011 was roughly $301 million and, since 2009, its corporate overhead has increased by over 20% as the number of hotels in its system have increased.  (Jacobs 6/29 Tr. 414:24-415:20; DX 9 at WALD015193; DX 146.)

79.    Hilton, however, insists that none of this corporate overhead is allocable to the Resorts.  (Jacobs 6/29 Tr. 417:3-5 (Q: "And so, therefore, that $330 million [in budgeted corporate overhead] cannot be traced in Hilton's books specifically to these resorts, correct? A: "Correct."); *see also* Jaskulske 6/27 Tr. 183:22-184:1.)  There is no credible evidence to support Hilton's contention.  To the contrary, Hilton admits that the fees it collects from its businesses, including its management agreements, go toward paying its corporate overhead.  (Jacobs 6/29 Tr. 427:17-428:1 (Q: "And just so we're clear, it's your understanding that Hilton's $330 million in corporate overhead today is not being borne in any way by the Debtors under the agreements." A: "Again, I'm struggling with 'borne in any way.'  We earn fees from -- and earnings from all our business, right?  The net profit from those earning streams goes into our general corporate funds.  We use those general corporate funds to pay our expenses.  So, yeah, a portion.  Some of all of our owners fees that they pay us go to pay expenses.  Cash is fungible.").)

80.    In reality, Hilton cannot establish with any degree of certainty how much corporate overhead was allocable to these Resorts for any year during the course of its management.  (*See* Jacobs 6/29 Tr. 440:6-13 (Q: "You have no precise knowledge of the corporate expenses that the debtor spent [for] the debtors' resorts in 2011, correct?" A: "I don't know." Q: "You don't know what -- what Hilton spent on the resorts in 2010, right?" "A: "Correct." Q: "And that's same from 2006, all the way up to 2009, right?"  A: "That's correct."); Jaskulske 6/27 Tr. 244:13-15, 252:22-24 (Q: "Does Hilton allocate corporate overhead to any of its properties?"  A: "No."); Jacobs 6/29 Tr. 396:9-11.)

81.    Hilton's only attempt to establish the corporate overhead attributable to the Resorts consisted of a two-page document entitled "Corporate Expense Estimate for the Management of Paulson Properties."  (WAX 12.)  This document was not prepared in the ordinary course of business but, instead, was created by Hilton specifically for purposes of this litigation.  (Jacobs 6/29 Tr. 433:20-434:1 (Q: "Okay.  Now before this litigation, you've never seen an analysis of the Hilton corporate overhead attributable to these resorts, right; this was the first time?" A: "Yes." Q: "And just to be clear, this was not created for any other purpose other than this litigation, right?" A: "That's right.").)

82.    According to Hilton's Treasurer, WAX 12 illustrates that, if Hilton lost the Resorts, it would cease only to incur $380,000 in corporate expenses for the Resorts.  (Jacobs 6/29 Tr. 396:17-397:21.)

83.    Hilton has not produced any supporting materials for the document to the Debtors, and Mr. Jacobs has not inspected the underlying records himself to verify the data. (Jacobs 6/29 Tr. 436:23-437:2 (Q: "And did you verify the data by looking at those records or any records to confirm that the information contained here is true?" A: "My process for verifying the analysis was -- did not include inspecting records, no.").)  Nor did Hilton call any of the individuals mentioned in the document as witnesses during the trial.

84.    Finally, the assumptions in WAX 12 were not based on the number of hotel rooms Hilton manages, even though the Resorts at issue are among the largest resorts Hilton manages, and even though Hilton could have conducted such an analysis. (Jacobs 6/29 Tr. 438:15-25 (Q: "Now none of the assumptions behind this exhibit involve the number of hotel rooms that Hilton actually manages, right?"  A: "They don't. They were done -- most of -- you know, they were -- the analysis was done in different ways, depending on how the groups --

effectively how the groups' PNLs are allocated and the purview of the people that work on these hotels. And none of them were done based on the number of rooms. That's correct." Q: "If Hilton wanted to do the number of rooms, it could have done the number of rooms, right?" A: "We could have, yes.").)

## V.    HILTON'S LOST PROFITS MUST BE DISCOUNTED TO REFLECT THE SPECIFIC RISKS OF THE HMAs AT THE TIME THEY WERE EXECUTED.

85.    After projecting Hilton's anticipated profits and deducting expenses Hilton would no longer incur as a result of the Debtors' rejection of the HMAs, the next step in the damages analysis is to determine the present value of Hilton's lost profits by applying the appropriate discount rate. (DX 1 at 15-18; DX 2 at 20-23; DX 3 at 14-16.)

86.    To arrive at the appropriate discount rate, the Debtors' expert, Mr. Morone, first calculated Hilton's overall weighted average cost of capital ("WACC") as of the beginning of 2006,[7] when Hilton entered into the HMAs. (DX 1 at 16; DX 2 at 21; DX 3 at 15; Morone 7/13 Tr. 1071:10-17.) Mr. Morone concluded that Hilton's overall WACC as of that time was 10.6%. (DX 1 at 16; DX 2 at 21; DX 3 at 15; Morone 7/13 Tr. 1072:6-8.)

87.    There was evidence at trial showing that, as of the end of 2005, Bloomberg reported Hilton's WACC as 8.7%. (Hennessey 7/2 Tr. 545:4-7.) The difference between Mr. Morone's calculations and Bloomberg lies primarily in the fact that Mr. Morone used a beta of 1.29, whereas Bloomberg used a default beta of 1. (Morone 7/13 Tr. 1073:12-16.) The purpose of the beta is to measure Hilton's risk in relation to the market (for example, the S&P 500).[8] (Morone 7/13 Tr. 1073:8-11.) Mr. Morone's use of a 1.29 beta, rather than a default beta of 1, is

---

[7]    Mr. Morone had to calculate Hilton's 2006 WACC because Hilton chose not to disclose it as part of these proceedings. (Hennessey 7/2 Tr. 558:22-25 (confirming that Mr. Hennessey asked Hilton for its WACC but did not receive it).)

[8]    Roughly speaking, a security with a beta of 1.5 will move 50% more than the market, so if the market goes up by 20%, the security's price will go up by 30%.

appropriate because Hilton's stock was clearly more risky than the market as a whole.  Mr. Morone's beta of 1.29 is confirmed by data contained in the expert report of Derek Pitts, which shows that Hilton's beta as of January 2006 was 1.289.  (DX 5 at Ex. B.)

88.    Hilton's 2006 WACC, however, reflects the aggregate risk that Hilton ascribed to its entire diversified portfolio of management agreements.  (DX 1 at 15; DX 2 at 21; DX 3 at 14.)  As such, Mr. Morone adjusted Hilton's overall WACC to account for the property-specific risks of the Resorts otherwise eliminated through portfolio diversification.  (DX 1 at 16-18; DX 2 at 21-23; DX 3 at 15-16.)

89.    To quantify the specific risks of each HMA, Mr. Morone used a well-established methodology: Ibbotson's Size Risk Premium.   (Morone 7/13 Tr. 1074:12-22.)    Applying Ibbotson's Size Risk Premium, Mr. Morone adjusted Hilton's 2006 overall WACC to reflect specific risks of each HMA, including (1) size risk factor; (2) brand risk factor; and, for the Grand Wailea, (3) volatility risk factor.  (*See* DX 1 at 17-18; DX 2 at 22-23; DX 3 at 15-16.)

90.    There is little question that a large, complex resort such as the Grand Wailea, located in a remote island in the Pacific, entails risks that are not applicable to typical hotels located on the mainland.  (Bailey 7/2 Tr. 611:2-612:14, 613:6-8 (Q: "Would you say there's any other hotel that's like Grand Wailea?" A: "Grand Wailea is unique."); Shumaker 7/13 Tr. 994:17-995:15 (characterizing the Grand Wailea as "an extremely complicated operation with multiple sources of revenues and many different businesses").)   As Mr. Morone confirmed, managing a luxury resort on the island of Maui necessarily entails a number of unique risks, including dependency on the air travel industry, the appetite of leisure and group travelers, and natural conditions.  (DX 2 at 6, 22; Morone 7/13 Tr. 1076:4-1077:9.)

91.     Likewise, there was substantial record evidence confirming the increased complexity and risks of the La Quinta and Arizona Biltmore resorts as compared to more typical domestic hotels.  (Shumaker 7/13 Tr. 996:9-998:23.)   After adding the HMA-specific risks to Hilton's overall WACC, Mr. Morone arrived at a discount rate of 13.6% for the Arizona Biltmore and the La Quinta and 14.6% for the Grand Wailea.  (DX 1 at 15-18; DX 2 at 20-23; DX 3 at 14-16.)

92.     Mr. Morone's calculation of a 13.6% and 14.6% discount rate is consistent with the 2005 Hilton Memo (JX 4) Hilton presented to its board of directors requesting authorization to acquire the HMAs.  (*See* JX 4 at Ex. 4; Middleton 6/27 Tr. 101:19-21.)   In the 2005 Hilton Memo, Hilton applied an 8% discount rate to its projected Base and Corporate Overhead Fees, and a 23% discount rate to its projected Incentive Fees.  (JX 4 at Ex. 4.)   Blending these two rates produces a rate of 13.2%, which is the discount rate applicable to the HMAs as a whole at the time of contracting.  (*See* DX 4 at 18; JX 4 at Ex. 4.)

A.     **Mr. Cline's Proposed Discount Rate Ignores Hilton's Expectations And The Risks Of The HMAs.**

93.     Hilton's expert, Mr. Cline, did not use Hilton's WACC as the starting point for determining the discount rate.  (Cline 7/3 Tr. 965:14-16.)   Instead, Mr. Cline adopted the 8% discount rate that Hilton for years has used to value the base fees -- and only the base fees -- for ***all*** of its management agreements.  (*See* WAX 25 at 40; Cline 7/3 Tr. 897:20-25 (Q: "Okay. And I believe one of the reasons that you used the eight percent is because it was consistent with the practice of Hilton in its internal valuations of hotel management agreements that are being investigated for possible Hilton involvement, right?" A: "Correct.").)

94.     Hilton's witnesses repeatedly confirmed that this 8% discount rate is the same general rate that Hilton has used to value base management fees for all new and existing

management agreements over the last six years.  (JX 4 at Ex. 4; Jaskulske 6/27 Tr. 209:8-10 (Q:

"And is there a standard discount rate that you apply to base management fees when you do

these valuations?" A: "Eight percent."); Jacobs 6/29 Tr. 372:4-10 (Q: "And does Hilton use a

particular discount rate when analyzing the base fee management stream from management

contracts?" A: "We do." Q: "What is that discount rate that Hilton uses today?" A. "So for

transactions in the United States, we use eight percent.").)  That is, Hilton uses the same 8%

discount rate to value base management fees, regardless of whether the hotel at issue is the

Grand Wailea or a Hampton Inn.  (Middleton 6/27 Tr. 156:17-20 (Q: "Hilton was going to use

the eight percent discount rate, whether it's a Hampton Inn in Hampton, Virginia, or the Hotel

Elysian in Chicago." A: "That's correct."); Jacobs 6/29 Tr. 442:16-443:13; Cline 7/3 Tr. 899:1-

6.)

95.    The 8% discount rate used by Mr. Cline is not the appropriate discount rate for

several reasons.  *First*, the 8% discount rate is not tethered to Hilton's WACC.  (Jacobs 6/29 Tr.

378:18-24 (Q: "[W]ould you use Hilton's weighted average cost of capitol [sic] to try to

determine the appropriate discount rate for either base or incentive management fees?"  A: "No,

we don't use what WACC [sic] does not enter into how we figure out the discount rate.  Now,

they are related concepts.  They need to make sense relative to one another because they're both

measures of risk.").)

96.    *Second*, the 8% discount rate is "not tooled to an individual property," and thus

does not account for the unique risks associated with these three HMAs.  (Middleton 6/27 Tr.

156:10-16 (Q: "Now let's talk about the discount rate that Hilton applied in Exhibit 4.  Now the

eight percent discount rate for the base management fee, we can agree that that didn't take into

account any specific risks associated with these particular resorts?" A: "No.  It was the discount

27

rate that we used as corporate policy, corporate financial policy for base management fees. They -- ***it's not tooled to an individual property***."), 113:5-8 (Q: "Why didn't you add additional risk factors in connection with this particular deal?" A: "Our -- our standard financial protocol was to discount base fees at eight percent.").)

97.    Nearly half of Hilton's hotels are Hampton Inn hotels, a limited service brand lacking multiple revenue streams. (DX 144; Bailey 7/2 Tr. 675:25-676:10; Cline 7/3 Tr. 900:16-24.)    In total, roughly 70% of all Hilton hotels are of the limited service variety.  (DX 144.) These Resorts are fundamentally different from those and other Hilton hotels in that they depend on revenue from a variety of specialized sources, including golf courses, a spa, high-end retail outlets, and multiple restaurants.  (Shumaker 7/13 Tr. 998:24-999:4 ("[I]t is a -- a much trickier operation to run because you have to have expertise in so many different businesses."); *id.* at 1000:5-11 ("[O]ne of the witnesses talked about sort of the cash cow component, you know, limited service hotel; for example, that the revenue stream is a lot more consistent.  It's solely coming from hotel rooms in that example.  Whereas here, you're counting on so many different streams of revenues.  Those can be more volatile.").)

