David M. Neff (*admitted pro hac vice*)
Brian A. Audette (*admitted pro hac vice*)
PERKINS COIE LLP
131 S. Dearborn St., Ste. 1700
Chicago, Illinois 60603
Telephone:    (312) 324-8400
Facsimile:    (312) 324-9400

- and -

Schuyler Carroll
PERKINS COIE LLP
30 Rockefeller Plaza, 25th Floor
New York, New York  10112
Telephone:    (212) 262-6905
Facsimile:    (212) 977-1636

*Counsel to Waldorf=Astoria Management LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MSR RESORT GOLF COURSE LLC, *et al.*,[1] | ) | Case No. 11-10372 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**WALDORF=ASTORIA MANAGEMENT LLC'S POST-TRIAL PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING**
**TO THE MOTION OF MSR RESORT GOLF COURSE LLC, *ET AL.*,**
**FOR ENTRY OF AN ORDER ESTIMATING DAMAGES RESULTING**
**FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include:  MSR Resort Golf Course LLC (7388); MSR Biltmore Resort, LP (5736); MSR Claremont Resort, LP (5787); MSR Desert Resort, LP (5850); MSR Grand Wailea Resort, LP (5708); MSR Resort Ancillary Tenant, LLC (9698); MSR Resort Biltmore Real Estate, Inc. (8464); MSR Resort Desert Real Estate, Inc. (9265); MSR Resort Hotel, LP (5558); MSR Resort Intermediate Mezz GP, LLC (3864); MSR Resort Intermediate Mezz LLC (7342); MSR Resort Intermediate Mezz, LP (3865); MSR Resort Intermediate MREP, LLC (9703); MSR Resort Lodging Tenant, LLC (9699); MSR Resort REP, LLC (9708); MSR Resort Senior Mezz GP, LLC (9969); MSR Resort Senior Mezz LLC (7348); MSR Resort Senior Mezz, LP (9971); MSR Resort Senior MREP, LLC (9707); MSR Resort Silver Properties, LP (5674); MSR Resort SPE GP II LLC (5611); MSR Resort SPE GP LLC (7349); MSR Resort Sub Intermediate Mezz GP, LLC (1186); MSR Resort Sub Intermediate Mezz LLC (7341); MSR Resort Sub Intermediate Mezz, LP (1187); MSR Resort Sub Intermediate MREP, LLC (9701); MSR Resort Sub Senior Mezz GP, LLC (9966); MSR Resort Sub Senior Mezz LLC (7347); MSR Resort Sub Senior Mezz, LP (9968); and MSR Resort Sub Senior MREP, LLC (9705).  The location of the Debtors' service address is:  c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10020.

# TABLE OF CONTENTS

Page

I.    Introduction .................................................................................................................. 1

II.    Findings Of Fact ......................................................................................................... 3

    A.    Jurisdiction and Venue ...................................................................................... 3

    B.    The Parties ......................................................................................................... 3

    C.    Hilton's Acquisition Of The HMAs .................................................................. 4

    D.    Hilton's Fees Under The HMAs ...................................................................... 12

    E.    Hilton's Foregone Fees Upon Termination ..................................................... 19

        1.    Financial Projections ........................................................................... 21

            a.    Annual Rate of Inflation .......................................................... 22

            b.    Capital Expenditures at the Hilton Resorts ............................. 23

            c    The Performance Test at Grand Wailea .................................... 28

                i.    The GOP Test ............................................................... 29

                ii.    The RevPAR Test .......................................................... 32

        2.    Hilton's Saved Expenses ..................................................................... 38

        3.    Discount Rate ...................................................................................... 41

    F.    Cline Versus Morone Comparisons ................................................................. 53

    G.    Group Services Expenses ................................................................................. 53

    H.    The Grand Wailea Expansion .......................................................................... 58

    I    Damages To The Waldorf Astoria Brand ......................................................... 59

III.    Conclusions of Law ................................................................................................... 69

    A.    Executory Contract Reject Damages ............................................................... 69

        1.    Claim Estimation ................................................................................. 69

        2.    Rejection Under The Bankruptcy Code ............................................... 70

        3.    State Law Remedies For Breach Of Contract ...................................... 71

            a.    Arizona ...................................................................................... 73

            b.    California ................................................................................... 74

            c.    Hawaii ....................................................................................... 76

        4.    Mitigation Of Damages ....................................................................... 77

            a.    Arizona ...................................................................................... 77

| | | | | |
|---|---|---|---|---|
| | | b. | California | 77 |
| | | c. | Hawaii | 77 |
| | | 5. | Los Volume Sellers | 78 |
| | B. | Estimation Of Hilton's Damages | | 79 |
| | | 1. | Foregone Fees | 79 |
| | | | a. | Hilton May Recover Lost Corporate Overhead Fees And Only The Expenses Hilton Actually Saves Are Deducted From Its Foregone Base And Corporate Overhead Fees | 80 |
| | | | b. | A Discount Rate Of 8% Appropriately Measures Hilton's Risk Of Receiving Base And Corporate Overhead Fees Under The HMAs At The Time Of Contracting | 84 |
| | | 2. | Group Services Expenses | 86 |
| | | 3. | Damages Associated With The Grand Wailea Expansion | 88 |
| | | 4. | Damage To The Waldorf Astoria Brand | 89 |
| | | 5. | Hilton's Lost Investment As A Measure Of Damages | 91 |
| IV. | Conclusion | | | 91 |

91004-0040/LEGAL24113101.7

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Smith*,
94 Cal.App.4th 1270 (Cal. Ct. App. 2002) .............................................................................82

*Armstrong v. Lassen Lumber & Box Co.*,
269 P. 453 (Cal. Sup. Ct. 1928) .............................................................................................72

*Autonumerics, Inc. v. Bayer Indus., Inc.*,
696 P.2d 1330 (Ariz. Ct. App. 1984) .....................................................................................78

*Biltmore Evaluation & Treatment Servs. v. RTS NOW, LLC*,
No. 1 CA-CV 07-0602, 2009 WL 223293, *2 (Ariz. Ct. App. Jan. 29, 2009) .......................73

*Brandon & Tibbs v. George Kavorkian Accountancy Corp.*,
226 Cal.App.3d 442 (Cal. Ct. App. 1990) ........................................................................74, 75

*Chung v. Kaonohi Ctr. Co.*,
618 P.2d 283 (Haw. 1980) .....................................................................................................76

*Electronic Funds Solutions v. Murphy*,
134 Cal.App.4th 1161 (Cal. Ct. App. 2005) ..........................................................................75

*GE Capital Hawaii, Inc. v. Shanghai Inv. Co., Inc.*,
162 P.3d 17 (Haw. Ct. App. 2007) .........................................................................................77

*Gen. Sec. Ins. Co. v. Reliance Ins. Co.*,
Nos. 00-55366, 00-55484, 2002 WL 505904 (9th Cir. April 2, 2002) ..................................82

*Giant Eagle, Inc. v. Phar-Mor, Inc.*,
528 F.3d 455 (6th Cir. 2008) .................................................................................................70

*Hadley v. Baxendale*,
9 Exch. 341 (1854).................................................................................................................72

*Hi-Pac, Ltd. v. Avoset Corp.*,
26 F.Supp.2d 1230 (D. Haw. 1997) .......................................................................................76

*Huskie v. Ames Bros. Motor & Supply Co., Inc.*,
678 P.2d 977 (Ariz. Ct. App. 1984).......................................................................................81

*In re Adelphia Bus. Sols., Inc.*,
341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................................69

*In re Chemtura Corp.*,
    448 B.R. 635 (Bankr. S.D.N.Y. 2011) ...................................................................................84

*In re Frascella Enters., Inc.*,
    360 B.R. 435 (Bankr. E.D. Pa. 2007) ...................................................................................69

*In re M. Waikiki*,
    No. 11-02371, 2012 WL 2062421
    (Bankr. D. Haw. Jun. 7, 2012) .......................................23, 79, 83, 84, 85, 86, 88, 90

*In re Old Carco LLC*,
    406 B.R. 180 (Bankr. S.D.N.Y. 2009) ...................................................................................70

*In re The Penn Traffic Co.*,
    524 F.3d 373 (2d Cir. 2008)...................................................................................................70

*In re SCCC Assoc. II Ltd. P'ship*,
    158 B.R. 1004 (Bankr. N.D. Cal. 1993) ...............................................................................82

*In re Statewide Realty Co.*,
    159 B.R. 719 (Bankr. D. N.J. 1993) ......................................................................................71

*In re Stoltz*,
    315 F.3d 80 (2d Cir. 2002)......................................................................................................71

*In re Worldcom, Inc.*,
    361 B.R. 675 (Bankr. S.D.N.Y. 2007) ...........................................................................78, 79

*Jackson v. Yarbray*,
    179 Cal.App.4th 75 (Cal. Ct. App. 2009) ............................................................................77

*Jones v. Johnson*,
    41 Haw. 389, 1956 WL 10315 (1956) .............................................................................72, 76

*Kids' Universe v. In2Labs*,
    95 Cal.App.4th 870 (Cal. Ct. App. 2002) ............................................................................75

*Koenen v. Royal Buick Co.*,
    783 P.2d 822 (Ariz. Ct. App. 1989)......................................................................................77

*Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.*,
    91 F.3d 909 (7th Cir. 1996) ....................................................................................................75

*Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*,
    114 F.3d 379 (2d Cir. 1997)...............................................................................................70, 71

*Mize-Kurzman v. Marin Cmty. College Dist.*,
    202 Cal.App.4th 832 (Cal. Ct. App. 2012) .........................................................................77

iv

*Nat'l Controls, Inc. v. Commodore Bus. Machs., Inc.,*
    163 Cal.App.3d 688 (Cal. Ct. App. 1985) .............................................78

*Omura v. Am. River Investors,*
    894 P.2d 113 (Haw. Ct. App. 1995) ....................................................76

*Pasco Indus., Inc. v. Talco Recycling, Inc.,*
    985 P.2d 535 (Ariz. Ct. App. 1999).....................................................74

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990)..............................................................................81

*Russell v. Golden Rule Mining Co.,*
    159 P.2d 776 (Ariz. 1945)...................................................................81

*Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),*
    371 B.R. 680 (Bankr. S.D.N.Y. 2007)................................................71

*Strawberry Water Co. v. Paulsen,*
    207 P.3d 654 (Ariz. Ct. App. 2009) ....................................................77

*Tabieros v. Clark Equip. Co.,*
    944 P.2d 1279 (Haw. 1997) ................................................................77

*Tech. Const., Inc. v. City of Kingman,*
    278 P.3d 906 (Ariz. 2012)...................................................................72

*Welk v. Fainbarg,*
    255 Cal.App.2d 269 (Cal. Ct. App. 1967) ..........................................82

*West Pinal Family Health Ctr. v. McBryde,*
    785 P.2d 66 (Ariz. Ct. App. 1990)......................................................77

*Woolley v. Embassy Suites, Inc.,*
    227 Cal.App.3d 1520 (Cal. Ct. App. 1991) .........................................90

**STATUTES**

11 U.S.C. § 365(a) ....................................................................................70

11 U.S.C. § 365(g)(1) ................................................................................70

11 U.S.C. § 502(c)(1)................................................................................69

28 U.S.C. §§ 157 and 1334.........................................................................3

28 U.S.C. §§ 1408 and 1409.......................................................................3

section 502(c) of the Bankruptcy Code ...................................................69

v

**OTHER AUTHORITIES**

22 AM. JUR. 2d *Damages* § 46 (2011) ...........................................................................................72

9 ARIZ. PRAC. BUSINESS LAW DESKBOOK at § 7:32......................................................................73

9 ARIZ. PRAC. BUSINESS LAW DESKBOOK § 7:32 (2010-2011 ed.)..........................................72, 73

12 CAL. REAL EST. § 34:29 (3d ed. 2010).....................................................................................74

23 CAL. JUR. 3d *Damages* § 19 (2011) ..........................................................................................74

24 WILLISTON ON CONTRACTS § 64:11 .........................................................................................75

17A AM. JUR. 2d *Contracts* § 382 (2012)....................................................................................81

Fed. R. Evid. 803(6).........................................................................................................................4

91004-0040/LEGAL24113101.7

Waldorf=Astoria Management LLC ("Hilton"), by its undersigned counsel, and in

connection with the Motion of MSR Resort Golf Course LLC, *et al.*, for Entry of an Order

Estimating Damages Resulting From Rejection of the Hilton Management Agreements and an

Order Authorizing Rejection of the Hilton Management Agreements, submits these Post –Trial

Proposed Findings of Fact and Conclusions of Law.

## I.      INTRODUCTION

This matter comes before the Court on the April 24, 2012 Motion of MSR Resort Golf

Course LLC, *et al.*, for Entry of an Order Estimating Damages Resulting From Rejection of the

Hilton Management Agreements and an Order Authorizing Rejection of the Hilton Management

Agreements (the "Motion").  The Debtors have not yet requested the entry of an order

authorizing rejection of the agreements, but rather they only seek at this time an estimation of the

damages Hilton would sustain if the Debtors reject the agreements.

The Court conducted a trial over the course of five days (June 27, June 29, July 2, July 3,

and July 13).  The Court heard from five fact witness and two expert witnesses on behalf of

Hilton, and one fact witness and one expert witness on behalf of the Debtors.  Overall, the Court

viewed Hilton's witnesses to be more persuasive and credible.  A tremendous amount is at stake

for Hilton because it stands to lose the management rights to three incredibly valuable, iconic

and irreplaceable resorts that Hilton was expecting to manage as part of its newly launched

Waldorf Astoria luxury brand through 2034.  The importance to Hilton is evident to the Court

based upon the stature and expertise of Hilton's witnesses, as well as the extraordinary amount

Hilton paid to acquire the subject management agreements.  For example, the Court heard from:

Hilton's President of Brands and Commercial Services (Paul Brown); Hilton's Senior Vice

President of Corporate Strategy and Treasurer (Kevin Jacobs); Hilton's Vice President of Owner

Relations and Management Contract Services (Dianne Jaskulske); Hilton's Senior Vice President

of Development for the Caribbean and Latin America and Timeshare Development in Hawaii

(Ted Middleton); and the Managing Director of the Grand Wailea Resort Hotel & Spa (Matthew

Bailey).

In contrast to Hilton's substantial economic interest, much less is at stake for the Debtors'

estates.  In fact, the outcome of this litigation will likely only materially affect one of the

Debtors' indirect equity owners, Paulson & Company ("Paulson").  For example, if Hilton's

damages turn out to be too large, the Debtors may have no choice but to auction their assets – a

result contemplated for almost a year now since the Debtors settled with one of their mezzanine

lenders – in which case Paulson would not likely obtain a recovery.  However, Paulson may reap

a substantial return on its minimal $10 million investment made in 2010 if the Court awards

Hilton the damages advocated by the Debtors.  The lack of any material impact on the Debtors'

creditors is apparent from the lack of any support for the Debtors' position by any of the other

major constituents, including the creditors' committee, the Debtors' mortgage lender that is owed

over $1 billion, Midland Loan Services, and the Debtors' four mezzanine lenders that are owed in

excess of $500 million collectively.

After considering the exhibits introduced into evidence and the testimony at trial, the

Court makes the following Findings of Fact and Conclusions of Law.

91004-0040/LEGAL24113101.7

## II.    FINDINGS OF FACT

### A.    Jurisdiction And Venue

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B.    The Parties

3.    Debtor MSR Grand Wailea Resort, LP ("MSR Grand Wailea") owns the Grand Wailea Resort Hotel & Spa, Maui Hawaii ("Grand Wailea"); Debtor MSR Desert Resort, LP ("MSR Desert Resort") owns the La Quinta Resort & Club and PGA West, La Quinta, California ("La Quinta"); and Debtor MSR Biltmore Resort, LP ("MSR Biltmore") owns the Arizona Biltmore Resort & Spa, Phoenix, Arizona ("Arizona Biltmore").  MSR Grand Wailea, MSR Desert Resort and MSR Biltmore are collectively referred to herein as the "Fee Owners."  Grand Wailea, La Quinta and Arizona Biltmore are collectively referred to herein as the "Hilton Resorts."

4.    The Fee Owners do not operate the Hilton Resorts, but rather lease them to their affiliates, Debtors MSR Resort Lodging Tenant, LLC and MSR Resort Ancillary Tenant, LLC (together, the "MSR Tenants"), pursuant to certain ground leases in a typical real estate investment trust, or REIT, structure.  *See* Memorandum of Decision in Adversary Proceeding No. 11-02920 (SHL), entered on May 11, 2012 (the "Opinion") at p. 3.

5.    The Debtors do not have any employees and their business is managed by their asset manager, Pyramid Asset Management, LLC ("Pyramid").  *See* Motion of MSR Resort Golf Course LLC, *et al*., for the Entry of an Order (A) Authorizing the Payment of Prepetition Amounts Under the Management Agreements and (B) Authorizing the Debtors to Honor Postpetition Obligations Under the Management Agreements [Docket No. 11] at ¶¶ 10, 11;

Declaration of Christopher Divine Authenticating Evidence Pursuant to Fed. R. Evid. 803(6)

[Docket No. 793] (the "Divine Declaration") at ¶ 1 ("[Pyramid] oversees the management and

operation of the Debtors' resorts for the benefit of the Debtors.").[2]

6.       Hilton[3] brands and manages the Hilton Resorts pursuant to three management

agreements with the MSR Tenants (collectively, the "HMAs"), which Hilton acquired from KSL

II Management Operations, LLC ("KSL") in January 2006 and are discussed in more detail

below.  *See* Op. at p. 3.  Hilton is an international organization that manages more than 600

resorts and hotels, franchises more than 3,000 hotels and runs a billion dollar timeshare

enterprise.  *See* Trial Tr. at 100:3-8, 174:25, 175:1-5.  Hilton has brands and hotels in 91

countries around the world, with major offices in McLean, Virginia, Dallas, Texas, Memphis,

Tennessee, London, Singapore and Dubai.  *See id*. at 267:2-12.  Hilton currently owns 10 hotel

and resort brands, which consist of Waldorf Astoria Hotels & Resorts (Hilton's most luxurious

brand), Conrad Hotels, Hilton Hotels, DoubleTree Hotels & Resorts by Hilton, Embassy Suites,

Hilton Garden Inn, Hampton Inn, Homewood Suites, Home2 Suites by Hilton and Hilton Grand

Vacations (Hilton's timeshare brand).  *See id*. at 100:9-19, 267:16-25, 268:1-20.  Hilton's primary

competitors consist of Marriott International ("Marriott"), Starwood Hotels & Resorts

("Starwood"), Hyatt Hotels & Resorts and InterContinental Hotels.  *See id*. at 106:5-12, 268:21-

25, 269:1-10.

## C.       Hilton's Acquisition Of The HMAs

7.       It is undisputed that the Hilton Resorts have historically been and continue to be

world class, iconic and irreplaceable properties.  In 2005, Hilton initially believed that procuring

the right to manage the Hilton Resorts would fill a gap in its system and provide the members of

---

[2]  Divine is Pyramid's Chief Financial Officer.  *Id.*
[3]  The term "Hilton" includes its predecessor, 90210 Management Company, LLC, its parents, and affiliates.  *See* Op. at p. 2, n.1.

Hilton's guest loyalty program, HHonors, with highly desirable properties at which to redeem

their HHonors points.  *See* Trial Tr. at 105:12-25, 106:1-4.  However, Hilton's strategy evolved

while it was considering the acquisition of the HMAs, and it concluded that it could also

leverage the renown of one of its preeminent properties, the Waldorf=Astoria Hotel in New York

City, to launch a Waldorf Astoria luxury brand to compete with the likes of Marriott and

Starwood, among others.  *See id.*; *see also* Trial Tr. at 272:20-25, 273:1-25, 274:1-25.  Indeed,

the Ritz-Carlton luxury brand had been launched from the Ritz-Carlton Hotel in Boston, which

utilized the name recognition of Ritz Hotels in Paris and London and the Carlton Hotel in

London, and Starwood was able to capitalize on the prestige of the St. Regis Hotel in New York

to launch is luxury St. Regis brand.  *See* W-A Tr. Ex. 25 at pp. 53-54.

   8.  The luxury hotel market is the most competitive segment within the hotel industry

and it takes a substantial amount of time, money and effort to build a successful luxury hotel

portfolio.  *See* Trial Tr. at 274:22-24, 285:13-25, 286:1-13.  Hilton was lagging behind its

primary competitors and believed in late 2005 and the beginning of 2006 that it was important

for it to penetrate the luxury hotel and resort market.  *See id.* at 273:9-25, 274:1-25; Joint Ex. 4 at

pp. 3-4; W-A Tr. Ex. 25 at pp. 52-56.  Hilton's HHonors guest loyalty program was and is a

critically important source of Hilton's business and it is imperative for Hilton to provide

HHonors members with a broad range of attractive properties at which they can redeem their

rewards points.  *See* Trial Tr. at 273:9-25, 274:1-2.  Also, it is important for Hilton to provide

corporate customers and meeting planners with a full spectrum of resort options for their group

business, something Hilton could not adequately offer prior to 2006.  *See id.* at 274:3-15.

Moreover, the stock market generally takes a very positive view toward hotel companies that

have a strong luxury portfolio, a concern to Hilton in 2005 when it was a public company.  *See id.* at 274:16-25.

9.      In November 2005, Hilton's President and Chief Operating Officer at the time, Matt Hart, requested authority from Hilton's Board of Directors to acquire the HMAs from KSL. *See* Joint Ex. 4.  Hart explained in a  memo to the Board that Hilton would benefit by adding the Hilton Resorts to its portfolio because:  (a) Hilton could add three premier hotels that significantly increase resort and golf offerings, which could form the nucleus of a "Luxury Collection"; (b) Hilton could procure another selling tool for its group sales efforts, *e.g.*, enhanced cross-selling opportunities with Hilton's other large group-oriented properties; and (c) the Hilton Resorts could attract a new high-end leisure and group customer base that Hilton was not reaching at the time.  *See id.* at p. 3.  Hart described the Hilton Resorts as "awesome properties that are truly once in a lifetime opportunities."  *Id.* at p. 4.  Indeed, he believed that "[i]f there are three markets in North America that we covet it's these three and these are the best properties in these markets.  The price is high but the value is there."  *Id.* (emphasis in original); *see also* Trial Tr. at 108:16-25, 109:1-3.

10.      In that same memorandum to Hilton's board, Hilton valued the HMAs at approximately $260 million, which did not include the approximately $73 million of guaranty, conversion or improvement costs that Hilton would later pay to acquire the HMAs, which will be discussed below.  *See* Joint Ex. 4 at p. 4, Ex. 4; *see also* W-A Tr. Ex. 25 at p. 111; Trial Tr. at 111:7-22, 118:9-23.  According to the Board memo, Hilton assumed that it would receive a base management fee under the HMAs in the amount of 3% of total revenues and certain incentive fees.  *See* Joint Ex. 4 at p. 3.

11.    In January 2006, Hilton closed on its acquisition of the HMAs from KSL for a substantial sum (the "Purchase Price")[4] and entered into the following three HMAs:  an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp., as Owner, and 90210 Management Company, LLC, as Manager, for Grand Wailea Resort Hotel & Spa, Maui, Hawaii; an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp. and CNL Resort Biltmore Real Estate, Inc., collectively, as Owner, and 90210 Management Company, LLC, as Manager, for Arizona Biltmore Resort & Spa, Phoenix, Arizona; and an Amended and Restated Management Agreement between CNL Resort Lodging Tenant Corp., CNL Resort Ancillary Tenant Corp., and CNL Resort Desert Real Estate, Inc., collectively, as Owner, and 90210 Management Company, LLC, as Manager, for La Quinta Resort & Club and PGA West, La Quinta, California.  *See* Op. at p. 4, n.2.  The HMAs were not in the form of Hilton's standard management agreement; rather, they were inherited from KSL, and Hilton tried to negotiate as few changes as possible to them at the time.  *See* Trial Tr. at 103:12-21, 123:9-14, 176:1-4.  To the best of the knowledge of Hilton's witnesses, this was the first and only time Hilton purchased management agreements.  *See id.* at 142:17-19, 371:6-8.

12.    The HMAs have an initial fixed term of 20 years (the "Base Term") that can be extended, at Hilton's sole option, for an additional 10-year period (the "Extension Term").  Joint Ex. 2 at § 3.1.