98.    Because these Resorts are also highly dependent on large group bookings, they involve risks and volatility not found at other domestic hotels.  (*See, e.g.*, Shumaker 7/13 Tr. 999:6-11 ("[B]ecause of their dependence on group business, that can be, again, a more volatile revenue stream, in my view, because you're prone to, first of all, a reliance on those large groups coming to these resorts.  You know, these resorts need to bring in those groups to create that core of demand.").)

99.    The Grand Wailea, in particular, is highly dependent on large groups, even as compared to its competitors.  (Bailey 7/2 Tr. 667:7-14 (Q: "Is Grand Wailea particularly

dependent upon large groups?"  A: "Very much so."  Q: "More so than your competitors?"  A: "Not only more dependent on them, but also we're the only ones in our comp set who can really handle -- Hyatt to a degree, but our -- our configuration of meeting space allows us to handle large groups that the other properties can't necessarily handle.").)  This dependence on group business increases the risk attributable to the Grand Wailea; indeed, between 2009 and 2010 alone, there were more than 25,000 group room nights cancellations, roughly five times the typical number of group room nights cancellations.  (Bailey 7/2 Tr. 637:14-18, 638:13-25.)

100.    As such, all three Resorts, and the Grand Wailea in particular, pose risks that are not applicable to all Hilton hotels, a fact reflected in Hilton's November 9, 2005 memorandum: "[T]hese contracts don't fit [Hilton's] normal management contract model."  (JX 4 at 2.)

101.    *Third*, an 8% discount rate does not reflect the risks associated with the entire HMA investment stream at the time Hilton entered each contract.  As noted, the 8% only reflects the discount rate that Hilton applied to a component of the HMAs: the projected Base and Corporate Overhead Fees.  But at the time of contracting, Hilton also expected to receive significant incentive fees under the HMAs.  (*See* JX 4 at Ex. 4; Middleton 6/27 Tr. 109:4-17 (explaining that "[a]ttaining the projected management fees is predicated on realizing the incentive fee"); Cline 7/3 Tr. 897:2-15, 915:23-916:1.)  These projected incentive fees thus played a critical role in Hilton's decision to execute the HMAs.  Even today, Hilton acknowledges that it is possible, albeit unlikely, that it may receive incentive fees.  (Jacobs 6/29 Tr. 449:23-450:3; Hennessey 7/2 Tr. 591:6-8 (Q: "And even today, there is the possibility that Hilton could recover those incentive fees, right?"  A: "I believe so.").)

102.    Thus, in discounting the risks of the entire HMA investment stream Hilton acquired in 2006, the discount rate must also account for the risks of the incentive fee stream that

Hilton expected to receive.  No less than Hilton's expert, Mr. Hennessey, agreed that a discount rate for the entire HMAs would necessarily include a discount rate for all of the fee streams, including incentive fees.  (Hennessey 7/2 Tr. 591:9-12 (Q. "And we can agree that a discount rate for the entire management agreement in 2006 would need to include a discount rate for incentive fees, correct?" A. "I believe it would be appropriate, yes.").)

103.    It is undisputed that the incentive fee stream commands a higher discount rate because it constitutes a riskier stream of income than other contractual fees.  (Middleton 6/27 Tr. 112:8-17.)   At the time of contracting, Hilton ascribed a 23% discount rate to its projected incentive fees.   (JX 4 at Ex. 4.)   Mr. Morone determined that, when blended with the 8% discount rate that Hilton ascribed to base and corporate overhead fees, an overall discount rate of 13.2% exists for Hilton's total HMA investment as of 2006.  (DX 4 at 16-18.)

104.    **Fourth**, the 8% discount rate does not take into account the risk of early termination that exists in each HMA based on Hilton's failure to satisfy the Performance Test in Article 3.3.1.  The Performance Test gives the Debtors the right to terminate an HMA, without penalty, if for any two consecutive years (i) the Gross Operating Profit ("GOP") is less than 90% of the GOP set forth in that Resort's Annual Operating Plan, and (ii) the Annualized RevPAR for that Resort is less than 95% of the Annualized RevPAR for the Resort's Competitive Set (or 85% in the case of the Arizona Biltmore).  (JXs 1-3 at Art. 3.3.1.)

105.    Hilton's expert and the Debtors' expert both agree that there is a possibility that Hilton will fail the HMAs' Performance Test at **each** of the Resorts.  (Morone 7/3 Tr. 1084:14-21; Cline 7/3 Tr. 908:3-5 (Q: "It -- it's a risk of performance termination that exists as we sit here today --" A: "I believe so."), 914:18-21 (Q: "So it is possible that they fail the performance test --" A: "Of course."  Q: "-- correct?"  A: "Yes.").)  While the experts disagree as to the likelihood

that this possibility will materialize, there really is no need to resolve this disagreement.  As long as there is a risk, even a remote one, that Hilton will fail the Performance Test, this risk must be accounted for in any discount rate.

106.    The evidence confirms what both experts acknowledge -- namely, that the question of whether Hilton will pass the Performance Test going forward is not free from doubt.

107.    With respect to the first prong of that Test, the Gross Operating Profit ("GOP") Test, Hilton has failed this test at the Grand Wailea in three of the last six years.  (Morone 7/13 Tr. 1084:11-13 (Q: "And over those six years, how many times did Hilton fail the GOP test?" A: "That's in the right column, and it's three times.").)

108.    With respect to the second prong of the Performance Test, since 2009, the Grand Wailea's RevPAR Yield, which measures its performance against the Competitive Set, has steadily declined from 113.5% to 99.4%.  (Cline 7/3 Tr. 913:22-25.)  Based on this trend, Mr. Morone concludes that Annualized RevPAR at the Grand Wailea is likely to fall below 95% of the Competitive Set for the next two years.  (Morone 7/13 Tr. 1084:14-21.)

109.    While Mr. Cline opined that Hilton probably will not fail the RevPAR Performance Test, that opinion is based upon his assumption that Hilton properly included a $25 "resort fee" as "room revenue" in reporting its room revenue to Smith Travel Research.  (Cline 7/3 Tr. 815:15-816:17.)  Hilton began including this resort fee in its room revenue in 2009, after performance at the Grand Wailea began to decline as against the Competitive Set.  (Jaskulske 6/27 Tr. 200:6-8; Bailey 7/2 Tr. 622:12-14, 681:23-25.)

110.    Hilton's decision to include the resort fee in its room revenue presently increases the Resorts' RevPAR index as against the Competitive Set.  (Morone 7/13 Tr. 1058:22-25 (Q: "What happens to the RevPAR index for these resorts if you include the twenty-five-dollar resort

31

fee in room revenue?" A: "It increases the room revenue, and therefore, increases the RevPAR yield."); Bailey 7/2 Tr. 622:15-16 (Q: "How does [including the resort fee in the room revenue calculation] impact what's known as your RevPAR?" A: "It raises our RevPAR index."); *see also* Jaskulske 6/27 Tr. 223:11-15 (Q: "And then in 2009, it went up to 113.5. Do you see that?" A: "Yes." Q: "Now 2009 was the same year that Hilton decided to include resort fees in its calculation of RevPAR, right?" A: "I believe so, yes."); *see also* Shumaker 7/13 Tr. 1003:5-13.)

111.    But at least half of the Grand Wailea's Competitive Set do not include a resort fee in their RevPAR calculations.  (Bailey 7/2 Tr. 683:14-17.)   Any RevPAR gains due to the inclusion of the resort fee could thus disappear if and when Hilton's competitors decide to do the same.  To be sure, Hilton does not know where the Grand Wailea's RevPAR would rank in its Competitive Set if all of the hotels in that set started to include the resort fee when reporting their room revenues.  (Bailey 7/2 Tr. 683:18-21.)

112.    The evidence casts serious doubt upon the propriety of Hilton's decision to include the resort fee in room revenue.  Smith Travel Research only allows hotels to include resort fees as part of room revenue if there is no other "bucket" to which the resort fee could be allocated.  (Jaskulske 6/27 Tr. 219:10-14 (Q: "Well, the STAR guidelines say that you should report each line item based on what it would otherwise be; and if nothing else, if there's no bucket it falls in, then you put it in room revenue, right?" A: "If there's no bucket that it falls in.").)

113.    Thus, the evidence suggests that Hilton's resort fee can and should instead be allocated to buckets other than room revenue.  For example, part of the Grand Wailea's resort fee includes two bottles of water.  (Bailey 7/2 Tr. 686:21-24.)  Had a guest ordered room service and

had those same two bottles of water delivered to the room, the water would be allocated to food and beverage, not "room revenue."  (Bailey 7/2 Tr. 687:9-12.)

114.    If the resort fee is removed from room revenue, then Mr. Cline's performance projections, like Mr. Morone's projections, demonstrate that Hilton will fail the RevPAR test in 2012, 2013 *and* 2014.  (*See* DX 4 at 19.)

115.    But as noted, there is no need to determine whether Hilton will in fact fail the RevPAR Test.  The mere fact that there exists the possibility of failure requires an adjustment to any discount rate for each of the Resorts.

116.    Mr. Cline opines that the appropriate discount rate adjustment to account for a risk of early termination is 400 basis points, or 4%.  (Cline 7/3 Tr. 904:9-12 (Q: "And I think you said that the appropriate adjustment was a 400 basis point adjustment to count for the -- account for the risk of early termination?" A: "Correct.").)  In his analysis, Mr. Cline only adds the 4% premium after 2024, when Hilton faces a risk of early termination because of a sale of the Resorts.  (Cline 7/3 Tr. 904:13-17 (Q: "And I just want to be clear about what you did in terms of mathematics.  You increased the discount rate in your projections to 12 percent for the years 2024 through 2034.  Is that right?" A: "Yes.").)  But Mr. Cline concedes that the risk of early termination under the Performance Test exists today.  (Cline 7/13 Tr. 914:18-21 (Q: "So it is possible that they fail the performance test --" A: "Of course."  Q: "-- correct?"  A: "Yes.").)

117.    Accordingly, at a minimum, the discount rate to be applied in this case must include an upward adjustment of 4% to account for the risk of early termination under the Performance Test.

118.    *Finally*, the 8% discount rate cannot be the applicable rate because it is lower than Hilton's WACC at the time of contracting.  When Hilton acquired the HMAs, it expected

that it would make money on its investment. (Middleton 6/27 Tr. 137:7-13 (Q: "And in 2005, when Hilton entered these contracts, it believed that they would be profitable to the company, correct?" A: "Yes, sir." Q: "Hilton was operating on the expectation that it would make money on this deal, correct?" A: "We operated under the assumption that we would get management fees out of it, yes, sir.").) To accomplish that goal, Hilton's expected rate of return under the HMAs had to exceed its WACC. That is because a company's WACC is a "hurdle rate" representing the minimum return that a company needs to achieve on an investment in order for the investment to be value accretive. (Cline 7/13 Tr. 919:24-920:16.)

119.    Using Mr. Morone's WACC of 10.6%, it would have been economically irrational for Hilton to invest in the HMAs if it was only expecting an 8% return, as such an investment would have no possibility of being value accretive for Hilton. (*See* Morone 7/13 Tr. 1078:8-20 (explaining that a "good businessperson" would not invest at a rate of return below WACC.).)

**B.    Mr. Hennessey's Proposed 7.5% Discount Rate Lacks Evidentiary Support And Again Ignores The Risks Of The HMAs.**

120.    Hilton's other expert, Mr. Hennessey, opines that a discount rate of 7.5% is appropriate. (Hennessey 6/29 Tr. 486:15-22.) Like Mr. Cline, Mr. Hennessey did not calculate Hilton's WACC at the time it acquired the HMAs. (Hennessey 7/2 Tr. 559:1-4.) His calculations should be rejected as baseless.

121.    Mr. Hennessey purports to justify his discount rate by first equating the HMAs to a mortgage in his "Discount Rate Measure 1." (WAX 23 at 5; Hennessey 7/2 Tr. 561:13-19.) But Mr. Hennessey acknowledges that mortgages are fully secured instruments that are not subject to termination for poor performance, and that are usually not subject to fluctuation in revenues. (Hennessey 7/2 Tr. 563:10-11 (Q: "Now mortgage loans are fully secured by property,

34

right?" A: "Generally, yes."), 563:15-17 (Q: "Mortgages are not subject to termination for poor

performance, right?" A: "Well, on a contractual level they're not."), 563:24-564:3.)

122.    The management fees under the HMAs are plainly not mortgages and Mr.

Hennessey's analogy is not persuasive. (*See generally* Hennessey 7/2 Tr. 561-65.)  As even Mr.

Hennessey admits, the HMA fee stream is, unlike a mortgage, not secured by property and

subject to termination for poor performance and fluctuations in performance and revenue.

(Hennessey 7/2 Tr. 563:12-14; 563:19-23; 564:14-18 (Q: "Now you would agree with me that

the fees that Hilton earns under these contracts, those are -- those are subject to fluctuations in

revenue at the resorts; they are based on revenue at the resort, right?" A: "Absolutely.").)

123.    Mr. Hennessey's second attempt to justify his 7.5% discount rate, "Discount Rate

Measure 2," is no less flawed. (*See* Hennessey Tr. 7/2 565-573.)  Here, Mr. Hennessey relies

upon a 2006 survey of hotel owners concerning the discount rate that they apply to resort profit,

not management fee income.  Mr. Hennessey then reduces that discount rate for hotel owners by

a factor of forty percent.  (Hennessey 7/2 Tr. 566:19-22.)  Mr. Hennessey cannot identify any

authority that supports that adjustment, nor did he conduct an actual volatility analysis of

revenue and profitability at these Resorts.  (Hennessey 7/2 Tr. 566:23-567:11.)  Nor could Mr.