13.    In addition to the Purchase Price, Hilton:  (a) paid $20 million in capital improvements (the "Improvement Costs") for the Hilton Resorts; (b) paid $3,234,740 to convert the Hilton Resorts to the Waldorf Astoria brand of hotels and resorts (the "Conversion Costs");

---

[4]  The parties orally stipulated to the amount of the Purchase Price at the outset of trial.  The Purchase Price is not referenced herein because it is confidential and must remain under seal pursuant to that certain Order Authorizing the Sealing of Confidential Commercial Information of KSL II Management Operations, LLC, entered by this Court on June 26, 2012 [Docket No. 1288].

and (c) executed a Guaranty of the financial performance of the Hilton Resorts, pursuant to

which Hilton paid $50 million (the "Guaranty Costs").  *See* W-A Tr. Ex. 25 at p. 111; Trial Tr. at

118:9-23.  The Purchase Price, the Improvement Costs, the Conversion Costs and the Guaranty

Costs are collectively referred to herein as the "Financial Commitments."

14.     In connection with its acquisition of the HMAs, Hilton launched its Waldorf

Astoria luxury brand, consisting of the three Hilton Resorts and its flagship Waldorf=Astoria

Hotel in New York.  *See* Joint Exs. 1-3 at § 2.4, Ex. F; W-A Tr. Ex. 25 at p. 8.  In January 2006,

Hilton and the then owner of the Hilton Resorts, CNL Hotels & Resorts, Inc. ("CNL"), publicly

announced the launch of Hilton's Waldorf Astoria luxury brand.  *See* Op. at p. 7, n.10; W-A Tr.

Ex. 1.  CNL's CEO at the time was quoted as stating that:

> The extension of the legendary Waldorf=Astoria designation to three of our
> premier destination resorts is an exciting undertaking that we expect will take
> these properties to even higher levels of sophistication . . . We are particularly
> pleased to showcase this exclusive world-class designation within our portfolio of
> distinctive assets and to further our strong relationship with Hilton.

W-A Tr. Ex. 1 at pp. 1-2.

15.     In 2007, Morgan Stanley Real Estate Fund V U.S., L.P. ("MSREF") acquired

CNL, thereby indirectly acquiring the Hilton Resorts, and it changed the "CNL" in the names of

the entities it acquired, including the Fee Owners and MSR Tenants, to "MSR."  *See* Op. at p. 6,

n.8.  In January 2011, the Debtors' current equity owner and non-Debtor, CNL-AB LLC,

foreclosed on certain membership interests, replacing MSREF as the equity holder of the

Debtors, and thereby becoming the indirect owner of the Hilton Resorts.  *See id*. at p. 7.

16.     On February 1, 2011, CNL-AB LLC caused the Debtors to commence these

chapter 11 cases (collectively, the "Bankruptcy Case").

17.     The Debtors have repeatedly touted the iconic and irreplaceable nature of the

Hilton Resorts throughout this Bankruptcy Case.  Indeed, the Debtors continually represented to

-8-

this Court and creditors that there is tremendous value associated with branding and managing

the Hilton Resorts, and have repeatedly alleged that they could unlock substantial value by

restructuring or rejecting the HMAs:

> a.      "The Debtors, with the help of their advisors, have scrutinized the terms
> and economics of the Hilton Management Agreements and believe they can
> unlock significant value by restructuring or replacing those Agreements."  Motion
> of MSR Resort Golf Course LLC, *et al.*, for Entry of an Order Extending the
> Exclusive Periods During which Only the Debtors May File a Chapter 11 Plan
> and Solicit Acceptances Thereof [Docket No. 324] at ¶ 34.

> b.      "Given the iconic nature of the [Hilton] Resorts, the right to manage the
> [Hilton] Resorts provides important strategic benefits to a brand system" and "this
> right carries considerable value on the open market, especially for brands seeking
> to improve their profile . . . By way of example, as noted in the Hilton response,
> Hilton paid 'a substantial sum,' believed to be upwards of $220 million, for the
> right to manage the Resorts and launched the entire 'Waldorf=Astoria' brand off
> the Resorts."  Debtors' Omnibus Reply in Support of Motion for Entry of an
> Order Extending the Excusive Periods During which Only the Debtors May File a
> Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 437] (the "First
> Omnibus Reply") at ¶ 24.

> c.      "Removing or modifying [the HMAs] likely would increase the value of
> the Hilton Resorts by approximately 10% to 15%."  *See id*. at ¶ 26; *see also*
> Motion of MSR Resort Golf Course LLC, *et al.*, for Entry of an Order Further
> Extending the Exclusive Periods During which Only the Debtors May File a
> Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 638]  (the "Second
> Exclusivity Motion") at ¶ 37 (same).

> d.      "Given the tremendous cost of the [HMAs] – *i.e.*, in excess of 10 to 15
> percent of the value of the [Hilton Resorts] – and the significant amount of the
> Debtors' cash flows accounted for by the [Hilton Resorts], the potential
> incremental value of this initiative is *tremendous*."  Debtors' Omnibus Reply in
> Support of Motion for Entry of an Order Further Extending the Exclusive Periods
> During which Only the Debtors May File a Chapter 11 Plan and Solicit
> Acceptances Thereof [Docket No. 684] (the "Second Omnibus Reply") at ¶ 23
> (emphasis in original).

> e.      "[P]otential replacement managers have offered significant economic
> incentives, including, but not limited to, key money commitments, reduced
> management fees, and significant cash flow guaranties.  The Debtors are
> continuing to evaluate these opportunities and are focused on identifying the
> manager or managers that will best fit their iconic and irreplaceable [Hilton]
> Resorts for the long-term."  Motion of MSR Resort Golf Course LLC, *et al.*, for
> Entry of an Order Further Extending the Exclusive Periods During which Only

-9-

the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 997] at ¶ 4.

     f.      "Simply put, the Debtors are confident that replacing Hilton . . . will provide tremendous value for their stakeholders." Motion of MSR Resort Golf Course, LLC, *et al.*, for Entry of an Order Extending the Exclusive Periods During which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof [Docket No. 1225] (the "Fourth Extension Motion") at ¶ 30.

18.     Although the Debtors allege that the HMAs represent a tremendous encumbrance, they have maintained throughout the Bankruptcy Case that the Hilton Resorts have performed well and the Debtors expect continued positive performance into the future:

     a.      "The Resorts continue to appreciate in value . . . Through April, year-to-date RevPAR . . . is 12.6% higher than last year . . . And year-to-date net operating income is approximately 18.7% greater than last year." First Omnibus Reply at ¶ 30 (internal citations omitted).

     b.      "In addition to the Resorts' improved financial outlook, larger hospitality industry performance is also enjoying a significant upswing . . . Available market data indicates that the lodging and hospitality industry is performing significantly better in year-over-year comparisons . . . For example, the Goldman Sachs Lodging Index shows an approximately 30% increase in lodging industry stock valuations compared to 2010 second quarter figures." *Id.* at ¶ 31 (internal citations omitted).

     c.      "The luxury hotel subset of the larger hospitality industry shows even stronger financial performance. For example, luxury hotel RevPAR for the first four months of 2011 were up 12.2% as compared to the first four months of 2010 . . . The first four months of 2011 also showed 7.5% growth in luxury hotel rooms sold . . . 2011 and 2012 performance forecasts indicate that the luxury hotel market will continue to perform at a high level – predicting RevPAR growth of 8.2% for 2011 and 10.7% for 2012 . . . The Debtors' Resorts are performing at higher level [sic] than the larger luxury resort market (year to date net operating income up 18.7%, year to date total revenues up 7.9%, and average daily rate up 10.9% compared with the same period in 2010)." *Id.* at ¶ 32 (internal citations omitted).

     d.      "Improving hospitality performance is likely attributable to increased corporate and consumer demand driven by the recent economic recovery, coupled with a lack of new competitors entering the marketplace in recent years . . . If correct, the significant barriers to entry into the luxury resort industry should ensure that the Resorts' asset values continue to increase for the foreseeable future." *Id.* at ¶ 33 (internal citations omitted).

-10-

e.        "While the accuracy of market predictions can never be guaranteed, converging evidence from multiple sources points towards the same conclusion: the hospitality and lodging industry is performing at increasingly high levels with no signs of regression on the horizon."  *Id*. at ¶ 34.

f.        "[T]he Resort assets continue to perform.  Year-to-date RevPAR . . . is approximately 10% higher than last year.  Year-to-date performance for the Resorts is up, with a 13% increase in net operating income over this time last year."  Second Exclusivity Mot. at ¶ 9.

g.        "The Debtors' iconic and irreplaceable Resort assets continue to demonstrate value and performance on a year-over-year basis.  Through August, year-to-date RevPAR is approximately 9.1 percent higher than last year.  Year-to-date net operating income is approximately 11.0 percent greater than last year, and year-to-date average daily rates ("ADR") are up approximately 7.6 percent above last year.  Moreover, the Debtors are enjoying substantial improvement in advanced group bookings for 2012 versus those that had been recognized for 2011 at this time last year."  Second Omnibus Reply at ¶ 51.

h.        "The luxury hotel segment of the hospitality industry is also improving . . . Compound annual average ADR growth is forecasted to be 5.6 percent from 2011 to 2015.  ADR is also expected to top 2010 levels by 5 percent.  Similarly, compound annual average Rev PAR growth is forecasted to be 6.3 percent from 2011 to 2015 and RevPAR is expected to top 2010 levels by 10.2 percent.  Thus, extrinsic data strongly suggests that the Debtors should expect that the performance of their Resort assets will continue to improve for the foreseeable future."  *Id*. at ¶ 53.

i.        "Business performance remains on track with the Debtors' 2012 budget . . ."  Fourth Extension Mot. at ¶ 9.

19.        As the above representations indicate, the Debtors have repeatedly confirmed to the Court the iconic nature of the Hilton Resorts and their positive and improving performance, with not so much as a hint that they were performing poorly.  However, the Debtors' consistent positive economic views about the Hilton Resorts – or at least the Debtors' litigation posture regarding the performance of the resorts – changed after this Court ruled in an adversary proceeding commenced by the Debtors against Hilton that Hilton was not estopped from seeking

rejection damages from the Fee Owners if the MSR Tenants reject the HMAs.[5]  It was only after

the Court's ruling that the Debtors' story changed.  Virtually overnight the Hilton Resorts went

from being iconic and irreplaceable properties with performance on the upswing to ordinary

properties that have been performing poorly and are expected to continue performing poorly in

the future under Hilton's management.

20.    Indeed, the Debtors contend that Hilton will only sustain damages totaling

approximately $46 million if it loses from its Waldorf Astoria portfolio three of the most well-

known hotel and resort properties in the United States.  *See* Trial Tr. at 540:5-6.  The Debtors'

position is disingenuous and the Court feels compelled to point out that the Debtors' credibility is

obviously subject to serious question for issuing positive reports about the performance of the

Hilton Resorts for many months and then, in the absence of any materially changed

circumstances, claiming through their retained expert that those resorts have actually performed

poorly and will decline during the next three years.

**D.    <u>Hilton's Fees Under The HMAs</u>**

21.    The HMAs provide that Hilton is entitled to the payment of a "Management Fee,"

which is defined as "collectively, the Base Fee and Incentive Fee to be paid to [Hilton] pursuant

to this [HMA]."[6]  Joint Ex. 2 at p. 6, § 5.1.  Base Fee is defined as "an amount equal to two

percent (2%) of Gross Revenues, *payable* to [Hilton] as set forth in Section 5.5."  *Id*. at p. 2

(emphasis added).  Incentive Fee is defined as an amount "equal to fifty percent (50%) of the

amount by which Net Operating Income exceeds the Incentive Threshold."  *Id*. at p. 5.  Although

Hilton has in the past received Incentive Fees, the parties agree that Hilton is unlikely to receive

---

[5]  The Debtors had attempted to limit Hilton's rejection damages to the MSR Tenants because those entities have no
material assets and could not likely satisfy any of Hilton's substantial rejection damages.
[6]  The three HMAs are nearly identical.  References to the HMAs herein shall be made only to the HMA for Grand
Wailea [Joint Ex. 2].

future Incentive Fee payments under the HMAs, and Hilton is not requesting any damages

relating to such fees.  *See e.g.* W-A Tr. Ex. 25 at p. 11, 17; Debtors' Ex. 1 at p. 18, n.7; Debtors'

Ex. 2 at p. 24, n.9; Debtors' Ex. 3 at p. 17, n.9.

22.    Hilton is also entitled to a "Corporate Overhead Fee":

> . . . Owner shall *pay* to Manager an annual *fee* equal to one percent (1%) of Gross
> Revenues (the "Corporate Overhead Fee").  The Corporate Overhead Fee *shall be*
> *paid* in accordance with Section 5.5 below.  The Corporate Overhead Fee is
> distinct from the Group Services Expenses and Reimbursable Expenses payable to
> Manager hereunder versus what would have been charged had the Corporate
> Overhead Fee not been in place.

Joint Ex. 2 at § 5.3 (emphasis added).  "Corporate Overhead Fee" is a novel and defined term

that does not typically appear in hotel management agreements.  *See* Trial Tr. at 123:21-24,

176:21-25, 398:17-19, 491:2-9, 797:15-22, 1155:16-24.  In fact, not a single witness could recall

ever having seen that term before in a hotel management agreement.  *See id*.  The parties dispute

whether it is a fee or reimbursement of Hilton's corporate overhead.  Despite the word

"overhead" in the title and a reference in the HMAs that the Corporate Overhead Fee is

"reimbursed," *see* Joint Ex. 2 at § 5.1, the Court finds that the Corporate Overhead Fee is

nevertheless a fee and not an expense reimbursement.  *See* Joint Ex. 2 at § 5.1.

23.    Like the Base Fee, the Corporate Overhead Fee is automatically *payable* to Hilton

based solely upon the Hilton Resorts' gross revenues.  *See id*. at §§ 5.1, 5.3 and 5.5.  The

Corporate Overhead Fee is not limited in any way or conditioned upon Hilton actually incurring

any corporate overhead expenses.  The HMAs clearly provide that "[t]he Base Fee [and] the

Corporate Overhead Fee . . . shall be *payable* monthly (for the preceding calendar month), on the

date [Hilton] furnishes to Owner the monthly operating report required by Section 4.3."  *Id*. at

§ 5.5 (emphasis added).  Nothing in that section or any other section of the HMAs in any way

restricts or conditions the payment of the Corporate Overhead Fee to Hilton – other than the

-13-

limitation that Hilton may not be paid more than 6% of gross revenues for the Base Fee, the

Incentive Fee and the Corporate Overhead Fee combined (which is not applicable to this

litigation).[7]  *See id.* at § 5.1.  Indeed, Cline aptly described it when he stated that "[t]he Corporate

Overhead fee is simply a mathematical calculation of 1.0% of Gross Revenue, which in

combination with the Base Fee of 2.0% of Gross Revenue, gives Hilton its actual minimum

annual compensation under the HMA equal to 3.0% of Gross Revenue."  W-A Tr. Ex. 26 at p.

21.

24.    Similarly, Hilton is not required under the HMAs to reconcile the payment of the

Corporate Overhead Fee with any of its actual corporate overhead expenses, which Hilton would

be unable to do because it does not and cannot attribute its general corporate overhead to any one

or more of the hotels or resorts it manages, including the Hilton Resorts.  *See* Trial Tr. at 244:1-

15, 396:9-11, 401:6-14.  Indeed, Hilton does not charge its general corporate overhead to the

hotels and resorts it manages, but rather only charges for the actual reimbursable expenses

relating to the management of specific hotels and resorts.  *See id.* at 244:1-12.  Hilton's general

corporate overhead is therefore distinct from the expenses Hilton actually incurs in connection

with managing any one or more specific hotels or resorts.  As Hilton's Treasurer, Kevin Jacobs,

testified, "[b]y definition [Hilton's] corporate overhead is money that [Hilton] spend[s] as a

company that cannot otherwise be allocated to any other part of the business."  *Id.* at 401:12-14;

*see also* Trial Tr. at 252:22-24.  Jacobs also testified that there is "[v]ery little, if any" correlation

between the amount Hilton might be able to save if it lost the HMAs and the corporate overhead

that Hilton incurs as a global enterprise.  *See id.* at 466:25, 467:1-4.

---

[7]  The mention of the Corporate Overhead Fee with the Base Fee and Incentive Fee as part of the 6% cap further
suggests the parties viewed the Corporate Overhead Fee as a fee as the cap does not include any expense
reimbursements to Hilton under the HMAs.

-14-

25.     The HMAs expressly provide for the reimbursement of Hilton's expenses actually incurred in connection with managing the Hilton Resorts.  *See* Joint Ex. 2 at §§ 5.2, 5.4.  For instance, Hilton is entitled to the payment of Group Services Expenses (not to exceed 2% of gross revenues) to reimburse Hilton for the costs it incurs in providing Group Services.[8] However, Hilton may not use the Group Services Expenses for the reimbursement of its general corporate overhead, including its corporate officers' salaries.  *See id*. at § 5.2.  In addition, Hilton is entitled to be reimbursed for the costs it actually incurs in providing services to the Hilton Resorts (up to $1.4 million plus Consumer Price Index increases for all three Hilton Resorts), including its "Out-of-Pocket Expenses", costs and expenses of third party goods and taxes levied against reimbursements payable to Hilton under the HMAs, among other things.  *See id*. at § 5.4; *see also* Trial Tr. at 181:16-25, 182:1-11.  Moreover, the MSR Tenants have approval rights over Hilton's Out-of-Pocket Expenses that Hilton includes in its annual budgets, *see* Joint Ex. 2 at § 4.1.1, but the MSR Tenants have no such rights with respect to the payment of the Corporate Overhead Fee under Sections 5.3 and 5.5 of the HMAs.  Because Hilton is already reimbursed for its costs and expenses directly relating to the services it provides to the Hilton Resorts, it would be illogical to construe the Corporate Overhead Fee as an additional expense reimbursement for Hilton's corporate overhead that could not be attributed to any one or more of its managed properties; nothing in the HMAs warrants such a result.

26.     Other provisions in the HMAs corroborate the conclusion that the Corporate Overhead Fee is a fee and not a reimbursement.  For example, in addressing the Hilton Resorts' mandatory participation in the "Group Services," the HMAs provide that "[i]n consideration for [Hilton's] provision of the Group Services, Owner shall pay the costs and expenses described in

---

[8] Group Services and the Group Services Expense are discussed in more detail below, but generally relate to funds Hilton utilizes to provide services to all Waldorf Astoria hotels and resorts, including advertising, marketing, promotion, publicity, public relations and group sales services.  *See* Joint Ex. 2 at §§ 2.6, 5.2.

-15-

and in accordance with Sections 5.2, 5.4, 5.5 and 5.6."  Joint Ex. 2 at § 2.6.  Section 5.2

addresses the payment of Group Services Expenses; Section 5.4 addresses the payment of

Reimbursable Expenses; Section 5.5 addresses the actual payment of fees and reimbursements;

and Section 5.6 addresses Hilton's right to utilize funds in the Hilton Resorts' operating accounts.

Conspicuously absent from the description of "costs and expenses" in Section 2.6 is any

reference to the Corporate Overhead Fee, which is addressed in Section 5.3 of the HMAs.  If the

Corporate Overhead Fee was a reimbursement as the Debtors suggest, it would have been

described as a cost and expense in Section 2.6 of the HMAs.

27.    When Hilton valued the HMAs prior to acquiring them in January 2006, Hilton

assumed it would be receiving base management fees totaling 3% of gross revenues (*i.e.*, the

Base Fee plus the Corporate Overhead Fee) because Hilton's receipt of the Corporate Overhead

Fee was not restricted in any way.  *See* Joint Ex. 4 at p. 3; *see also* Trial Tr. at 102:8-25, 103:1-

21, 123:25, 124:1-4.  Had there been any restriction upon Hilton's receipt of the Corporate

Overhead Fee, Hilton would not have considered it in valuing the HMAs.  *See* Trial Tr. at

123:25, 124:1-4.  Moreover, a customary base management fee in the hotel industry is 3% of

gross revenues.  *See id.* at 177:1-5, 589:15-18, 855:25, 856:1-2.

28.    Hilton has always treated the Corporate Overhead Fee and the Base Fee the same

on its books and records:  they are both accounted for as fees.  *See id.* at 176:17-23, 242:15-17,

394:14-18, 805:22-25, 806:1-16.  Likewise, Hilton applies the 1% Corporate Overhead Fee as

cash to its bottom line.  *See id.* at 176:17-23.  Also, Hilton reported the Corporate Overhead Fee

to the Hilton Resorts' owners as a fee.  *See id.* at 808:3-23; *see also* W-A Tr. Ex. 26 at Ex. 15.

Jacobs also testified credibly at trial that "[o]ur accountants characterize this corporate overhead

fee -- 'fee' being the operative word there as far as our accountants are concerned, I believe -- our

accountant[s] characterize this one percent corporate overhead fee at 100 percent profit on our profit-and-loss statement." Trial Tr. at 426:21-25. In other words, in determining its gross operating profit, or GOP, Hilton accounts for the Corporate Overhead Fee below the GOP line (just like the Base Fee); whereas, if the Corporate Overhead Fee was truly an expense reimbursement, Hilton would have to deduct it in calculating its GOP. *See id.*

29.    It is noteworthy that the Debtors treat the Corporate Overhead Fee as part of the management fee paid to Hilton under the HMAs. Pyramid, the Debtors' agent that essentially runs the Debtors' business, prepared consolidated profit and loss statements for the Hilton Resorts in March 2012 that it shared with the Hilton Resorts' owners, which reflected Hilton's "Management Fee" as 3% of total revenues, rather than including a separate line item for the Corporate Overhead Fee. *See* Debtors' Ex. 35 at pp. 10, 32 and 51.[9] Like Hilton, Pyramid accounts for the 2% Base Fee and 1% Corporate Overhead Fee collectively below the GOP line as a single "Management Fee." *See id.*[10] In those same profit and loss statements, Pyramid appropriately accounts for the Hilton Resorts' "Overhead Costs" above the GOP line. *See id.* Even Morone's projections that assume Hilton will remain manager of the Hilton Resorts have but a single management fee line item at 3%. *See* Debtors' Ex. 1 at Ex. C; Debtors' Ex. 2 at Ex. C; Debtors' Ex. 3 at Ex. C.

30.    Similarly, business plans for Grand Wailea and La Quinta for the periods 2007 through 2012 contain financial results and projections for those resorts. In the projections, Hilton's "Management Fee" is *always* calculated at 3% and *always* appears below the GOP line.

---

[9] References to the pages of Debtors' Ex. 35 are to those pages designated to the exhibit by the Debtors, rather than any of the page numbers appearing within the text of the exhibit itself.

[10] According to Pyramid, as of March 31, 2012: (a) Grand Wailea's year-to-date revenues totaled $48,966,000 and Pyramid included Management Fees below the GOP line totaling $1,427,000 (approximately 3%), *id.* at p. 10; (b) Arizona Biltmore's year-to-date revenues totaled $29,865,000 and Pyramid included Management Fees below the GOP line totaling $896,000 (approximately 3%), *id.* at p. 32; and (c) La Quinta's year-to-date revenues totaled $40,024,000 and Pyramid included Management Fees below the GOP line totaling $1,176,000 (approximately 3%), *id.* at p. 51.

*See e.g.*, Debtors' Ex. 26 at p. 11; Debtors' Ex. 27 at p. 15; Debtors' Ex. 28 at p. 14; Debtors' Ex. 29 at p. 9; Debtors' Ex. 30 at p. 9; Debtors' Ex. 31 at p. 12; Debtors' Ex. 32 at p. 14; Debtors' Ex. 33 at p. 14.[11]  There is no evidence that any of the Hilton Resorts' owners, including CNL, MSREF or CNL-AB LLC, ever inquired of Hilton regarding whether it uses the Corporate Overhead Fee to pay for so-called overhead, or asked Hilton for an accounting of its overhead. *See* Trial Tr. at 176:10-16, 466:18-24.  The Court finds the Debtors' and their predecessors' repeated treatment of the Corporate Overhead Fee as part of the "Management Fee" paid to Hilton in consideration of its management of the Hilton Resorts to be particularly persuasive.  As one of Hilton's experts succinctly put it:  "It looks like a fee, it smells like a fee; to me, it's a fee." *Id.* at 808:19-20.