Hennessey provide any support for his assumption that revenue at these Resorts would be less

volatile than revenue at the smaller hotels that formed the basis of his analysis.  (Hennessey 7/2

Tr. 573:13-15.)

124.    Mr. Hennessey's third attempt at supporting his 7.5% discount rate, "Discount

Rate Measure 3," is unreliable.  (*See generally* Hennessey 7/2 Tr. 573-577.)  There, Mr.

Hennessey references a published WACC for Hilton of 8.1%, as reported in a Bear Stearns

investment memo from December 7, 2006.  (Hennessey 7/2 Tr. 573:21-23, 574:16-18.)  The

Bear Stearns memo, however, was issued nearly one year after Hilton acquired not only the HMAs, but also Hilton International and its 392 properties -- a $6 billion acquisition that was the largest acquisition in Hilton's history.  (*See* WAX 23 at 6; DX 7 at WALD011006; Hennessey 7/2 Tr. 574:23-575:8.)  Mr. Hennessey does not even attempt to adjust the Bear Stearns rate to account for the additional portfolio diversification that resulted from the Hilton International acquisition.  (Hennessey 7/2 Tr. 576:13-25.)

125.    Mr. Hennessey's final attempt at supporting his discount rate opinion, "Discount Rate Measure 4," is based on the 8% discount rate of the 2005 Hilton memo.  (Hennessey 7/2 Tr. 578:3-5.)  But as discussed above, this generic discount rate -- applied by Hilton to all base fees in its management agreements -- does not reflect the specific risks of these contracts.  (*See generally* Hennessey 7/2 Tr. 578-79.)  In fact, Mr. Hennessey acknowledged that the Resorts are more complex than most Hilton hotels, and that a number of risks affect the Resorts that do not affect other Hilton hotels.  (Hennessey 7/2 Tr. 579:9-14.)

## VI.    HILTON'S DAMAGES MUST ACCOUNT FOR THE LIKELY TERMINATION OF THE GRAND WAILEA HMA IN 2014.

126.    Mr. Morone concluded that, based on its current performance trend, the Grand Wailea will fail the Performance Test in 2013 and 2014, giving the Debtors the right to terminate the Grand Wailea HMA for cause in 2014.  (Morone 7/13 Tr. 1084:14-21.)  This failure will lead Hilton to make a cure payment with a present value of $6,221,223 that should be deducted from Hilton's future lost profits.  (DX 2 at 24; Morone 7/13 Tr. 1084:22-25.)

127.    Through applying a Monte Carlo probability analysis, Mr. Morone projected that Hilton will fail the Performance Test a second time in 2031.  (DX 2 at 24; Morone 7/13 Tr. 1085:20-22.)  This failure will prompt Hilton to make a second cure payment, with a net present value of $965,318, which likewise should be deducted from Hilton's future lost profits.  (DX 2 at

24; Morone 7/13 Tr. 1085:23-1086:2 (Q: "And did you determine the present value of that cure payment?" A: "Yes." Q: "And what was that?" A: "Nine hundred and sixty-five -- yeah, $965,000.").)

## VII.    HILTON'S LOST PROFITS SHOULD BE REDUCED TO REFLECT THE AMOUNT BY WHICH IT IS SUBSIDIZING ITS GROUP SERVICES EXPENSE.

128.    Using Hilton's franchise disclosure document, Mr. Morone estimated the cost of the Group Services that Hilton provides to the Resorts at roughly 2.5% of revenues.  (DX 1 at 13; DX 2 at 18; Morone 7/13 Tr. 1081:22-1082:7.)  Mr. Morone determined that Hilton's actual cost of providing Group Services to the Resorts (2.5%) exceeds the maximum allowable reimbursement Hilton can receive for Group Services under the HMAs (2%).  (*See* DX 1 at 12-13; DX 2 at 18; Morone 7/13 Tr. 1081:9-1082:7.)

129.    Thus, Mr. Morone concluded that Hilton is effectively subsidizing the Group Services provided to the Grand Wailea and Arizona Biltmore.  (DX 1 at 12-13; DX 2 at 18.)  Upon rejection of the three HMAs, Hilton will no longer subsidize Group Services for these Resorts.  (*See id.*)  Accordingly, the net present value of this subsidy -- roughly $13 million -- should be deducted from Hilton's projected lost profits.  (Morone 7/13 Tr. 1080:22-1081:8 (explaining the Group Services subsidy adjustment on Slide 12 of DX 149).)

## VIII.    HILTON'S DAMAGES BROKEN DOWN BY INDIVIDUAL RESORT.

### A.    The Grand Wailea.

130.    Taking Mr. Morone's projections, deducting the 33% Corporate Overhead Fee, and applying Mr. Morone's 14.6% risk adjusted rate incorporating risk factors specific to the Grand Wailea yields lost profit damages to Hilton of $30,473,838 for the Grand Wailea.  (DX 2 at 25.)  Attached hereto as Appendix B are demonstratives showing how the Debtors arrived at this number, along with other permutations of damages for the Grand Wailea based upon

37

different projections, expense margins, and discount rates.

131.    Adjusting this number for (1) the $6,221,223 cure payment that Hilton will make in 2014, (2) the $965,318 cure payment that Hilton will make by 2031, and (3) the Group Services subsidy that Hilton will save when it no longer manages the Grand Wailea yields total lost profits to Hilton of $12,520,121 for the Grand Wailea.  (*Id.*)

**B.    The Arizona Biltmore.**

132.    Taking Mr. Morone's projections, deducting the 33% Corporate Overhead Fee, and applying Mr. Morone's 13.6% risk adjusted rate incorporating risk factors specific to the Arizona Biltmore yields lost profit damages to Hilton of $16,609,319 for the Arizona Biltmore. (DX 1 at 19.)  Attached hereto as Appendix C are demonstratives showing how the Debtors arrived at this number, along with other permutations of damages for the Arizona Biltmore based upon different projections, expense margins, and discount rates.

133.    Adjusting this number for the Group Services subsidy that Hilton will save when it no longer manages the Arizona Biltmore yields total lost profits to Hilton of $13,886,286 for the Arizona Biltmore.  (*Id.*)

**C.    The La Quinta.**

134.    Taking Mr. Morone's projections, deducting the 33% Corporate Overhead Fee, and applying Mr. Morone's 13.6% risk adjusted rate incorporating risk factors specific to the La Quinta yields lost profit damages to Hilton of $19,826,532 for the La Quinta.  (DX 3 at 17.) Attached hereto as Appendix D are demonstratives showing how the Debtors arrived at this number, along with other permutations of damages for the La Quinta based upon different projections, expense margins, and discount rates.

## IX.    THERE IS NO EVIDENCE OF ANY DAMAGE TO THE WALDORF=ASTORIA BRAND.

135.    Hilton also demands roughly $120 million in brand damages that have not been demonstrated.  (WAX 25 at 14, 69.)  Hilton admits that its brand damages claim is "somewhat speculative."  (Hilton Opening 6/27 Tr. 51:12-14 ("[O]bviously it's somewhat speculative ….").)

136.    Hilton bases its claim for brand damages on the expert testimony of Mr. Cline.  (WAX 25 at 61-73; Cline 7/3 Tr. 852-873.)

137.    Mr. Cline, however, has never provided a brand damages analysis related to rejection of a hotel management agreement, and no court or arbitrator has ever awarded brand damages on the basis of Mr. Cline's expert testimony.  (Cline 7/3 Tr. 937:25-938:7.)

### A.    There Is No Evidence That The Waldorf=Astoria Brand Will Be Damaged By Rejection Of The HMAs.

138.    The evidence is undisputed that Hilton cannot identify a single hotel that will leave, or refuse to join, the Waldorf=Astoria brand upon rejection of the HMAs.  Indeed, Hilton's President of Brands and Commercial Services, Mr. Paul Brown, testified that none of the existing Waldorf=Astoria owners have indicated that they will seek to terminate Hilton as manager if Hilton loses the HMAs.  (Brown 6/29 Tr. 309:19-23; *see also* Jaskulske 6/27 Tr. 215:6-8 (Q: "No Hilton had [sic] owner has told you that they would pull their property from Hilton if these resorts were lost, correct?"  A: "No.").)

139.    Nor could Mr. Brown identify prospective Waldorf=Astoria properties that will refuse to join the brand as a result of rejection of the HMAs.  (Brown 6/29 Tr. 315:2-15 (Q: "Okay.  And as to these hotels that have not yet signed, am I correct that none of the owners of these hotels have indicated that they will not join the Waldorf=Astoria brand if Hilton loses any of these contracts here?" A: "I'm not in communication with the owners, but I'm not aware." Q: "But that's not something that you've been told by any the these owners --" A: "No." Q: "--

correct?" A: "You're right.  Correct." Q: "And that's not a conversation that's been reported to you by anyone on your team, correct?" A: "That is correct.").)  Mr. Brown likewise could not identify any co-branding opportunities Hilton will lose upon rejection of the HMAs (Brown 6/29 Tr. 316:12-15 (Q: "But is it also correct you cannot identify any co-branding opportunities that Hilton will lose as a result of the rejection of these three contracts?" A: "Not at this time.").)

140.    In sum, Mr. Brown could not identify a single opportunity to expand the Waldorf=Astoria brand that would be lost as a result of the Debtors' rejection of the HMAs. (Brown 6/29 Tr. 316:20-25 (Q: "I just want to be clear. Am I correct that you cannot identify any specific opportunities to expand the Waldorf=Astoria brand that will be lost if Hilton loses the three management agreements at issue here?" A: "That is correct.").)

141.    Mr. Brown's testimony was echoed by Kevin Jacobs, Hilton's Treasurer, who testified that no Waldorf=Astoria opportunities actually have been lost as a result of rejection of the HMAs.  (Jacobs 6/29 Tr. 462:19-21 (Q: "And you're not aware of any Waldorf opportunities that have been lost based on this rejection claim, correct?" A: "Not specifically, no.").)

142.    The testimony of Ted Middleton, Hilton's Senior Vice President of Development, was to the same effect.  (Middleton 6/27 Tr. 173:2-5 (Q: "And you're not aware of any specific hotel opportunities that would be lost to Hilton if these contracts are rejected, correct?" A: "No specific opportunities; no, sir.").)  Similarly, Mr. Middleton was not aware of any development opportunity that would become more expensive for Hilton upon termination of the HMAs. (Middleton 6/27 Tr. 172:17-20 (Q: "Now you're not aware of any specific hotel opportunities that would become more expensive to Hilton if these contracts were terminated, correct?" A: "No, sir.").)

143.    Hilton's witnesses also conceded that, to their knowledge, there are no other

40

Hilton management agreements that contain a cross-default, that is, a provision giving the hotel owner a termination right if Hilton loses the HMAs.  (Brown 6/29 Tr. 310:6-11 (Q: "And am I also correct that you are not aware of any single management agreement for any Waldorf=Astoria property that gives the owner the right to terminate Hilton as manager if Hilton loses any of the three management agreements at issue here, correct?"  A: "That is correct."); Middleton 6/27 Tr. 172:23-173:1 (Q: "You're not aware of any management agreement that gives a hotel owner the right to terminate their agreement with Hilton if these particular contracts are terminated, correct?" A: "I'm not aware of that; no, sir[.]").)

144.    Hilton asserts that its failure to identify any lost opportunities to expand the Waldorf=Astoria brand stems from the fact that the possibility of termination has not been made public.  (Hilton Opening 6/27 Tr. 51:22-52:1 ("But the fact -- so the fact that it's not in the public that Hilton is going to be terminated should make it not surprising that you won't hear testimony, well we know that this person will terminate or that person will, or we won't get this contract or that contract.").)  Hilton's assertion is contrary to the evidence.

145.    Over a year ago, the Debtors announced, in a public filing, that they would seek to restructure or reject the HMAs.  (Brown 6/29 Tr. 310:16-23 (Q: "But you will agree that over a year ago, in May 2011, the debtors announced in a public filing in this court the possibility that they were going to restructure or terminate the Hilton management agreements, correct?" A: "That is correct." Q: "And that filing that talked about the potential rejection of management agreements is out in the public domain, correct?" A: "That is correct; if you searched for it, yes."); *see also* Jacobs 6/29 Tr. 452:12-453:2 (acknowledging that blogs and industry publications have discussed the possibility of the HMAs' rejection by the Debtors, and the fact that Hilton has known since May 2011 that the Debtors have a right to reject the HMAs.)  And

41

hotel owners have already heard rumors that Hilton may lose the three Resorts.  (Brown 6/29 Tr. 302:8-15.)

146.     Yet, during the pendency of this bankruptcy, the Waldorf=Astoria brand has actually expanded the number of its hotels with the addition of the Waldorf=Astoria Chicago, formerly the Hotel Elysian.  (Brown 6/29 Tr. 463:20-464:4.)

147.     In fact, Mr. Brown admitted that, even if the HMAs are rejected, Hilton expects to add at least six additional hotels to the Waldorf=Astoria brand in 2012, and another six hotels in 2013.  (JX 5; Brown 6/29 Tr. 317:4-17.)

148.     Overall, during the next four years, Hilton expects the number of hotels in the Waldorf=Astoria brand to nearly double, from 22 to 40, even if the HMAs are rejected.  (JX 5; Brown 6/29 Tr. 318:21-319:10; Cline 7/3 Tr. 944:6-11.)   As of the time of trial, Hilton still believed these projections were accurate.  (Brown 6/29 Tr. 319:3-10.)