31.    Perhaps most importantly, it is simply irrelevant that the one percent is called a "corporate overhead" fee.  Whatever it may be called, it is a guaranteed monthly payment equal to one percent of gross revenues that Hilton may use as it pleases.  If Hilton no longer receives that fee, it will suffer direct damages equal to that one percent of gross revenues.

32.    The Debtors suggest that the Corporate Overhead Fee should not be recoverable by Hilton as part of its damages because the liquidated damages provision in the HMAs does not permit Hilton's recovery of the Corporate Overhead Fee if the MSR Tenants exercise their right to terminate the HMAs during the Extension Term.  *See* Joint Ex. 2 at § 3.4.3.  However, this provision does not preclude Hilton's right to receive the Corporate Overhead Fee if the HMAs are terminated during the Base Term, which is what will occur if the MSR Tenants reject the

---

[11]  References to the pages of Debtors' Exs. 26 - 33 are to those pages designated to the exhibit by the Debtors, rather than any of the page numbers appearing within the text of the exhibit itself.

HMAs during the Bankruptcy Case.[12]  Thus, the Court rejects the Debtors' contention concerning liquidated damages.  Hilton is entitled to the Corporate Overhead Fee as part of its damages.

**E.**    **Hilton's Foregone Fees Upon Termination**

33.    The Court agrees with Hilton's expert, Roger Cline, that if the MSR Tenants reject the HMAs, Hilton will lose fees – the Base Fee and the Corporate Overhead Fee – with a present value totaling $165,409,000 that it would have earned under the HMAs.  *See* W-A Tr. Ex. 25 at p. 6.  Of this amount, the Court finds that $122,375,000 pertains to the Base Term, and $43,034,000 pertains to the Extension Term.  *See id.* at p. 47.  In addition, the Court finds that the present value of the fees Hilton would lose upon rejection of the HMAs should be allocated among the Hilton Resorts as follows:  Grand Wailea ($77,306,000); Arizona Biltmore ($40,396,000); and La Quinta ($47,706,000).  *See id.* at p. 6.

34.    In evaluating Hilton's lost fees, the Court notes that it generally found the expert analysis and testimony of Hilton's expert, Roger Cline, far more thorough and convincing than that of the Debtors' expert, Thomas Morone.[13]  Indeed, there is a stark difference in the level of work and depth of analysis of the experts.  For example, Cline is among the leading experts in the hospitality industry in the United States.  He thoroughly inspected each of the Hilton Resorts (spending five days at Grand Wailea alone, *see* Trial Tr. at 768:17-25, 769:1-3), interviewed no fewer than 25 individuals, including Hilton executives and the managing directors and directors of finance for each of the Hilton Resorts, and reviewed and analyzed more than 175 documents. *See* W-A Tr. Ex. 25 at p. 16, Appendix M, Appendix N; *see also* Trial Tr. at 765:24-781:13. Cline spent more than 600 hours on the engagement, *see* Trial Tr. at 764:25, 765:1-3, which

---

[12]  Hilton's expert, Roger Cline, did not include the Corporate Overhead Fee during the Renewal Term when he made his projections of the amounts the Debtors would have to pay as liquidated damages upon selling the Hilton Resorts during that time period.

[13]  Cline and Morone both authored expert reports dated as of May 11, 2012, and supplemental reports dated as of June 11, 2012.  *See* W-A Tr. Exs. 25, 26; Debtors' Exs. 1-4.

-19-

efforts culminated in more than 125 pages of expert analysis, exclusive of the numerous exhibits

to his reports.  *See* W-A Tr. Exs. 25, 26.

35.     On the other hand, Morone conducted a superficial analysis that took him less

than 100 hours to complete, *see* Trial Tr. at 1106:22-25, 1107:1-11, and which culminated in

three initial reports (one for each of the Hilton Resorts) totaling on average 20 pages each (with a

substantial amount of duplication among the reports), *see id*. at 1110:2-5, and a single

supplemental report totaling 21 pages, pursuant to which he only addressed Hilton's lost profits.

He did not do any independent analyses regarding Hilton's damages relating to the loss of Group

Services Expenses or damages to the Waldorf Astoria brand.  *See e.g.* Debtors' Ex. 4 at pp. 2-9.[14]

Morone did not interview a single Hilton employee or anyone at the Hilton Resorts or,

surprisingly, even talk with the Debtors' asset manager, Pyramid.  *See* Trial Tr. at 1111:8-9,

1112:1-10, 1113:5-12, 22-25, 1114:1-3, 1139:13-25, 1140:1-7.  Notably, Morone spent only one

hour at the expansive Grand Wailea, solely so he could testify that he had been there in

connection with his assignment.  *See id*. at 1110:25, 1111:1-2, 1112:25, 1113:1-4.  It also is

unclear the extent to which Morone was assisted by the Debtors' counsel, Kirkland & Ellis, in

this matter, as he admitted he viewed them as "part of his team."  *See id*. at 1053:18-25.[15]

Finally, the Court notes that Morone is a principal of Warnick + Company, the entity that the

Debtors retained to assist them with finding a replacement manager for the Hilton Resorts, and

---

[14]  As described in more detail below, Morone never considered or calculated the damages Hilton would suffer as a
result of its loss of the Hilton Resorts' contribution of Group Services Expenses or the damages that the Waldorf
Astoria brand would sustain upon rejection of the HMAs.  *See* Debtors' Exs. 1-3.  Rather, he merely criticized
Cline's extensive analysis relating to both of these components of Hilton's damages.  *See* Debtors' Ex. 4 at pp. 2-9.
[15]  The extent to which Morone relied on counsel lessens the Court's view of his conclusions.  The Court finds
troubling that the Debtors' lawyers were adding citations to deposition transcripts to Morone's supplemental report
and that Morone could not vouch for them.  *See id*. at 1107:17-25, 1108:1.  Indeed, Morone never testified at trial
that he had read any deposition transcripts and admitted he did not attend any depositions in the case.  *See id*. at
1111:19-21.  Most surprisingly, he was not aware that the Managing Director of Grand Wailea, Matthew Bailey, had
been deposed until the day before Morone himself was deposed.  *See id*. at 1111:10-15.  He also apparently
reviewed but a few hundred of the 14,000 pages of documents Hilton produced in the litigation.  *See id*. at 1109:17-
22.  The Court places less weight on Morone's opinions because it appears his access to documents and testimony
was restricted.

that has expressed a desire to become the asset manager for the Hilton Resorts.  *See id*. at

1029:2-14.

36.    In addition, Morone undermines his initial conclusion that $46 million is the

appropriate measure of damages if Hilton loses all three HMAs by freely acknowledging that

Hilton's rejection damages would be at least $86 million based on the recent proposed Gaylord

hotel transaction, which the Court notes has yet to actually close.  *See* Debtors' Ex. 4 at p. 21

(stating that the use of an "eight times multiple of Hilton's 2011 total fee would result in damages

of $86,254,400.").  The Gaylord transaction is not reasonably comparable to the substantial

damages Hilton is seeking in this case; however, even if it was, Morone's analysis is wrong,

because to compare apples to apples, the Court would have to apply an eight times multiple to

Hilton's total projected fees for 2013, not its actual fee from 2011.  This alone would cause

Hilton's lost fee damages to increase to nearly $100 million based on Morone's 2013

projections.[16]

## 1.    **Financial Projections**

37.    Although the financial projections of the two sides' experts are not markedly

different, for reasons explained below the Court accepts the projections for the Hilton Resorts

prepared by Hilton's expert, Roger Cline, which form the basis of Hilton's lost fees under the

HMAs.  Cline and Morone agree that the economic performance of the Hilton Resorts will be

stabilized in 2015 (reflecting recovery from the Great Recession which began in 2008 and, in the

case of Grand Wailea, recovery also from the economic effect of the Japanese earthquake and

tsunami in 2011) and their projections through 2015 are similar (only 2.9% apart).  *See* W-A Tr.

Ex. 26 at p. 10.  However, the experts part ways when it comes to projecting the Hilton Resorts'

---

[16]  *See* Debtors' Ex. 1 at Ex. C; Debtors' 2 at Ex. C; Debtors' Ex. 3 at Ex. C.

revenues and Hilton's corresponding fees following 2015 and through the end of the term of the HMAs.

### a.    Annual Rate of Inflation

38.    One of the disparities between the experts that accounts for differing financial projections beyond 2015 relates to the rate of inflation they apply to their projected income and expenses.  Cline assumes inflation following 2015 at 3% per annum, while Morone assumes inflation at 2.5% per annum.  *See* W-A Tr. Ex. 26 at p. 10.  Morone provided little back up for his conclusion that 2.5% should apply, stating that "2.5 percent . . . is the average of the annual national inflation rate between 2002 and 2011."  *See e.g.* Debtors' Ex. 2 at p. 10.  His testimony on the topic was no more illuminating, as he simply offered that 2.5% for inflation is what his firm uses in projections, which is only based upon the Bureau of Labor and Statistics.  *See* Trial Tr. at 1060:16-21.

39.    Cline, on the other hand, had a more reasoned approach to his inflation factor, noting that this was a forward-looking (not backward-looking) consideration.  *See* W-A Tr. Ex. 26 at pp. 10-12.  First, relying upon "forecast-chart.com," Cline noted that the U.S. Inflation Rate for the 12 months ended in February 2012 was 2.87% and that "[h]igher inflation over the last 12 months compared to the average inflation over the last 10 years serves as an indicator that the long term trend in the U.S. Inflation Rate is up."  *Id*. at p. 11.  Second, inflation rates vary by industry; and two industries relevant to hotels – energy and food and beverage – had inflation rates for the 12 months ended in February 2012 of 7% and 3.8%, respectively, *i.e.*, much higher than the 2.87% average inflation rate for that same period.  *See id*.[17]  Finally, and perhaps most persuasive, is the fact that leading hotel appraisers generally apply inflation at 3% per annum

---

[17] Indeed, the Debtors' only fact witness, Jonathan Shumaker, noted that one reason why Grand Wailea's profitability may be lagging is the increase in energy costs.  *See* Trial Tr. at 1013:1-25.

when projecting future hotel revenues, including the world's largest hotel appraisal firm, HVS,[18] as does one of Hilton's expert witnesses, Sean Hennessy, an MAI[19] who has been appraising hotels since 1983.  *See* Trial Tr. at 475:6-7, 479:9-10.  Indeed, earlier in the Bankruptcy Case, the Debtors relied upon appraisals for the Hilton Resorts prepared by Pinnacle Advisory Group, which applied a 3% rate of inflation when projecting the financial performance of the Hilton Resorts for the period 2011 through 2021.[20]  *See* W-A Tr. Ex. 26 at p. 12; Divine Decl. at Exs. A-C.

### b.    Capital Expenditures at the Hilton Resorts

40.    Another difference between the experts affecting the financial projections relating to the Hilton Resorts, and in particular Grand Wailea, relates to the capital expenditures required to maintain the Hilton Resorts at an appropriate operating level.  As set forth below, the Court finds (and indeed Morone projects) that if the Hilton Resorts are allowed to deteriorate, their performance will suffer, but if they are adequately maintained, which the Court believes they will, they will thrive and remain competitive.  Cline confirms this in his initial expert report:

> There is clearly a significant relationship between the physical condition of the properties, their market positioning and their revenue potential.  Four-year (2012-2015) capital expenditure plans are therefore presented for each property.  On the basis of my inspection of each property, my discussions with property-level and corporate management and my review of the budgeted amounts, I consider these plans to be reasonable and, furthermore, critical in support of the revenue opportunity at each property.

W-A Tr. Ex. 25 at p. 17.

41.    The HMAs provide that:

---

[18]  Cline was once at HVS and had a major role in many hotel appraisals.  *See* Trial Tr. at 751:7-25, 752:1-14.

[19]  MAI is a designation by the Appraisal Institute to identify "appraisers who are experienced in the valuation and evaluation of commercial, industrial, residential and other types of properties, and who advise clients on real estate investment decisions."  *See* http://www.appraisalinstitute.org/designations/MAI_Designations.aspx; *see also* Trial Tr. at 474:23-25, 475:1-3.

[20]  The Court also notes that one of the expert witnesses in a recent case involving damages to Marriott under a rejected hotel management agreement also used a 3% inflation rate.  *See In re M. Waikiki*, No. 11-02371, 2012 WL 2062421 *7, n.1 (Bankr. D. Haw. Jun. 7, 2012).

> The Hotel shall be operated, serviced, maintained and refurbished (i) at the level of service and quality substantially consistent with the level of service and quality in existence at the Hotel as of the Effective Date, (ii) in a manner consistent with the requirements and limitations set forth in this Agreement (including those relating to the Annual Operating Plan) and (iii) in a manner reasonably calculated to (a) protect and preserve the assets that comprise the Hotel, and (b) optimize over the Term the financial performance of the Hotel's operations. The foregoing shall collectively constitute the "Operating Standards" of the Hotel's operations. Owner and Manager agree to perform their respective obligations under this Agreement, and exercise their respective rights of approval in a manner that permits Manager to maintain the Operating Standards and preserves the character, physical condition, state of repair and reputation of the Hotel at a level substantially consistent with that which is in existence at the Hotel as of the Effective Date.

Joint Ex. 2 at § 2.2.[21] In addition, the MSR Tenants are required to fund 4% of total revenues per year into an interest bearing account (the "CapEx Reserve") for routine capital expenditures at the Hilton Resorts (the "Routine Capital Expenditures"). *See id.* at § 6.1. Further, the MSR Tenants shall, at their sole expense, make all recommended major capital expenditures (the "Major Capital Expenditures") "that are: (i) included in the Annual Operating Plan; [or] (ii) otherwise approved by Owner, if not included in the Annual Operating Plan." *Id*. at § 6.2. If the parties cannot agree regarding Major Capital Expenditures, they "shall submit the matter to mediation and, if necessary, arbitration for resolution." *Id*. When Hilton's or the MSR Tenants' approval is required under the HMAs, "such approval . . . shall not be unreasonably withheld or delayed." *Id*. at § 15.17. Additionally, no failure on the part of the parties "to insist on the strict performance of any term of this [HMA], or to exercise any right or remedy consequent on a breach thereof, shall constitute a waiver of any breach or any subsequent breach of such term." *Id*. at § 15.18.

---

[21] The Annual Operating Plans are the yearly budgets that Hilton prepares in accordance with the HMAs for the Hilton Resorts, which the MSR Tenants must approve. *See* Joint Ex. 2 at § 4.1. If the parties cannot agree on an Annual Operating Plan, they must mediate any disputes, followed by arbitration if a dispute remains. *See id*. at § 4.1.1.

42.    For the period 2012 through 2015, Cline estimates that Grand Wailea will generate revenues totaling $818,082,000; thus producing $32,723,000 for the CapEx Reserve by the end of 2015 (the "4% CapEx").  *See* W-A Tr. Ex. 26 at p. 6.  However, Hilton has prepared and routinely shared with Pyramid detailed capital plans that call for the funding of approximately $81,907,000 in capital expenditures at Grand Wailea through 2015 – more than double the 4% CapEx.  *See* W-A Tr. Ex. 25 at p. 19; W-A Tr. Ex. 26 at p. 6; Trial Tr. at 205:3-8, 649:17-22.  This amount of spending on capital expenditures is consistent with Hilton's general practices regarding capital expenditures at resorts it owns according to Hilton's Vice President of Owner Relations and Management Contract Services, Dianne Jaskulske, who testified that "[i]n our owned properties, we average -- for the same size and complexities of [the Hilton Resorts], we average eight to ten percent of revenue annually, sometimes more."  Trial Tr. at 207:12-14.[22]

43.    Hilton's analysis also is consistent with the opinion of Matthew Bailey, the Managing Director of Grand Wailea, who doubtless knows Grand Wailea and its condition better than anyone else who testified.  Bailey testified that Hilton's capital plan is reasonable, the 4% CapEx is "an unrealistically low number" and that Grand Wailea cannot maintain the Operating Standards under the HMA by spending only the 4% CapEx because "there are aspects of [Grand Wailea] . . . that are badly in need of attention."[23]  *See id*. at 649:3-12, 651:4-25, 652:1-11.  Indeed, Bailey believes that approximately eight to nine percent of total revenues should be reserved for capital expenditures to maintain a property as expansive as Grand Wailea.  *See id*. at 724:7-18.

---

[22] Jaskulske also concluded that the Hilton Resorts are not being maintained to the Operating Standards under the HMAs.  *See* Trial Tr. at 206:10-14.  In particular, she noted that Arizona Biltmore and La Quinta are badly in need of rooms renovations.  *See id*. at 207:5-8.

[23] Shumaker testified that he thought the condition of Grand Wailea was "excellent" and "great," *see* Trial Tr. at 1018:6-13; however, as he admitted he had only been to the resort once in the past year, *see id*. at 1024:18-22, the Court credits that testimony much less than the testimony of Bailey, who is at the resort every day.

44.    Morone's opinion that the owners of the Hilton Resorts would only spend 4% on capital expenditures is not credible.  Morone acknowledges that almost all of the primary competitors of the three resorts have recently made major capital expenditures.  *See* Debtors' Ex. 1 at p. 7; Debtors' Ex. 2 at p. 7; Debtors' Ex. 3 at p. 7.  It is unrealistic to believe that the owner of these resorts would allow them to fall any farther behind the competition, especially as Morone projects that each resort will have to be aggressive on average daily rate to compete for business in the future.  *See* Debtors' Ex. 1 at pp. 7-9, Debtors' Ex. 2 at pp. 7-9, Debtors' Ex 3 at pp. 7-9.

45.    Based upon the foregoing, the Court agrees with Cline that it would be irrational for an owner to allow an assets as spectacular as these to deteriorate physically, thereby reducing its market share and revenue per available room, or RevPAR, in comparison to its competition, which have all been recently renovated as even Morone concedes.  *See* W-A Tr. Ex. 26 at p. 6; Trial Tr. at 793:6-13; Debtors' Ex. 1 at p. 7; Debtors' Ex. 2 at p. 7; Debtors' Ex. 3 at p. 7.  Cline's opinion was also corroborated by Hennessey, who opined as follows:

> Morone's expert reports forecast each of the Resorts to have declining revenue per available room relative to their defined competitive sets.  Morone also opines that the Resorts will only have capital investment up to the HMA-specified minimum amounts.  Morone's forecast of ongoing erosion of the Resort's competitiveness directly impacts his forecast of net income for the Resorts.  This outlook is completely at odds with my experience as a hotel consultant and MAI appraiser over the course of my career.  It is also at odds with the appraisal reports prepared by others that I have reviewed in the course of consulting on hotel investments.  Simply put, an outlook of deteriorating performance is inconsistent with the actions of market participants, who compete for property investments with expectations of maximizing profit by exploiting opportunities to bring properties up to their highest and best use.

W-A Tr. Ex. 24 at p. 5.

46.    Morone assumes for purposes of his financial projections that "Grand Wailea would be limited to utilizing dollars available in the [CapEx Reserve] . . . to fund renovation."

-26-

Debtors' Ex. 2 at p. 12.  Morone's assumption caused him to conclude that Grand Wailea's

performance will lag behind its competitors in the future, thereby causing Hilton to fail the

Performance Test (hereinafter defined) under the Grand Wailea HMA.  *See* W-A Tr. Ex. 26 at p.

6.  However, Morone never reviewed Hilton's capital plans for Grand Wailea.  *See* Trial Tr. at

1117:8-12.  He also testified that he had reviewed a Pyramid recommendation for the

expenditure of $16 million of owner-funded capital expenditures for 2012 at Grand Wailea; yet

Pyramid's recommendations never factored into his analysis.  *See id*. at 1118:6-10; 1120:14-25;

1121:1-3.  Further, Morone's statement that ". . . at no point until this litigation had those same

employees actually voiced to ownership the need for capital expenditures at the level Mr. Cline

has assumed necessary in his analysis," Debtors' Ex. 4 at p. 11, was contradicted by Hilton's

witnesses.  Jaskulske testified that "[n]ot only do we share [five-year capital plans] with [the

owners], but we have great dialogue with them on those plans.  I've sat in on some of those

meetings, that's why I know."  Trial Tr. at 205:3-8.  Bailey also testified that"[w]e've shared the

five-year plan every year that we've produced them with our asset managers."  *Id*. at 649:17-22.

The Court is troubled that Morone never reviewed these capital plans and had no idea of the

capital needs of the Hilton Resorts.  *See id*. at 1115:23-25, 1116:1-9, 1123:10-20, 1141:1-15,

1142:16-22.

        47.    Although the Debtors try to make much of the fact that Hilton never initiated the

dispute resolution mechanism under the HMAs to compel greater spending on capital

expenditures than the 4% reserve, the Court agrees with Jaskulske and Bailey that Hilton was

being an understanding partner during the challenges of the Great Recession time period.  *See id*.

at 196:22-25, 197:1-10, 647:11-16.  In any event, the failure of Hilton to demand strict

performance under the HMAs does not prevent it from doing so in the future.  *See* Joint Ex. 2 at § 15.18.

48.     Accordingly, the Court finds that Morone's projections are not credible and that the necessary amount of capital expenditures beyond the 4% CapEx will be funded to ensure that the Hilton Resorts will operate to enhance their performance into the future.  The Court therefore rejects any contention that the Hilton Resorts' physical condition will negatively impact revenues beyond 2015.  Indeed, if the Hilton Resorts' owners do not contribute the funds necessary to maximize resort operations, the owners would likely be in breach of the HMAs, which require them to optimize the resorts' financial performance, and not unreasonably withhold their consent when Hilton requests it.  *See* Joint Ex. 2 at §§ 2.2, 15.17.

### c.     The Performance Test at Grand Wailea

49.     Another disparity between the experts' views relates to whether Hilton will fail the performance test under the HMA for Grand Wailea (the "Performance Test"), thereby causing Hilton to have to make a "cure" payment to be able to continue managing Grand Wailea.[24]  For the reasons that follow, the Court finds that Hilton is not in danger of failing the Performance Test for Grand Wailea, and would not be required to pay any cure costs associated with the Performance Test.

50.     Under the Performance Test, the MSR Tenants may terminate the HMAs:

> [i]f, for any two (2) consecutive Full Operating Years . . . each of the following is applicable for both of such Operating Years:  (i) the GOP achieved by the Hotel for each Operating Year is less than ninety percent (90%) of the GOP set forth in the approved Annual Operating Plan for such Operating Year, and the Annualized RevPAR for the Hotel for each of such Operating Years is less than ninety-five percent (95%) of the Annualized RevPAR for the Competitive Set for each respective Operating Year.

---

[24]  Morone contends that Hilton will fail the Performance Test at Grand Wailea, but concedes that Hilton is not at risk of failing the Performance Test at Arizona Biltmore or La Quinta.  *See* Trial Tr. at 1082:20-22.

Joint Ex. 2 at § 3.3.1.[25]  However, even if Hilton fails the Performance Test, it has unlimited cure

rights to retain the HMAs.  *Id*. at § 3.3.4.  With respect to Hilton's first cure, it would be required

to pay to the owner "the difference between:  (i) ninety percent (90%) of the GOP set forth in the

approved Operating Plan for the second of the two consecutive Operating Years giving rise to

Owner's right to terminate, and (ii) the actual Gross Operating Profit for such Operating Year."

*Id*. at § 3.3.4(a).  For subsequent cures, Hilton would be required to pay "the difference between

(i) ninety percent (90%) of the GOP set forth in the approved Operating Plan for both of the two

consecutive Operating Years giving rise to Owner's right to terminate, and (ii) the actual Gross

Operating Profit for both Operating Years."  *Id*. at § 3.3.4(b).

51.     The Performance Test is designed to be particularly "weak" – and accordingly

easy to satisfy – because Hilton's operating requirements are based in part upon each of the

Hilton Resorts' Annual Operating Plans, which Hilton prepares; and Hilton also has unlimited

cure rights.  *See* Op. at pp. 20-21 (accepting the expert testimony of Hilton's expert, Michael

Feldman, and recognizing that "Hilton's unlimited cure rights – Hilton may cure any

performance test failure as set forth in Section 3.3. of the Management Agreements – [are] 'quite

extraordinar[y]' since most long-term agreements limit the number of times to cure from one to

three times.").