149.     Even Hilton's expert, Mr. Cline, believes that Hilton will continue to grow the Waldorf=Astoria brand regardless of whether or not the HMAs are rejected.  (Cline 7/3 Tr. 944:15-17 (Q: "And you yourself believe that Hilton will continue to grow the Waldorf=Astoria brand and add new hotels, correct?"  A: "Oh, absolutely.").)

150.     In fact, Mr. Cline believes that by 2028, Hilton will add 2,500 rooms per year to the Waldorf=Astoria brand, notwithstanding that outside of the acquisition of the HMAs and the addition of Blackstone's luxury hotels, Hilton has never added more than 370 rooms to the Waldorf=Astoria brand in any single year.  (Cline 7/3 Tr. 945:15-946:5, 946:13-16, 946:19-21.)

### B.     Mr. Cline's "Development Forecast" Analysis Is Speculative And Unreliable.

151.     Notwithstanding the absence of any evidence that the Waldorf=Astoria brand will be damaged by rejection of the HMAs, Mr. Cline proffers two different analyses for measuring what he refers to as brand damages.  The first of these analyses, the "Development Forecast,"

purports to measure (i) "the likely termination of existing relationships with Hilton" that will result from rejection of the HMAs, and (ii) the reduced "pick-up rate" of new properties.  (*See* WAX 25 at 61.)  Hilton seeks $112 million based on this "development forecast" analysis.

152.    There was no evidence to support Mr. Cline's assumption that existing owners of Waldorf=Astoria hotels will terminate their relationships with Hilton upon rejection of the HMAs.  To the contrary, the record belies this assumption.  (*See* Findings of Fact ¶¶ 138-143, *supra*.)  Indeed, Mr. Cline could not identify a relationship with any existing Waldorf=Astoria hotel that would be terminated upon rejection of the HMAs.  (Cline 7/3 Tr. 941:12-17.)  Moreover, Hilton's own documents demonstrate that, going forward, Hilton expects to lose hotels from the Waldorf=Astoria brand for reasons having nothing to do with rejection of these HMAs.  (JX 5.)

153.    While Mr. Cline purported to calculate the existing rooms that would be lost from the Waldorf=Astoria brand, he fundamentally could not link up this projected lost inventory with any particular hotel anywhere in the world.  (Cline 7/3 Tr. 947:18-948:13.)

154.    Nor was there any evidence to support Mr. Cline's assumption that the Waldorf=Astoria brand will be able to "pick up" fewer hotels due to the rejection of the HMAs.  (*See* Findings of Fact ¶¶ 146-150, *supra*.)  And Mr. Cline admitted that if this assumption is flawed, his entire "development forecast" analysis is flawed.  (Cline 7/3 Tr. 941:25-942:10 (Q: "Basically, what you're saying is, because of the rejection of these contracts, Waldorf=Astoria will be able to pick up fewer hotels for the brand.  Is that right?"  A: "Because -- yes, because their developers will be disadvantaged."  Q: "And this assumption also is a linchpin of your brand damages model, correct?"  A: "It's a -- it's a component of it, yes."  Q: "If this assumption is flawed, then your brand damage model is flawed, correct?"  A: "Absolutely.  Correct.").)

C.    **Mr. Cline's Brand Impairment Analysis Is Speculative And Unreliable.**

155.    As an alternative to his "development forecast" analysis, Mr. Cline proffers an "impairment loss" analysis he believes calculates the impact of rejection of the HMAs on the value of the Waldorf=Astoria brand.  (*See* WAX 25 at 66.)  Hilton seeks $128M based on this impairment loss analysis.

156.    There are a number of problems that render Mr. Cline's impairment loss analysis speculative and unreliable.

157.    *First*, Mr. Cline's impairment loss analysis is premised upon the assumption that the departure of hotel rooms from the Waldorf=Astoria brand automatically harms the value of the brand.  But the evidence does not support this assumption.  (Brown 6/29 Tr. 320:15-19 (Q: "Now am I also correct that the fact that a hotel leaves the Waldorf=Astoria brand does not always cause damage to the value of the brand?"  A: "That is correct.  It depends on the circumstances under which it left the brand.").)

158.    In fact, the evidence demonstrates that the departure of hotels from the Waldorf=Astoria brand can actually *add* value to the brand.  (Brown 6/29 Tr. 323:4-18 (explaining that the departure of the El San Juan from the Waldorf=Astoria brand will be value accretive to the brand).)

159.    Hilton's own documents refute Mr. Cline's assumption that there is a direct correlation between number of rooms and brand value.  Between 2007 and 2011, the number of rooms in Hilton's system increased by roughly 140,000.  (DX 9 at WALD015193; DX 146.)  Yet, during that same period, Hilton's brand value decreased by more than $1 billion.  (DX 8; *see also* Jacobs 6/29 Tr. 460:10-13 (agreeing that Hilton's brand value has remained constant despite the addition of 835 new hotels).)

160.    *Second*, the results of Mr. Cline's impairment loss analysis are inherently suspect

44

and unreliable.  The total brand value of Hilton's entire enterprise -- consisting of more than 3,750 hotels and 600,000 rooms -- is $5.025 billion.  (DX 8; DX 9 at WALD015193; *see also* DX 4 at 3.)  Yet, according to Mr. Cline, the Waldorf=Astoria brand, which consists of 23 hotels and roughly 9,320 rooms, accounts for $2.265 billion in brand value.  (WAX 25 at 68.)  Thus, according to Mr. Cline, the Waldorf=Astoria brand, representing roughly one-half of one percent of Hilton's hotels and just 1.6% of Hilton's total rooms, accounts for nearly 50% of Hilton's entire brand value.  (DX 4 at 3.)

161.    **Third**, while Mr. Cline purports to calculate Hilton's impairment loss, Hilton has not in fact reported any brand impairment loss related to any possible rejection of the HMAs in its financial statements.  (Jacobs 6/29 Tr. 453:24-454:1.)

162.    **Fourth**, as demonstrated by the unrebutted Declaration of Joseph Floyd, one of the Debtors' experts, for Mr. Cline's $2.265 billion valuation to be supportable, it should reflect the amount that a willing buyer would currently pay for the Waldorf=Astoria brand.  (*See* Floyd Decl. ¶ 15.)  To test this assertion, Mr. Floyd calculated the effective after-tax earnings multiple based on Mr. Cline's brand valuation and the amounts presented in the schedule included at page 67 of Mr. Cline's Report:  the result is a multiple of approximately 107 times the current after tax earnings.  (*See id.*)  As Mr. Floyd correctly concluded, this multiple appears grossly excessive and well outside of the reasonable range that a willing buyer in a fair market value transaction would be willing to pay for the brand.  (*See id.*)  The 107 times multiple is also more than ten times higher than any earnings multiple that, according to Mr. Cline, would be applied to even the most highly-regarded brands.  (WAX 25 at 66.)

163.    **Finally**, Mr. Cline's attempt to characterize his impairment loss analysis as consistent with ISO 10668 is undermined by the credible evidence.  For one thing, ISO 10668

45

requires that, in any brand valuation, cash flows be calculated on an after-tax basis. Mr. Cline

did not do so. (Cline 7/3 Tr. 959:11-960:15.) ISO 10668 also requires that the discount rate

used for discounting future expected cash flows must be derived from Hilton's WACC, as

adjusted to reflect the specific risks of the brand. Again, Mr. Cline did not do so. (Cline 7/3 Tr.

965:3-20.)

### D.    Hilton's Alleged Brand Damages Were Not Reasonably Foreseeable At The Time Hilton Acquired The HMAs.

164.    The evidence negates any suggestion that the parties to the HMAs contemplated,

or could have foreseen, that the Debtors would have to pay hundreds of million of dollars in

brand damages upon rejection of the HMAs. The HMAs do not mention, let alone contemplate,

any recovery of brand damages upon termination. (*See* JXs 1-3.) Nowhere is any "brand"

damage mentioned or suggested in the HMAs, and the liquidated damages provision contained

therein does not provide for any brand damages recovery.

165.    Moreover, at the time it acquired the HMAs in 2006, Hilton had not placed any

value on the Waldorf=Astoria brand or the impact that these HMAs might have on that brand.

(Middleton 6/27 Tr. 171:1-11 (Q: "Let's talk about the efforts to value the halo benefits that you

talked about with Mr. Neff. Now you've never quantified any of those halo benefits." A:

"That's correct, sir." Q: "And you're not aware of anyone at Hilton who ever quantified those

halo benefits, correct?" A: "That's correct, sir." Q: "You're also not aware of anyone at Hilton

ever quantifying the halo benefits that went specifically [sic] this Waldorf brand, either." A:

"That's correct.").)

166.    In fact, since acquiring the HMAs, Hilton has never ascribed any specific value to

the Waldorf=Astoria brand. (Brown 6/29 Tr. 324:19-325:2 (Q: "Now am I correct that you are

not aware of Hilton itself ever ascribing an internal value to the Waldorf=Astoria brand?" A:

46

"I'm not aware of that."  Q: "And you are the president of brands, correct?"  A: "That is correct."

Q: "And the only analysis you've seen quantifying the Waldorf=Astoria brand is Mr. Cline's

expert report.  Is that right?"  A: "That is correct.").)

167.    Finally, the evidence demonstrates that the brand that Hilton launched with the

acquisition of the three HMAs is no longer in existence.  Specifically, the three Resorts were

used to launch a new Hilton brand called the "Waldorf Astoria Collection."  (Brown 6/29 Tr.

326:3-15 (Q: "And at Page 53, Lines 20 to 23, did I ask you the following question, did you give

the following answer: 'Are you aware that those three hotels were used to launch a new brand at

Hilton?'  Answer: 'I'm aware of that, yes.'  Was that your testimony?"  A: "Yes."  Q: "Okay.

And the name of that brand was the Waldorf=Astoria Collection, correct?"  A: "Yes."  Q: "And

in fact, these three hotels were the foundation of the Waldorf=Astoria Collection, correct?"  A:

"Yes."); *see also* Middleton 6/27 Tr. 166:21-167:7.)

168.    The Waldorf Astoria Collection was distinct from the Waldorf=Astoria brand,

which "started in 1939, with the New York property, the Waldorf=Astoria."  (Brown 6/29 Tr.

272:22-25.)    Indeed, in a 2008 press release, Hilton made clear that the Waldorf Astoria

Collection and Waldorf=Astoria were different brands under Hilton's luxury and lifestyle

umbrella.  (DX 141; Brown 6/29 Tr. 329:11-20 (Q: "And the last sentence of that reads: 'The

Waldorf=Astoria is a member of Hilton's luxury and lifestyle brands, along with the

Waldorf=Astoria Collection and Conrad Hotels and Resorts.'  Do you see that?"  A: "Correct."

Q: "So, at least according to this, it appears the Waldorf=Astoria Collection and Waldorf Astoria

are different brands within Hilton's luxury and lifestyles brand, correct?"  A: "Correct.").)

169.    The brand known as the Waldorf Astoria Collection was used at the same time

that Hilton used a different brand called Waldorf=Astoria Hotels & Resorts.  (Brown 6/29 Tr.

335:16-25 (THE COURT: "-- I just had one question, which is: Did the name that was used to unite all of these global historic properties; I guess it's Waldorf=Astoria Hotels and Resorts, did that name -- was it every [sic] used at the same time as the company used the name or term 'Waldorf=Astoria Collection'?"  THE WITNESS: "Yes.  So we would be using -- some hotels, even at that time, would be designated a Waldorf=Astoria.  So the Waldorf=Astoria New York was Waldorf=Astoria New York at the same time as we had a different naming convention for these three assets.").)

170.    Hilton discontinued the Waldorf Astoria Collection in 2010 because it was not associated with the "luxury, high quality and excellent service" that guests associated with the Waldorf=Astoria brand.  (*See* DX 11 at WALD011968.)  At that time, Hilton made the decision to unite all of its properties into a single luxury brand.  (DX 11 at WALD011971; Brown 6/29 Tr. 333:17-20 (Q: "So, according to this brochure, what Hilton is doing was uniting all of its properties into a single luxury brand called 'Waldorf=Astoria Hotels and Resorts,' right?"  A: "Yes.").)  Hilton's Global Head of Luxury Brands, John Vanderslice -- who reports directly to Mr. Brown -- characterized the elimination of the Waldorf Astoria Collection as an "important shift in our brand strategy."  (DX 11 at WALD011971; Brown 6/29 Tr. 334:2-12.)

171.    Today, the brand "Waldorf Astoria Collection" is no longer used.  (*See* Middleton 6/27 Tr. 169:22-170:9.)

## X.    HILTON CANNOT PROFIT FROM ITS $38 MILLION CLAIM FOR REIMBURSEMENT OF GROUP SERVICES IT WILL NO LONGER PROVIDE.

172.    All hotels in the Waldorf=Astoria brand pay either a Group Services Expense (applicable to the three Resorts and international hotels) or a program fee (applicable to domestic hotels).  (Brown 6/29 Tr. 283:19-25, 338:18-24.)

173.    The Group Services Expense payments and program fees are used to fund the

48

Group Services that Hilton provides to the Waldorf=Astoria branded hotels.  (*See* JX 5.)

174.    Hilton seeks approximately $17 million in lost Group Services Expense damages because, according to Hilton, it spends more on Group Services than it takes in from the Waldorf=Astoria branded hotels and, in the event of rejection of the HMAs, Hilton would fund an increased portion of the costs associated with the provision of Group Services to the other Waldorf=Astoria branded hotels from its own corporate resources.  (WAX 25 at 48.)