### i.     The GOP Test

52.     Hilton has *never* failed both prongs of the Performance Test at Grand Wailea in a

single year; yet, Morone concludes that Hilton will imminently fail both prongs of the

---

[25]  Revenue per available room, or RevPAR, is a hotel's occupancy times the average room rate.  *See* Trial Tr. at
192:21-24.  The second element of the Performance Test focuses on the Hilton Resorts' RevPAR yield, which
compares the Hilton Resorts' identified competitors' RevPAR to Hilton's RevPAR.  *See id*. at 192:18-25, 193:1-5.
The goal is to obtain at least a RevPAR yield of 100, or 100% of the share of revenue per available room within a
competitive set.  *See id*.  The data utilized to calculate the RevPAR yield is reported to Smith Travel Research
("STR") by participating hotels and resorts.

Performance Test.  Morone opines that because Hilton failed to achieve GOP of at least 90% of

the Annual Operating Plan for 2008, 2009 and 2011, Hilton will also fail to achieve this

threshold in the future.  *See* Debtors' Ex. 2 at pp. 13-14.  To determine by how much Hilton

likely will miss the budgeted GOP, Morone concludes that "[o]n average Hilton has missed the

Performance Test at Grand Wailea by 13.7 percent each time it failed; this equates to

$9,810,709,[26] which can be looked at as the cure amount should Hilton fail both prongs of their

Performance Test."  *Id*. at p. 17.  In other words, Morone says that because Hilton only achieved

an average of 76.3% of budgeted GOP in 2008, 2009 and 2011, it will have to make a cure

payment equal to 13.7% of budgeted GOP in 2014 (*i.e.*, the difference between 76.3% and 90%),

which Morone calculates as $6,221,223 on a present value basis.  *See* Debtors' Ex. 2 at p. 25.

53.    Morone provides no basis for why he looked only at the years that Hilton failed

the GOP Test as opposed to Hilton's performance against the GOP test for each of the years that

Hilton has been managing Grand Wailea.  According to Morone, "[o]n average, Hilton is only

able to achieve 85.5% of budgeted GOP" from 2006-2011.  *See id*. at p. 13.  It seems only fair

that any assumptions for a cure payment should be based on the entire time Hilton has been

managing Grand Wailea, not the three worst years.  Doing so would substantially reduce any

cure payment Hilton would have to make.

54.    Morone opines that Hilton will fail the Performance Test for two consecutive

years.  However, it is unclear to which two years Morone is referring.  He testified that Hilton

will fail the Performance Test in 2012 and 2013.  *See* Trial Tr. at 1084:17-19, 1124:10-12.  His

report also says that Hilton will fail those two years, *see* Debtors' Ex. 2 at p. 2, and he projects

Hilton making the cure payment in 2014 (which presumably will occur the year after until Hilton

---

[26]  Morone dos not indicate where he got this $9,810,709 figure and the Court could not determine where it came
from either.

fails the second year, *i.e.*, 2013), *see* Debtors' Ex. 2 at p. 25; Trial Tr. at 1084:19-20, 1124:13-14.

He even titled his Opinion # 2 as "Hilton will likely fail the Performance Termination provision

set forth in the HMA in 2012-2013." Debtors' Ex. 2 at p. 12. Yet Morone's own report shows

Hilton *passing* the RevPAR portion of the Performance Test in 2012; therefore, it cannot

possibly fail the two-year test in 2013. *See id.* at p. 12 (showing a projected RevPAR yield in

2012 of 96.2%, a passing grade). In contrast to his testimony and other sections of his report,

Morone's report later claims that Hilton will fail the two-year test in 2014. *See id.* at p.15. Such

inconsistencies cast serious doubt over Morone's conclusions and the thoroughness of his reports.

55.     Even if Morone's testimony and report were consistent, they lack credibility.

First, Hilton can simply propose budgets based on Morone's own projections and the Debtors

could hardly complain they are not appropriate. As these would be Morone's own projections, it

is unlikely Hilton will have difficulty meeting at least 90% of the GOP in those budgets for the

foreseeable future. Second, Morone does not actually calculate by how much Hilton will fail the

GOP test in the future, so he cannot possibly know how much Hilton would have to pay in cure

costs. As noted above – using the three worst years (encompassing the "Great Recession") – is

not a reasonable basis to calculate a future cure payment, especially as Morone does not predict a

future Great Recession in his 10 years of projections. Trial Tr. 1128:23-1129:1. Third, Morone's

prediction that Hilton will fail the Performance Test is belied by the testimony that Hilton has

never been terminated from *any* management contract for failure to pass a performance test. *See*

Trial Tr. at 198:20-25, 199:1-2, 401:15-23.

56.     In any event, the evidence established that Hilton will not fail the GOP test and

will not have to make a cure payment, certainly not as soon as in 2014. Because Hilton first sets

the Annual Operating Plan, the Court finds that it is unlikely that Hilton would agree to a budget

that it did not believe it could satisfy in the future. With respect to Hilton's past failures of the

GOP prong of the Performance Test at Grand Wailea, the Court finds that extenuating

circumstances discussed at length by Matt Bailey are extremely unlikely to repeat themselves in

the future. *See id*. at 636:17-643:17. Moreover, the Debtors' agent, Pyramid, was responsible for

approving or rejecting budgets on behalf of the MSR Tenants and it is evident from Bailey's and

Jaskulske's unrebutted testimony that Pyramid may have had an incentive to see Hilton fail so

that it could manage the Hilton Resorts. *See id*. at 198:12-19, 727:18-25, 728:1-5. Indeed,

Morone did not interview anyone from Pyramid in connection with his reports because he

concluded that Pyramid was biased and wanted to manage the Hilton Resorts. *See id*. at 1113:9-

24.[27] Shumaker likewise confirmed that Pyramid has expressed a desire to manage the Hilton

Resorts. *See id*. at 1027:24-25, 1028:1-4. Pyramid's possible ulterior motives are apparent from

the testimony that Pyramid has *never* agreed to an Annual Operating Plan that Hilton presented

for any of the Hilton Resorts. *See id*. at 195:3-5, 646:2-5. Rather, Pyramid repeatedly required

increases in the Annual Operating Plans that were unrealistic and unachievable in the minds of

Hilton and property management, thereby setting the table for Hilton's potential "failure." *See id*.

For Grand Wailea, Pyramid has insisted upon increases in revenues in every year but one, and

has insisted upon increasing the bottom line every year – increases that Bailey testified were not

reasonably achievable. *See id*. at 646:6-12. Indeed, Jaskulske testified that "there is no owner I

think of today -- and I deal with many owners -- that rejects the budget consistently, every year."

*Id*. at 240:7-9. That testimony speaks volumes considering that Hilton manages more than 600

hotels. *See id*. at 174:25.

---

[27]  The Court takes note that the Debtors never offered anyone from Pyramid as a witness at trial to refute any
testimony of Hilton's witnesses or support the testimony of the Debtors' witnesses.

91004-0040/LEGAL24113101.7

57.    2011 happened to be a particularly bad year for Grand Wailea because it suffered from reduced group business that is typically booked two or more years prior to a group's stay. *See id*. at 639:2-18.  In 2008 and 2009, group bookings were significantly reduced as a result of the so-called "Great Recession" and the "AIG" effect (which placed heightened scrutiny on corporations and the expenses they incurred by booking trips to luxury resorts) and year 2011's performance was further hurt by the earthquake and tsunami in Japan.  *See id*. at 637:7-640:20.

58.    That Hilton did not seek to mediate or arbitrate disputes over the budget in the past does not mean it will not do so in the future.  Hilton had less of an incentive to pursue its dispute resolution rights over the terms of the Annual Operating Plan in 2008 through 2011 because Hilton was not in danger of failing the RevPAR yield for any of those years.  *See* W-A Tr. Ex. 26 at p. 16.  Thus, even when Hilton did not achieve 90% of the GOP contained in the Annual Operating Plan during certain years, it still did not fail the RevPAR portion of the Performance Test.  *See id*.  Jaskulske's and Bailey's testimony are convincing that Hilton will not continue to accept Annual Operating Plans that are not reasonably achievable and will exercise its dispute resolution rights to resolve similar conflicts in the future.  *See* Trial Tr. at 197:1-16, 198:8-10, 647:8-20.

59.    The Court also notes that the Debtors did not refute Bailey's testimony that Grand Wailea will achieve not just 90% of GOP in 2012, but *100%*.  *See id*. at 661:9-19.  That is particularly telling as Bailey testified based on Grand Wailea's results through the first half of the year, combined with the business already on the hotel's books for the remainder of the year.  *See id*. at 661:9-25, 662:1-23.  As a result, the Court concludes that Grand Wailea will satisfy the GOP test for 2012.  Moreover, Bailey's testimony about the strength of group bookings now

-33-

being on par with 2007 (prior to the start of the Great Recession in 2008) contradicts any

suggestion that Hilton will fail the GOP test for the foreseeable future. *See id.* at 669:11-23.

### ii.    The RevPAR Test

60.    Morone further argues that Hilton will not achieve the second prong of the

Performance Test – a RevPAR yield of at least 95%. However, to make this conclusion, Morone

must restate how Grand Wailea reports its room revenue to STR by excluding the $25 "resort

charge" it assesses guests. Debtors' Ex. 2 at pp. 14-17. The Court rejects Morone's contention

and finds that Hilton properly includes the resort charge in its room rates.

61.    Both the Uniform System of Accounts for the Lodging Industry and STR publish

certain guidelines for reporting room revenue, which essentially provide that resort fees should

be allocated to the appropriate department when they can be so allocated. *See* W-A Tr. Ex. 26 at

p. 5. If any portion of a charge or fee cannot be allocated, it should be included in "Other Rooms

Revenue" – which is included in the room revenue data upon which RevPAR is based and

reported to STR. *See id.*; *see also* Trial Tr. at 622:8-25, 623:1-3.[28]

62.    Grand Wailea's $25 resort charge covers a lei presented to arriving guests, a bottle

of water and a mai tai, coffee and tea, fitness and scuba classes, use of the business center, use of

mountain bikes, in-room safes and refrigerators, internet usage, free phone calls from the guest

rooms and beach umbrellas. *See* Trial Tr. at 623:25-627:3. According to Bailey, other than

beach umbrellas, which account for approximately six to eight percent of the resort charge, all

other items included in the resort charge are either specifically allocable to Grand Wailea's rooms

---

[28]  Morone states in his reports that "I have spoken with representatives of [STR] who indicated to me that they have
directed participating hotels to report revenue without including Resort Fees." *See* Debtors' Ex. 2 at p. 15.
However, at trial Morone admitted that he did not in fact personally speak with anyone from STR regarding this
issue. *See* Trial Tr. at 1134:7-9, 1135:2-10. Moreover, any such statement attributed to STR is not supported by the
direct email exchange Cline had with STR and included as an exhibit to his supplemental expert report. *See* W-A
Tr. Ex. 26 at p. 5, Ex. 3.

division or not allocable to any particular department.  *See id.*  Notably, Morone never refuted this testimony or offered any explanation in his report or in his trial testimony as to where any of the resort charge items could be allocated.  Rather, he concludes, with no analysis, "that virtually no amount of the resort fee should be allowable as room revenue."  Debtors Ex. 2 at p. 15.

63.    It is apparent that there is no uniform way to report room revenue to STR.  In fact, Grand Wailea's largest competitor, the approximately 812-room Hyatt Regency in Maui, includes its $25 resort charge in its room rate for purposes of calculating its RevPAR.  *See* Trial Tr. at 628:17-25, 629:1-5.  So does Arizona Biltmore and La Quinta.  *See id*. at 200:4-10.  Thus, Morone even admitted that Grand Wailea would be harmed if it did not report its resort charge similar to the Hyatt Regency, *see id*. at 1135:21-25, 1136:1-11, and that the inclusion of the resort charge increases Grand Wailea's RevPar yield by 3-5%, *see id*. at 1138:1-10; *see also* Debtors' Ex. 2 at p. 16.  As Morone stabilizes Grand Wailea's RevPAR yield at 92.9%, inclusion of that 3-5% is sufficient to satisfy the RevPAR portion of the Performance Test.

64.    The Court also finds it noteworthy that Pyramid has been well aware that Grand Wailea includes the resort charge to calculate RevPAR, but has never raised any question or complaint regarding that practice.  *See* Trial Tr. at 629:21-25, 630:1-3. One would think Pyramid in particular would have raised this issue if Grand Wailea was in violation of applicable STR standards and removal of the resort charge from the room rates reported to STR would cause Hilton's performance to look worse.  Accordingly, the Court finds that Hilton appropriately includes Grand Wailea's resort charge for purposes of calculating Grand Wailea's RevPAR. [29]

65.    Whether or not Hilton's accounting of the resort fee as room revenue complied with the Uniform System of Accounts, the HMA expressly permits Hilton to vary from the

---

[29]  The Court also notes that the Debtors did not allege that Hilton might be subject to termination for failing a performance test until Morone's report was issued, more than 15 months after the filing of these cases.

Uniform System of Accounts.  *See* Joint Ex. 2 at § 2.3.13 (". . . Manager shall be permitted to vary from the Uniform System to the extent consistent with its accounting practices for the Managed Hotels"), Def. of "Gross Revenue"(same), Def. of "Operating Expenses"(same), § 4.2 (same).  Thus, even if the Uniform System of Accounts did not allow the inclusion of a resort charge in the room rates for Grand Wailea, the HMA expressly authorizes Hilton to vary from the Uniform System, thereby expressly permitting Hilton's inclusion of the resort charge in the room rates reported to STR for all three Hilton Resorts.

66.    The Court also notes that Bailey testified that he expects Grand Wailea to achieve a RevPAR yield of approximately 101% to 103% by the end of 2012.  *See* Trial Tr. at 666:25, 667:1-2.  Not only did Morone not refute that contention, but also it appears Morone last considered the financial performance of the resorts as of March 2012, *see id.* at 1130:11-14, whereas Bailey provided testimony reflecting results through June, *see id.* at 665:25, 666:1-4.[30]

67.    As noted, Hilton will pass the RevPAR portion of the Performance Test, as rooms revenue is properly included in its RevPAR reported to STR.  However, even if the Court agreed with Morone on this point, there are additional sources of revenue that Hilton could include in Grand Wailea's room rate that would substantially increase Grand Wailea's RevPAR.  For example, Grand Wailea does not currently report revenues from its rental of the Ho'olei villas adjacent to the resort as room revenues reported to STR.  *See id.* at 632:15-25, 633:1-16.  Including those revenues as room revenue – a decision wholly within Hilton's discretion – would be in accord with how Arizona Biltmore and La Quinta report revenues from their villa rentals as room revenues for purposes of calculating their RevPAR.  *See id.*; *see also id.* at 201:23-25, 202:1-16.  It also would be consistent with how two of Grand Wailea's competitors (the Fairmont

---

[30]  Morone's ability to project results is also called into question regarding La Quinta, which he projects will have a RevPAR yield in 2012 of 101.3%, but through June 2012 La Quinta's RevPAR was at 115%.  *See* Debtors' Ex. 3 at p. 11; Trial Tr. at 193:10.

Kea Lani and the Ritz-Carlton Kapalua) report their villa revenue to STR.  *See id*. at 633:9-16.

Also, when Grand Wailea provides free breakfast to guests, it deducts the full value of the

breakfast ($56 for a couple) from the room rate and credits it to the food and beverage

department, whereas, the Hyatt Regency, a major competitor, only credits a small part of the

value of the breakfast to food and beverage and reports the rest in the room rate, thereby

increasing its RevPAR.  *See id*. at 204:8-22, 630:4-632:14.  Again, Hilton has sole discretion

how to report this revenue to STR.  *See id*. at 204:14-18, 634:4-9.  Neither Morone nor any other

witness for the Debtors contradicted the testimony Hilton offered regarding how it could increase

its RevPAR yield by reporting the villa and breakfast revenue to STR.  Thus, the Court finds that

Grand Wailea's RevPAR yield could be increased to 105% for 2012 if these items were included

in room revenue.  *See* W-A Tr. Ex. 19.  Consequently, it is clear that Hilton is not in danger of

failing the Performance Test at Grand Wailea for the foreseeable future.

   68. Morone also projects that Hilton will have to make a second cure payment at

Grand Wailea in 2031.  *See* Debtors' Ex. 2 at p. 25.  Morone reaches this opinion after having

conducted a so-called "Monte Carlo" analysis, a statistical method to determine the likelihood of

a certain event occurring in the future based on certain inputs.  *See id*.  As an initial matter,

Morone concedes in his reports that "any estimates of performance beyond [a ten-year] time

period would be wholly speculative and unreliable."  *See id*. at p. 10.  Thus, presumably

projecting a Performance Test failure 19 years from now would be similarly fraught with peril.

No less so under the "Monte Carlo" analysis, which Morone acknowledged he had never used

before this case and was unaware of its use ever before in projecting the possible future failure of

a management contract performance test.  *See* Trial Tr. at 1136:12-25, 1127:1-11.  That being

said, as Morone acknowledges that the test is only as good as its inputs, *see id*. at 1137:19-21, the

Court does not find it credible.  Morone did not input Grand Wailea's resort charge as part of its

room revenue in connection with his Monte Carlo analysis.  *See id*. at 1137:22-25.  He also

obviously did not include the Grand Wailea's villa rental revenue or its breakfast revenue in its

room revenue.  Similarly, he assumed the Grand Wailea would continue to decline relative to its

competitors, in part caused by his limitation of capital expenditures to 4% of gross revenue.  *See

id*. at 1138:11-18.  As the Court does not find any of those inputs (or lack of inputs) reasonable,

it rejects Morone's opinion that Hilton will have to make a cure payment in 2031.

### 2.    Hilton's Saved Expenses

69.    As set forth in more detail above, the Court finds that the Corporate Overhead Fee

is a fee that Hilton is free to use as it sees fit without any limitation.  Thus, it should be included

in considering Hilton's lost future fees.  Morone suggests that even if the Corporate Overhead

Fee is a fee, Hilton's fees attributable to each of the Hilton Resorts should still be reduced by 1%

because that allegedly represents the amount of expenses Hilton will save if it loses the right to

manage the Hilton Resorts.  *See e.g.*, Debtors' Ex. 2 at pp. 20-21.  In other words, "the expenses

incurred by Hilton to perform under the HMAs . . . amount to 33 percent of the fees that Hilton

expects to earn under the HMAs going forward."  Debtors' Ex. 4 at p. 14.  Morone's analysis

misses the mark and was contradicted by the overwhelming evidence presented at trial.

70.    First, Morone inappropriately focuses on what appears to be approximately 33%

as the amount that Hilton attributes to the costs it incurs at the corporate level in running its

management business.  *See e.g.*, Debtors' Ex. 2 at p. 21; Debtors' Ex. 4 at p. 14.  That is the

wrong standard.  *See* W-A Tr. Ex. 26 at 22-23.  Instead, the Court must consider the expenses

that Hilton will *actually* save if it loses the HMAs.  The testimony at trial clearly demonstrated

that Hilton's incremental cost of managing the Hilton Resorts is virtually nothing.  Jaskulske

credibly testified as follows:

> We are a very deep and large enterprise, and we have built a strong enterprise at the corporate level to support our growth.  And I'm 99.9 percent certain that losing these three resorts would not change one iota what we're doing at the corporate office.  It would not even be a blip on the screen.
>
> Conversely, if we brought in three resorts this large, it wouldn't about [sic] blip on the screen.

*See* Trial Tr. at 188:22-25, 189:1-3.

71.     Similarly, Cline opined that:

> In valuing the income stream to Hilton of its management fees earned under the HMAs, no associated corporate overhead has been deducted.  The reason for this is two-fold – first, no such deduction is made by Hilton in the ordinary course in evaluating HMAs for investment and development purposes and second, there is no reason to believe that at the margin, with Hilton operating approximately 700 hotels under management agreements, that it would save any related expenses in the event the HMAs are terminated.  Hilton's management and corporate infrastructure are designed to support a large number of properties and the incremental cost associated with individual properties is close to zero. Furthermore, unlike many hotels that can be managed in a "cluster" format and thereby reduce the cost of "management" at the property level, the Resorts are organized to operate on a free-standing basis with a full panoply of management, accounting and technical personnel.

W-A Tr. Ex. 25 at p. 37.

72.     Indeed, Jaskulske confirmed that the infrastructure at the Hilton Resorts supports

those resorts on a day-to-day basis.  *See* Trial Tr. at 187:19-25, 188:1-9.  For example, each of

the Hilton Resorts has its own managing director, director of finance and a human resources

director who can provide all the management functions and resources needed to operate a

complex resort.  *See id*. Thus, Hilton's corporate offices are rarely called upon to assist directly

with providing services to the Hilton Resorts.  *See id*.  Bailey corroborated Jaskulske's testimony

for Grand Wailea, testifying that Grand Wailea:  has a strong financing department that handles

all of its own accounts payable and accounts receivable; handles all of its own human resource

-39-

processing; and maintains a large sales and marketing department based at the resort and across

the "mainland," which is distinct from Hilton's general sales team.  *See id*. at 619:15-25, 620:1-1-

4.

73.    Jaskulske further explained how Hilton's corporate operations are structured.  For

example, Hilton employs area vice presidents who have a collection of hotels that they oversee

and who report to a senior vice president who might handle certain geographic regions, such as

the United States or South America by way of example.  *See id*. at 189:10-25, 190:1-2.  Thus, if

Hilton loses the management rights to any of the three Hilton Resorts, which are handled by two

different groups within Hilton, these job duties are not going to change, *i.e.*, the area and senior

vice presidents will still have hotels and resorts to oversee in their respective regions.  *See id*.

74.    Hilton's treasurer confirmed that the only expense Hilton would save if it lost the

HMAs is the payment of a certain Hawaii sales and use tax that totals $240,000 per year (the

"Hawaii Taxes").  *See id*. at 396:17-25, 397:1-11; *see also* W-A Tr. Ex. 12.  He also testified that

there is "[v]ery little, if any" correlation between the amount Hilton might be able to save if it

lost the HMAs and the corporate overhead that Hilton incurs as a global enterprise.  *See id*. at

466:25, 467:1-4. Otherwise, no Hilton witness testified that Hilton would or could save any other

expenses if it lost the HMAs, *see id*. at 183:22-25, 184:1, 470:21-25, 471:1; and the Debtors did

not rebut any of that testimony or offer *any* evidence relating to a single dollar that Hilton would

save if it lost the HMAs.  Indeed, Morone admitted that he could not point to a single expense

Hilton would save if it lost these three HMAs.  *See id*. at 1160:6-13.

75.    Hilton is actually reimbursed for all of its costs in providing services to the Hilton

Resorts.  Under Section 5.4 of the HMAs, Hilton is entitled to reimbursement of its expenses

incurred in connection with providing services to the Hilton Resorts (up to $1.4 million plus

increases for Consumer Price Index for all three Hilton Resorts), which includes certain pass-

through costs for which the owners are responsible, *e.g.*, payroll and benefits, and expenses

incurred in connection with retail operations, supply management fees, benefits administration

fees for employees, risk management services, legal services, internal audit procedures,

technology costs and certain SAS 70 reports contemplated by Section 2.3.18 of the HMAs.  *See*

Joint Ex. 2 at § 5.4, Ex. E; *see also* Trial Tr. at 181:16-183:3.  Hilton also is entitled to receive its

"Out of Pocket Expenses" for corporate personnel doing certain hotel-specific tasks.  *See* Joint

Ex. 2 at § 2.7.  Thus, the unrefuted testimony that Hilton recoups all of its corporate expenses

under the terms of the HMAs is not surprising.  *See* Trial Tr. at 183:22-25, 184:25, 470:21-25,

471:1, 620:5-9.