### A.    The HMAs Do Not Permit Recovery Of Any Group Services Expenses Following Termination.

175.    The HMAs expressly provide that Hilton cannot "profit" from Group Services Expense payments: "The cost of the Group Services shall be allocated among the Managed Hotels and other hotels and resorts that are operated by Manager's Affiliates in the United States of America, without profit or mark-up, in a fair and equitable manner as reasonably determined by Manager."  (JXs 1-3 at Art. 5.2.)

176.    There is nothing in the HMAs to suggest that the parties contemplated that the Debtors would be required to pay damages for foregone Group Services Expense payments in the event the HMAs were terminated.  (*See generally* JXs 1-3.)  In fact, the HMAs point to the opposite conclusion.  (JXs 1-3 at Art. 3.4.)

177.    Specifically, Article 3.4, the Termination on Sale provision, allows the Debtors to terminate the HMAs upon a sale of the Resorts after the twentieth anniversary of the HMAs.  (JXs 1-3 at Art. 3.4.)  In the event of a termination on sale, Hilton is entitled to a multiple (ranging from one to five times) of the Management Fee for the trailing twelve months.  (*Id.* at Art. 3.4.3; Cline 7/3 Tr. 896:11-21.)  The Management Fee, in turn, includes the 2% Base Fee and any Incentive Fee, but does not include the 2% Group Services Expense.  (JXs 1-3 at p. 6.)

178.    Thus, in the event of a termination on sale, Hilton does not receive a termination

fee based in any way upon Group Services Expense payments under the HMAs.  (JXs 1-3 at Art. 3.4.3, p. 6.)

### B.    <u>Hilton Will Replace Any Lost Group Services Expenses By 2014.</u>

179.    In arriving at a damages number of $17 million for foregone Group Services Expense payments, Mr. Cline assumed that it will take five years for Hilton to fully replace the Group Services Expense payments that Hilton would have received had the HMAs continued in effect.  (WAX 25 at 49.)

180.    According to Hilton's internal projections, however, Hilton will replace the Group Services Expense payments from the three Resorts in less than two years, that is, by 2014.  (JX 5; Brown 6/29 Tr. 354:5-12 (Q: "But according to [JX 5], it's based upon an assumption of termination on July 1, 2012, right?"  A: "Yes."  Q: "Okay.  And based on that assumption, by 2014, Hilton will be taking more in group services and program fees from the Waldorf=Astoria hotels, roughly 2 million more, than it did in 2012, based on this chart, correct?"  A: "That is correct.");  *see also* Cline 7/3 Tr. 928:2-4, 928:11-15.)

181.    Hilton's projections demonstrate that if the HMAs are terminated on July 1, 2012, the total Group Services Expense payments and program fees from the Waldorf=Astoria branded hotels will equal $20,922,580 for 2012.  (JX 5.)  By 2014, that number is projected to increase to $22,882,967, an increase of nearly $2 million above 2012 levels.  (JX 5; Brown 6/29 Tr. 353:12-354:1 (Q: "And according to this chart, Hilton expects to receive a total of 22.8 million in group service expense and program fees from its Waldorf=Astoria hotels in 2014, correct?"  A: "In this analysis, yes."  Q: "And that's an increase of roughly 2.3 million over 2013, correct?"  A: "That would be the math, yes."  Q: "And it's an increase of almost 2 million over 2012, correct?"  A: "Yes."  Q: "So, at least according to these projections, within two years of rejection of these agreements, Hilton will be taking in more in program fees and group service expense than it did

in 2012, correct?"  A "Yes.").)

182.    Furthermore, Hilton expects that its Group Services Expense payments and program fees will continue to increase each year after 2014.  (Brown 6/29 Tr. 354:13-16 (Q: "Okay.  And according to Hilton, the Waldorf=Astoria program fees and group services will continue to increase each year after that, correct?"  A: "That is correct.").)

**C.**    **Hilton Cannot Recover Damages For Loss Of Group Services Expenses Because It Can Choose To Avoid Incurring Any Such Damages.**

183.    Moreover, Hilton has complete discretion as to how much it spends on Group Services for the Waldorf=Astoria branded hotels.  (Brown 6/29 Tr. 337:18-20 (Q: "And just so I'm clear, Hilton has discretion as to how much it can spend on the Waldorf=Astoria Brand, correct?"  A: "That is correct.").)

184.    There is nothing in any Waldorf=Astoria management agreement that requires Hilton to spend more on marketing the Waldorf=Astoria brand than Hilton receives in Group Services Expense payments.  (Brown 6/29 Tr. 338:11-17 (Q: "But I just want to make sure I get my question answered which is: There's nothing in any Waldorf=Astoria management agreement that requires Hilton to spend more on marketing the brand than it takes in, in group services expense --"  A: "No."  Q "-- correct?"  A: "That is correct.").)

185.    In October of each year, Hilton determines the amount it will spend on the Waldorf=Astoria brand for the coming year.  (Brown 6/29 Tr. 337:21-24 (Q: "And in October of each year, Hilton determines the brand spend for the coming year, correct?"  A: "That's the middle of our budget cycle; yes, that is correct.").)

186.    Hilton can increase or decrease the amount it spends on the Waldorf=Astoria brand as it sees fit.  (Brown 6/29 Tr. 337:25-338:2 (Q: "And Hilton can increase or decrease the brand spend as it see fits, correct?"  A: "That is correct.").)

187.    In 2013, for example, Hilton plans to reduce the amount it spends on Group Services for the Waldorf=Astoria branded hotels by roughly $1 million dollars, including a reduction of roughly $500,000 in advertising and marketing.  (JX 5; Brown 6/29 Tr. 343:15-344:8.)

188.    Notably, Hilton would not impose these budget cuts if it thought doing so would hurt the Waldorf=Astoria brand.  (Brown 6/29 Tr. 342:19-343:2 (Q: "And I take that it is the job of the luxury and lifestyle brand team to promote the Waldorf=Astoria brand, corrects [sic]?"  A: "Yes, it is."  Q: "They're not going to take any action that they think is going to be harmful to the brand, correct?"  A: "That is correct."  Q: "And they are not going to cut the budget in a way that they think would be harmful to the brand, correct?"  A: "That is -- that is correct.").)

189.    Hilton can further control the amount that it decides to "deficit spend" on the Waldorf=Astoria brand by exercising its discretion to "rebrand" a hotel and move it into the Waldorf=Astoria brand.  (Brown 6/29 Tr. 340:12-14 (Q: "And the decision whether to rebrand a hotel is a discretionary one, correct?"  A: "Yes, it is.").)

190.    For example, moving a hotel into the Waldorf=Astoria brand -- as Hilton did with its Caledonian hotel -- would increase the total sources of funds for the brand and decrease the amount that Hilton decides to deficit spend on the brand.  (Brown 6/29 Tr. 341:5-9 (Q: "Now Hilton can also rebrand properties to move them into the Waldorf=Astoria brand, correct?"  A: "We could."  Q: "In fact, we saw that with the Caledonian, correct?"  A: "That is correct."); Brown 6/29 Tr. 341:14-20 (Q: "And moving a hotel into the Waldorf=Astoria brand would increase the total sources of fund -- funds for the Waldorf=Astoria brand, correct?"  A: "That is correct."  Q: "And that could decrease the amount that Hilton has to deficit-spend on the brand, correct?"  A: "That is correct.").)

52

191.    By 2016, Hilton expects to take in more in Group Service Expense payments and program fees than it will spend on Group Services for the Waldorf=Astoria brand and, thereafter, Hilton will begin paying off its prior deficit spending on the brand.  (Brown 6/29 Tr. 346:25-347:7 (Q: "And so according to this, by 2016, Hilton will be taking in more in program fees and group service expense than it will be spending on the brand, correct?"  A: "That is correct."  Q: "And when you reach that point, Hilton is going to start paying off all of its prior deficit spending on the brand, correct?"  A: "That is correct.").)

192.    Hilton's decision to deficit-spend on a brand is nothing new; it is a decision Hilton has historically made.  (Brown 6/29 Tr. 341:21-24 (Q: "Now the fact that Hilton deficit-spends on the Waldorf=Astoria brand is nothing new; it's something that Hilton has done historically, correct?"  A: "That is correct.").)

193.    Hilton treats its deficit spending on the Waldorf=Astoria brand as a liability on its balance sheet specifically because Hilton expects to recoup all of its deficit spending.  (Brown 6/29 Tr. 347:15-18 (Q: "Because you anticipate recouping the investment of your deficit spending, Hilton does not expense its deficit spending, correct?"  A: "That is correct."), 348:7-13 (Q: "Okay. But as of right now, Hilton treats its deficit spending as a liability on the books, correct?"  A: "That is correct. It's evaluated every year on whether we can do that or not."  Q: "And that's because there's an expectation that Hilton will recoup its investment in the Waldorf=Astoria brand, correct?"  A: "That is correct.").)

194.    According to Hilton's own assessment, it will be able to recoup all of its deficit spending on the Waldorf=Astoria brand even if it loses the management agreements for these Resorts.  (Brown 6/29 Tr. 349:24-350:2 (Q: "Okay.  And according to Hilton's assessment, it will be able to recoup its investment in the Waldorf=Astoria brand even if it loses these three

management agreements, correct?"  A: "According to this analysis, that is correct.").)

> **D.** **Hilton's Claim That It Is Entitled To "Key Money" Damages Is Speculative And Unsubstantiated.**

195.    Hilton also seeks approximately $21 million for "Key Money" that it claims it will have to pay to acquire management agreements that would produce the stream of Group Services Expense payments that Hilton would have received had the HMAs remained in effect. (*See* WAX 25 at 49.)  There is no basis to that request.

196.    As an initial matter, Hilton cannot identify which hotel management agreements this Key Money will be used to acquire.  (Cline 7/3 Tr. 933:17-25 (Q: "Now you can't tell me which specific hotel management agreements Hilton will be buying with this key money, correct?"  A: "No, absolutely not."  Q: "You can't tell me when Hilton is going to spend this key money, correct?"  A: "Yes.  I project it will be on the last day of fifth year."  Q: "But you don't know what management agreement they're going to be buying on that day, right?"  A: "No.").)

197.    Moreover, Hilton acknowledges that the unidentified management agreements that it may one day acquire with an unknown amount of Key Money could very well be management agreements that Hilton would seek to acquire regardless of whether the HMAs are rejected.  (Cline 7/3 Tr. 935:18-936:5.)

198.    That is because Hilton is a growth company that is always looking at the possibility of expanding its brand by acquiring management agreements through the payment of Key Money.  (Middleton 6/27 Tr. 163:1-4 (Q: "Hilton is always looking at the possibility of expanding its brand by entering into new management agreements by paying key money."  A: "Correct.").)

199.    Thus, even if the HMAs remained in place, Hilton would look to acquire new management agreements through Key Money deals.  (Middleton 6/27 Tr. 163:5-7 (Q: "Hilton is

going to -- or Hilton is looking at key money deals if it keeps these agreements, right?"  A: "Yes, sir.").)

200.    In estimating the Key Money that Hilton would need to pay to secure Group Services Expense payments to replace the ones from the Resorts, Mr. Cline estimated the Group Services Expense payments that the Resorts would have made through 2034, discounted that number back to present value, and then simply took 25% of the present value.  (Cline 7/3 Tr. 932:20-933:16.)

201.    Mr. Cline claims to base his assumption of a 25% ratio in part on conversations that he had with Mr. Ted Middleton, Hilton's Vice President of Development.  (Cline 7/3 Tr. 936:22-25 (Q: "You said that assumption was based on your experience and confirmed by your conversations with Mr. Middleton.  Is that right?"  A: "Correct.").)

202.    Mr. Middleton, however, testified that he had done no analysis of the amount of Key Money that Hilton would be required to pay to replace the Group Services Expense payments from the Resorts, nor was he aware of anyone else at Hilton doing such an analysis. (Middleton 6/27 Tr. 163:11-19 (Q: "You've done no analysis of the amount of key money Hilton would be required to pay to produce the payment stream if it -- if it were to keep these agreements; in other words, what's the difference the key money would have to pay [sic] if these agreements were rejected or if Hilton keeps them."  A: "I'm not aware of anybody doing that analysis within Hilton."  Q: "So you haven't done that analysis, and you don't know anyone at Hilton who has?"  A: "That's correct; yes, sir.").)

203.    Another Hilton witness, Mr. Jacobs, confirmed that Hilton has conducted no analysis of the Key Money Hilton would be required to pay to replace the Resorts' Group Services Expense payments.  (Jacobs 6/29 Tr. 461:14-17 (Q: "Hilton hasn't conducted an

analysis of exactly what it would cost in key money or any other expense to replace these specific contracts, correct?"  A: "No, we have not.").)

## XI.    HILTON IS NOT ENTITLED TO $10 MILLION IN DAMAGES FOR A $250 MILLION GRAND WAILEA EXPANSION THAT IS NEITHER REQUIRED NOR CONTEMPLATED.

### A.    The Debtors Have No Obligation To Undertake The Grand Wailea Expansion.

204.    Hilton assumes that the Debtors will spend over $250 million to add 300 rooms to the Grand Wailea Resort (the "Grand Wailea Expansion").  (WAX 25 at 74.)  There is no evidentiary basis for this assumption.