76.     Although Hilton no longer assumes any incremental cost of management in

underwriting new management opportunities, *see id.* at 116:5-6, 429:8-13, Hilton did underwrite

an incremental cost of 0.25% of gross revenue of the resorts (*i.e.*, one-twelfth of its expected

Base and Corporate Overhead Fees) when it contemplated acquiring the HMAs in 2005.  *See*

Joint Ex. 4 at Ex. 4.  However, the Court will not deduct these fees because there simply was no

evidence offered at trial to suggest that Hilton will actually save 0.25% or indeed any amount

other than the Hawaii Taxes. In the absence of any such evidence, the Court concludes that the

only expenses Hilton would save if it lost the HMAs are the Hawaii Taxes.[31]

### 3.     **Discount Rate**

77.     To calculate the present value of Hilton's lost fees under the HMAs, the Court

must apply a discount rate to the fees that Hilton would earn in the future.  A discount rate is a

rate of return that equates a stream of income to be received in the future with a lump sum

---

[31]  W-A Tr. Ex. 12 shows about $140,000 a year of potentially allocable cost of Hilton corporate personnel that
could be attributed to the Hilton Resorts, but some of those are recoverable as Reimbursable Expenses under the
HMAs and none will go away if Hilton no longer manages the resorts.  *See* Trial Tr. at 397:12-21.

present value, *i.e.*, it represents the time value of money as well as the risk associated with receiving a future income stream. *See* Trial Tr. at 482:6-24.

78.    Under the applicable test, the Court's determination is easy as it is undisputed that Hilton actually used a discount rate of 8% to its anticipated income stream for the Base Fee and Corporate Overhead Fee under the HMAs.[32]  *See* Joint Ex. 1 at p. 3, Ex. 4.  Hilton's application of that 8% discount rate makes the Court's consideration of expert testimony unnecessary.

79.    It would be inappropriate more than six years after the fact to revisit the wisdom of the actual discount rate used by a party in analyzing a fee stream, especially a party as sophisticated as Hilton analyzing a business deal in its area of expertise.  Hilton's Senior Vice President of Development for the Caribbean and Latin America and Timeshare Development in Hawaii, Ted Middleton, who was responsible for negotiating the HMAs in 2006, testified that he believed that the risks at the time to Hilton's ultimate receipt of base management fees under the HMAs were *de minimus*.  *See* Trial Tr. at 119:12-15.  Indeed, Jacobs testified convincingly why Hilton used an 8% discount rate for base management fees at the time and continues to do so to this day.  *See id*. at 372:8-374:5, 377:14-25, 378:1, 392:19-25.  The rate is an industry standard, and varying from it would put Hilton at a competitive disadvantage.  *See id*. at 373:6-25, 374:1-5; *see also* Trial Tr. at 548:8-20 (Hennessey noting that an 8% discount rate for base management fees is consistent with what he has seen other hotel companies use).

80.    The use of an 8% discount rate was corroborated by both of Hilton's experts, Cline and Hennessey.  Hennessey actually concluded that the appropriate discount rate should be 7.5% and the Court finds his analysis and testimony particularly thorough and credible.  At the outset, the Court notes that because a hotel management company's receipt of base management

---

[32]  The Court equates the 1% Corporate Overhead Fee with the Base Fee under the HMAs because the Base Fee and the Corporate Overhead Fee are both paid based upon the Hilton Resorts' total gross revenues, without any restrictions.

fees is derived from a hotel's total revenues, the receipt of such fees is far less risky than if the fees were a function of the hotel's profitability, as is the case with incentive fees.  *See* W-A Tr. Ex. 23 at p. 2.  The reason for this is that like the Base Fee and the Corporate Overhead Fee under the HMAs, base management fees are typically paid first from a hotel's total revenues, as opposed to payments to equity, which can only made after accounting for all of a hotel's expenses.  *See id*.  Indeed, a hotel's total revenue stream is typically 30% to 50% less volatile than that of its income before fixed charges, which itself is less volatile than a hotel's net operating income.  *See id*. at p. 3.

81.    The Debtors suggest that the Court should consider that Hilton used a 23% discount rate for the incentive fees it expected to earn from the contracts.  Although Hilton expected the payment of Incentive Fees at the time it acquired the HMAs and applied a 23% discount rate to value such fees, *see* Joint Ex. 1 at p. 3, Ex. 4, those facts are irrelevant because Hilton is not seeking payment for any foregone Incentive Fees.  Moreover, Hilton has never used a "blended" rate (combining the discount rate for base and incentive fees) to analyze a deal; rather it applies different discount rates to different income streams.  *See* Trial Tr. at 393:10-25, 394:1-3; 553:17-25, 554:1-7.  Because Hilton does not seek damages for lost Incentive Fees and expects to receive only the Base Fee and the Corporate Overhead Fee, the 8% discount rate is the only appropriate rate to measure the damages Hilton would suffer if the MSR Tenants reject the HMAs.

82.    The Debtors criticize Hennessey's analysis because the data from PKF Consulting ("PKF") upon which he partially relied in concluding that a hotel's total revenues are typically less risky than a hotel's income before fixed charges is not applicable to the Hilton Resorts.  The Debtors suggest that this data is useless because it is derived from smaller hotels throughout the

United States, as opposed to complex resorts located in Hawaii, Phoenix and La Quinta.

However, Hennessey testified that his conclusion was not based solely upon the PKF data, but

also his years of experience in the hospitality industry.  *See id*. at 495:8-20.  Moreover,

Hennessey concluded, and the Court accepts, that the Hilton Resorts' total revenues are less risky

than the revenues of the types of hotels that contribute data to PKF because the Hilton Resorts

(a) are located in three of the leading states for tourism, (b) are larger hotels with revenue

streams that are many times larger than the typical lodging property, (c) have multiple sources of

income, including golf facilities, (d) have significant meeting space to cater to a highly profitable

customer segment, (e)  are located in high barrier-to-entry markets that provides them with a

competitive advantage and (f) have long-standing reputations for excellence.  *See* W-A Tr. Ex. at

p. 4; *see also* Trial Tr. at 498:10-503:18.  Moreover, Hennessey opined that Hilton's income

stream under the HMAs is less risky as a result of Hilton's procurement of subordination and

non-disturbance agreements, or SNDAs, which provide Hilton with the right to continue

managing the Hilton Resorts even if the any of the Debtors' lenders obtains title to the Hilton

Resorts.  *See* W-A Tr. Ex. 23 at p. 4; W-A Tr. Exs. 3-10.  That the SNDAs do not give Hilton an

iron clad guaranty that it will maintain the right to manage the Hilton Resorts under all

circumstances does not render the SNDAs meaningless.  Indeed, Hilton's income stream under

the HMAs is clearly more secure with the SNDAs than without.

      83.      Hennessey calculated four discount rate measures that the Court finds relevant

and persuasive.  First, Hennessey considered the mortgage interest rates for full service hotels as

of April 2006, which were averaging 6.88%, with a range of 6.0% to 9.5%.[33]  *See* W-A Tr. Ex. at

---

[33]  The Court notes that the Debtors' mortgage, entered into just a year after the Hilton acquisition, is at a 5.699% rate.  *See* Declaration of Kevin Semon of Midland Loan Services, Inc. Regarding One Billion Dollar Principal Amount Senior Secured Loan, and Related Documents, Claims, Liens and Security Interests [Docket No. 123] at Ex. 2 (Mortgage Note).

p. 5.  Because a hotel management company's receipt of base management fees is nearly as

secure as a mortgage lender's anticipated repayment (and in some instances more secure), the

mortgage interest rates at the time of Hilton's acquisition of the HMAs are instructive.  *See id*.

Hennessey increased the 6.88% average for interest rates to arrive at a discount rate of 7.5% to

account for the increased risk associated with the receipt of base management fees versus a

mortgage lender's expected repayment.  *See id*.; *see also* Trial Tr. at 534:3-20.  The Court finds

that this is an appropriate adjustment and sound analysis.

84.      Second, Hennessey considered the discount rate that was generally utilized for

hotel investments as of April 2006, which averaged 12.81%, with a range of 11.5% to 15.0%.

*See id*. at p. 5.  This discount rate is applicable to a hotel's net operating income, which is more

risky than a hotel's total revenues from which base management fees are paid; thus, a downward

adjustment is necessary.  *See id*.  The Court agrees with Hennessey that because the Hilton

Resorts are notable and significant assets, *i.e.*, investors would be highly interested in the assets,

an investment in the Hilton Resorts would command a discount rate at the lower end of the cited

range for hotel investments – between 11.5% to 12.0%.  *See id*.; *see also* Trial Tr. at 539:25,

540:1-18.  From there, the Court agrees with Hennessey that a downward adjustment of

approximately 40% is appropriate in connection with valuing future streams of base management

fees, thereby resulting in a discount rate between 6.9% and 7.2%.  *See* W-A Tr. Ex. 23 at p. 5;

*see also* Trial Tr. at 540:19-25, 541:1-25.  The conservative reduction of 40% accounts for the

lack of volatility in the Hilton Resorts' revenue streams from which Hilton's fees are paid.  *See*

*id*.  Indeed, as Cline noted, Morone's projections of gross revenue for Grand Wailea "are the very

picture of stability."  *See* W-A Tr. Ex. 26 at p. 25.

85.      Third, Hennessey considered Hilton's weighted average cost of capital, or

"WACC," at the time of its acquisition of the HMAs.  *See* W-A Tr. Ex. at p. 6.  An enterprise's

WACC is a percentage that takes into account all aspects of the enterprise's income.  *See* W-A

Tr. Ex. 26 at p. 24; Debtors' Ex. 2 at p. 21.  It is not the equivalent of a discount rate, but is

something that is typically considered when calculating a discount rate.  *See* Trial Tr. at 543:17-

21.  Thus, because a hotel company's WACC would include a blended rate reflecting the risks

associated with all sources of income, the WACC should be adjusted downward to reach a

discount rate applicable to a hotel company's reliable income stream derived from base

management fees.  *See id.* at 543:22-25, 544:1-9.  In determining Hilton's WACC, Hennessey

relied upon analyses from Bloomberg, upon which Hennessey and others in the hospitality

typically rely in determining an entity's WACC.  *See* W-A Tr. Ex. 24 at pp. 3-4; *see also* Trial

Tr. at 544:14-546:17.

86.      According to Bloomberg, Hilton's WACC was 8.7% as of December 31, 2005,

and 8.2% in the first quarter of 2006.  *See* W-A Tr. Ex. 24 at pp. 3-4; *see also* Trial Tr. at 544:14-

25.  Because a company's WACC is generally a stable measure, Hilton's WACC as of the end of

January 2006 should not have been materially different from its WACC at the end of 2005.  *See*

Trial Tr. at 545:19-25, 546:1-7.  Indeed, Hennessey concluded that it would have been highly

unlikely, based upon his review of the relevant sources of information, for Hilton's WACC to be

as high as the 10.6% proposed by Morone.  *See id.* at 546:18-25; *see also* Debtors' Ex. 2 at p. 21,

Ex. D.

87.      Morone's calculation of Hilton's WACC is questionable not only because it is so

far off from Bloomberg's conclusions, but also because he does not provide the source for some

of the key underlying data he uses to calculate Hilton's WACC, such as his Expected Market

Return of 10.8% or Hilton's Beta of 1.29.  *See* Debtors' Ex. 2 at Ex. D.  For example, calculating

a company's Beta involves "[a] measure of a security's sensitivity to the market, that is otherwise

known as its systematic risk.  The systematic risk of a security is estimated by regressing the

security's excess returns against the market portfolio's excess returns.  The slope of the regression

equation is the beta."  *See* Stocks, Bonds, Bills and Inflation, or SBBI, Valuation Edition, 2006

Yearbook, published by Ibbotson Associates, Inc., 2006.  Morone testified that he calculated

Hilton's Beta (*see* Trial Tr. at 1073:7-14), yet there is no evidence in the record, including in

Morone's reports, specifying precisely *how* Morone calculated Hilton's Beta.  The Court

therefore rejects Morone's conclusions and finds that Hilton's WACC could not have been any

greater than 8.7% as of the end of January 2006.  Even if Hilton's WACC was 10.6% in January

2006, for the reasons set forth above, that percentage must be adjusted downward to determine

the discount rate that should be applied to Hilton's future fees under the HMAs because a WACC

is not the equivalent of a discount rate.[34]  *See* Trial Tr. at 543:22, 544:1-9.

      88.     Hennessey's fourth and final discount rate measure was the 8% rate that Hilton

utilized and continues to utilize to value base management fees under its management

agreements.  *See* W-A Tr. Ex. 24 at p. 6.  Hennessey considered Hilton's analysis particularly

instructive:

> Well [8%] is the rate of return used by Hilton in its committee --
> management committee memos relating to the transaction.  And that is, in some
> ways, a perfect comparable, if you will, if you are looking for a discount rate that
> reflects the type of risks associated with this transaction and this fee stream.

---

[34]  The Court also rejects the Affidavit of Derek Pitts, pursuant to which Pitts argues that the discount rate should be
a function of CNL's WACC as of January 2006.  *See* Debtors' Ex. 5 at ¶ 6.  The Debtors did not rely upon Pitts'
opinions at trial and based upon Hennessey's testimony the Court concludes that CNL's WACC as of January 2006
is irrelevant in any event because it is unrelated to Hilton's projected income stream under the HMAs.  *See* Trial Tr.
at 550:25, 551:1-10.

You know, the properties themselves are normally considered the ideal comparable.  So it is, you know, the rate that Hilton used, and it's consistent with the rate that we see other hotel companies use.

Trial Tr. at 548:11-20.  Hilton's use of an 8% discount rate likewise informed Cline's expert

analysis:

I think that there are – I think the custom and practice of the company and how it goes about evaluating its own investments, is extremely informative.  And that, to me, really should count for a great deal.  Because after all, the company itself is in the best position on a continuing base of evaluating the risks in this particular line of business.

And as we've heard testimony before, they regard -- Hilton regards, and I concur with this, that the management agreement business is a less risky business from Hilton's perspective than the ownership of real estate or the leasing of real estate or the franchise business, and certain[ly] less risky than time sharing.

So in their infinite wisdom, they concluded that the way to underwrite this back in two thousand -- end of 2005, was to use the rate that they did.  And that was very important from my perspective, and Mr. Middleton's testimony was also important.

Id. at 975:20-25, 976:1-6.

89.    Morone ignores Hilton's analysis at the time it acquired the HMAs or any

balanced approach to determining a discount rate for that matter.  Morone appears to have made

assumptions designed to drive the discount rate as high as possible (and Hilton's damages

correspondingly as low as possible).  First, Morone admits Morone admits that WACC is "a

reflection of investors' and lenders' views of the riskiness of [Hilton's] aggregated income

stream."[35]  Debtors' Ex. 2 at p. 21 (emphasis in original).  But he then proceeds to ignore that

---

[35]  The Court notes that Morone contradicted his reports at trial.  At trial he refused to acknowledge that an entity's WACC takes into account the risk of all aspects of an entity's income stream, testifying:
    Q.  And it's fair to say that a weighted average cost of capital considers each of the income streams of a business, right?
    A.  No, it doesn't.  It considers percentages of debt and equity the weighing of those.
    Q.  But in doing so, the weighted average cost of capital reflects the riskiness of the business, or at least with regard to how you've used it for these purposes.
    A.  No, it doesn't.
See Trial Tr. at 1143:20-25, 1144:1-3.

-48-

base management fees under hotel management agreements represent a far less risky stream of income than all of Hilton's other income streams, including its real estate and timeshare business, which accounted for more than 75% of Hilton's revenue in 2005.[36]  *See* Trial Tr. at 381:21-25, 382:1-15, 1145:14-1146:17. Accordingly, as Hennessey explained, Hilton's WACC should be adjusted downward when considering the risk of Hilton's receipt of base management fees because that is Hilton's least risky income stream.  Yet Morone inexplicably failed to do that.

90.     Instead of reducing Hilton's purported WACC, Morone *increased* Hilton's purported WACC as of January 2006 to determine the discount rate that should apply to Hilton's foregone fees if the HMAs are terminated today.  Morone justifies this upward adjustment based on his "intuition" that Hilton's income stream under the HMAs is more risky than that of its entire portfolio of management agreements.  *See* Trial Tr. at 1074:12-13.  To do so, Morone makes some questionable, unsupported conclusions.

91.     For example, Morone contends that the income stream under all of the HMAs is more risky because of his so-called "Size Risk Factor," which includes risks associated with potential termination at will by an owner, change in supply and demand, loss of competitiveness, bankruptcy, casualty or condemnation and termination resulting from an uncurable default.  *See* Debtors' Ex. 4 at p. 22.  However, these are not risks that Morone attributes only to the Hilton Resorts; rather, it appears to the Court (and Morone even admitted on cross-examination) that these risks could be present with any size hotel in any region within the United States.  *See* Trial Tr. 1148:5-1149:13.  Consequently, these risk factors presumably would already be baked into Hilton's WACC regarding the base management fee stream.

---

[36] Hilton's franchise and management fees accounted for 26.8% of Hilton's 2005 income.  *See* Debtors' Ex. 2 at p. 20.  Morone admitted that management fee income was Hilton's least risky income stream.  *See* Trial Tr. at 1146:11-17.

91004-0040/LEGAL24113101.7

92.    Morone next applies a "volatility" factor.  *See* Debtors' Ex. 2 at p. 22**.**  However, Morone only applied this factor to Grand Wailea, and could offer no reason for why he excluded it for the other two resorts when he was deposed a few weeks earlier.  *See* Trial Tr. at 1149:11-17.  Moreover, he failed to counter-balance any volatility of a resort in Maui with the offsetting benefits of Grand Wailea's ability to host large groups and to obtain guests from the Pacific Rim.  *See id*. at 499:17-25, 500:22-25, 501:1-25, 502:10-3.  Morone justifies adding risk to Hilton's income stream under the HMA for Grand Wailea because "upper-upscale and luxury hotels in Maui are more volatile than any collection of hotels diversified over geography and segmentation," including with respect to "occupancy, ADR, or RevPAR.  *Id*.  Yet the Court adopts Cline's view of why Morone's "Volatility Risk Factor" is irrelevant and should not impact the discount rate:

> Mr. Morone rationalizes some adjustment for 'volatility' by explaining that the hotel market in Maui is somehow more volatile than average because the hotels in Maui have more variation in their occupancy, ADR and RevPAR performance. While revenue changes will certainly impact the bottom line earnings of the Hotel and thus should be considered as part of a property valuation, especially given the high fixed cost ratios of operating expenses in hotels, they would hardly have much impact over the long term on a contract that provides for a revenue stream based exclusively on three percent of total revenues.  Mr. Morone is confusing the principles of hotel property valuation with the valuation of a long-term hotel management agreement.

*See* W-A Tr. Ex. 26 at pp. 24-25.

93.    Morone also contends that there is additional risk associated with all of the HMAs because of his so-called "Brand Risk Factor," which accounts for the purported additional risk associated with Hilton's launch of its Waldorf Astoria brand in 2006 when it acquired the HMAs.  *See* Debtors' Ex. 2 at pp. 22-23.  This factor makes little sense. Morone admitted that none of the Hilton Resorts changed their names at the time of Hilton's acquisition, *i.e.*, they continued to be known by their existing and well-known names.  *See* Trial Tr. at 1150:10-16.  Morone even

-50-

admitted that if Hilton's brand failed, the Hilton Resorts would continue to operate under their

existing names. *See id.* Indeed, as Cline points out, "Hilton's earnings from the HMA are not

impacted by the success or failure of the Waldorf=Astoria brand and accordingly there is no

basis for assuming that this brand brings any element of risk to the earnings of the HMA." *See*

W-A Tr. Ex. 26 at p. 26. In other words, even if Hilton's brand was unsuccessful, the Hilton

Resorts would still continue to operate under their existing and well-known names, which even

Morone admits.

94.      Applying these alleged risk factors, Morone adds 4% to Hilton's WACC for

Grand Wailea and 3% for each of Arizona Biltmore and La Quinta. Morone does not reference

any valuation literature that provides for an adjustment to a company's WACC for so-called

brand risk or volatility risk, and Ibbotson (upon which Morone relies for certain aspects of his

conclusions) makes no reference to it. *See id.* Indeed, Cline properly notes that Ibbotson is

irrelevant:

> Mr. Morone also addresses the question of 'size' as a risk factor, noting that
> Ibbotson provides data for a size premium adjustment to account for the risks
> associated with small companies . . . The concept of a size premium used by
> Ibbotson relates however to the valuation of a business enterprise, not a single
> asset (the HMA) owned by a large company (Hilton). Mr. Morone refers to the
> size risk premium tables produced by Ibbotson and extracts the difference
> between Hilton's size and that of the Hotel. Again, Mr. Morone misstates the
> assets that Hilton actually owns – they are the HMAs, not the Resorts.

*Id.* Morone even admitted that he had never used Ibbotson to determine a discount rate for a

management fee income stream and was unaware that anyone else had done so. *See* Trial Tr. at

1151:15-22.

95.      The Court is mindful that Hilton's witnesses testified that the termination of a

management contract is a rare occurrence and that none could recall it occurring without the

payment of termination fees or conversion to a franchise relationship since they had been at the

-51-

company, a time period going back for many years.  *See* Trial Tr. at 209:20-25, 301:4-6, 401:15-19.  The Court also notes that there was no special risk at the time these HMAs were entered into in 2006, a time both sides agree was robust for the hotel industry.  *See id*. at 119:3-15, 1146:20-23.  These considerations suggest lower risk, and here, a lower discount rate.

96.    In sum, the Court accepts testimony of Hilton's fact witnesses and experts that the revenues of the Hilton Resorts, and Hilton's corresponding fees based on such revenues, are actually less risky than those of Hilton's typical management agreements.  *See* Trial Tr. at 390:13-25, 391:1-5, 497:3-10; *see also* W-A Tr. Ex. 23 at p. 4.

97.    As set forth above, the Court finds Hilton's analysis particularly reliable and unbiased and accepts it.  Indeed, Hennessey testified that:

> [Morone's discount] rates are clearly rates of return that are much more proximate to, either to the property's overall discount rate or the even [sic] equity yield rate; much more risky investment positions that the position that Hilton had for its fees under the HMAs.  An it's a -- it's a -- from an investment point of view, it's a very significant differential, and it's inconsistent with how I've seen other hotel companies valuing HMAs over the years.

*See* Trial Tr. at 551:24-25, 552:1-6.

98.    The Court also accepts Cline's discount rate analysis for the Extension Term of the HMAs.  Indeed, Cline argues convincingly that two approaches should be applied and reconciled in arriving at an appropriate discount to the fees Hilton would receive during the Extension Term.  *See* W-A Tr. Ex. 25 at pp. 45-46.  First, Cline applied a 12% discount rate to account for the heightened risk of termination during the Extension Term.[37]  Second, Cline assumed a probability of sale for each of the first five years of the Extension Term with the associated liquidated damages to Hilton built into an "expected value."  *See id*. at p. 45.  The discount rate for this second approach is 8% because the risk of sale is considered in the

---

[37]  The MSR Tenants may terminate the HMAs during the Extension Term upon a sale of the Hilton Resorts, which would trigger Hilton's right to receive liquidated damages under the HMAs.  *See* Joint Ex. 2 at §§ 3.4.1 – 3.4.3.

probability of sale analysis and the projected fee income is then discounted the same rate as that used for the Base Term. *See id.*; *see also* Trial Tr. at 811:2-25, 812:1-4.

**F.    Cline Versus Morone Comparisons**

99.    The Court notes that Cline provides a sliding-scale chart showing adjustments to Morone's damages calculations that the Court finds instructive. *See* W-A Tr. Ex. at p. 30.

100.    In addition, if the Court applied differing discount rates ranging from 8% to 13% to Cline's financial projections to calculate the present value of Hilton's lost Base Fee and Corporate Overhead Fee, Hilton's damages for the loss of all three HMAs would be as follows:

| Discount Rate | Loss (in 000's) |
|---|---|
| 8.0% | $165,408 |
| 9.0% | $152,168 |
| 10.0% | $140,472 |
| 11.0% | $130,104 |
| 12.0% | $120,882 |
| 13.0% | $112,650 |

**G.    Group Services Expenses**

101.    The HMAs provide for the payment of a Group Services Expense to Hilton, which shall not exceed 2% of gross revenues. *See* Joint Ex. 2 at § 5.2; *see also* Trial Tr. at 180:8-14. The Group Services Expense represents a reimbursement to Hilton for the costs incurred in providing Group Services to the Waldorf Astoria brand generally, including advertising, marketing, group services, reservation services and other brand support. *See* Joint Ex. 2 at §§ 2.6, 5.2; *see also* Trial Tr. at 179:17-25, 180:1-14. All Waldorf Astoria owners pay group services or similar expenses into a fund that Hilton uses to market and promote the brand and employ individuals dedicated to the brand.[38] *See* Trial Tr. at 283:17-25, 284:1-12. The Group Services for the Waldorf Astoria brand are not allocated or attributable to any one or more

---

[38]    Morone errantly speculates that Hilton is contractually obligated to pass these group services expenses along to its owners. *See* Debtors' Ex. 2 at p. 19. Rather, it is a percentage of revenue agreed to be paid by an owner as part of its contract with Hilton.

hotels or resorts within the brand because they are intended to benefit the entire brand. *See* Trial
Tr. at 246:6-25, 253:2-4. Neither Hilton nor the Waldorf Astoria brand makes any profit from
the receipt of the Group Services Expenses from the Hilton Resorts. *See id*. at 181:7-11. In fact,
Hilton spends more on Group Services for the Waldorf Astoria brand than it receives from the
owners of Waldorf Astoria hotels and resorts to increase owners' revenues and the Waldorf
Astoria brand's recognition. *See id*. at 284:4-25, 285:1-12.