205.    The Grand Wailea has been seeking approval for the large-scale, 300-room Grand Wailea Expansion since at least 2007.  (Bailey 7/2 Tr. 672:1-4 (Q: "To your knowledge, for how long has the resort been seeking approval for the expansion?"  A: "I believe it -- the process started under CNL.  It was underway when I got to the hotel in 2007.").)  The Resort has had the ability to increase the number of rooms by fourteen, however, dating back to the early 1990s. (Shumaker 7/13 Tr. 1039:5-17.)

206.    In April 2012, the Grand Wailea received final approval for a Special Management Area (SMA) permit from the Maui Planning Commission.  (Shumaker 7/13 Tr. 1029:20-21 (Q: "The final approvals were obtained in April of 2012?"  A: "Yes."); Bailey 7/2 Tr. 672:10-14 (explaining that the Maui Planning Commission has approved the SMA permit, "which allows them to now go to design and seek building permits").)

207.    But it is undisputed that the Debtors have no obligation to undertake the $250 million Grand Wailea Expansion.  (Bailey 7/2 Tr. 713:10-16 (Q: "And you understand that the management permit that the debtors got, that doesn't obligate any actual construction at the property, correct?"  A: "No, it does not."); Cline 7/3 Tr. 922:5-11 (Q: "Now just so I'm clear,

56

Hilton does not have the right to force the owners to undertake the Grand Wailea expansion, correct?"  A: "Of course not."  Q: "There's nothing in the management agreements that obligates the owners to undertake the Grand Wailea expansion, correct?"  A: "Nothing whatsoever.").)

208.    The SMA permit likewise does not obligate the Debtors to undertake the Grand Wailea Expansion.  And the time the Debtors have to commence and complete the Grand Wailea Expansion can be extended under the SMA permit.  (Bailey 7/2 Tr. 713:20-714:1.)

209.    It is further undisputed that, at present, the Debtors have no plans to expand the Grand Wailea, and likely will not do so as long as Hilton is managing the Resort as a result of Hilton's sub-par performance.  (*See* Shumaker 7/13 Tr. 1021:16-1022:6 (Q: "Do the debtors intend to expand the Grand Wailea by 300 rooms?"  A: "We -- we have no plans to expand the resort today."  Q: "And why is that?"  A: "Well, I think, again, similar to how we look at project CapEx, the expansion, you know, while we haven't done the costing required to really know what the total cost would be, you know, I believe it would be at least a couple hundred million dollars, if not more; so it would be a huge capital outlay.  You know, based on the performance of the resort, with revenues increasing and profits actually decreasing, it wouldn't make any sense to invest that kind of money and to expand the resort until we better understand what economics look like, and then feel comfortable that there will be -- that the return on that investment will make sense." ).)

210.    Hilton's witnesses confirmed at trial that the Debtors have never committed to expanding the Grand Wailea while Hilton is Manager.  (*See* Jaskulske 6/27 Tr. 241:3-8 (Q: "Now, with respect to the expansion that you heard other witnesses talk about today, and I believe you might have addressed, the debtors have never told you that they are willing to build 300 new guest rooms at the Grand Wailea over the next few years while Hilton is managing,

correct?"    A: "Correct."); Bailey 7/2 Tr. 713:13-15 (Q: "Neither the debtors nor their asset manager have committed to building a certain number of rooms, right?"    A: "That is correct.").)

211.    Indeed, Hilton agrees that having unconfirmed plans to expand a property is "absolutely" different from actually committing the funds to do so.  (Middleton 6/27 Tr. 172:13-16 (Q: "And as someone with a lot of experience in development, we can agree that the option of building or expanding a resort is very different than actually committing funds to do it --" A: "Oh, absolutely, yes, sir.").)

### B.    Hilton's Contemplated Expansion Would Negatively Impact The Grand Wailea's Performance.

212.    Hilton's expert, Mr. Cline, assumes that expanding this resort by 310 guest rooms, or roughly 40%, would have no impact on the property's overall occupancy and average daily rate.[9]  (*See* WAX 25 at 74-75.)  This assumption is fatally flawed.

213.    First, the Grand Wailea Expansion would actually dilute occupancy rates and average daily rate ("ADR") at the Resort during construction.  (Bailey 7/2 Tr. 715:5-11 (Q: "We can agree that, if new rooms were constructed, occupancy and rate at the Grand Wailea would be affected?"    A: "During the construction period?"    Q: "During the construction."    A: "It's probably fair to assume that, although I don't know that anyone has run the numbers to determine what that impact would be.").)

214.    In fact, the Grand Wailea Expansion would likely have a long-term negative effect on occupancy and ADR at the Resort, as there is no proven market demand for a roughly 40% increase in supply of Grand Wailea rooms at the existing price point.  (DX 4 at 9.)

---

[9]    Although Mr. Cline asserts that "[t]he expansion project provides for the addition of 310 guest rooms," (WAX 25 at 74), the settlement reached regarding the Expansion reduces the number of rooms from 310 to 300.

215.    There could also be a drop in certain group sales if 300 rooms were added to the Grand Wailea over the next six years.  (Bailey 7/2 Tr. 715:12-15 (Q: "If 300 rooms were added to the Grand Wailea over the next six years, there could be a loss to certain group sales as well, correct?"  A: "Could be.").)

216.    Second, construction on such a massive scale will disrupt daily operations and resulting revenue.  (DX 4 at 9; Shumaker 7/13 Tr. 1036:14-17 (referring to a 300-room Grand Wailea Expansion as "a pretty substantial undertaking" and acknowledging "all the disruption you'd have if you suddenly started tearing apart the resort and, you know, doing heavy construction and adding 300 rooms"); Morone 7/13 Tr. 1091:17-1092:8 (Q: "Do you believe that the Grand Wailea expansion would negatively impact revel [sic] revenues at the resort during the construction period?"  A: "Yes."  Q: "Why do you say that?"  A: "There's a -- both a protocol and real application.  On the -- on the real application, the industry, the hotel industry generally includes clauses in group contracts that say, if there's construction or renovation, we can back out of our contract.  It's a very, very common theme.  We would have some group -- I believe, group cancellations.  This would be a very big construction project.  With a big construction project, you may have rooms out of order, you may have amenities out of order, you may have restaurants and bars out of order.  You're going to have a lot of noise, a lot of people running around the site building a new hotel.  And I think it would be disruptive to the business.").)

217.    The Managing Director of the Grand Wailea, Mr. Bailey, confirmed that when there is construction at the Grand Wailea it may cause otherwise available rooms to go offline. (*See* Bailey 7/2 Tr. 714:11-17.)  For example, when the Grand Wailea underwent renovations from February through June of 2008, it was deprived of 5% of its annual inventory with over 13,000 room nights offline during the renovation period.  (Bailey 7/2 Tr. 696:22-697:1 (Q: "In

2008, there were renovations at the resort, correct?"  A: "Yes, that's correct?"  Q: "I believe five

percent of the rooms were out of service during those renovations, correct?"  A: "That's

correct.").)

218.    Additionally, prior construction at the Grand Wailea has forced the Resort to

provide economic concessions to customers.  (Bailey 7/2 Tr. 714:25-715:4 (Q: "During the time

that there has been prior construction at the Grand Wailea, there were discounts given to people

who stayed at the property, to compensate for the noise and the hassle of dealing with

construction."  A: "That's pretty normal in the industry, yes.").)

## PROPOSED CONCLUSIONS OF LAW

### I.    HILTON IS LIMITED TO THE CONTRACT DAMAGES IT CAN PROVE WITH REASONABLE CERTAINTY.

219.    Under the Bankruptcy Code, rejection of an executory contract "constitutes a

breach of such contract … immediately before the date of the filing of the petition."  *See* 11

U.S.C. § 365(g) (2006).[10]  Thus, the Bankruptcy Code prohibits Hilton from claiming rescission

damages as rejection damages.  *See, e.g., In re Onecast Media, Inc.,* 439 F.3d 558, 563 (9th Cir.

2006)  ("[R]ejection of an executory contract in accordance with applicable provisions of the

Bankruptcy Act is not the equivalent of rescission."); *In re Rudaw/Empirical Software Prods.

Ltd*., 83 B.R. 241, 245 (Bankr. S.D.N.Y. 1988) ("[T]he rejection of an executory contract is not

the equivalent of rescission.").

220.    "The damages for a contract's rejection are determined in accordance with the law

that would govern the value of the claim outside the context of bankruptcy."  *In re WorldCom,

Inc.*, 361 B.R. 675, 684 (Bankr. S.D.N.Y. 2007).   Here, Arizona Law governs the Arizona

---

[10]    Because the Debtors have been paying Hilton's Management Fees in the ordinary course, damages will not begin to accrue until and unless the Debtors decide to reject Hilton, the Court ultimately approves of the Debtors' rejection of the HMAs, and the Debtors actually reject Hilton.

Biltmore HMA, Hawaii Law governs the Grand Wailea HMA, and California Law governs the
La Quinta HMA.  (*See* JXs 1-3 at Art. 15.5.)

221.    Hilton's recovery is limited to only those damages that were reasonably
foreseeable by the parties when Hilton entered the HMAs.  *See*, *e.g.*, *Blackburn v. Goettel-
Blanton*, 898 F.2d 95, 97 (9th Cir. 1990) ("Under a breach of contract theory [under Hawaii law],
the plaintiffs were entitled only to the benefit of their bargain."); *Martin v. United States*, 649
F.2d 701, 705 (9th Cir. 1981) (under California law, "expectation damages" are "characteristic of
a contractual action"); *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d
257, 262 (Cal. 2004) (noting that expectation damages are, by definition, only those that were
"reasonably foreseeable when the contract was formed"); *Enyart v. Transamerica Ins. Co.,* 985
P.2d 556, 561 (Ariz. Ct. App. 1998) (awarding non-breaching party to contract his
"entitle[ment]" to "expectation damages").

222.    Moreover, at all times, it is Hilton's burden to prove its damages with "reasonable
certainty."  *Walter v. Simmons*, 818 P.2d 214, 221 (Ariz. Ct. App. 1991) ("In an action for breach
of contract, the burden clearly is on the plaintiff to prove the amount of his damages with
reasonable certainty.").

223.    Damages that are "speculative, remote or uncertain" are not recoverable.  *Dillon
Real Estate Co. v. Am. Nat. Ins. Co.*, No. CV-08-01508, 2010 WL 4682455, at *1 (D. Ariz. Nov.
10, 2010); *Omura v. Am. River Investors*, 894 P.2d 113, 115 (Haw. Ct. App. 1995) ("While lost
profits do not necessarily have to be determined with mathematical certainty … the extent of loss
must be shown with reasonable certainty and cannot be based upon mere speculation or guess.").

224.    Hilton may only recover damages proximately caused by rejection of the HMAs.
*Electro Lock, Inc. v. Core Indus., Inc.*, No. B13436, 2002 WL 1057468, at *9 (Cal Ct. App. May

28, 2002) ("Moreover, under contract principles, the nonbreaching party is entitled to recover only those damages, including lost future profits, which are proximately caused by the specific breach."); *Jones v. Johnson*, 41 Haw. 389, 393 (1956) ("The general rule is that in an action for damages for breach of contract only such damages can be recovered as are the natural and proximate consequence of its breach; that the damages recoverable must be incidental to the contract and be caused by its breach; as the cases express it, such as may reasonably be supposed to have been in the contemplation of the parties at the time the contract was entered into.").

225.    Hilton cannot recover, as it seeks to do through its damages model, an impermissible windfall that would place it in a better position than if the HMAs were actually to remain in place.  *Lucente v. Int'l Bus. Machs. Corp.*, 146 F. Supp. 2d 298, 304 (S.D.N.Y. 2001) ("Damages for breach of contract are intended to place a party in the same position he would have occupied if the breach had never occurred.  They are not designed to create windfall recoveries."); *Luquetta v. Regents of the Univ. of Cal.,* No. A128882, 2012 WL 1499040, at *15 (Cal. Ct. App. Apr. 30, 2012) ("[N]o one should reap a windfall from the breach of a contractual obligation").

## II.    HILTON CAN ONLY RECOVER DAMAGES OF $46,232,939 FOR THE DEBTORS' REJECTION OF THE HMAS.

226.    The only damages pertaining to the termination of the HMAs that were reasonably foreseeable to the parties are Hilton's lost profits.

227.    The Debtors' lost profits damages calculation and underlying lost profits model are reasonably certain and consistent with the terms of the HMAs.

228.    Hilton's lost profits damages model, by contrast, is not only premised upon speculation, but upon speculation that is fundamentally inconsistent with the HMAs.  *See Scott v. Pac. Gas & Elec. Co.*, 904 P.2d 834, 845 (Cal. 1995) ("It is fundamental that contract damages

which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery."); *DeVore Const. v. Tirapelli*, No. C059240, 2009 WL 3246415, at *5 (Cal. Ct. App. Oct. 9, 2009) ("To recover lost profits, a plaintiff must prove both its occurrence and extent with reasonable certainty.").

229.   Specifically, Hilton's projections of lost revenues improperly and speculatively assume the Resorts would receive approximately $76 million more in capital expenditures than the HMAs require.

230.   This assumption is belied by the terms of the HMAs and uncontested record evidence that the Debtors have never committed to fund capital expenditures beyond the contractually required 4% of revenues, as there is no evidence that such expenditures would drive increased performance at the Resorts.   (*See* Findings of Fact, ¶¶ 45, 52); *Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 221 Cal. Rptr. 171, 194 (Ct. App. 1985) ("A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities.").