102.    If Hilton loses the Hilton Resorts' contribution of Group Services Expenses, the
Hilton witnesses testified that Hilton will not reduce the amount of money it spends to support
the Waldorf Astoria brand; rather, Hilton will fund out of its own pocket the lost contributions so
that it can maintain the same level of brand support and marketing that it currently provides. *See
id*. at 291:1-293:17. In particular, Hilton's President of Brands and Commercial Services, Paul
Brown, and Hilton's expert, Roger Cline, both credibly testified that it would not be a reasonable
business decision to reduce the amount of funds Hilton contributes to support the Waldorf
Astoria brand if Hilton loses the Group Services Expenses currently paid by the Hilton Resorts.
*See id*. at 293:13-17, 833:16-25, 834:1-21. Brown described the fierce competition among
luxury hotel brands and the spending that each must do as a result to support their brand. *See id*.
at 285:15-17. The Debtors did not dispute this testimony.

103.    In his reports, Morone speculated that Hilton would "save" more than $13 million
on a present value basis by no longer having to subsidize the group services costs it spends on
Grand Wailea and the Arizona Biltmore. *See e.g.* Trial Tr. at 1081:2-8. In other words, Morone
claims that Hilton will actually save substantial money by no longer having to spend in excess of
2% of gross revenue to support these two Hilton Resorts. The Court rejects Morone's conclusion

-54-

that these "subsidies" should be deducted from the amount of Hilton's future profits under the

HMAs. *See id.*; *see also* Debtors' Ex. 1 at pp. 13-15; Debtors' Ex. 2 at pp. 19-20; Trial.

104.    The unrefuted testimony demonstrates that Morone has it backwards. Hilton does

not pay in excess of 2% of gross revenue because of any services it provides the Grand Wailea or

the Arizona Biltmore. Rather, Hilton pays more money than it takes in from all Waldorf Astoria

owners to support and market the Waldorf Astoria brand as a whole. *See* Trial Tr. at 246:6-25,

253:2-4. Losing the Hilton Resorts simply means that Hilton will have that much less money to

support and market the brand, not that it will save any money. Indeed, if Hilton loses the Hilton

Resorts' contribution of Group Services Expenses, the total Group Services Expense deficit will

increase from $12,277,801 as of the end of 2005 to $25,543,678 as of the end of 2016, even

considering the addition of the Waldorf Astoria hotels and resorts currently in the brand's

pipeline. *See* Joint Ex. 5. Thus, losing these two resorts harms, not helps, Hilton.

105.    Moreover, Morone's analysis is fatally flawed. The sole basis to support his

conclusion is Hilton's Franchise Disclosure Document (the "Hilton FDD"). *See e.g.* Debtors' Ex.

1 at p. 13; Debtors' Ex. 2 at p. 18. Morone contends that Hilton franchisees pay a program fee in

the amount of 4% of room revenue for the same types of services Waldorf Astoria provides the

Debtors in exchange for a Groups Services Expense in the amount of 2% of gross revenue. *See*

*e.g.* Debtors' Ex. 4 at p. 7. Relying on the Hilton FDD alone, Morone then concludes that Hilton

must be subsidizing the difference between 4% of room revenue and the 2% of gross revenue at

Grand Wailea and Arizona Biltmore. *See* Debtors' Ex. 1 at pp. 12-14; Debtors' Ex. 2 at pp. 18-

19.

106.    Even if the Hilton FDD had relevance to the issue (which it does not, as Waldorf

Astoria only franchises one property, *see* Trial Tr. 962:1-5), Morone relies upon the *wrong*

franchise disclosure document.  Waldorf Astoria has its own franchise disclosure document that,

as Cline pointed out, is markedly different from the Hilton FDD.  *See* W-A Tr. Ex. 26 at p. 17.

Yet, Morone ignored the Waldorf Astoria Franchise Disclosure Document (the "Waldorf FDD").

The Waldorf FDD describes such a great range in size and services of a Waldorf Astoria

property that no conclusion can be drawn as to the costs to be paid by a typical Waldorf Astoria

hotel.  *See id.*  Moreover, the services and support Hilton provides to Waldorf Astoria owners

cannot be attributable to any one or more specific hotels or resorts because the funds are used for

the brand as a whole.  *See* Trial Tr. at 246:6-25, 253:2-4.  Thus, it is impossible to accurately

determine how much of Hilton's additional funding can and should be attributed to the Hilton

Resorts, or any other Waldorf Astoria branded hotel or resort for that matter.

107.    Of even greater importance and of substantial concern to the Court is that Morone

made a fundamental mathematical error in his determination of a "subsidy".  Morone's reports

for Grand Wailea and Arizona Biltmore contain charts that purport to show how Group Service

Expenses actually incurred by Hilton in connection with these two resorts are greater than the

2% contract limit.  *See* Debtors' Ex. 2 at p. 18; Debtors' Ex. 1 at p. 13.  The charts allegedly

reflect the group services expense from the Hilton FDD (4% of room revenue according to

Morone), the group services limit under the HMAs (2% of gross revenue) and the difference

between the two, *i.e.*, the "subsidy."  The problem is that when you compare the numbers on the

charts in Morone's reports for group services expense from the Hilton FDD, *see id.*, they do not

reflect 4% of room revenue as projected by Morone, but rather 5.4% of room revenue for Grand

Wailea and 5.9% for Arizona Biltmore, *see* Debtors' Ex. 1 at Ex. C; Debtors' Ex. 2 at Ex. C

(projections for each resort).  Taking the correct 4% of room revenue from the projections set

forth on Exhibit C to Morone's reports for Grand Wailea and Arizona Biltmore show that both

resorts are actually paying *less* than 4% of room revenue for 2012-2014.  This is not surprising as

a number of witnesses testified that the resorts obtain a large percentage of their overall revenue

from non-room sources.  *See e.g.* Trial Tr. at 995:2-15, 996:11-25, 997:23-25, 998:1-11.

108.    Lastly, Morone decreases Hilton's future profits under this "subsidy" theory for

Grand Wailea and Arizona Biltmore, but, without explanation, does not do likewise for La

Quinta.  *See* Debtors' Ex. 3.  As the three Hilton Resorts are similarly situated because they all

pay the Group Services Expenses, one would expect Morone's "subsidy" theory would apply to

all three resorts.  That Morone omitted any reference to this theory in his report for La Quinta

and did not explain its absence further reduces Morone's credibility in the Court's view.

109.    The Court also accepts Cline's analysis and conclusion that it will take Hilton at

least five years to replace the Group Services Expenses that it would lose if the MSR Tenants

reject the HMAs.  *See* W-A Tr. Ex. 24 at p. 49.  Indeed, the Court finds that Cline's five-year

projection is conservative because Hilton's testimony at trial suggested that it would be a

tremendously difficult and lengthier process for Hilton to replace the HMAs.  *See* Trial Tr. at

108:16-25, 109:1-3, 130:17-25, 131:1-18, 305:11-25, 306:1-12, 404:10-25.  In addition, during

those five years, Hilton will fund out of pocket the amount of Group Services Expenses that the

Hilton Resorts would have otherwise contributed, which Cline estimates have a net present value

of $17,190,000.  *See* W-A Tr. Ex. at pp. 49-50.  In addition, the Court accepts Cline's conclusion

that Hilton would have to pay "key" money totaling $21,736,000 to obtain additional

management agreements for the Waldorf Astoria brand to replace the foregone Group Services

Expenses.  *See id.*  Key money represents funds that a management company may be required to

pay to a hotel owner to obtain management rights, and the payment of key money is typical to

obtain management rights for hotels and resorts suitable to be converted to the Waldorf Astoria

-57-

brand.  *See* Trial Tr. at 403:16-25, 404:1-25.  The unrefuted testimony at trial, which the Court

accepts, is that Hilton will have to pay considerable key money to replace resorts of the three

Hilton Resorts' stature.  *See id.* at 305:11-25, 306:1-4, 404:10-25.

110.    The net present value of the foregone Groups Services Expenses (*i.e.*,

$17,190,000 plus the $21,736,000 in key money) totals $38,926,000, which Cline allocates to the

Hilton Resorts as follows:  (a) Grand Wailea ($18,193,000); (b) Arizona Biltmore ($9,507,000);

and  (c) La Quinta ($11,227,000).  The Court accepts Cline's analysis and conclusions.

**H.    The Grand Wailea Expansion**

111.    In April 2012, the County of Maui granted final approval for a $250 million

expansion at Grand Wailea (the "Expansion"), which would add approximately 310 additional

rooms, increasing the size of the resort from 780 to 1,090 rooms and thereby increasing the

resort's total revenues and Hilton's corresponding Base Fee and Corporate Overhead Fee.  *See*

W-A Tr. Ex. 25 at p. 74; *see also* Trial Tr. at 608:6-25, 609:1-24.  Bailey testified that the plan

for the Expansion was in the works since 2007.  *See id.*; *see also* Trial Tr. at 672:1-4.  Hilton's

Senior Vice President of Development for the Caribbean and Latin America and Timeshare

Development in Hawaii, Ted Middleton, testified that he knew about the Expansion possibilities

back in 2005 when Hilton was looking at acquiring the HMAs. *See id.* at 132:13-25, 133:1-8.

112.    That the Expansion has substantial value is beyond dispute.  Middleton described

the Expansion as "low hanging fruit," *see id.* at 132:22-25, and Cline opined that the Expansion's

approval is "literally golden", *see id* at 835:15-18, and that he could not "imagine any reasonable

investor . . . not pursuing [the Expansion]", *see id.* at 837:3-7.  Shumaker, too, acknowledged the

value of the Expansion rights. *See id.* at 1029:17-24, 1044:2-4.

91004-0040/LEGAL24113101.7

113.    Reflective of the value of the Expansion, both Pyramid and Shumaker prepared pro forma financial statements of the potential value of adding the rooms contemplated by the Expansion.  *See* W-A Tr. Exs. 15, 16; *see also* Trial Tr. at 1031:7-25, 1032:1-18.  Those values were estimated at $255.670 million and $76.4 million, respectively.

114.    Cline assumed that the Expansion would be completed by 2017, *see* W-A Tr. Ex. 25 at p. 75, a not unreasonable assumption considering that construction on the Expansion must start within two years of approval (*i.e.* by April, 2014) and be completed within five years thereafter (i.e. by April 2019),[39] *see* Trial Tr. at 672:15-20.  Cline further assumed that if the HMAs are terminated, Hilton would not have the opportunity to reap the benefits of the Expansion in the form of increased fees.  *See* W-A Tr. Ex. 25 at pp. 74-76.  Cline opined that the present value of Hilton's foregone Base Fees and Corporate Overhead Fees totals $9,804,000 after applying a 13% discount rate to account for the risk that the Expansion may not be pursued and completed.  *See id*.  The Court agrees with Cline's analyses and assumption that any reasonable owner of Grand Wailea would pursue completion of the Expansion to maximize the value and revenues of Grand Wailea and that Hilton will lose this fee stream if the HMAs are terminated.

## I.    Damages To The Waldorf Astoria Brand

115.    The launch of Hilton's Waldorf Astoria brand at the beginning of 2006 with the Hilton Resorts and the Waldorf=Astoria Hotel in New York represented Hilton's foray into the luxury resort segment of the hospitality industry, an initiative calculated to allow Hilton to keep pace with its primary competitors, Marriott and Starwood.  *See* W-A Tr. Ex. 25 at pp. 52-56.

---

[39]  Although there was some testimony that the completion date could be extended, there was no evidence under what terms or for how long.  Based on how long it took to obtain the permits and the sensitive political issues that seemed to surround it, the Court would expect the owners to move with all deliberate speed to take advantage of these valuable rights without having to seek any extension.

Indeed, prior to 2006, Hilton was lagging behind its competition because it did not have an

adequate luxury line of resorts to offer its HHonors members.  *See id.*  With its acquisition of the

HMAs for the Hilton Resorts in January 2006 Hilton seized upon the opportunity to make a

splash in the hospitality industry and solidify its status as one of the world's leading hotel

companies.  *See id.*  Since the beginning of 2006, Hilton has grown its Waldorf Astoria brand to

include 23 hotels and resorts worldwide and the brand continues to be one of Hilton's "growth"

brands – that is, Hilton is continually trying to increase the scope of the brand and its name

recognition around the world.  *See* Trial Tr. at 275:1-10.  This goal of focused growth largely

accounts for Hilton's commitment to spend more on brand support services than it collects from

its owners. *See id.* at 284:4-25, 285:1-12.

116.    Prior to addressing the impact the loss of the HMAs will have to the Waldorf

Astoria brand, the Court rejects the Debtors' contention that Hilton could not have suffered

damage to its brand because the "Waldorf Astoria Collection" used initially in connection with

the Hilton Resorts no longer exists.  When Hilton launched the Waldorf Astoria Collection in

January 2006, it was taking advantage of the name Waldorf Astoria, which had been in use since

the 1930's in connection with the famed New York hotel.  *See id.* at 272:22-25, 273:1-8.  Thus,

the brand – Waldorf Astoria – had been in existence since then.  *See id.*  The use of "Waldorf

Astoria Collection" after the names of the Hilton Resorts was simply a different naming

convention of that Waldorf Astoria name.  *See id.* at 277:18-21.  Over time, Hilton's market

research suggested that customers related more positively to the term "hotels and resorts" rather

than "collection," *see id.* at 276:24-25, 277:1-17, and that utilizing "hotels and resorts" would

provide a financial benefit to Waldorf Astoria owners, *see id.* at 281:9-17.  Therefore, Hilton

decided to eliminate the use of the term "collection", and simply refer to all Waldorf Astoria

branded hotels and resorts – including the Hilton Resorts – as "Waldorf Astoria Hotels & Resorts." *See id*. at 276:24-25, 277:1-17, 278:1-19. Indeed, the HMAs even contemplated the use of "Waldorf Astoria Hotels" as an acceptable "sub-brand" to Waldorf Astoria Collection." *See* Joint Ex. 2 at § 2.4.

117.    Despite this change in the naming convention, the Court finds that the Hilton Resorts and all other Waldorf Astoria branded properties have always been in reality part of the same brand – Waldorf Astoria. *See* Trial Tr. at 122:25, 123:1-8, 168:16-19, 210:8-14, 277:18-21. Indeed, whether called "Waldorf Astoria", "Waldorf Astoria Collection" or "Waldorf Astoria Hotels & Resorts," the brand has always had a single web-site, a single set of brand standards[40] and, most importantly, the same "GDS code", *i.e.*, codes utilized by Global Distribution Systems around the world to identify and distinguish different hotel brands. *See id*. at 277:21-25, 278:1-19, 355:9-15. Therefore, the Court rejects the Debtors' contention that the brand used initially in connection with the Hilton Resorts no longer exists. Moreover, no matter what the Hilton Resorts are called today, the fact remains that they were the linchpin that caused Hilton to spend the time, money and effort expanding use of the Waldorf Astoria name in connection with luxury properties throughout the world. Stated differently, but for the HMAs, Hilton would not have launched the brand that today consists of 23 Waldorf Astoria hotels and resorts. It is that group for which Hilton seeks brand damages if the MSR Debtors reject the HMAs.

118.    As the foundation of the Waldorf Astoria brand, the Hilton Resorts are critically important to the brand, with Grand Wailea apparently carrying the most weight. Indeed, Grand Wailea is the property at which more HHonors members redeem their points than at any other Hilton property. *See id*. at 294:3-9. Therefore, losing Grand Wailea, in addition to Arizona

---

[40] Morone states that that Waldorf Astoria does not have any brand standards. *See* Debtors' Ex. 2 at p. 24. That contention was refuted by Hilton's witnesses. *See* Trial Tr. at 278:12-15.

Biltmore and La Quinta, would harm Hilton's HHonors program because Hilton would no longer

be able to offer its HHonors members leading luxury resorts in Maui, Phoenix and La Quinta at

which to redeem their points.  *See id*. at 211:13-18.  Similarly, the loss of the Hilton Resorts

would have a "huge impact" to Hilton's overall sales efforts because Hilton would no longer be

able to offer its largest corporate customers the ability to rotate their group business through

these resorts Maui, Phoenix and La Quinta.  *See id*. at 211:19-25, 212:1-9.  Jaskulske explained

that "if, all of a sudden, we pull three of their rotations out, it's really going to harm that

relationship because we don't have another sort of Phoenix or Maui property."  *See id*. at 212:6-9.

119.    The loss of the Hilton Resorts would likely create tension with other Waldorf

Astoria owners.  *See id*. at 210:15-25, 211:1-12.  Hilton already gets pressure from its Waldorf

Astoria owners regarding how quickly Hilton intends to grow the brand and increase its

awareness among potential customers.  *See id*.  It necessarily follows that if Hilton loses the

Hilton Resorts and the Waldorf Astoria brand is reduced from 23 to 20 hotels and resorts,

Waldorf Astoria owners will be displeased.  *See id*.; *see also* Trial Tr. at 854:10-25, 855:1-7,

969:3-14.  That is especially true as the Hilton Resorts account for almost *25%* of all of the

rooms in the Waldorf Astoria brand.  *See* W-A Tr. Ex 25 at pp. 18, 23, 28, 67 (Waldorf Astoria

brand has 9,367 rooms in 2012, of which 2,316 are at the Hilton Resorts).

120.    For these reasons, the Court accepts Cline's analysis and finds that if Hilton loses

the Hilton Resorts, the Waldorf Astoria brand will suffer losses totaling $120,195,000, broken

down as follows:  (a) Grand Wailea ($66,107,000); (b) Arizona Biltmore ($24,039,000); and (c)

La Quinta ($30,049,000).  *See* W-A Tr. Ex. 25 at p. 6.  In determining the loss to the Waldorf

Astoria brand, Cline applied two methodologies.

121.    First, Cline considered the historical growth of the Waldorf Astoria brand and its

anticipated growth in the future with the Hilton Resorts.  *See id*. at pp. 61-65.  The Court accepts

Cline's development outlook for the Waldorf Astoria brand, which was founded upon empirical

evidence of the development of two of Hilton's primary competitors – Ritz Carlton and St. Regis.

*See id*. at pp. 59-63.  His development outlook was also based upon the growth of the Waldorf

Astoria brand by Hilton, one of the world's most successful and highly regarded hotel branding

and management companies.  Cline then considered the impact on Waldorf Astoria's growth if

the HMAs are terminated, which Cline concluded will slow growth and cause some existing

Waldorf Astoria owners to terminate their ties with the brand.  *See id*. at pp. 59-65.  To value the

financial impact on the brand, Cline used parameters relating to the foregone performance of lost

rooms, in terms of average rate, occupancy, revenue and fee income to Hilton.  *See id*. at p. 64.

To determine the net present value of the foregoing fees, Cline applied a 15% discount rate to

reflect the uncertainty associated with the projected stream of income.  *See id*.  Based upon his

analysis, Cline concluded that the net present value of Hilton's lost future income stream from

Waldorf Astoria branded hotels other than the Hilton Resorts totals $112,183,000.  *See id*. at pp.

64-65.  The Court concludes that Cline's approach does not constitute speculation, but rather is

based upon evidence of a brand expected to grow with Hilton's and its customer's support, but

with the setback produced by losing the HMAs.  The Court also notes that Cline spoke to 12

people at Hilton's corporate offices in connection with his analysis, including Brown, who is the

President, Brands and Commercial Services, John Vanderslice, who is the Global Head, Luxury

& Lifestyle Brands, and Michael Ennes, who is the Senior Director, Brand Development (Luxury

& Lifestyle Brands).  *See* W-A Tr. Ex. 25 at p. 127.

122.    Cline's second approach addressed the value of the Waldorf Astoria brand and how it would be impacted if the HMAs are terminated.  First, he valued the brand by estimating the amount of royalty income (5% of room revenue according to Waldorf Astoria's franchise disclosure document) that could be generated from the brand name *if* it were licensed to a third-party for the duration of the HMAs (2012-2034).  *See id*. at 66.  He then established a residual value at the end of the term using a 6% capitalization rate (a multiple of 16.7), "reflective of the high multiples for well-regarded branded companies that typify the landscape in the public markets."  *Id*.  Cline then discounted the resulting cash flow by 8%, the rate Hilton uses for its internal valuation purposes as applied to its management contract and its franchise business.  *See id*.  Based upon this analysis, Cline determined that the Waldorf Astoria brand has a net present value of $2.265 billion.  *See id*. at p. 68.  The Debtors' criticism of Cline's approach based upon the stated value of all of Hilton's brands in its financial statements is unavailing because the values attributed to Hilton's brands in its financial statements are unrelated to the actual fair market value of Hilton's brands.  *See* Trial Tr. at 399:30-7, 460:1-13.  Indeed, the brand values in Hilton's financial statements did not materially change upon Hilton's acquisition of an additional 835 properties.  *See id*. at 460:1-13.  Moreover, to completely understand the value of Hilton's brands, among other things, it is imperative to review the line item for "good will" in Hilton's financial statements, which is substantially higher than the value attributable to Hilton's brands. *See id*. at 968:8-17.

123.    Having already projected the growth of the Waldorf Astoria brand, Cline then considered the relationship of the Hilton Resorts to the Waldorf Astoria brand as a whole.  Although the Hilton Resorts currently account for nearly 25% of the total rooms within the Waldorf Astoria brand, Cline applied only a 5.66% impairment ratio to the net present value of

the brand, which he conservatively based upon the ratio of the Hilton Resorts' room count to the projected system-wide room count for the final 10 years of the 2012-2034 period.  *See id*.  Cline therefore concludes that the loss to the Waldorf Astoria brand under this methodology totals $128,200,000 ($2.265 billion x 0.566).  *See id*.  The Court notes that the loss would be substantially higher under this methodology if Cline applied an impairment ratio based upon the current composition of the Waldorf Astoria brand, *i.e.*, the Hilton Resorts accounting for 25% of total rooms.

124.    Cline then reconciled his two approaches and concluded that the total loss to the Waldorf Astoria brand if the HMAs are terminated will be $120,195,000.  *See id*. at p. 69.  The Court accepts Cline's balanced analysis and adopts this figure.  Indeed, reconciling two approaches is consistent with classic appraisal methodology, which requires the reconciliation of values using alternative approaches to valuation (such as the  income approach, sales approach and cost approach), and which is precisely what Pinnacle did when it appraised the Hilton Resorts in 2010.  *See* Divine Decl. at Exs. A-C.

125.    The Court finds that Cline's analysis is generally consistent with the so-called "royalty relief method", which was adopted by and described in *Brand Valuation – Requirements for Monetary Brand Valuation* (International Organization for Standardization, Geneva, Switzerland), September 1, 2010, 1st ed. (the "ISO Standard").  Although Cline was not aware of the ISO Standard at the time he prepared his reports, he subsequently learned of it and testified credibly that, with one exception, he valued the Waldorf Astoria brand and the impairment to it if the HMAs are terminated consistent with the ISO Standard, which Cline has utilized in the past when he has had occasion to value hotel brands.  *See id*. at 865:2-25, 866:1-25, 867:1-2.  The only exception is that Cline prepared his projections on a pre-tax, rather than a post-tax basis.