## III.   HILTON MUST OFFSET THE CORPORATE OVERHEAD EXPENSES THAT IT WILL NO LONGER INCUR FOLLOWING REJECTION.

231.   The best evidence of what damages were contemplated by the parties lies in the express language of the HMAs.   *Trustees of the PAMCAH-UA Local 675 Trust Funds v. Drain-N-Rooter Plumbing, Inc.*, Civ. No. 11-00565, 2012 WL 1203470, at *4 (D. Haw. Mar. 22, 2012) (citing *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 839 P.2d 10, 33-34 (Haw. 1992)) ("[A] court should construe the plain and unambiguous language of a contract in determining whether particular damages were reasonably within the contemplation of the parties."); *Armstrong v. Lassen Lumber & Box Co.*, 269 P. 453, 455 (Cal. 1928) ("It is a well-settled rule that the damages that can be recovered for any breach of contract are only such as may reasonably be

supposed to have been in the contemplation of the parties at the time of entering into the agreement, as the probable result of a breach ... The understanding and intention of the parties in this regard must of course be ascertained from the language of the contract, in the light of such facts.").

232.    Hilton cannot vary the unambiguous terms of the HMAs through expert testimony, such as Mr. Cline's testimony that the HMA provisions on the Corporate Overhead Fee are "irrelevant," a "curiosity," or "the product of faulty drafting." (*See* Findings of Fact, ¶¶ 30, 50, 64, 73.) *See In re Tobacco Cases I*, 111 Cal. Rptr. 3d 313, 320 (Ct. App. 2010) ("[T]he interpretation of contractual language is a legal matter for the court … expert opinion on contract interpretation is usually inadmissible."); *Pulawa v. GTE Hawaiian Tel*, 143 P.3d 1205, 1217 (Haw. 2006) ("Generally, the testimony of expert witnesses is … confined to matters of fact, as distinguished from matters of law.  In other words, an expert or nonexpert opinion that amounts to a conclusion of law cannot be properly received in evidence, since the determination of such questions is exclusively within the province of the court."); *see also N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir. 1997) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.").

233.    The plain terms of the HMAs do not contemplate Hilton's recovery of the Corporate Overhead Fee in the event of termination by the Debtors.  Indeed, the HMAs consistently define the Corporate Overhead Fee as a ***reimbursement,*** rather than as a profit, to Hilton. (*See* Findings of Fact, ¶¶ 29-30.)

234.    The liquidated damages provisions of the HMAs confirm the parties' contractual intent to treat the Corporate Overhead Fee as an expense reimbursement, not a profit center.  As noted, under the liquidated damages provision, Hilton is entitled to a multiple of its Management

Fee -- meaning the Base Fee and any Incentive Fee -- for the prior twelve months, but is not entitled to any multiple of the Corporate Overhead Fee.

235.    The expense allocation set forth in the HMAs is consistent with credible industry data, including treatises cited by Hilton's own expert, as to the expenses that hotel management companies incur in managing assets.  (*See* Findings of Fact, ¶¶ 68-71.)

236.    The Corporate Overhead Fee should be excluded from Hilton's lost profits damages for the additional reason that it simply reimburses Hilton for management expenses that it will no longer incur upon rejection.  (*See* Findings of Fact, ¶¶ 75-84.)  *See Armored Grp., LLC v. Supreme Corp.*, No. CV09-414, 2010 WL 4736312, at *4 (D. Ariz. Nov. 16, 2010) ("[T]he basic formula for calculating lost profit damages is gross profits minus the costs the plaintiff would have incurred to generate those profits."); *Avery v. Fredericksen & Westbrook*, 154 P.2d 41, 43 (Cal. Ct. App. 1944) ("The plaintiff could not recover beyond the injury sustained, *and it was improper to award compensation for an expense which might never be incurred.*") (emphasis in original).)

237.    Hilton's claim that damages in this case should include no reduction for corporate overhead expenses is barred not only by the unambiguous language of the HMAs, but also by Hilton's failure to carry its burden of demonstrating the specific amount of corporate overhead attributable to the Resorts.  *Omura*, 894 P.2d at 115 (noting that the plaintiff "had the burden of proving his costs with competent evidence but failed to do so" and holding that "a plaintiff fails to prove lost profits, i.e., net profits, where the plaintiff submits evidence of lost gross sales revenue but neglects to submit any evidence of costs or expenditures related to the gross sales revenue"); *Tourelle Dev., Inc. v. Proffitt*, No. 1 CA-CV 09-0138, 2010 WL 1050316, at *3 (Ariz. Ct. App. Mar. 23, 2010) (because plaintiffs "provided no evidence of the costs that reasonably

would be incurred before the lots would be sold, they presented no rational basis for a fact-finder to determine the lost profits the Project reasonably could be expected to yield").

238.    That is, even putting aside the contract language, it was Hilton's burden to prove up its corporate overhead with reasonable certainty, and Hilton failed to do so.  Hilton's claim of 0% corporate overhead is incredible and belied by its own statements and other record evidence. (*See* Findings of Fact, ¶¶ 57-84.)  It is therefore entitled to no weight.

## IV.    THE DEBTORS' DISCOUNT RATE IS CORRECTLY DETERMINED UNDER APPLICABLE LAW.

239.    In calculating the discount rate, the Debtors properly began with Hilton's WACC at the time the HMAs were acquired and then appropriately adjusted upward to reflect the specific risks of the HMAs.  *See In re M Waikiki LLC*, No. 11-02371, 2012 WL 2062421, at *4 (Bankr. D. Haw. June 7, 2012) ("Although WACC is a reasonable starting point in determining a proper discount rate, WACC must be adjusted upwards because the Base Management Fees are more risky than Marriott's aggregate stream of income."); *see also Olson v. Nieman's, Ltd.*, 579 N.W.2d 299, 312 (Iowa 1998) (adopting expert's 19.4% discount rate comprised of 14.4% to reflect the normal rate of return for publicly held corporations and 5% to reflect the market risk for the device in calculating reasonable royalties for misappropriation of a trade secret).

240.    The Debtors' upward adjustments for the risks of these properties are well-supported based on their use of Ibbotson's Size Risk Premium, a reliable method for calculating the risks associated with specific investments.  *See, e.g.*, *In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2008 WL 2037592, at *55, 56 (Bankr. D.D.C. May 12, 2008) ("the Ibbotson yearbook is sort of the Bible … for determining equity risk premiums" and agreeing with both experts that an Ibbotson Yearbook is "a good starting point for determining a risk premium for the size of a company").

241.    By contrast, neither of Hilton's experts base Hilton's proposed discount rates on Hilton's WACC at the time it entered the HMAs, which is the accepted starting point.  (*See* Findings of Fact, ¶¶ 93, 120.)  *See In re M Waikiki LLC*, 2012 WL 2062421, at *4.

242.    Nor does the 8% discount rate derived by Mr. Cline or the 7.5% discount rate derived by Mr. Hennessey reflect the specific risks of the HMAs at the time that they were acquired by Hilton.  *See In re Mirant Corp.*, 332 B.R. 139, 157 n.49 (Bankr. N.D. Tex. 2005) (an appropriate discount rate should include "a risk factor based upon an *ex ante* view of the debtor's creditworthiness, that is its creditworthiness at the time the parties entered into the contract"); *In re Chemtura Corp.*, 448 B.R. 635, 677 (Bankr. S.D.N.Y. 2011) ("the relevant time to consider the obligor's risk is the time at which the underlying contract was entered into").

243.    What is more, Hilton's proposed 8% discount rate could never be the appropriate discount rate for lost profits flowing from these contracts, because it is merely the generic rate that Hilton has applied to the base fees for ***all*** of its hotel management agreements for at least the past six years.  (Findings of Fact, ¶ 94.)

244.    Moreover, because Hilton's proposed 8% discount rate applies only to base management fees, and not incentive management fees, this rate does not accurately value the risk of Hilton's ***entire*** investment, that is, the HMAs.  *See In re Chemtura Corp.*, 448 B.R. at 673 ("existing caselaw and common sense require that the discounting to fix the damages award must reflect the same payment risk, insofar as the court can accomplish that, as the original contract did").

245.    Hilton also fails to properly account for the presence of the Performance Test that could terminate its management of all three of the HMAs.  As the court stated in *In re M Waikiki LLC*:

67

> Marriott's fee income after the performance test comes into effect
> are substantially more uncertain than for the period before the
> performance test.  I find that Marriott would probably have passed
> the performance test, likely avoiding a possible termination by the
> Debtor.  But this finding is not free from doubt.  Even a relatively
> small variation in the Hotel's performance would trigger the
> Debtor's right to terminate the Management Agreement, requiring
> Marriott either to accede to termination or make a potentially
> sizable cure payment to the Debtor.  Therefore, the fee income for
> the period after the performance test is triggered should be subject
> to a significantly higher discount rate.

*In re M Waikiki LLC*, 2012 WL 2062421, at *5.

246.   Hilton's claim that the HMA performance test is irrelevant because it is "weak" is misguided.  The law is clear that a discount rate must reflect the risk of early termination under a performance test even where a manager is unlikely to fail the test or where its failure can be cured.  *Id*.

247.   Hilton does not adjust its discount rate to reflect the Performance Test in the HMAs, notwithstanding the uncontested testimony that there currently exists a possibility that any of the three Resorts could fail the HMAs' Performance Test.  (*See* Findings of Fact, ¶¶ 104-115.)

248.   The discount rate must be adjusted upward by at least 400 basis points based on the analysis of Hilton's own expert to account for this risk of early termination.  (*See* Findings of Fact, ¶¶ 116-117.).

## V.   HILTON'S DAMAGES MUST ACCOUNT FOR PAYMENTS IT WOULD MAKE IF IT CONTINUED TO PERFORM.

249.   The Debtors correctly accounted for payments that Hilton would have made had it continued performing.  *See Pet Food Express Ltd. v. Royal Canin USA, Inc.*, No. CV 09-01483, 2011 WL 1464874, at *12 (N.D. Cal. Apr. 18, 2011) ("Failure to reduce damages due to uncertainty of lost profits towards the end of the … agreement ignores the contingency in the

68

agreement that would have allowed defendant to terminate the agreement prior to [the end of the term] for plaintiff's failure to perform its contractual duties and obligations… .").

250.    The Debtors are correct in offsetting the lost profits amounts by cure payments Hilton would be forced to pay resulting from its failure of the Performance Test in 2012 and 2013.  (*See* JX 2 at Art. 3.3.1; DX 2 at 12-16.)

251.    The Debtors are likewise correct in offsetting the amounts Hilton is subsidizing for Group Services for the Resorts, as these are amounts that Hilton will no longer incur upon rejection of the HMAs.  *See Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) ("revenues due a plaintiff because of a breached contract must be offset by any amount plaintiff saved as a result of the breach").

## VI.    HILTON IS NOT ENTITLED TO ANY BRAND DAMAGES.

252.    Hilton has presented no evidence of damage to any Hilton brand, let alone evidence that satisfies Hilton's burden to prove damages with reasonable certainty.  *Walter*, 818 P.2d at 221 ("In an action for breach of contract, the burden clearly is on the plaintiff to prove the amount of his damages with reasonable certainty.").

253.    In particular, Hilton was unable to identify a single "lost opportunity" for its Waldorf=Astoria brand that would result from the Debtors' rejection of the HMAs, rendering brand damages unrecoverable as a matter of law.  (*See* Findings of Fact, ¶¶ 138-150)  *Saxton Commc'ns Grp., Ltd. v. Valassis Inserts, Inc.*, No. 93 Civ. 0388 (MBM), 1995 WL 679256, at *2 (S.D.N.Y. Nov. 15, 1995) (refusing to award lost opportunity damages because party could not point to specific opportunities lost); *see also Bouygues Telecom, S.A. v. Tekelec,* No. 4:05-CV-78-FL, 2007 WL 4699237, at *4 (E.D.N.C. Feb. 5, 2007) ("[T]he translation of harm to brand image into monetary damages must necessarily rely on lost customers or some other quantitative measure."); *In re M Waikiki LLC*, 2012 WL 2062421, at *2 (refusing to award damages for harm

to Marriott's reputation and goodwill where Marriott "did not offer evidence of any damages" in support of this claim).

254.    The "development forecast" and "impairment loss" analyses invented by Hilton's expert are unsupported by any evidence and are based on multiple flawed assumptions that render them wholly speculative and unreliable.  (*See* Findings of Fact, ¶¶ 151-163.)  *See Dillon*, 2010 WL 4682455, at *1 ("[D]amages that are speculative, remote or uncertain may not form the basis of a judgment."); *see also McDevitt v. Guenther*, 522 F. Supp. 2d 1272, 1287 (D. Haw. 2007); *S. Union Co. v. Sw. Gas Corp.,* 180 F. Supp. 2d 1021, 1050-51 (D. Ariz. 2002).

255.    Further, the only brand contemplated by the parties under the HMAs is the Waldorf Astoria Collection, which undisputedly no longer exists.  (Findings of Fact ¶¶ 164-171.) Hilton cannot recover for harm to a different brand, the Waldorf=Astoria Hotels & Resorts, that was not within the contemplation of the parties at the time of contracting.  *See Francis v. Lee Enters.*, 971 P.2d 707, 712-13 (Haw. 1999) ("[C]ontract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable."); *see also McAlister v. Citibank (Ariz.), a Subsidiary of Citicorp*, 829 P.2d 1253, 1257 (Ariz. Ct. App. 1992) (consequential damages, including lost profits, are "those reasonably foreseeable losses that flow from a breach of contract").