*See id*.  However, the Court agrees with Cline that such approach makes sense here because (a) Cline has never prepared any valuations on a post-tax basis; (b) considering pre-tax projections was consistent with Cline's analysis regarding the impact on the Waldorf Astoria development pipeline; and (c) if Hilton receives compensation for loss to its Waldorf Astoria brand, it would have to pay taxes on the income; thus, to analyze the anticipated income on an after tax basis would essentially subject Hilton to double taxation.  *See id*. at 864:13-25, 865:1, 869:4-21.

126.    The declaration of Joseph Floyd tendered by the Debtors to refute Cline's methodology is not persuasive.  Cline convincingly explained why he disagrees with Floyd's critique.  *See id*. at 868:16-873:2.  Among other things, Cline noted that:  (a) it was more appropriate to prepare his analysis on a pre-tax basis; (b) his use of 22-year projections is not excessive because it relates precisely to the number of years remaining on the term of the HMAs; and (c) he used a 6% per annum growth rate for the Waldorf Astoria brand because he believes the growth of the brand will be significant and his rate is in line with Ritz Carlton's 6.3% growth rate from 1995 through 2010.  *See id*.  Accordingly, nothing in Floyd's declaration causes the Court to conclude that Cline's analysis was anything but thorough and consistent with industry standards.

127.    The Court also finds that Cline properly allocated the majority of damages to Grand Wailea because it is the most valuable and important of the three Hilton Resorts.  Indeed, Grand Wailea accounts for 84% of total redemptions by HHonors members among the three resorts, *see* W-A Tr. Ex. at p. 71, and in 2015 it will represent 46.7% of the total management fee income for all three Hilton Resorts, *see id*. at p. 72.  Cline argued convincingly that:

> Because of the significance of the Grand Wailea property to Hilton's Waldorf=Astoria brand strategy and to its HHonors program, I conclude that the allocation of the loss relating to the impact of the HMA terminations on the Waldorf=Astoria growth and brand value requires an upward adjustment.  I

-66-

conclude on the basis of my experience with brand development strategies and my analysis on the evolution of the Waldorf=Astoria brand and the HHonors program that the portion of the loss attributable to Grand Wailea should be adjusted to 55 percent.

*Id*. at p. 72.

128.    The Court rejects the Debtors' contention that the Waldorf Astoria brand cannot possibly sustain any damages if Hilton loses the management rights to the Hilton Resorts because Hilton was unable to identify a single Waldorf Astoria owner that will leave the system, or a single prospective Waldorf Astoria owner that will not join the system, if the MSR Tenants reject the HMAs.  The Debtors have not yet rejected the HMAs so it is impossible to know which owners might leave the brand and which prospective owners will decline to join in as a result of the loss of these resorts.  Although there has been some press about a possible rejection of the HMAs, there is no evidence that fact is generally known to existing Waldorf Astoria owners or prospective owners or franchisees.  Even if it was, the possibility of termination is not the same as actual termination and removal from the Waldorf Astoria system.  As Brown credibly testified, one can expect Hilton's competitors to use the loss of the Hilton Resorts against Hilton when courting luxury hotel developers, *see* Trial Tr. at 301:16-18, just as Bailey testified that Grand Wailea's competitors used the bankruptcy filing against Grand Wailea in pitching group business, *see id*. at 643:1-17.  Thus, the Court must rely upon Cline's unrebutted analysis and the testimony of Hilton's witnesses to aid the Court in determining the extent of the damages to the Waldorf Astoria brand upon rejection.  The Court specifically notes that it is not relying upon Cline's guesswork or speculation as the Debtors' suggest, but upon Cline's analysis and methodologies that are corroborated by at least the ISO Standard.

129.    Second, Cline utilized more than one methodology in calculating his brand damages, which includes damages to the brand's value from losing the three Hilton Resorts.

-67-

Indeed, the Court is hard pressed to conclude that the Waldorf Astoria brand will suffer no damages if it loses three of its four anchor properties, which currently account for nearly 25% of the total rooms in the Waldorf Astoria system. *See* W-A Tr. Ex. 24 at p. 67. Common sense (in addition to Cline's opinion and the testimony of Hilton's witnesses) suggest otherwise.

130.    Morone admitted that he did not know how to value a brand and that he could not determine the damage to a brand as a result of losing management agreements. *See* Trial Tr. at 1090:1-11, 1161:13-18. Thus, he is not qualified to opine on the issue and his criticism of Cline's analysis is not credible or helpful to the Court. Similarly, Floyd did not opine on whether Hilton would suffer brand damages, but rather only whether Cline conducted part of his analysis in accordance with the ISO Standard. Thus, Cline's conclusion that the Waldorf Astoria brand will be damaged upon the loss of the Hilton Resorts went entirely unrebutted at trial. The Debtors did not offer even a scintilla of evidence to refute the overwhelming testimony and expert analysis in favor of Hilton's brand damages. Thus, the Court is compelled to award Hilton brand damages in the amount requested by Hilton.

131.    Even if the Court had found uncertainty with Hilton's brand damages and/or Cline's expert analysis (which it did not), that would not warrant the complete denial of Hilton's brand damages because the Court can adjust Hilton's brand damages based on the evidence. For example, it could increase the discount rate Cline applied to account for uncertainty beyond that already contemplated by Cline or it could consider Hilton's brand damages on an after-tax basis as Floyd suggests. Doing so would produce the following results, which the Court provides by way of example only:

| Alternative Brand Damages Analysis | | | |
| *(in 000's)* | | | |
| | **A** | **B** | |
| **Discount Rate** | **Loss Relating to Negative Impact on Waldorf Astoria's Development Outlook (*Note 1*)** | **After Tax Loss Relating to Waldorf Astoria's Brand Impairment (*Note 2*)** | **Reconciliation (Columns A+B/2)** |
| 15% | $112,183 | $49,366 | **$80,775** |
| 16% | $103,603 | $49,366 | **$76,485** |
| 17% | $ 95,952 | $49,366 | **$72,659** |
| 18% | $ 89,108 | $49,366 | **$69,237** |
| 19% | $ 82,966 | $49,366 | **$66,166** |
| 20% | $ 77,437 | $49,366 | **$63,402** |

**Note 1:**  See page 65 of Cline's May 10, 2012 Report in which he applies a 15% discount rate. This column A illustrates the impact on Cline's originally projected loss by increasing the discount rate.

**Note 2:**  See page 68 of Cline's May 10, 2012 Report for his Pre-Tax Analysis.  This column B illustrates the impact of calculating the Waldorf Astoria brand value on an after-tax rather than a pre-tax basis, utilizing Hilton's 31% tax rate according to its 10-K Report for 2006.  See Debtors' Ex. 7 at p. 44.  This column does not reflect any change in a discount rate.

### III.    CONCLUSIONS OF LAW

**A.    Executory Contract Rejection Damages**

**1.    Claim Estimation**

132.    The Court has been called upon to estimate Hilton's rejection damages pursuant to section 502(c) of the Bankruptcy Code, which provides in part that, "[t]here shall be estimated for purpose of allowance under this section . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1).  Though the Bankruptcy Code does not define which party has the burden of proof in connection with a claim's estimation, the burdens should be consistent with the burdens of proof in claim litigation, *e.g.*, a claim is *prima facie* valid, the objector has the burden of going forward with evidence supporting its objection and, if the objector succeeds in rebutting

-69-

the claim's *prima facie* validity, the claimant has the ultimate burden of persuasion.  *See In re Frascella Enters., Inc.*, 360 B.R. 435, 458-59 (Bankr. E.D. Pa. 2007).  Moreover, courts have wide discretion in employing appropriate procedures for estimating claims.  *See In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003).

133.    Here, the Court exercised its discretion to conduct a full evidentiary hearing on the estimation of Hilton's contingent rejection damages claims.  However, this case is unusual because the Debtors have not yet rejected the HMAs, and Hilton accordingly has not filed proofs of claim.  As such, the Debtors do not have claims to which they may object.  Nevertheless, the Court concludes that the Debtors have put forth evidence to rebut the *prima facie* validity of Hilton's contingent claims; thus, the ultimate burden of persuasion rests with Hilton.  The Court concludes that Hilton has satisfied its burden.

### 2.    Rejection Under The Bankruptcy Code

134.    Subject to the court's approval, a debtor "may assume or reject any executory contract or unexpired lease."  11 U.S.C. § 365(a).  "[T]he rejection of an executory contract or unexpired lease . . . constitutes a breach of such contract or lease . . . immediately before the date of the filing of the petition."  11 U.S.C. § 365(g)(1).  Therefore, rejection of an executory contract constitutes the debtor's "decision to breach the contract" as of the date immediately prior to the petition date.  *In re The Penn Traffic Co.*, 524 F.3d 373, 378 (2d Cir. 2008).  Consequently, the non-debtor party to the contract is "generally relegated to pursuing an unsecured prepetition claim against the estate."  *Id.*; *see also Med. Malpractice Ins. Assoc. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997) (stating that "[r]ejection gives rise to a remedy for breach of contract in the non-debtor party").  The Bankruptcy Code does not prescribe the mechanism for calculating damages arising from the rejection of executory

contracts such as the Hilton Management Agreements; rather, the resulting breach of contract

claim against the debtor's estate is determined according to state law.  *See In re Old Carco LLC*,

406 B.R. 180, 190 (Bankr. S.D.N.Y. 2009); *see also Giant Eagle, Inc. v. Phar-Mor, Inc.*, 528

F.3d 455, 459 (6th Cir. 2008) (stating that "[b]ecause the bankruptcy code does not address how

to calculate damages for such a rejection/breach . . . the bankruptcy court looks to state law, to

the extent that it does not conflict with the bankruptcy code");[41] *In re Stoltz*, 315 F.3d 80, 86 (2d

Cir. 2002) (stating that upon rejection, "the non-debtor party to the contract may generally

pursue state law remedies"); *Lavigne*, 114 F.3d at 387 (acknowledging that "the [Bankruptcy]

Code does not determine parties' rights regarding the contract and subsequent breach.  To

determine these rights, we must turn to state law"); *Sterling Vision, Inc. v. Sterling Optical Corp.*

*(In re Sterling Optical Corp.)*, 371 B.R. 680, 692 (Bankr. S.D.N.Y. 2007) (same).

### 3.    State Law Remedies For Breach Of Contract

135.    Each of the Hilton Management Agreements provides that it is governed by the

laws of the state in which the subject resort is located.  *See* Joint Ex. 2 at § 15.5.  Accordingly,

the laws of Arizona, California and Hawaii will govern the calculation of damages to which

Hilton will be entitled upon the rejection of the HMAs.  Although courts in each state may

describe the allowable damages resulting from the breach of a contract somewhat differently,

they generally agree that:

> Damages for breach of contract embrace both losses incurred and gains
> prevented; contract damages seek to approximate the agreed upon performance.
> Generally, in a breach-of-contract action, a plaintiff may recover the amount of
> damages necessary to place him in the same position he would have occupied had
> the breach not occurred.  In other words, the general rule of damages in a breach-
> of-contract action is that the award should place the injured party in the same or

---

[41] There are no limitations in the Bankruptcy Code that would be applicable to the calculation of damages resulting
from the rejection of a hotel management agreement.  *See e.g. In re Statewide Realty Co.*, 159 B.R. 719, 724 (Bankr.
D. N.J. 1993) (stating that the "[a]ssessment of the allowable amount of damages which result from the rejection [of
a hotel management agreement] requires merely the application of contract law").

-71-

> as good a position as he would have been in had the contract been performed, less proper deductions . . .
>
> The usual recovery for the breach of a contract is the contract price or the lost profits therefrom.  To calculate lost profits as an element of damages, expenses are subtracted from revenue.  Only net profits, as opposed to gross profits, are recoverable for breach of contract, and depending on particular transactions involved, what does or does not have to be deducted to reach the net lost-profit figure may vary.

22 AM. JUR. 2d *Damages* § 46 (2011) (internal citations omitted).

136.    Perhaps the leading case upon which American jurisprudence regarding damages for breach of contract is based is *Hadley v. Baxendale*, 9 Exch. 341 (1854).  That case provided the following direction for measuring damages:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally; i.e., according to the usual course of things, from such breach of contract itself, *or* such as may reasonably be supposed to have been in the contemplation of both parties at the same time they made the contract as the probable result of breach.

*Jones v. Johnson*, 41 Haw. 389, 1956 WL 10315, *3 (1956) (quoting *Hadley v. Baxendale*) (emphasis added); *Armstrong v. Lassen Lumber & Box Co.*, 269 P. 453, 454 (Cal. Sup. Ct. 1928) (same); *see also Tech. Const., Inc. v. City of Kingman*, 278 P.3d 906, 911 (Ariz. 2012) (referencing the following quote from *Hadley v. Baxendale*:  "[d]amages recoverable on a breach of contract are measured by the actual loss sustained, provided such loss is what would naturally result as the ordinary consequence of the breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties as the probable result of a breach.") (internal citation omitted).  In other words, damages may be recoverable following the breach of contract if they flow directly from the breach or were within the contemplation of the parties at the time of contracting.

-72-

### a.    Arizona

137.    In Arizona, the best remedy for breach of a contract is money damages that are "proximately caused by the breach *or* within the contemplation of the parties."  9 ARIZ. PRAC. BUSINESS LAW DESKBOOK § 7:32 (2010-2011 ed.) (emphasis added).  The most common form of damages is compensatory damages, which are designed "to provide the non-breaching party with the expected benefit of the contract," including "current expenses caused by the breach and prospective gains that would have been realized through performance of the contract."  *Id*. at § 7:34; *see also Biltmore Evaluation & Treatment Servs. v. RTS NOW, LLC*, No. 1 CA-CV 07-0602, 2009 WL 223293, *2 (Ariz. Ct. App. Jan. 29, 2009) (stating that "[c]ompensatory contract damages will be awarded for the net amount of losses caused and gains prevented").  Compensatory damages are assessed as follows:  "(1) [t]he loss in value to the non-breaching party caused by the other party's non-performance; (2) [p]lus any consequential loss caused by the breach; (3) [l]ess any cost or other loss that he has avoided by not having to perform."  9 ARIZ. PRAC. BUSINESS LAW DESKBOOK at § 7:32 (internal citation omitted).  In essence, appropriate compensatory damages are those "that place the non-breaching party in the same position as had the contract been performed, including damages that are foreseeable, minus any cost that has been mitigated."  *Id*.  To be foreseeable, damages must arise naturally from the contract's breach *or* "[m]ay reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of a breach."  *Id*. at § 7:35; *see also Biltmore Evaluation & Treatment Servs.*, 2009 WL 223293, *2 (stating that "it is well-established that damages resulting from a breach of contract are those which 'arise naturally from the breach itself or which may reasonably be supposed to have been within the contemplation of the parties at the time they entered the contract'") (internal citation omitted).

-73-

138.    Arizona courts agree that lost profits may be recovered as damages resulting from a breach of contract. *See Biltmore Evaluation & Treatment Servs.*, 2009 WL 223293, *2. In calculating lost profits, *variable costs should be deducted but fixed costs need not be deducted*. *Id*. Moreover, "[i]n calculating lost profit damages, '[o]nce the fact of damages has been proven, the amount of the damages may be shown with proof of a lesser degree of certainty than is required to establish the fact of damage.'" *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 985 P.2d 535, 549 (Ariz. Ct. App. 1999).

**b.    California**

139.    Under California law, damages resulting from the breach of a contract are often described as "those that flow directly and necessarily from a breach of contract, or that were the natural result of a breach." 23 CAL. JUR. 3d *Damages* § 19 (2011). Such damages "are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are deemed to have contemplated them." *Id*. As such, the damaged party "should receive as nearly as possible the equivalent of the benefits of performance, meaning the plaintiff should be put in as good a position as he or she would have been had performance been rendered as promised; this may include lost profits if the plaintiff can prove that the defendant's failure to perform caused the plaintiff to lose profits." *Id*. *See also Brandon & Tibbs v. George Kavorkian Accountancy Corp.*, 226 Cal.App.3d 442, 455-56 (Cal. Ct. App. 1990) (recognizing the continued application of *Hadley v. Baxendale* and stating that "[t]he basic objective of damages is compensation, and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalent of the benefits of performance"). However, damages must be calculated based upon what "would arise naturally from the breach, *or* which was contemplated *or* might have been foreseen

-74-

reasonably by the parties at the time they contracted, as the probable result of breach." 12 CAL.
REAL EST. § 34:29 (3d ed. 2010) (emphasis added); *see also Brandon & Tibbs*, 226 Cal.App.3d
at 455-56 (same).

140.    Courts addressing contract cases involving services have permitted the recovery
of lost profits as damages; that lost profits may be "'collateral' or 'remote' has been raised and
rejected from the time that the earliest cases were decided awarding such damages." *Brandon &
Tibbs*, 226 Cal.App.3d at 456.  In fact, "[t]he only prerequisite to recovery of lost profits is
proximate causation:  the lost profits must be the natural and direct consequences of the breach."
*Id.* at 457.

141.    An aggrieved party "must show loss of net pecuniary gain, not just loss of gross
revenue." *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 884 (Cal. Ct. App. 2002).
Consequently, damages awarded in injury to business cases are based upon net profits, which
California courts have consistently defined as "'the gains made . . . 'after deducting the value of
the labor, materials, rents, and all expenses, together with the interest of the capital employed.'"
*Electronic Funds Solutions v. Murphy*, 134 Cal.App.4th 1161, 1180 (Cal. Ct. App. 2005); s*ee
also Lapinee Trade, Inc. v. Boon Rawd Brewery Co., Ltd.*, 91 F.3d 909, 913 (7th Cir. 1996)
(recognizing the definition of "net profits" under California law in determining the appropriate
amount of damages for breach of contract under California law).  Thus, "although    . . . fixed
overhead expenses need not be deducted from gross income to arrive at the net profit properly
recoverable as damages based upon lost profits under a contract, all applicable variable expenses
should be deducted when arriving at lost profits."  24 WILLISTON ON CONTRACTS § 64:11
(Richard A. Lord, 14th ed.).

142.    A plaintiff need not establish the amount of its lost net profits with absolute certainty because "'[i]t is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct.'" *Electronic Funds Solutions*, 134 Cal.App.4th at 1180; s*ee also Lapinee Trade*, 91 F.3d at 912 (recognizing that under California law "[o]nce lost profits have been ascertained, 'recovery will not be denied because the amount cannot be shown with mathematical precision'").

### c.    Hawaii

143.    In Hawaii, "[t]he general rule with regard to damages in a breach of contract action is that 'when one sustains loss by breach of a contract, he is entitled to have just compensation commensurate with his loss.'" *Chung v. Kaonohi Ctr. Co.*, 618 P.2d 283, 290 (Haw. 1980).  Generally, the non-breaching party may recover those damages that arise naturally from the breach *or* were within the contemplation of the parties at the time of contracting.  *See Jones*, 1956 WL 10315, *3.  Indeed, "[d]irect damages are always recoverable but 'consequential losses' must be compensated if it can be determined that the parties contracted with them in view."  *Id*.

144.    Lost profits may be awarded as damages for the breach of a contract.  *See e.g. Hi-Pac, Ltd. v. Avoset Corp.*, 26 F.Supp.2d 1230, 1237 (D. Haw. 1997); *Omura v. Am. River Investors*, 894 P.2d 113, 115 (Haw. Ct. App. 1995).  "'[L]ost profits are measured by the loss of net profits, meaning net earnings or the excess of returns over expenditures. . . . ." *Omura*, 894 P.2d at 115 (internal citation omitted).  Like the other jurisdictions, lost profits need not be proven with certainty.  *See Chung*, 618 P.2d at 290-91.

91004-0040/LEGAL24113101.7

### 4.    **Mitigation Of Damages**

145.    Other than with respect to the Debtors' contention that Hilton could avoid losses

associated with foregone Group Services Expenses by simply reducing the amount it spends on

group services for the Waldorf Astoria brand if it loses the HMAs, the Debtors do not contend

that Hilton could otherwise mitigate its damages.  Nevertheless, the Court will summarize the

applicable law in support of its conclusion that it would not be reasonable for Hilton to reduce its

funding of the Waldorf Astoria brand if the Debtors reject the HMAs.

### a.    **Arizona**

146.    "[T]he mitigation doctrine only requires that the party seeking relief engage in

*reasonable* efforts to avoid further damages, without exposing the party to 'undue risk, burden or

humiliation.'"  *West Pinal Family Health Ctr. v. McBryde*, 785 P.2d 66, 69 (Ariz. Ct. App. 1990)

(internal citation omitted)(emphasis added).  Similarly, the party seeking recovery is not required

to mitigate damages if "mitigation efforts required 'substantial expense and effort.'"  *Strawberry*

*Water Co. v. Paulsen*, 207 P.3d 654, 664 (Ariz. Ct. App. 2009) (internal citation omitted).

"'[T]he burden of proof as to mitigation of damages is on the party asserting the requirement.'"

*Koenen v. Royal Buick Co.*, 783 P.2d 822, 828 (Ariz. Ct. App. 1989) (internal citation omitted).

### b.    **California**

147.    The plaintiff will be compensated for damages that it could not have avoided by

reasonable effort or expenditure.  *See Mize-Kurzman v. Marin Cmty. College Dist.*, 202

Cal.App.4th 832, 869 (Cal. Ct. App. 2012).  The burden of proof is on the breaching party

regarding mitigation.  *See Jackson v. Yarbray*, 179 Cal.App.4th 75, 97 (Cal. Ct. App. 2009).

### c.    **Hawaii**

148.    Under Hawaii law:

91004-0040/LEGAL24113101.7

> [i]n contract . . . the plaintiff has a duty to make every reasonable effort to
> mitigate his [or her] damages.  The burden, however, is upon the defendant to
> prove that mitigation is possible, and that the injured party has failed to take
> reasonable steps to mitigate his [or her] damages.

*Tabieros v. Clark Equip. Co.*, 944 P.2d 1279, 1316 (Haw. 1997) (internal citation omitted).  *See also GE Capital Hawaii, Inc. v. Shanghai Inv. Co., Inc.*, 162 P.3d 17 (Haw. Ct. App. 2007) (stating that "damages are not recoverable for loss that could have been avoided 'without undue risk, burden or humiliation.'") (internal citation omitted).

### 5.    <u>Lost Volume Sellers</u>

149.    An injured party is not required to mitigate its damages if that party is a lost volume seller, *i.e.*, "'one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity.'"  *In re Worldcom, Inc.*, 361 B.R. 675, 685 (Bankr. S.D.N.Y. 2007).  *See also Nat'l Controls, Inc. v. Commodore Bus. Machs., Inc.*, 163 Cal.App.3d 688, 697 (Cal. Ct. App. 1985) (recognizing that a lost volume seller is entitled to recover lost profits even after selling subject goods to a third party if it can prove "that had the breaching buyer performed, the seller would have realized profits from two sales."); *Autonumerics, Inc. v. Bayer Indus., Inc.*, 696 P.2d 1330, 1340 (Ariz. Ct. App. 1984) (accepting that mitigation is immaterial "'in a case where after the buyer's default a seller resells the goods, the proceeds of the resale are not to be credited to the buyer if the seller is a lost volume seller – that is, one who had there been no breach by the buyer, could and would have had the benefit of both the original contract and the resale contract.'") (internal citation omitted).  Indeed, "[a] lost volume seller does not minimize its damages by entering into another contract because it would have had the benefit of both contracts even if the first were not breached." *Worldcom*, 361 B.R. at 685.  "'The philosophical heart of the lost volume theory is that the seller would have generated a second sale irrespective of the buyer's breach' and that '[i]t

-78-

follows that the lost volume seller cannot possibly mitigate damages.'"  *Id*.  The theory applies to contracts for services as well as goods.  *Id*. at 685-86.

150.    To be deemed a lost volume seller, the non-debtor party to the rejected contract "must establish that [it] would have had the benefit of both the original and subsequent contracts" if the subject contract had not been rejected.  *Id*. at 686.  The test is as simple as determining whether the non-debtor party to the rejected contract could have and would have entered into subsequent agreements notwithstanding rejection.  *See id*.  In other words, the lost volume seller's intent to enter into new contracts is the same before and after rejection.  *See id*. at 689.

151.    Even if the Debtors argued that Hilton could mitigate all of its damages, the Court would reject any such contention because Hilton is a "lost volume seller," that is, it is continually looking to add properties and it has the unlimited resources to do so.  *See e.g.* Trial Tr. at 275:1-25.