## VII.    HILTON IS NOT ENTITLED TO ANY FURTHER REIMBURSEMENT FOR THE GROUP SERVICES EXPENSE.

256.    Hilton has not met its burden of proving that it is entitled to recover for the loss of future Group Services Expense payments under the HMAs.

257.    Most importantly, the language of the HMAs expressly prohibits Hilton from profiting from the Group Services Expense.  (*See* Findings of Fact, ¶¶ 27, 175.)  Because the

70

HMAs treat the Group Services Expense as a reimbursable expense not recoverable upon termination, Hilton may not recover damages for its loss. *See Streamline Capital, L.L.C. v. Hartford Cas. Ins. Co.*, No. 02-8123, 2003 WL 22004888, at *6 (S.D.N.Y. Aug. 25, 2003) ("Thus, the language of the contract, a key factor under New York law in determining whether consequential damages for breach of an insurer's policy obligations were within the contemplation of the parties, in this case further demonstrates that the parties did not anticipate the insurer would be liable for such damages.").

258.    Furthermore, the trial record contradicted Hilton's claim that it will take five years to replace the loss of the Group Services Expenses.   (Findings of Fact, ¶¶ 179-182.)

259.    Nor can Hilton recover damages based on its expert's conjecture that Hilton may someday have to pay Key Money as a result of the Debtors' rejection of the HMAs. *See In re Rock & Republic Enters.*, No. 10-11728, 2011 WL 2471000, at *23 (Bankr. S.D.N.Y. June 20, 2011) (quoting, inter alia, *Scott v. Pac. Gas.*, 904 P.2d at 845 ("It is fundamental that [contract] damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.").   Given that Hilton is a growth company that is continuously seeking to add new management agreements through Key Money deals, Hilton has not demonstrated that rejection of the HMAs will proximately cause any future Key Money disbursements.

260.    Finally, because Hilton, admittedly, has the ability to change its budget and avoid incurring any damage related to the loss of the Resorts' Group Services Expenses, it must do so. (Findings of Fact ¶¶ 183-194.) *Life Investors Ins. Co. of Am. v. Horizon Res. Bethany, Ltd.*, 898 P.2d 478, 483 (Ariz. Ct. App. 1995) ("A party's failure to mitigate damages may be invoked to negate and reduce damages where the party by its own voluntary activity has unreasonably

71

exposed itself to damage or increased its injury."); *see also W W Leasing Unlimited v. Torok Exploration, Mining & Constr. Co.*, 575 F.2d 1259, 1261 (9th Cir. 1978) ("Settled legal principles require a wronged party to mitigate damages to the degree possible.").

## VIII. HILTON IS ENTITLED TO NO DAMAGES FOR THE GRAND WAILEA EXPANSION, WHICH IS NEITHER REQUIRED NOR CONTEMPLATED BY THE GRAND WAILEA HMA.

261.    Hilton has failed to meet its burden of demonstrating entitlement to damages for the so-called Grand Wailea Expansion because nothing obligates the Debtors to undertake the expansion and the Debtors have not committed to doing so.  (*See* Findings of Fact, ¶¶ 207-211.)

262.    Furthermore, Hilton is not entitled to damages for the speculative future expansion of the Grand Wailea.  The mere possibility that a property may be developed is insufficient to entitle a party to lost profits from that future development.  *See Cal. Shoppers, Inc.*, 221 Cal. Rptr. at 194.

263.    That the Debtors are considering possibly expanding the Grand Wailea is insufficient to entitle Hilton to damages from that expansion.  *Greenwich S.F., LLC v. Wong*, 118 Cal. Rptr. 3d 531, 551, 553 (Ct. App. 2010) (holding that "[t]he existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits" and that reliance on a real estate project that may not occur in order to claim lost profits was "inherently uncertain, contingent, unforeseeable and speculative"); *see also Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (finding that there was "no way to evaluate, other than through speculation," the profits a prospective purchaser of land would have made on the shopping center it would have built on a parcel of land had it been able to purchase it).

## <u>CONCLUSION</u>

For the foregoing reasons, the Debtors respectfully request that the Court estimate the

amount of Hilton's rejection damages to be $46,232,939, consisting of $12,520,121 for the

Grand Wailea, $13,886,286 for the Arizona Biltmore, and $19,826,532 for the La Quinta.

Dated: July 19, 2012
New York, New York

*/s/ Paul M. Basta*
James H.M. Sprayregen, P.C.
Paul M. Basta
Eric F. Leon
Atif Khawaja
Ryan Morettini
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

# APPENDIX A

| EXHIBITS ADMITTED AT TRIAL | | | |
|---|---|---|---|
| **Exhibit Number** | **Exhibit Name** | **Date Admitted** | **Citation** |
| JX 1 | Arizona Biltmore Management Agreement | 6/27/12 | Tr. 101:25-102:4 |
| JX 2 | Grand Wailea Management Agreement | 6/27/12 | Tr. 101:25-102:4 |
| JX 3 | La Quinta Management Agreement | 6/27/12 | Tr. 101:25-102:4 |
| JX 4 | November 9, 2005 Investment Memo | 6/27/12 | Tr. 101:25-102:4 |
| JX 5 | Waldorf Astoria Forecast of Brand Sources and Uses of Funds | 6/27/12 | Tr. 101:25-102:4 |
| DX 1 | 5/11/2012 Expert Report, Thomas F. Morone, Arizona Biltmore | 7/13/12 | Tr. 1050:21-1051:4 |
| DX 2 | 5/11/2012 Expert Report, Thomas F. Morone, Grand Wailea | 7/13/12 | Tr. 1050:21-1051:4 |
| DX 3 | 5/11/2012 Expert Report, Thomas F. Morone, La Quinta | 7/13/12 | Tr. 1050:21-1051:4 |
| DX 4 | 6/11/2012 Supplemental Report, Thomas F. Morone | 7/13/12 | Tr. 1050:21-1051:4 |
| DX 5 | 5/11/2012 Affidavit of Derek Pitts | 6/29/12 | Tr. 485:17-486:7 |
| DX 7 | 12/31/2006 2006 Hilton 10K | 7/13/12 | Tr. 1063:21-1064:4 |
| DX 8 | 2011 Hilton Consolidated Balance Sheet up to December 31, 2011<br><br>**(EXTREMELY CONFIDENTIAL)** | 7/3/12 | Tr. 958:8-15 |
| DX 9 | Hilton Worldwide Inc. Consolidated Financial Statements for 2010 and 2011 **(EXTREMELY CONFIDENTIAL)** | 7/13/12 | Tr. 1168:23-1169:4 |
| DX 11 | Waldorf Astoria Hotels & Resorts Brochure | 6/29/12 | Tr. 280:4-13 |
| DX 12 | Waldorf Astoria Hotels & Resorts Overview | 7/13/12 | Tr. 1169:5-11 |
| DX 13 | Conrad Luxury Brand Openings Report | 6/29/12 | Tr. 312:18-22 |
| DX 21 | 12/7/2006 Bear Stearns Report | 7/2/12 | Tr. 574:9-14 |
| DX 23 | Hotel Asset Management, Principles and Practices, America Hotel & Lodging Association, 2004, excerpt | 7/13/12 | Tr. 1067:4-13 |

75

| EXHIBITS ADMITTED AT TRIAL | | | |
|---|---|---|---|
| **Exhibit Number** | **Exhibit Name** | **Date Admitted** | **Citation** |
| DX 26 | Operations 2012 Business Plan, Grand Wailea, A Waldorf Astoria Resort, as of February 10, 2012 | 7/2/12 | Tr. 703:21-25 |
| DX 27 | Operations Business Plan-September 13, Grand Wailea Resort & Spa-Waldorf=Astoria Collection, as of August 2007 | 7/2/12 | Tr. 691:25-692:4 |
| DX 28 | Operations Business Plan Grand Wailea Resort & Spa-Waldorf=Astoria Collection, as of May 2008 | 7/2/12 | Tr. 696:4-8 |
| DX 29 | Operations Business Plan Grand Wailea Resort & Spa-Waldorf=Astoria Collection, as of April 2009 | 7/2/12 | Tr. 697:18-22 |
| DX 30 | Operations 2010 Business Plan Grand Wailea Resort & Spa-Waldorf=Astoria Collection, as of May 31, 2010 | 7/2/12 | Tr. 699:7-11 |
| DX 31 | Operations Business Plan Grand Wailea November 13, 2010 | 7/2/12 | Tr. 701:24-702:3 |
| DX 35 | 5/4/2012 5 Pack March 2012 Period 3 Hotel Portfolio KPI Final | 7/13/12 | Tr. 1044:22-1045:1 |
| DX 141 | Press Release: Legendary Waldorf Astoria Brand Welcomes First New Build Hotel in Europe, dated 1/26/2008 | 6/29/12 | Tr. 328:4-9 |
| DX 142 | Hilton Worldwide - Corporate Overhead - 2008 Baseline through 2012 Budget | 6/29/12 | Tr. 414:8-13 |
| DX 144 | Hilton Hotels by Brand (previously Debtors' Demonstrative No. 1) | 7/3/12 | Tr. 902:19-20 |
| DX 145 | Grand Wailea Gross Operating Profit Test | 7/3/12 | Tr. 1089:17-24 |
| DX 146 | Press Release: Hilton Closes Merger with Blackstone Investment Funds | 7/3/12 | Tr. 952:10-14 |
| DX 147 | Declaration of Joseph Floyd | 7/13/12 | Tr. 1169:12-1170:8 |
| WAX 1 | January 17 and 18, 2006 Articles/Press regarding Waldorf=Astoria | 6/27/12 | Tr. 120:22-121:4 |
| WAX 2 | Guaranty between Manager and Hilton, as Guarantors, in favor of Owners dated January 31, 2006 | 6/27/12 | Tr. 128:16-20 |
| WAX 3 | Non-Disturbance and Attornment Agreement, *Grand Wailea Resort Hotel & Spa* | 6/27/12 | Tr. 125:23-126:4 |

| EXHIBITS ADMITTED AT TRIAL | | | |
|---|---|---|---|
| **Exhibit Number** | **Exhibit Name** | **Date Admitted** | **Citation** |
| WAX 4 | Non-Disturbance and Attornment Agreement, *Arizona Biltmore Resort & Spa* | 6/27/12 | Tr. 125:23-126:4 |
| WAX 5 | Non-Disturbance and Attornment Agreement**,** *La Quinta Resort & Spa* | 6/27/12 | Tr. 125:23-126:4 |
| WAX 6 | Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement | 6/27/12 | Tr. 126:17-25 |
| WAX 7 | Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement (*First Mezzanine*) | 6/27/12 | Tr. 126:17-25 |
| WAX 8 | Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement (*Second Mezzanine*) | 6/27/12 | Tr. 126:17-25 |
| WAX 9 | Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement (*Third Mezzanine*) | 6/27/12 | Tr. 126:17-25 |
| WAX 10 | Manager's Consent, Subordination of Management Agreement, and Non-Disturbance Agreement (*Fourth Mezzanine*) | 6/27/12 | Tr. 126:17-25 |
| WAX 11 | Waldorf=Astoria advertisements/marketing materials | 6/29/12 | Tr. 299:16-20 |
| WAX 12 | Corporate Expense Estimate for the Management of Paulson Properties | 6/29/12 | Tr. 469:15-16; 470:17-19 |
| WAX 13 | Summary of Fees – Grand Wailea, Biltmore, LaQuinta | 6/27/12 | Tr. 186:2-6 |
| WAX 14 | Grand Wailea 5 Year Capital Plan | 7/2/12 | Tr. 650:15-20 |
| WAX 15 | Grand Wailea Entitlement Values Chart | 7/13/12 | Tr. 1030:21-1031:1 |
| WAX 16 | Grand Wailea Entitlement Values Chart | 7/13/12 | Tr. 1031:15-19 |
| WAX 17 | Graph – Grand Wailea Annual RPI Index | 7/2/12 | Tr. 666:14-18 |
| WAX 18 | Graph – Grand Wailea Group Booking Position | 7/2/12 | Tr. 719:17-24 |
| WAX 19 | Graph – Grand Wailea RevPar Index with Additions | 7/2/12 | Tr. 635:2-8 |
| WAX 20 | Graph – Grand Wailea Group and Transient Room Night History | 7/2/12 | Tr. 669:5-9 |

| EXHIBITS ADMITTED AT TRIAL | | | |
|---|---|---|---|
| **Exhibit Number** | **Exhibit Name** | **Date Admitted** | **Citation** |
| WAX 22 | Graph – Grand Wailea RevPar Rooms and Total Hotel Change | 7/2/12 | Tr. 664:11-14 |
| WAX 23 | Expert Report of Sean Hennessey | 6/29/12 | Tr. 486:11-13 |
| WAX 24 | Supplemental Expert Report of Sean Hennessey | 6/29/12 | Tr. 486:11-13 |
| WAX 25 | Expert Report of Roger Cline | 7/3/12 | Tr. 765:16-22 |
| WAX 26 | Supplemental Expert Report of Roger Cline | 7/3/12 | Tr. 485:17-486:7 |
| WAX 28 | ISO 10668 - Brand Valuation--Requirements for Monetary Brand Valuation | 7/3/12 | Tr. 866:6-9 |
| WAX 29 | HVS 2011 Hotel Franchise Fee Guide | 7/3/12 | Tr. 862:13-17 |

# APPENDIX B





# APPENDIX C





# APPENDIX D