**B.    Estimation Of Hilton's Damages**

152.    If the MSR Tenants reject the HMAs, Hilton will sustain monetary damages equal to:  (a) the present value of Hilton's lost net profits – the loss of 3% of total revenues of the Hilton Resorts – for the duration of the HMAs (including the 10-year option); (b) the loss of the MSR Tenants' payments for Group Services Expenses that Hilton will have to fund out of its own pocket for the next five years; and (c) the loss in value to Hilton's Waldorf Astoria luxury brand from the loss of the Hilton Resorts.

**1.    Foregone Fees**

153.    Under the laws of Arizona, California and Hawaii, Hilton's foregone fees are recoverable as direct damages from the breach of a contract for services, *i.e.*, they flow directly

from the breach.  The loss of a stream of fees is just such general damages.  *M. Waikiki*, 2012

WL 20624221 at *6 (referencing Marriott's pursuit of money to be paid under the hotel

management contract as "general damages").  Here, if the MSR Tenants do not reject the HMAs,

Hilton will continue to collect from the Hilton Resorts the Base Fee (2% of gross revenues) and

the Corporate Overhead Fee (1% of gross revenues).  Thus, in determining Hilton's lost profits,

the Court concludes that Hilton will lose 3% of gross revenues from the Hilton Resorts if the

MSR Tenants reject the HMAs.  As set forth above, the Corporate Overhead Fee does not

represent an expense reimbursement, but a payment Hilton receives under the HMAs regardless

of whether it is called a "management fee" or a "corporate overhead fee".  Put simply, it is cash

to Hilton that Hilton will no longer receive to use to pay general corporate overhead or for any

other purpose.

> ### a.    Hilton May Recover Lost Corporate Overhead Fees And Only The Expenses Hilton Actually Saves Are Deducted From Its Foregone Base And Corporate Overhead Fees

154.    The Debtors suggest that – despite the clear language of Section 5.3 of the HMAs

(". . . the Owner shall pay to Manager an annual fee equal to one percent (1%) of Gross

Revenues . . .") – Hilton may not recover damages consisting of lost Corporate Overhead Fees

because the parties did not contemplate the payment of Corporate Overhead Fees at the time of

contracting.  The Debtors' argument is specious and misleading.  Under *Hadley v. Baxendale*, as

adopted in the three relevant states, Hilton does not need to prove that the damages relating to the

Corporate Overhead Fee were in the contemplation of the parties at the time of contracting

because they are not consequential damages.  Rather, they are general damages that flow directly

from the breach of the HMAs because Hilton is entitled to receive them as long as those

contracts remain in effect without having to prove that it incurred any "corporate overhead."

Consequently, the Court finds that Hilton has satisfied its burden of persuading the Court that its

lost profits, including the loss of the Corporate Overhead Fee, flow directly from the breach of

the HMAs.

155.    Moreover, even if the contemplation of the parties or the contractual language

was relevant to Court's consideration, the Court would still find in favor of Hilton on this issue.

The names or labels used by parties to a contract are not dispositive.  Indeed:

> What a contract is styled or labeled by the parties does not determine its character
> or their legal relationship, nor is the name given a contract determinative in its
> construction.  While in certain cases captions or names of contracts must be
> considered in order to ascertain the meaning and nature of the contract, the greater
> weight must be given to the operative contractual clause of the agreement . . . It
> may be said, therefore, that the proper construction of a contract is not dependent
> upon any name given it by the parties, but upon the entire body of the contract
> and its legal effect as a whole.  In the determination of the real character of a
> contract, courts will always look to its purpose rather than to the name given it by
> the parties, and where a conflict exists between a name attempted to be applied to
> a particular contract and the language of the contract itself, the name will be
> rejected as inapplicable.

17A Am. Jur. 2d *Contracts* § 382 (2012) (internal citations omitted).  *See also Russell v. Golden*

*Rule Mining Co.*, 159 P.2d 776, (Ariz. 1945) (stating that "'[s]ubstance rather than form

ordinarily controls the construction or interpretation of contracts.  So the form or neme [sic]

which the parties give to an instrument will not control its interpretation nor determine its nature;

the effect which the law gives to the terms of the contract or to the acts of the parties is in general

determinative.  In determining the real character of the transaction, the court looks to the

intention of the parties duly ascertained, and to the purpose which is to be attained.'") (internal

citation omitted); *Huskie v. Ames Bros. Motor & Supply Co., Inc.*, 678 P.2d 977, 982 (Ariz. Ct.

App. 1984) (stating that "[t]he court looks to the substance of a document rather than to its form"

and "[t]he character of a contract is determined by its provisions and not by its label.").

156.    Accordingly, in interpreting the HMAs, the Court is not bound by the definitions contained in them, but rather must focus on the economic realities of the agreements.  *See e.g.*, *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (stating that "[i]n discharging our duty, we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation."); *Gen. Sec. Ins. Co. v. Reliance Ins. Co.*, Nos. 00-55366, 00-55484, 2002 WL 505904, * 4 (9th Cir. April 2, 2002) (stating that "[s]election of a name alone cannot transform a document's character"); *In re SCCC Assoc. II Ltd. P'ship*, 158 B.R. 1004, 1009 (Bankr. N.D. Cal. 1993) (concluding that "[i]n determining whether an agreement is a lease . . . 'the appropriate focus is on the . . . economic realities of [the agreement].'") (internal citation omitted); *Allen v. Smith*, 94 Cal.App.4th 1270, 1279 (Cal. Ct. App. 2002) (concluding that the "parties' use of various terms of art in a contract are not dispositive in the interpretation of that contract"); *Welk v. Fainbarg*, 255 Cal.App.2d 269, 272-73 (Cal. Ct. App. 1967) (recognizing that it is "well established that the form and name of an instrument are not controlling, for the law looks through the form to substance and gives effect to the intention of the parties").

157.    The Court needs to look no further than the provision in the HMAs defining the Corporate Overhead Fee to discern the intent of the parties and the economic realities of the HMAs.  In that regard, the HMAs state that "Owner *shall pay* to Manager an annual *fee* equal to one percent (1%) of Gross Revenues."  Joint Ex. 2 at § 5.3.  There are no limitations on the payment of this fee and it is not conditioned in any way upon Hilton's actual corporate overhead expenses.  The Debtors presented no evidence to the contrary.  Rather, like the Base Fee, the Corporate Overhead Fee is automatically payable as a percentage of the Hilton Resorts' gross revenues, *i.e.*, it is akin to a base management fee even though it is not defined as such and it includes the term "overhead."  There is simply no basis in law or fact to treat the Corporate

-82-

Overhead Fee as anything other than a fee.  To conclude otherwise would require the Court to
read language and concepts into the HMAs that do not exist.  That the HMAs refer to the
reimbursement of the Corporate Overhead Fee does not convert the Corporate Overhead Fee to
an expense reimbursement because the economic reality is that the Corporate Overhead Fee is
paid regardless of any expenses actually incurred by Hilton.  Consequently, the Court rejects the
Debtors' contention that it should not consider the Corporate Overhead Fee in calculating
Hilton's lost profits.

158.    Additionally, the Court rejects the Debtors' contention that Hilton's lost profits
should be reduced by 33% for the overhead expenses Hilton will allegedly save if it loses the
HMAs.  The legal test is what Hilton will actually save by no longer having to manage the Hilton
Resorts, not some proportionate share of overall general corporate expenses that can be attributed
to Hilton's management business.  The Debtors appear to agree with this test, as they cite it
favorably in the Brief of MSR Resort Golf Course LLC, *et al.*, in Support of the Debtors' Motion
for the Entry of an Order Authorizing Rejection of the Hilton Management Agreements, at ¶ 53
("As a matter of law, any calculation of Hilton's lost profits must offset the expenses associated
with performance of the HMAs") (citing cases).  Because the Debtors did not introduce *any*
evidence regarding *any* actual expenses that Hilton would save if it loses the HMAs, the Court
accepts the only evidence it received on the issue:  Hilton would only save the Hawaii Taxes in
the amount of $240,000 per year if it loses the HMAs.

159.    That Hilton incurs little incremental cost in managing the Hilton Resorts is
supported by the recent decision by the United States Bankruptcy Court for the District of
Hawaii in *M Waikiki*.  In that case, the bankruptcy court estimated Marriott International, Inc.'s
damages relating to the debtor's breach of a hotel management agreement for one of Marriott's

-83-

EDITION hotels, which was Marriott's very first "lifestyle" brand hotel.  In rejecting the debtor

hotel owner's contention that Marriott's claim should be reduced by 35 to 45 percent for overhead

expenses, the court stated that:

> The figure of thirty-five to forty-five percent appears to be the amount of
> overhead expense which is allocable to a particular management contract for cost
> accounting purposes.  This is the wrong standard.  Cost accounting requires the
> allocation of all costs, avoidable or not, among a business' revenue streams.  Only
> avoidable costs are deducted when calculating damages.

*M Waikiki*, 2012 WL 2062421 at *4.  Accordingly, the court found that: (a) "[t]he only expense

which Marriott could reasonably avoid because of the termination . . . is the travel expense for

periodic visits to the Hotel by Marriott's central office staff" (which totaled only $100,000); and

(b) "Marriott could not avoid any additional expenses without terminating or substantially

curtailing its development of the EDITION brand."  *Id.* at *3-4.  The Debtors and Morone ignore

the fact and logic of the *M Waikiki* holding by continuing to insist that the Court focus on

Hilton's general corporate overhead expenses for its entire business, and not Hilton's actual

incremental cost of managing the Hilton Resorts.

160.    The Court concludes that Hilton, like Marriott in *M Waikiki*, will not avoid any

material expenses if the MSR Tenants reject the HMAs other than the Hawaii Taxes.

### b.    A Discount Rate Of 8% Appropriately Measures Hilton's Risk Of Receiving Base And Corporate Overhead Fees Under The HMAs At The Time Of Contracting

161.    The discount rate the Court must apply to measure the present value of Hilton's

foregone fees "should reflect Hilton's expected return on its investment at the time it entered into

the HMA . . .."  Debtors' Ex. 2 at p. 20; *see also In re Chemtura Corp.*, 448 B.R. 635, 677

(Bankr. S.D.N.Y. 2011) (stating that "the relevant time to consider the obligor's risk is the time at

which the underlying contract was entered into").  There is no better evidence of the appropriate

discount rate than Hilton's use of an 8% discount rate in 2005, which is particularly credible

because Hilton was in the best position at the time to consider the risks associated with receiving

fees under the HMAs in the future, untainted by any anticipated litigation. *See e.g.*, *M Waikiki*,

2012 WL 2062421, *3 (accepting Marriott's internal projections regarding average daily rate and

stating that "I find these projections most credible because they were prepared by Marriott's

internal staff, on whose work Marriott relies when conducting its business and investing millions

of dollars, rather than by paid testifying experts.  Additionally, the projections were not prepared

with a view to being introduced in litigation, and therefore were not biased by a persuasive

impulse.").

162.    The Court's adoption of an 8% discount rate in this case is supported by *M*

*Waikiki*, in which the court utilized a discount rate based upon Marriott's WACC to determine

the net present value of Marriott's lost profits.  2012 WL 2062421, *4.  Although the court

concluded that Marriott's WACC was 6.5%, the court increased that rate by 1% for the initial

term of the management agreement before Marriott's performance test[42] commenced, to account

for risk related to the fact that "the Hotel is new (as a practical matter, due to its extensive

renovation and rebranding), the EDITION brand is new, and the lifestyle hotel concept is new to

Waikiki." *Id*.  In other words, unlike Hilton's income stream from Base and Corporate Overhead

Fees under the HMAs, Marriott's anticipated income stream under the agreement for the

EDITION was more risky than that of its base income stream from its other management

agreements.  Nevertheless, the court reasoned that during the initial period of the management

agreement "Marriott's receipt of [base management fees] is subject to relatively little risk.  The

---

[42]  The performance test provided that the debtor could terminate the management agreement if during two
consecutive years "(1) the operating profit . . . falls below certain threshold amounts, (2) the Hotel's [RevPAR] is
less than ninety percent of the RevPAR earned by six identified competitive hotels in Honolulu, *and* (3) the failure
of the Hotel to satisfy these tests is not attributable to certain specified causes." *Id*. at *2.  Marriott's cure rights were
limited to only twice in any 15-year period. *See id*.

-85-

fees are based upon the Hotel's gross income, not profits, and not subject to reduction due to any

expenses.  Marriott has a contractual right to the fees even if the Hotel is sold or foreclosed." *Id.*

163.    Even though the court concluded that Marriott would pass its performance test,

the court applied a higher discount rate (13.5%) for the period after which Marriott's

performance test commenced because Marriott's "margin of passage would probably be fairly

small and the question is subject to significant uncertainty." *Id*. at *4.  Therefore, the court

concluded that "fee income after the performance test comes into effect [is] substantially more

uncertain than for the period before the performance test . . . Even a relatively small variation in

the Hotel's performance would trigger the Debtor's right to terminate the Management

Agreement." *Id*. at *5.

164.    Hilton does not face the same risks as Marriott did in *M Waikiki*.  For example,

the Hilton Resorts were not new resorts in 2006 (quite the opposite; they were well established

and well known) and their names and luxury concepts (already accepted in their markets) did not

change when Hilton acquired their management rights, whereas in *M Waikiki*, the EDITION was

an entirely new *type* of hotel for its market bearing a new name.  For the Hilton Resorts, the

Waldorf Astoria brand was added as a tag line to each property's established name, adding value

rather than detracting from it.  Also, Morone admitted that EDITION was a riskier brand than

Waldorf Astoria.  *See* Trial Tr. at 1161:20-24.  Moreover, unlike Marriott's performance test in

*M Waikiki*, Hilton faces a weak Performance Test and has unlimited cure rights.  Thus, the Court

concludes that *M Waikiki* supports its application of an 8% discount rate.

## 2.    Group Services Expenses

165.    The HMAs require the Debtors to pay Group Services Expenses.  If the MSR

Tenants reject the HMAs, Hilton obviously will no longer receive the Group Services Expenses

that the Hilton Resorts would have otherwise paid for the balance of the term of the HMAs.

Because the brand fund for Waldorf Astoria currently operates at a loss that Hilton subsidizes,

Hilton would have to continue to fund that loss in addition to the amounts the Hilton Resorts had

paid to sustain the spending on the Waldorf Astoria brand at its current level.  That funding will

have to continue until Hilton completely replaces, *i.e.*, mitigates, the amount of Group Services

Expense previously paid by the Hilton Resorts, which Cline conservatively estimates will take

five years.  Hilton would thus incur damages in the form of increased out-of-pocket expenses

related to the reduction in Group Services Expenses, including the substantial key money that

Hilton would have to pay to obtain new management contracts under which it would receive

sufficient Group Services Expenses to replace the lost payments from the Hilton Resorts.

166.    The Debtors posit two arguments in opposition to Hilton's claim of damages

related to the Group Services Expenses.  First, the Debtors state that Hilton can simply reduce its

funding of the Waldorf Astoria brand in an amount equal to the payments received from the

Debtors.  Second, the Debtors claim that Hilton already expects to acquire new Waldorf Astoria

management contracts that should replace the lost Group Services Expenses from the Hilton

Resorts in a shorter time period than five years.  Neither of these arguments has merit.

167.    As noted above, the Debtors bear the burden to prove that Hilton could mitigate

its damages by taking reasonable steps.  The only evidence the Court heard was from Hilton's

witnesses that it would not be a prudent business decision to reduce the funding of the Waldorf

Astoria brand from its current level.  *See* Trial Tr. at 293:13-17, 833:16-25, 834:1-21.  Even

Morone conceded that it was entirely a business decision for Hilton whether it could reduce

funding for the Waldorf Astoria brand.  *See id.* at 1160:15-19.  The Court finds Hilton's

witnesses credible, especially in light of the very competitive nature of the luxury hotel business

and the amount that Hilton's competitors spend to promote their luxury brands.  *See id.* at 274:22-24, 285:13-25, 2861-25, 287:1-6.  As a result, the Court concludes that it would be unreasonable and risky to the future growth of the Waldorf Astoria brand for Hilton to reduce the amount of money it contributes to the brand fund if it loses the Hilton Resorts' payments of Group Services Expenses.  In that regard, the Court agrees with the *M Waikiki* court when it refused to reduce Marriott's damages by alleged "saved" expenses associated with losing an EDITION branded hotel:  "Marriott could not avoid any additional expenses without terminating or substantially curtailing its development of the EDITION brand."  2012 WL 2062421, *4.  As Waldorf Astoria is a growth brand in the highly competitive luxury hotel segment of the hospitality industry, it cannot materially reduce advertising, marketing and other brand support without risking loss of market share and upsetting owners of Waldorf Astoria hotels and resorts.

168.    Because the Group Services Expenses were expressly provided for in the HMAs, Hilton's damages resulting from the loss of the Hilton Resorts' contribution of Group Services Expenses would flow directly from the MSR Tenants' breach of the HMAs.  In any event, it was obviously foreseeable at the time of contracting that a breach of the HMAs would cause Hilton to lose the Hilton Resorts' payments of Group Services Expenses, thereby causing Hilton harm.  Accordingly, this component of Hilton's damages is recoverable under the laws of Arizona, California and Hawaii.

   **3.      Damages Associated With The Grand Wailea Expansion**

169.    If the Debtors reject the HMAs, Hilton will lose the right to earn fees under the Grand Wailea HMA that would be generated by the increased resort revenues associated with the Expansion.  Because the Expansion was known at the time the parties entered into the HMAs, these are consequential damages that were within the contemplation of the parties at that time.

-88-

In other words, it was reasonably foreseeable that the Expansion would occur, and if the HMAs were prematurely terminated, Hilton would lose the fee stream it could have earned from the Expansion. Accordingly, Hilton's losses associated with the Grand Wailea's increased revenues resulting from the Expansion and corresponding fees Hilton would earn as a result are recoverable under the law of Hawaii.

### 4.     Damage To The Waldorf Astoria Brand

170.     If there has been one word used to describe the Hilton Resorts time and again it is that they are "iconic." Indeed, the fact the parties have fought so hard over whether Hilton was estopped from asserting claims against the fee owners of the Hilton Resorts, and now over damages upon termination, demonstrates the value of these properties. They are truly special, unique and valuable resorts. If Hilton loses the HMAs, which formed the foundation of Hilton's Waldorf Astoria luxury brand, the brand's reputation, value and growth prospects unquestionably will be damaged. These damages would flow directly from the MSR Tenants' rejection of the HMAs and were clearly within the contemplation of the parties when Hilton acquired the agreements in 2006. Indeed, CNL raved about the partnership it formed with Hilton and the Waldorf Astoria brand in press releases around the time of Hilton's acquisition of the HMAs and launch of the Waldorf Astoria brand. *See* W-A Tr. Ex. 1 at pp. 1-2. Thus, there is no dispute that CNL was keenly aware that Hilton was using the Hilton Resorts as the foundation for its Waldorf Astoria luxury brand. Even Morone noted that: "[i]t is clear that the Property [Grand Wailea], as well as The Arizona Biltmore and La Quinta Resort were critical to Hilton's ability to launch the [Waldorf Astoria] brand and its success in building the brand going forward." Debtors' Ex. 2 at p. 2. It is undisputed that they remain so to this day.

91004-0040/LEGAL24113101.7

171.    The Debtors did not retain a brand expert to rebut any of Cline's analysis

regarding the loss the Waldorf Astoria brand will sustain upon rejection of the HMAs.  In fact,

Morone admitted he does not know how to value a brand or loss to a brand.  *See* Trial Tr. at

1090:1-11, 1161:13-18.  Instead, the Debtors and Morone complain that any brand damages are

too speculative.  However, courts have recognized that hotel brand management companies can

sustain damages to reputation and good will as a result of the wrongful termination of hotel

management agreements.  In *Woolley v. Embassy Suites, Inc.*, 227 Cal.App.3d 1520 (Cal. Ct.

App. 1991), the court considered the request by a hotel branding and management company for a

preliminary injunction to prevent a hotel owner from terminating hotel management agreements.

The court declined to grant an injunction because, among other reasons, the hotel branding and

management company had an adequate remedy at law.  *See Woolley*, 227 Cal.App.3d at 1535-36.

Indeed, the court expressly recognized that "[w]hile the loss to Embassy's reputation as a result

of its wrongful termination might be difficult to measure, the subject could be adequately

addressed through expert testimony."  *Id.*

172.    Similarly, the *M Waikiki* court recognized that damages to a hotel management

company's reputation and good will may be recoverable.  2012 WL 2062421, *2.  In that case,

Marriott requested damages to its reputation and good will caused by the hotel owner's breach of

Marriott's management agreement.  *See id.*  However, because Marriott did not present evidence

of such damages at the estimation hearing, the court estimated the damages to Marriott's

reputation and good will at zero, but "*without prejudice to the ultimate allowance of Marriott's

claims*."  *Id.* (emphasis added).

173.    Here, Cline's analysis is not speculative guesswork, but is rooted in sound

methodologies that he has been utilizing and applying for years to determine the value and

damage to hotel brands.  Indeed, it is unrebutted that Cline largely performed his analysis in

accordance with accepted techniques for valuing brands contained in the ISO Standard.  Because

potential damage to the Waldorf Astoria brand were within the contemplation of the parties at

the time the HMAs were executed and Cline's expert analysis on brand damage was unrebutted

by competent evidence, the Court concludes that Hilton is entitled to recover the anticipated

damage to the Waldorf Astoria brand under the laws of Arizona, California and Hawaii.

### 5.    Hilton's Lost Investment As A Measure Of Damages

174.    This is one of those rare instances involving a breach of contract where the

contracting party actually paid in advance for an expected income stream.  It is undisputed that

Hilton paid substantial Financial Commitments to obtain the right to manage the Hilton Resorts.

Hilton has only been paid Management and Incentive Fees totaling approximately $79 million

through May 2012, *see* W-A Tr. Ex. 13, leaving a very substantial shortfall compared to the

amount of the Financial Commitments.  This simple cross-check on Hilton's damages exposes

the errors of the Debtors' conclusion that Hilton will only sustain approximately $46 million in

damages.  The Court notes this not to suggest that Hilton's investment minus the amount it has

been repaid to date is the proper measure of damages, but rather it is a useful tool to measure the

reasonableness of Hilton's estimated damages, especially considering the value of the Hilton

Resorts to Hilton and the Waldorf Astoria brand.

## IV.    CONCLUSION

175.    Based upon the foregoing, the Court estimates Hilton's claims as follows:

A.    Hilton's lost profits damages total $165,409,000, and they shall be allocated as follows:

Grand Wailea ($77,306,000); Arizona Biltmore ($40,396,000); and La Quinta ($47,706,000);

B.     Hilton's total lost profits shall only be reduced by $240,000 per year in connection with

Grand Wailea only – the amount of the Hawaii Taxes that Hilton will save if it loses the Hilton

Resorts;

C.     Hilton's total lost profits for Arizona Biltmore and Grand Wailea shall not be reduced by

any alleged saved expenses;

D.     Hilton's damages relating to the loss of the Hilton Resorts' contribution of Group Services

Expenses total $38,926,000, which shall be allocated as follows:  (a) Grand Wailea

($18,193,000); (b) Arizona Biltmore ($9,507,000); and (c) La Quinta ($11,227,000);

E.     Hilton's damages relating to its inability to benefit from the Grand Wailea Expansion

total $9,804,000; and

F.     Hilton's damages to its Waldorf Astoria brand total $120,195,000, which shall be

allocated as follows:  (a) Grand Wailea ($66,107,000); (b) Arizona Biltmore ($24,039,000); and

(c) La Quinta ($30,049,000).


New York, New York                          */s/ David M. Neff*
Dated: July 19, 2012                        David M. Neff (*admitted pro hac vice*)
                                            Brian A. Audette (*admitted pro hac vice*)
                                            PERKINS COIE LLP
                                            131 S. Dearborn St., Ste. 1700
                                            Chicago, Illinois 60603
                                            Telephone:   (312) 324-8400
                                            Facsimile:   (312) 324-9400

                                            - and -

                                            Schuyler Carroll
                                            PERKINS COIE LLP
                                            30 Rockefeller Plaza
                                            25th Floor
                                            New York, New York  10112
                                            Telephone:   (212) 262-6905
                                            Facsimile:   (212) 977-1636

91004-0040/LEGAL24113101.7