# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, NY 10022

| Eric F. Leon | | |
|---|---|---|
| To Call Writer Directly: | (212) 446-4800 | Facsimile: |
| (212) 446-4731 | | (212) 446-4900 |
| eric.leon@kirkland.com | www.kirkland.com | |

August 7, 2012

The Honorable Sean H. Lane
United States Bankruptcy Judge
United States Bankruptcy Court for the
Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re:    *In re MSR Resort Golf Course, LLC et al.* **(11-10372)**

Dear Judge Lane:

We write on behalf of the Debtors to seek the Court's guidance with respect to two issues that have arisen in connection with Your Honor's July 31, 2012 bench ruling (the "Order") in the Hilton estimation proceeding. (Ex. 1, Tr. at 43.) The first, and most critical, issue concerns Hilton's claim for lost Group Services Expenses. In the Order, the Court granted Hilton's claim for foregone Group Services Expenses ("GSE"), but noted that Hilton's claim for $17 million would have to be adjusted to account for the Court's finding that the appropriate discount rate in this case is higher than the 8% used by Hilton in its damages calculations. (*Id.* at 28-29.) The clear import of the Court's ruling was that Hilton's claim for $17 million in GSE, which was based on Hilton's 8% discount rate, would be adjusted downward. Yet, under the guise of implementing the Order, Hilton now claims that it is entitled to more than $33 million in GSE -- roughly double the amount it sought at trial -- because of supposed mathematical errors committed by its expert, Mr. Cline, and communicated throughout its trial presentation. The Debtors firmly dispute both the merits and introduction of Hilton's new calculations, which are intended to replace, wholesale, the existing trial record on GSE.

The second issue is whether, as both sides agreed at trial, the projections used to calculate Hilton's lost profits damages should be discounted after 2024 to account for the risk of a termination on sale. At trial, Hilton's own expert applied such a discount to what he called the "extension term," yet Hilton now seeks to disavow that limitation in computing damages.

## **Can Hilton double its claim for lost GSE three weeks after the close of evidence?**

Before, during, and after the trial, Hilton repeatedly took the position, and proffered evidence, that its claim for $17 million in GSE was, in fact, a net present value based on its proffered discount rate of 8%. The record on this point is unequivocal and includes, at least:

The Honorable Sean H. Lane
August 7, 2012
Page 2

- The initial report of Mr. Cline, which was admitted into evidence as Waldorf Ex. 25.  In his report, Mr. Cline claims to have calculated "NPV of Group Services Expense (for balance of term)" at "8%".  (Ex. 2, Cline Rep. at 50.)  To be sure, in describing his "Loss Estimate -- Group Services Expense," Mr. Cline expressly noted his use of an 8% discount rate in his calculation, stating: ***"The appropriate discount rate is eight percent, established in accordance with the rationale previously outlined."***  (*Id.* at 49.)

- The supplemental expert of Mr. Cline, which was admitted into evidence as Waldorf Ex. 26.  In his supplemental report, Mr. Cline expressly states that his calculations for "Loss Relating to foregone payments for Group Services" were premised upon a discount rate of 8%.  (Ex. 3, Cline Supp. Rep. at 30.)

- The trial testimony of Mr. Cline, who, when discussing Hilton's GSE claim, was expressly asked by Hilton counsel, ***"Why did you use an eight percent discount rate?"*** (Ex. 4, 7/3 Tr. at 829.)  Mr. Cline replied:   "The eight percent discount rate is used [in calculating GSE] for the same reason that I had used it for the management fees, the three percent management fee, because that is the rate that I deemed to be suitable for fee income like this.  And there is no reason to project -- or rather, to use a different discount rate for this type of income…."  (*Id.*)  To emphasize the point, on direct examination, Hilton's counsel instructed Mr. Cline to "work through your analysis" on page 50 of his expert report, the precise page on which Mr. Cline states that he calculated the "NPV of Group Services Expense (for balance of term)" by using an 8% discount rate.  (*Id.* at 827, referring to Ex. 2 at 50.)  On cross, Mr. Cline confirmed that Hilton's foregone Group Services Expenses were $17 million.  (Ex. 4, 7/3 Tr. at 925.)

- The post-trial submissions of Hilton, where it twice stated that the net present value of lost GSE was $17 million (Ex. 5, Hilton Post-Trial Br. at 57-58) and repeatedly argued for an 8% discount rate (*id.* at 43 ("the 8% discount rate is the only appropriate rate to measure the damages Hilton would suffer").).

In granting in part Hilton's claim for GSE, the Court specifically relied upon the record that Hilton submitted to demonstrate its $17 million claim, which, according to the undisputed evidence, Hilton arrived at by applying an 8% discount rate:  "The Court notes that Hilton has sought some $17 million in group services expense, a number that has been described to me as having been discounted to net present value."  (Ex. 1, Tr. at 28.)

Critically, the Court then noted that Hilton's award for GSE "presumably should be adjusted" because it was premised upon Hilton's proffered 8% discount rate -- a rate that the Court rejected as too low because it did not reflect the heightened risks of the three resorts at issue. (Ex. 1, Tr. at 22-23, 29.)  As the Court stated:

> While the Court awards group services expense, it notes that the correct number may be different than the $17 million.  While the parties do not address the issue, the Court's prior ruling on the discount rate presumably applies to this component

The Honorable Sean H. Lane
August 7, 2012
Page 3

of damages; and therefore, this number presumably should be adjusted accordingly.

(*Id.* at 28-29.)

Hilton apparently views the Court's ruling as an invitation to fundamentally recast its claim for GSE. Indeed, rather than decreasing its $17 million claim to reflect the application of the higher discount rate determined by the Court, Hilton now claims that it is actually entitled to $33 million in lost GSE, roughly 194% more than the $17 million it sought at trial. (Ex. 6, 8/1/2012 email from D. Neff and attachment.) To support its new claim, Hilton posits that the evidence it relied upon throughout discovery and at trial included mathematical errors that undervalued Hilton's claim for lost GSE. Specifically, Hilton now contends that instead of the 8% discount rate that it introduced into evidence and represented it was applying, Hilton ***actually applied a 45% discount rate to yield its $17 million claim***. Recognizing those alleged errors only now, nearly three weeks after the conclusion of the trial, Hilton contends that that the net present value of its lost GSE at an 8% discount rate is actually $36 million, not the $17 million that Hilton sought at trial. And according to Hilton, applying the Court's discount rates of 11.6% and 12.6%, rather than Hilton's 8% rate, yields a total GSE award of roughly $33 million.

Hilton's post-verdict attempt to redo its claim for GSE represents an improper attempt to modify the Court's Order under Rule 60. As the Court's Order made clear, Hilton's claim for $17 million in lost GSE "presumably should be adjusted" to reflect the Court's determination that the appropriate discount rate was higher than 8%, meaning that Hilton's damages number would be ***reduced***. (Ex. 1, Tr. at 22-23, 29.) Yet, based on its own purported mistake, Hilton now seeks to modify the Court's Order to open the door to an increase in Hilton's damages number. Hilton's position is contrary to law.

The only valid bases for modifying an Order applicable to this case are "(1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)[.]" Fed. R. Civ. P. 60(b). Hilton clearly cannot satisfy either of these prongs. As to the first prong, "[i]t is well-settled that mere dissatisfaction in hindsight with the choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief." *Quinones v. Police Dept. of the City of New York*, No. 10 Civ. 6195, 2012 WL 1232954, at *5 (S.D.N.Y. Apr. 12, 2012). And as to the second prong, it is beyond purview that Hilton could have discovered its allegedly new evidence concerning discount rates months before the estimation trial. *See Salter v. Hooker Chem., Durez Plastic & Chem. Div.*, 119 F.R.D. 7, 9 (W.D.N.Y. 1988) (denying motion under Rule 60(b), holding that "[a]s to plaintiff's claim that he has newly discovered evidence, plaintiff must establish, *inter alia*, that he exercised due diligence to discover this evidence earlier…"); MOORE'S FED. PRAC. 3d Ed. Vol. 12 ¶ 60.41(1)(c) ("Regardless of whether a court uses the word 'diligence' or not, when inadvertent conduct leads to judgment, a claim of mistake or excusable neglect will always fail if the facts demonstrate a lack of diligence.").

The Honorable Sean H. Lane
August 7, 2012
Page 4

Not only does Hilton improperly seek to modify the Order, it also attempts to reopen the record and retry its claim for GSE, an attempt that should be rejected under Rule 59. While Hilton takes the position it is merely implementing the Order, in truth Hilton is seeking to reopen the trial record to change both the discount rate that it allegedly applied to its GSE claim (from 8% to 45%) and the entire amount and calculation of its GSE claim (from $17 million to $33 million). Hilton cannot satisfy its burden of establishing the need for such extraordinary relief. *See John v. Sotherby's, Inc.*, 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994) ("The movant has the burden of demonstrating that the moving party's failure to submit evidence was not the result of its own lack of diligence, reopening the record would not unduly prejudice the nonmovant, and reopening the record would further the interests of justice.").

Hilton's belated recognition now -- after the record closed and a verdict issued -- of its own purported math errors is no basis for Hilton to undertake a wholesale revision of the trial record. To the extent that Mr. Cline committed mathematical error, it was error that Hilton, though a diligent investigation, could have, and should have, corrected long before the record closed. Mr. Cline served his initial expert report on May 11, 2012, served his supplemental expert report on June 11, 2012, sat for deposition on June 19, 2012, and testified at trial on July 3, 2012. And Hilton served its post-trial brief on July 19, 2012. Yet, it was not until August 1, 2012 that Hilton for the first time sought to redo its calculation of its alleged damages from lost GSE. Clearly, Hilton had more than ample opportunity to correct any alleged error in its claim for lost GSE, and its failure timely to do so wholly undermines its request to reopen the record. *See Schoenholtz v. Doniger*, 112 F.R.D. 110, 114 (S.D.N.Y. 1986) ("Put another way, we see no good and sufficient reason -- and defendants offer none -- why the evidence sought to be introduced at this late date was not offered at the time of trial."); *Ortho Diagnostic Sys., Inc. v. Abbott Labs, Inc.*, 926 F. Supp. 371, 372 (S.D.N.Y. 1996) ("An application to reopen the record ordinarily will be denied unless the party seeking to expand the record failed to adduce the evidence sought to be added notwithstanding its own due diligence.").

Permitting Hilton a second bite at its damages claim based on evidence that the Debtors never had the opportunity to challenge or rebut at trial would undeniably prejudice the Debtors. Hilton's new calculations would fundamentally impact every component of damages that Hilton sought at the estimation trial, increasing its GSE claim from the $38.9 million it actually sought to at least $57.7 million (representing the $36 million that Hilton now claims it is entitled to in GSE applying an 8% discount rate plus the $21.7 million it sought in Key Money), and increasing its overall rejection damages claim from $334.3 million to at least $353.3 million. Hilton should not be allowed to change the scope of the estimation trial after the fact. The Debtors appropriately crafted their trial defense on the basis of Hilton's pretrial Rule 26 disclosures and trial evidence, including Hilton's claim that it was seeking $17 million in lost GSE based upon the application of an 8% discount rate. Based on Hilton's evidence, the Debtors made critical strategic decisions concerning how to address Hilton's GSE claim in their supplemental expert reports, how to attack Hilton's GSE claim during trial (both in the cross-examinations of Hilton's witnesses and the direct examinations of the Debtors' witnesses), and how much emphasis to place on Hilton's GSE claim in their pre- and post-trial briefs. As such, the Debtors are entitled to the finality of the verdict that resulted from that trial evidence. *See*

The Honorable Sean H. Lane
August 7, 2012
Page 5

*Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964) ("where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again"). The Debtors would be grossly prejudiced by permitting Hilton to unilaterally "correct" its purported trial mistakes now that the record is closed and a verdict has issued.

Whereas Hilton improperly seeks to modify the Court's ruling, the Debtors seek to give effect to that ruling by adjusting Hilton's claim for damages from lost GSE to account for the discount rates determined by the Court. To do that, the Debtors first calculated the ratio of Hilton's proffered discount rate of 8% to the Court's discount rates of 11.6% and 12.6%, which, on a weighted basis, yield a blended discount rate of just over 12%. The result is that Hilton's proffered 8% discount rate is two-thirds, or 67%, of the appropriate discount rate as determined by the Court. Applying this same ratio to Hilton's claim for lost GSE yields a damages number of $11.365 million, or two-thirds of the $17 million that Hilton sought at trial.

**Should the Court's lost profits award be discounted to account for the possibility of termination on sale?**

The second dispute between the parties centers upon whether Hilton's projected management fees should be discounted after year 2024 to account for the probability that the resorts will be sold and Hilton terminated as manager. During trial, it was undisputed that such a discount was required, as both sides recognized that the Debtors have the right to terminate Hilton upon a sale of the resorts beginning in 2024. As such, Hilton's own expert, Mr. Cline, applied a probability analysis at page 46 of his initial expert report, and explained his reasoning during trial: "And I figured, well, wait a second, what if someone said to me, but Roger, you know, come January the 2nd of 2025, guess what, this owner has every intention of selling this place. And they come to Hilton and say we have found a buyer, you're out, here's a check for five times the management fee. So that's a possibility. I don't know whether it can happen. It might. So I decided to develop a model that would describe that process." (Ex. 4, 7/3 Tr. at 817-819, quote at 819:4-12); *see also* Ex. 2, Cline Rep. at 46; Ex. 5, Hilton's Post-Trial Br. at pp. 52-53.) Applying Mr. Cline's model results in a lost damages award of $104 million (not including any GSE damages), whereas the failure to apply Mr. Cline's analysis results in a lost profits award of $112.38 million.

As noted at the outset, the Debtors respectfully request the Court's guidance on resolving these significant issues. Should it be helpful, we have included the Debtors' damages calculations at Ex. 7. The Debtors are available at the Court's convenience to address any questions the Court may have.

Respectfully submitted,

/s Eric F. Leon

# EXHIBIT 1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2                                      .
                                        . Chapter 11
 3     IN RE:                           .
                                        . Case No. 11-10372 (SHL)
 4     MSR RESORT GOLF COURSE, LLC,     .
       et al,                           . New York, Ne York
 5                                      . Tuesday, July 31, 2012
                         Debtors.       . 4:09 p.m.
 6     . . . . . . . . . . . . . . .
```

```
 7                    TRANSCRIPT OF BENCH RULING RE:
         TRIAL RE:  MOTION TO AUTHORIZE; MOTION OF MSR RESORT GOLF
 8     COURSE, LLC, ET AL, FOR ENTRY OF AN ORDER ESTIMATING DAMAGES
       RESULTING FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS
 9      AND AN ORDER AUTHORIZING REJECTION OF THE HILTON MANAGEMENT
                                AGREEMENTS
10                 **BEFORE THE HONORABLE SEAN H. LANE**
                      **UNITED STATES BANKRUPTCY JUDGE**
11
12     APPEARANCES:
13     For the Debtors:           Chad J. Husnick, Esq.
                                  KIRKLAND & ELLIS, LLP
14                                300 North LaSalle
                                  Chicago, Illinois 60654
15
                                  Atif Khawaja, Esq.
16                                Eric F. Leon, Esq.
                                  KIRKLAND & ELLIS, LLP
17                                601 Lexington Avenue
                                  New York, New York 10022
18
19     (Appearances Continued)
20     Audio Operator:           Electronically Recorded
                                  by Matthew, ECRO
21
                        AudioEdge Transcription, LLC
22                 425 Eagle Rock Avenue - Suite 201
                        Roseland, New Jersey 07068
23                         (973) 618-2310
                       www.audioedgetranscription.com
24
       Proceedings recorded by electronic sound recording,
25     transcript produced by certified transcription service.
```

1   the size of the resorts, the brand, and the volatility as to

2   the Grand Wailea.  He noted the Grand Wailea's risk, in his

3   view, included the remote location, the dependency on air

4   travel, the dependency on group travelers, and natural

5   conditions.

6           Based on the credible evidence and the applicable law,

7   the Court starts off by adopting the WACC used by Mr. Morone.

8           The difference between Bloomberg's WACC of 8.7 percent

9   and Mr. Morone's determination is that Mr. Morone used a beta

10  of 1.29, as opposed to a beta of one.  The affidavit of

11  debtors' expert Derek Pitts provides support for the assertion

12  of using a beta of 1.29; and in fact, Mr. Pitts' affidavit

13  provides the only real analysis of beta in this case.

14          Using that beta and information from Hilton's own 10-

15  K, I reach the conclusion that Hilton's WACC at the time of

16  entering these management agreements was 10.6.

17          Mr. Hennessey opined that Hilton's WACC was 8.1, but

18  based his finding upon an internal Bear Stearns estimate

19  published in December 2006, almost a year after Hilton acquired

20  the resorts.

21          I also note that Hilton's expert makes reference to

22  Bloomberg's WACC.  There was discussion at trial that Bloomberg

23  apparently uses a default beta of one.  It was unclear from the

24  testimony; and indeed, no one seemed to know if that default of

25  one was used in all instances for Hilton, in all instances for

1   all companies.  And as no party has provided any explanation of

2   the basis for using that default of one here, the Court instead

3   relies on the 1.29 beta, for which analysis has been provided

4   by Mr. Pitts.

5        On the one hand, Hilton has failed to establish that

6   the management agreements lack any risk, and that its eight

7   percent rate that it applies to all acquired management

8   agreements is sufficient to discount its future fees upon

9   rejection.  Indeed, credible evidence has been presented

10  showing that these iconic resorts are exposed to unique risks

11  that make their revenue streams more volatile than a typical

12  Hilton property, supporting an upward adjustment of the WACC,

13  which represents the riskiness to Hilton's business as a whole.

14  Thus, the Court rejects the notion that the same risks apply to

15  these resorts as apply to the operation of one of Hilton's

16  Hampton Inns.

17       On the other hand, the debtors have failed to persuade

18  the Court that the attendant risks are as high as they claim.

19  There is credible evidence that the management fees here, taken

20  from gross revenues, rather than profits, are a less risky

21  source of revenue for Hilton than many of Hilton's other

22  revenue streams and other revenue streams at the resort.

23       For all these reasons, the Court will adjust the WACC

24  for the Arizona Biltmore and the La Quinta upward by one

25  percent, to arrive at a discount rate of 11.6.  And this is to

1   account for the attendant risks identified by Mr. Morone and

2   discussed by Mr. Pitts.

3           The Court will adjust the WACC for the Grand Wailea by

4   two percent upwards, rather than one percent, to reach a

5   discount rate of 12.6, based on the aforementioned attendant

6   risks, plus additional risks unique to the Grand Wailea that

7   were discussed at the trial, and that have been mentioned

8   previously, including its location.

9           The one additional percent increase is also

10  appropriate to account for the possibility that the Grand

11  Wailea may fail the performance tests over the life of these

12  agreements.  The credible evidence was that there have been

13  real economic struggles in the recent performance of the Grand

14  Wailea, which is perhaps the most iconic, and thus most unique

15  of these three resorts.  These struggles have been evidenced by

16  various metrics that Hilton itself prepared, rating performance

17  at the resort.  These difficulties no doubt have been

18  influenced by the current economic downturn and Grand Wailea's

19  location and unusual dependence on group bookings for success;

20  bookings that are incredibly sensitive to the economy.

21          Such an adjustment for risk has been recognized by the

22  courts.  See In Re M Waikiki, LLC 2012 WL 2062421, *4-5,

23  adjusting the WACC upwards to account for performance-based

24  termination risk.

25          See also Pet Food Express Limited v. Royal Canin USA,

1  <u>Inc.</u>, 2011 WL 1464874, *12 (N.D.Cal.), noting that the failure

2  to reduce damages due to uncertainty of lost profits towards

3  the end of an agreement ignores the contingency in the

4  agreement that would have allowed a defendant to terminate the

5  agreement prior to the end of the term for plaintiff's failure

6  to perform its contractual duties and obligations.

7       The Court now turns to the related issue of cure

8  payments.  Debtors' expert Mr. Morone deduced some $7 million

9  in cure payments because he contends that Hilton will fair the

10 performance test and will need to make cure payments on two

11 occasions:

12      First, in his view, it will fail in 2013 and '14, and

13 because the debtors can terminate the contract, Hilton will

14 need to make a cure payment of some $6 million.

15      As to the second instance, based on a so-called "Monte

16 Carlo Analysis," Mr. Morone concludes that Hilton will again

17 fail the performance test as to the Grand Wailea in 2031,

18 prompting a second cure payment of almost a million.

19      Mr. Morone believes that both these cure payments

20 should be deducted from Hilton's profits.

21      The Court rejects the debtors' arguments as unduly

22 speculative for several reasons:

23      First, while the Court agrees there is a risk that

24 Hilton will fail the performance test at the Grand Wailea, that

25 failure has not been shown to the degree of certainty so as to

1    continue until Hilton completely replaces the amount of group

2    services expenses previously contributed by the Hilton Resorts,

3    which its primary expert estimates will take at least five

4    years.

5            In addition to the group services expense itself,

6    Hilton seeks to recover $21 million in so-called "key money,"

7    which it alleges are payments that it will need to make to

8    obtain additional management agreements to replace the ones

9    that it would lose; and therefore, to replace the lost group

10   services expense.  Key money represents funds that a management

11   company may be required to pay a hotel owner to obtain those

12   management rights.

13           For their part, the debtors argue that the group

14   services expenses exceed the cap established in the management

15   agreements, and accordingly should be reduced to the amount

16   actually expended, so that Hilton is no longer subsidizing the

17   difference.  The debtors further argue that Hilton is also not

18   entitled to the $17 million in group services expense damages

19   because the management agreements don't permit recovery of such

20   expenses, and that Hilton will replace any lost group services

21   by 2014, and that Hilton can simply elect to avoid incurring

22   any such damages.  Finally, the debtors assert there is no

23   basis for Hilton's request for the $21 million in key money.

24           Given the facts and applicable law, the Court grants

25   in part and denies in part Hilton's request for damages in

1   connection with group services expense.  The language of the

2   management agreements contemplates the payment of group

3   services expenses for the costs incurred in providing group

4   services to the Waldorf=Astoria brand generally.

5          The evidence established that Hilton has used such

6   funds for their intended purpose.  The mere fact that Hilton

7   may spend more than is required for that purpose for its own

8   business reasons is irrelevant.  All that matters is that

9   Hilton seeks only to recover the fee provided for under the

10  management agreements, not any extra costs beyond that.

11  Moreover, there was no evidence at trial that Hilton intended

12  in the future to spend less on group services for the

13  Waldorf=Astoria brand than is contemplated by the management

14  agreements.

15         Relatedly, the Court concludes that Hilton's request

16  for payments of these fees for a five-year period represents an

17  appropriate exercise of its duty to mitigate its damages.  See,

18  e.g., Shaffer v. Debbas, 21 Cal. Rptr. 2d 110, 114 (Cal. App.

19  1993), as well as Shahata v. W Steak Waikiki, LLC, 721 F.Supp.

20  2d 968, 988 (D. Haw. 2010).

21         The Court notes that Hilton has sought some $17

22  million in group services expense, a number that has been

23  described to me as having been discounted to net present value.

24  While the Court awards group services expense, it notes that

25  the correct number may be different than the $17 million.

1   While the parties do not address this issue, the Court's prior

2   ruling on the discount rate presumably applies to this

3   component of damages; and therefore, this number presumably

4   should be adjusted accordingly.

5        Moving on to the second aspect of Hilton's group

6   services claim, the Court rejects Hilton's request for the

7   payment of so-called "key money" for several reasons.

8        As an initial matter, the provision to pay key money

9   is nowhere mentioned in the management agreements, in stark

10  contrast to the group services expense itself, so that it is

11  very hard to say the key money was within the parties'

12  contemplation at the time of contract formation as an

13  appropriate measure of damages, and is particularly troubling

14  given that the amount of key money sought here is in fact

15  greater than the amount of damages actually sought for group

16  services expense.

17       In any event, the evidence at trial was insufficient

18  to support Hilton's claim for key money damages.  Hilton cannot

19  identify which hotel agreements this key money will be used to

20  acquire.  Instead, Hilton's claim for recovery of key money is

21  not grounded on any specific facts, but rather on Mr. Cline's

22  professional judgment.

23       But Mr. Cline based his analysis, specifically the

24  twenty-five percent ratio assumption he used for calculating

25  key money, upon conversations with Ted Middleton, Hilton's Vice

1  President of Development.  Middleton, however, later testified

2  that he had done no analysis of the amount of key money that

3  Hilton would be required to pay to replace the group services

4  expense payments, and was not aware of anyone else at Hilton

5  who performed such analysis.

6          Finally, the Court notes that Hilton itself concedes

7  that whatever management agreements it may one day acquire

8  could very well be management agreements that Hilton would seek

9  to acquire regardless of whether these management agreements

10 are actually rejected.

11         So for all those reasons and the lack of evidence

12 supporting the necessity of key money payments, the Court

13 rejects that component of damages.

14         I now turn to Hilton's request for so-called "brand

15 damages."  Hilton seeks approximately $120 million in damages

16 stemming from its alleged damage to Hilton's Waldorf=Astoria

17 brand.  These damages purport to stem from the debtors'

18 termination of the management agreements and flow from the

19 theory that these properties are "iconic and irreplaceable,"

20 which is a phrase that has been used often in this trial and

21 seems to not be in dispute.

22         Hilton argues that such damages were contemplated by

23 the parties when Hilton acquired the agreements in 2006, as

24 part of an effort to launch the Waldorf=Astoria brand.  Hilton

25 believed the acquisition of these management agreements for

1   to the resort for the period during which construction was

2   underway, and could result in potential lost business, required

3   discounting, and loss of good will among affected guests.  The

4   debtors anticipate that the adverse effect on revenue and

5   earnings could last as long as two years.

6        Relatedly, the Court notes that the evidence that

7   group bookings typically have a provision that forbids them to

8   cancel their reservation if there's ongoing construction, and

9   that such group bookings are crucial to the Grand Wailea's

10  economic success.

11       That concludes the Court's rulings on the motion to

12  estimate damages from rejection of these three management

13  agreements.

14       Again, as I noted earlier, it's my normal preference

15  to provide a written decision to the parties, but debtors

16  explained the need for a quick resolution of this dispute and

17  requested a decision, if at all possible, by August 1st, 2012,

18  which is tomorrow; and the need for such an expedited decision

19  relates to the existing deadlines for an exit strategy in the

20  case, either by plan or sale or some combination of both.  And

21  those deadlines for an exit strategy were the result of hotly

22  contested hearings on exclusivity in this case, and that were

23  resolved by agreement of the parties on the timing for an exit

24  strategy.  And so I understand the quandary faced by the

25  debtors; and therefore prepared this bench ruling.

1        However, this being a bench ruling and transcription

2   being what it is, I plan to review the transcript to ensure

3   that it accurately reflects my ruling; and therefore reserve

4   the right to amend it accordingly.

5        So I'd ask the debtors to order the transcript on an

6   expedited basis, and I'll take a look at it.

7        And I also request that the debtors prepare an order

8   memorializing my ruling, and obviously consult with Hilton's

9   counsel on the appropriate language to do so.

10       So that didn't take quite an hour and a half; it was a

11  little shorter than my estimate, but that concludes my business

12  for the day.

13       Is there anything that any party needs to raise?

14       MR. LEON:  No.  I just wanted to take the opportunity

15  to once again thank Your Honor and your staff for accommodating

16  the parties, our schedule, and in particular the debtors' short

17  time constraints.  It's very much appreciated on all sides.

18  And we also appreciate Your Honor's attention to this matter.

19       THE COURT:  Absolutely.

20       Mr. Neff, is there anything you need to raise at this

21  time?

22       MR. NEFF:  Your Honor, did you want the parties to

23  attempt to come up and try to quantify what the amount is?

24       THE COURT:  Well, that actually was going to be the

25  next thing I was going to mention.  If you noted, there is no

44

1    ultimate bottom-line quantification.  That's because there are

2    many components to this that I was trying to get right, and I

3    was going to leave you all to do the math, particularly as to

4    the discount rate.

5            So yes, I -- that, I think, would be the appropriate

6    subject of discussion, in terms of memorializing the ruling in

7    an order.

8            MR. NEFF:  Very good.

9            THE COURT:  All right.  Thank you.

10           Anything else?  All right.

11           MR. LEON:  Nothing for debtors.

12           THE COURT:  Thank you.  Have a good evening.

13           MR. LEON:  Thank you, Your Honor.  You, too.

14           MR. NEFF:  Thank you, Judge.

15       (Proceedings concluded at 5:15 p.m.)

16                          * * * * *

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MSR Resort Golf Course LLC, et al., | ) | Case No. 11-10372 (SHL) |
| | ) | |
| Debtors | ) | Jointly Administered |
| | ) | |

EXPERT REPORT OF ROGER S. CLINE REGARDING THE ESTIMATED DAMAGES
INCURRED BY WALDORF=ASTORIA MANAGEMENT LLC AS A CONSEQUENCE
OF THE REJECTION OF THE HOTEL MANAGEMENT AGREEMENTS RELATING
TO ITS MANAGEMENT OF THE GRAND WAILEA RESORT,
THE ARIZONA BILTMORE HOTEL AND THE LA QUINTA RESORT

1

# Loss Estimate – Management Fees (contd.)

| Loss Estimate - Management Fees (Extension Term: 2025 - 2034) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Approach A:** | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| Base Management Fee | $ | 13,405 | $ 13,808 | $ 14,222 | $ 14,649 | $ 15,088 | $ 15,541 | $ 16,007 | $ 16,487 | $ 16,982 | $ 17,491 |
| Corporate Overhead Fee | $ | 6,703 | $ 6,904 | $ 7,111 | $ 7,324 | $ 7,544 | $ 7,770 | $ 8,003 | $ 8,244 | $ 8,491 | $ 8,746 |
| Total Management Fee | $ | 20,108 | $ 20,711 | $ 21,333 | $ 21,973 | $ 22,632 | $ 23,311 | $ 24,010 | $ 24,731 | $ 25,472 | $ 26,237 |
| Present Value Factors @ 12% | | 0.8929 | 0.7972 | 0.7118 | 0.6355 | 0.5674 | 0.5066 | 0.4523 | 0.4039 | 0.3606 | 0.3220 |
| Present Value | $ | 17,955 | $ 16,511 | $ 15,185 | $ 13,964 | $ 12,841 | $ 11,809 | $ 10,860 | $ 9,989 | $ 9,185 | $ 8,448 |
| Net Present Value at 1/1/2025 @ | 12% $ | 126,747 | | | | | | | | | |
| | | | | | | | | | | | |
| **Approach B:** | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| HMA Section 3.4.3. Multiplier X Base Fee | | 5 | 4.5 | 4 | 3.5 | 3 | 2.5 | 2 | 1.5 | 1 | 1 |
| Base Fee (2% of Revenue) | $ | 13,405 | $ 13,808 | $ 14,222 | $ 14,649 | $ 15,088 | $ 15,541 | $ 16,007 | $ 16,487 | $ 16,982 | $ 17,491 |
| Termination Fee | $ | 67,027 | $ 62,134 | $ 56,887 | $ 51,270 | $ 45,264 | $ 38,852 | $ 32,014 | $ 24,731 | $ 16,982 | $ 17,491 |
| Probability of Sale | | 25% | 20% | 15% | 10% | 5% | 0% | 0% | 0% | 0% | 0% |
| Expected Value of Termination Fee (assume sale at YE) | $ | 16,757 | $ 12,427 | $ 8,533 | $ 5,127 | $ 2,263 | $ - | $ - | $ - | $ - | $ - |
| Probability of Sale not taking place | | 75% | 55% | 40% | 30% | 25% | 25% | 25% | 25% | 25% | 25% |
| Expected Value of Fees (Note 1) | $ | 36,865 | $ 27,960 | $ 20,266 | $ 13,916 | $ 9,053 | $ 5,828 | $ 6,003 | $ 6,183 | $ 6,368 | $ 6,559 |
| Present Value Factors @ 8% | | 0.9259 | 0.8573 | 0.7938 | 0.7350 | 0.6806 | 0.6302 | 0.5835 | 0.5403 | 0.5002 | 0.4632 |
| Present Value | $ | 34,133 | $ 23,970 | $ 16,087 | $ 10,228 | $ 6,161 | $ 3,673 | $ 3,502 | $ 3,340 | $ 3,185 | $ 3,038 |
| Net Present Value at 1/1/2025 @ | 8% | $107,323 | | | | | | | | | |
| | | | | | | | | | | | |
| *Note 1. a) Mgmt Fee times Prior Yr's Probability of Sale not taking place plus b) Expected Value of Termination Fee* | | | | | | | | | | | |
| | | | | | | | | | | | |
| **Reconciliation:** | | | | | | | | | | | |
| Approach A: | $ | 126,747 | | | | | | | | | |
| Approach B: | | $107,323 | | | | | | | | | |
| | $ | 234,070 | | | | | | | | | |
| Average | $ | 117,035 | | | | | | | | | |
| | | | | | | | | | | | |
| Net Present Value as at 1/1/2012 @ | 8% | $43,034 | | | | | | | | | |

## Loss Estimate – Group Services Expense (contd.)

- In the analysis presented on the following page, the loss of payments to Hilton for Group Services as a consequence of the early termination of the HMAs is valued.  The valuation is developed on the basis of several key assumptions as follows:

  – It will take five years for Hilton to fully replace the revenues associated with the Resorts that would generate a payment equivalent to that which it would have received had the HMAs continued in effect;

  – At the end of the above-referenced five-year period, Hilton would be required to pay an amount of "key money" to secure HMAs that would produce the stream of payments that it would have received had the HMAs continued beyond this five-year period, to their full term (2034), accounting for the probabilities that the HMAs might be terminated upon a sale of the Resorts during the Extension Term.

  – The ratio of "key money" to the net present value of the anticipated payments [$86.945M] would be 25 percent.  The key money would thus amount to $21.736M.

  – The loss to Hilton of the Group Services Expense payments made by the Resorts is represented by the present value of those anticipated payments over the five-year period 2012 to 2016 plus the present value of the key money payments made by Hilton as outlined above.

  – The appropriate discount rate is eight percent, established in accordance with the rationale previously outlined.

- The result of the above-described analysis is presented on the following page and in summary produces a total loss to Hilton attributable to the termination of payments for Group Services by the Resorts in the amount of $38.926M.

49

# Loss Estimate – Group Services Expense (contd.)

| Loss Associated with Group Services Expense | | | | | | |
|---|---|---|---|---|---|---|
| Contract Year | | 8 | 9 | 10 | 11 | 12 |
| | | 2012 | 2013 | 2014 | 2015 | 2016 |
| Group Services Expense @ 2% of Gross Revenue | | $ 7,698 | $ 8,544 | $ 9,254 | $ 9,975 | $ 10,274 |
| Probability of Sale not taking place | | 100% | 100% | 100% | 100% | 100% |
| Expected Value of Group Services Expense | | $ 7,698 | $ 8,544 | $ 9,254 | $ 9,975 | $ 10,274 |
| NPV of Group Services Expense (for balance of term) | 8% | | | | | $86,945 |
| Number of Years to Replace Revenue base | 5 | | | | | |
| Key Money ratio | | | | | | 25% |
| | | | | | | |
| Key Money paid by Hilton (a) | | | | | | $21,736 |
| Lost Group Services Expense Now Paid by Hilton (b) | | $ 7,698 | $ 8,544 | $ 9,254 | $ 9,975 | $ 10,274 |
| Total Paid by Hilton (a+b) | | $ 7,698 | $ 8,544 | $ 9,254 | $ 9,975 | $ 32,010 |
| Present Value Factors @ 8% | | 0.9259 | 0.8573 | 0.7938 | 0.735 | 0.6806 |
| Present Value | | $ 7,127 | $ 7,325 | $ 7,345 | $ 7,332 | $ 21,786 |
| Total | | $ 50,915 | | | | |
| NPV | 8% | **$38,926** | | | | |

> *Note that the "probability of sale not taking place" changes during the*
> *Extension Term of the HMAs as outlined in the schedule on Page 46*

50

# EXHIBIT 3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MSR RESORT GOLF COURSE LLC, *et al.*, | ) | Case No. 11-10372 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

SUPPLEMENTAL EXPERT REPORT OF ROGER S. CLINE REGARDING THE ESTIMATED
DAMAGES INCURRED BY WALDORF=ASTORIA MANAGEMENT LLC AS A
CONSEQUENCE OF THE REJECTION OF THE HOTEL MANAGEMENT AGREEMENTS
RELATING TO ITS MANAGEMENT OF THE GRAND WAILEA RESORT,
THE ARIZONA BILTMORE HOTEL AND THE LA QUINTA RESORT

CONFIDENTIAL

Supplemental Report of Roger S. Cline

| | | Grand Wailea | | Arizona Biltmore | | LaQuinta Resort | | All 3 Resorts | |
|---|---|---|---|---|---|---|---|---|---|
| | Summary of Outcomes With Selected Adjustments to Mr. Morone's Lost Profits Analysis | | | | | | | | |
| | Discount Rate | 14.6% | 8.0% | 13.6% | 8.0% | 13.6% | 8.0% | A | B |
| A | Mr. Morone's Damages Amount | $ 12,470 $ 22,463 | | $ 13,856 $ 21,892 | | $ 19,800 $ 31,375 | | $ 46,125 $ 75,730 | |
| B | Adjust for 3% Inflation | $ 14,351 $ 26,264 | | $ 14,959 $ 23,894 | | $ 20,246 $ 32,333 | | $ 49,556 $ 82,491 | |
| C | Adjust for Inclusion of Corporate Overhead Fee as Gross Fee to Hilton rather than a Reimbursement for "Overhead" | $ 29,910 $ 52,548 | | $ 23,453 $ 37,340 | | $ 30,369 $ 48,499 | | $ 83,732 $ 138,387 | |
| D | Adjust for Elimination of "Subsidy" | $ 39,481 $ 68,241 | | $ 25,481 $ 40,338 | | $ 30,369 $ 48,499 | | $ 95,330 $ 157,077 | |
| E | Adjust for Elimination of Cure Payment | $ 46,678 $ 78,853 | | $ 25,481 $ 40,338 | | $ 30,369 $ 48,499 | | $ 102,527 $ 167,689 | |
| F | Total Variance to Morone Damages Amount (E-A) | $ 34,208 $ 56,390 | | $ 11,625 $ 18,446 | | $ 10,569 $ 17,124 | | $ 56,402 $ 91,959 | |
| | Compares to Losses Presented in R. Cline Report (Page 6): | | | | | | | | |
| G | Loss relating to Foregone Management Fees | | $ 77,306 | | $ 40,396 | | $ 47,706 | | $ 165,409 |
| H | Adjusted Loss Presented by Mr. Morone | | $ 78,853 | | $ 40,338 | | $ 48,499 | | $ 167,689 |
| I | Variance (G-H) | | $ (1,547) | | $ 58 | | $ (793) | | $ (2,280) |
| | Additional Losses Presented in R. Cline Report: | | | | | | | | |
| J | Loss Relating to foregone payments for Group Services | | $ 18,193 | | $ 9,507 | | $ 11,227 | | $ 38,926 |
| K | Loss to W=A Brand, Pipeline and Growth Prospects | | $ 66,107 | | $ 24,039 | | $ 30,049 | | $ 120,195 |
| L | Loss relating to Grand Wailea Expansion | | $ 9,804 | | | | | | $ 9,804 |
| M | Total | | $ 94,104 | | $ 33,546 | | $ 41,276 | | $ 168,925 |
| N | Total Loss Estimate of R. Cline (G+M) | | | | | | | | $ 334,334 |
| O | Total Variance between Morone and Cline Loss Estimates (Line N less Line A @ Discount Rate "A") | | | | | | | | $ 288,209 |

`3

CONFIDENTIAL

# EXHIBIT 4

1
                    UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
2                                        .
                                         . Chapter 11
3    IN RE:                              .
                                         . Case No. 11-10372 (SHL)
4    MSR RESORT GOLF COURSE, LLC,        .
     et al,                              . New York, New York
5                                        . Tuesday, July 3, 2012
                       Debtors.          . 10:05 a.m.
6    . . . . . . . . . . . . . . . . . Volume 7.  Pages 735-848

7                        TRANSCRIPT OF
      TRIAL RE:  MOTION TO AUTHORIZE/MOTION OF MSR RESORT GOLF
8    COURSE LLC, ET AL, FOR ENTRY OF AN ORDER ESTIMATING DAMAGES
     RESULTING FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS
9    AND AN ORDER AUTHORIZING REJECTION OF THE HILTON MANAGEMENT
                            AGREEMENTS
10               **BEFORE THE HONORABLE SEAN H. LANE**
                  **UNITED STATES BANKRUPTCY JUDGE**
11
     APPEARANCES:
12
     For the Debtors:           Chad J. Husnick, Esq.
13                              KIRKLAND & ELLIS, LLP
                                300 North LaSalle
14                              Chicago, Illinois 60654

15                              Atif Khawaja, Esq.
                                Maura M. Klugman, Esq.
16                              Paul Basta, Esq.
                                Eric F. Leon, Esq.
17                              KIRKLAND & ELLIS, LLP
                                601 Lexington Avenue
18                              New York, New York 10022

19   (Appearances Continued)

20   Audio Operator:            Electronically Recorded
                                by Emmanuel, ECRO
21
                       AudioEdge Transcription, LLC
22               425 Eagle Rock Avenue - Suite 201
                       Roseland, New Jersey 07068
23                        (973) 618-2310
                    www.audioedgetranscription.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by certified transcription service.

Cline - Direct                                          816

1   and he acknowledged that this is an area where many of their

2   contributors, in fact, include resort fees.  It's an area of

3   some -- I wouldn't call it "controversy," but some uncertainty,

4   if you will, subject to interpretation, and so it occurs.

5       My conclusion is that, number one, Hilton appropriately

6   includes its resorts fees as part of this; furthermore, could

7   include additional revenue, such as its -- in the case of Grand

8   Wailea, the Ho'olei condominium income, in their room rate,

9   which would have the affect of raising it, making this test

10  more difficult to fail.

11      And in the agreement itself, I should point out, although

12  the uniform system of accounts is the -- essentially the system

13  that is adopted by the parties, Hilton has the ability to vary

14  from this uniform system.  So even if the uniform system said

15  X, there is a clause in here under accounting that allows

16  Hilton to modify its application of the uniform system of

17  accounts.

18  Q   In looking at Grand Wailea, did you consider at all its

19  group booking pace?

20  A   I did.

21  Q   And how did that impact your conclusion?

22  A   Well, as Mr. Bailey testified yesterday, the hotel has

23  taken, certainly, its hits during the great recession for a

24  variety of reasons.  However, my review of the recent booking

25  pace reports reinforces my conclusion that the Grand Wailea,

Cline - Direct                                        817

1    under Mr. Bailey's and Hilton's management, is certainly coming

2    out of that downward track from the great recession and coming

3    out very strongly.  And in fact, that booking pace certainly

4    points to a positive trajectory, which in fact is what I

5    incorporated into my projections.

6    Q   And was there any issue with regard to the Arizona Biltmore

7    or the La Quinta possibly failing the performance test?

8    A    No.

9             THE COURT:  Just before we leave this issue, since you

10   pointed out Page 47 and 46 of the report, would you be so kind

11   to give a general explanation of how the numbers -- the setup

12   of your chart on Page 46?

13            THE WITNESS:  Yes.  Putting -- I'm sorry.  46?

14            THE COURT:  46.  47 is --

15            THE WITNESS:  Yeah.

16            THE COURT:  -- is a small enough charge --

17            THE WITNESS:  Yeah.

18            THE COURT:  -- even I can master 47.  But 46 is a

19   little more detailed.

20            THE WITNESS:  Yes, Your Honor.  No problem.

21            As I said earlier, this ten-year extension term is

22   different than the base term because the owner has the option

23   to terminate the agreement, if it sells the hotel to a third

24   party, so the risks are different to Hilton.

25            So in thinking about this, Approach A is the

Cline - Direct                                          818

1    straightforward, simple approach.  Approach A basically takes

2    the two fees, the base fee and this so-called "corporate

3    overhead fee," projects it out, and discounts the income back

4    by twelve percent during the course of the extension term.

5           You will see it says "present value factored at twelve

6    percent."  So you arrive at present value at January the 1st,

7    2025, which is the day of the beginning of the extension term,

8    with a value of a hundred and twenty-six million, seven forty-

9    seven.

10          THE COURT:  And is the one twenty-six the sum of all

11   the numbers in the prior line?

12          THE WITNESS:  It is.

13          THE COURT:  All right.

14          THE WITNESS:  So what that represents is the present

15   value discounted at twelve percent, as opposed to the eight

16   percent discount factor I used during the base term.  So it's a

17   different approach.  I've increased the discount rate by 400

18   bases points --

19       (Reporter confers.)

20          THE WITNESS:  Discount rate by 400 bases points to

21   reflect the increase risk that these fees will be interrupted

22   if, in fact, the contract goes away.

23          But you will see in that ten-year term under Approach

24   A, they don't go away.  They stay.  So the risk is reflected in

25   the discount rate, not in the projected income.  Okay?  So

Cline - Direct                                              819

1    that's the simple approach.

2          But I always like to look at things with a little more

3    complexion than that.  Things aren't so simple.

4          And I figured, well, wait a second, what if someone

5    said to me, but Roger, you know, come January the 2nd of 2025,

6    guess what, this owner has every intention of selling this

7    place.  And they come to Hilton and say we have found a buyer,

8    you're out, here's a check for five times the management fee.

9    So that's a possibility.  I don't know whether it can happen.

10   It might.

11         So I decided to develop a model that would describe

12   that process.  It's a little complicated, but suffice it to say

13   that if you look down the -- Approach B, the fourth line has

14   something called "probability of sale."  So what I'm basically

15   doing here is assigning a probability that the hotel will

16   actually, in fact, be sold.

17         And in the first year you can see it's twenty-five

18   percent.  I decided that, in my judgment, based on all my

19   factors and experience and what have you, that in that --

20   during the course of that first year, there was a one-in-four

21   shot, twenty-five percent, that this property will get sold,

22   Hilton would be terminated, and it would receive its management

23   fee for that year, plus its liquidated damages the end of the

24   year.

25         But since that probability is only twenty-five

Cline - Direct                                           820

1   percent, it means that, at the end of that first year, there's

2   a seventy-five percent probability that they'll still be there

3   the next year, and so on.  And so, without going into all of

4   the math, that's essentially the concept.

5           THE COURT:  All right.

6           THE WITNESS:  Does that help.

7           THE COURT:  Yes, it does.

8           And I guess, again, the one oh seven three twenty-

9   three is the sum of all the numbers listed in the present value

10  line above it?

11          THE WITNESS:  Right.

12          And then, just to finish up, if I may Your Honor, just

13  like in appraisals where you use two, or maybe even three

14  different approaches, and look at how they vary from each

15  other, I looked at these two approaches and compared them and

16  saw that they were within the strike zone of each other.  One

17  was 126 million; the second approach produced 107 million.  So

18  I decided the most straightforward concept here was to average

19  the two, and that's what 117 million is.

20          But here's the important part to note, if I may.  That

21  $117 million is the value as at January the 1st, 2025, the

22  beginning of the extension term.  That now requires discounting

23  back to today.  And that discount rate I used eight percent,

24  just as I did at the beginning during the base term.  And so --

25  BY MR NEFF:

Cline - Direct                                           826

1   to warrant separate study, which is what I did.

2   Q    And in undertaking that separate study, did you discuss the

3   growth of the Waldorf=Astoria brand and the potential impact of

4   the loss of these resorts with folks at Hilton corporate?

5   A    Yes.  And I discussed with Hilton the budget that they have

6   currently, where there's money that flows in and supports  the

7   brand.

8       Hilton, as I recall -- for example, the Waldorf=Astoria

9   brand level, which is what this is directed at, has a current

10  subsidy on the order of $17 million, growing over the next four

11  years to 25 million.  And so it's this increased funding

12  corporately that Hilton will be obligated to now provide that

13  is the essence of the loss that I'm describing here.

14  Q    Are you referring to Joint Exhibit No. 5, which is in the

15  smaller book?

16  A    (Witness reviews exhibits.)

17      Yes, this one right here.

18  Q    And when you talk about the subsidy, what are you -- what

19  are you talking about?

20  A    Well, as you can see there, on the very bottom of this

21  page, or close to the bottom, there's an enclosed box for 2012.

22  There's a line item called "cumulative surplus," the deficit.

23  And the deficit is the seventeen-million-plus that I was

24  referring to previously.

25  Q    That --

1   A    Now --

2   Q    That's 17 million as of the end of this year.

3   A    As of the end of 2012.

4   Q    And the other figure you were talking about, is that the

5   end of 2016?

6   A    2016, that definitely grows to twenty-five million five.

7   And that -- and that increased deficit is driven by the

8   terminations.  You can see the lost fees from the terminated

9   hotels on the higher level in this chart.

10  Q    Do you have any reason to doubt the figures that are set

11  forth in that exhibit?

12  A    No, not at all.

13  Q    I'd like to turn your attention to Waldorf=Astoria Exhibit

14  No. 25, which is your initial report, in the bigger book.  And

15  if you would turn to Page 50, I think it would be worthwhile to

16  work through your analysis on that particular page.

17  A    Yes.  So on this page, I've take the next five years, 2012

18  to '16; and, as you can see, the line item -- the second -- the

19  first line item is group services expense at two percent of

20  gross revenue, which is derived from the projections of revenue

21  we discussed earlier.

22       And a little further down, you can see that there is a line

23  item marked MPV of the group expense for the balance of the

24  term, and that figure is eighty-six million nine hundred and

25  forty-five.

Cline - Direct                                    828

1     So Hilton, at the end of five years, will finally find a

2   transaction that will replace this eighty-six million nine

3   forty-five, which absent the termination of these management

4   agreements, would have flowed to Hilton at that point in time.

5     In order for Hilton to secure this amount of money to

6   replace the foregone group service expense lost as a

7   consequence of the HMA terminations, they would have to pay key

8   money, which in the normal course of business for a volume of

9   this size, in my estimation, would amount to approximately

10  twenty-five percent.

11  Q    Now why did you come to that conclusion?

12  A    I came to that conclusion because, in the super-competitive

13  environment that we are in today, and I project we will

14  continue to be in during this period of time, for management

15  agreements, companies like Hilton really have to step up and

16  show financial commitment in order to secure long-term streams

17  of fee income.

18    Hilton certainly stepped up in a very big way in 2006 to

19  secure this dream.  I'm not suggesting they repeat the

20  performance again here, but it seemed to me that, on the order

21  of magnitude of twenty-five percent key money would be what I

22  have seen in the marketplace; what Hilton, Mr. Middleton, for

23  example, has indicated to me, is sort of the going rate, if you

24  will, to buy into an agreement of this nature that would

25  produce this kind of stream, relative to this expense.

Cline - Direct                                  829

1   Q    When you say "an agreements of this nature," what do you

2   mean?

3   A    Well, an agreement that was last until 2034 (sic), which is

4   the duration of these agreements.

5   Q    Why did you use an eight percent discount rate?

6   A    The eight percent discount rate is used for the same reason

7   that I had used it for the management fees, the three percent

8   management fee, because that is the rate that I deemed to be

9   suitable for fee income like this.  And there is no reason to

10  project -- or rather, to use a different discount rate for this

11  type of income because they are both generated by the same time

12  of conflict.

13  Q    When you talk about using key money equivalent to twenty-

14  five percent, you're talking about twenty-five percent of what?

15  A    Of this net present value of 86 million.  So, in order to

16  secure that value, Hilton of would have to pay twenty-five

17  percent key money, and that's a cost to Hilton, which is this

18  twenty-one million seven thirty-six.  They would have to write

19  a check to replace this.

20  Q    In other words, to obtain a new -- new management contracts

21  to replace its revenue?

22  A    To replace this.

23  Q    All right.  Can you look simply at the numbers of

24  properties that Hilton may be bringing into the Waldorf=Astoria

25  system and drawing any conclusions as to how quickly it will be

Cline - Direct                                    830

1   able to replace the income from the three resorts with regard

2   to group services expenses?

3   A   Well, yes.  I think it's informative, and I think when we

4   get to the discussion of the Waldorf brand damage, we we'll see

5   some of these figures.  But suffice it to say that, given the -

6   - you know, the pace, the steady pace, it's going to take five

7   years, in my judgment.

8       And again, what's important here is that I'm not looking at

9   the existing pipeline to mitigate this because the existing

10  pipeline is a current asset of Hilton, and I would not be,

11  therefore, counting -- accounting for the damage Hilton would

12  incur, because that money they already have.

13  Q   So you consider that to be --

14  A   Prospectively.

15  Q   -- present assets of Hilton?

16  A   Absolutely.  And that's how, when it was a public company,

17  as is the case for most public companies and as we know, they

18  are valued by the public markets on the basis of their future

19  earnings, not what has happened in the past.  Although the past

20  is important, everything looks forward.  And so growth

21  companies have higher multiples than companies that don't grow.

22  Q   Now the debtors' expert Mr. Morone does not attribute any

23  loss to group services expense; in fact, he opines that Hilton

24  will actually save money by not having to manage these resorts

25  because Hilton is subsidizing these resorts with regard to

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2                                      .
                                        . Chapter 11
 3   IN RE:                             .
                                        . Case No. 11-10372 (SHL)
 4   MSR RESORT GOLF COURSE, LLC,       .
     et al,                             . New York, New York
 5                                      . Tuesday, July 3, 2012
                           Debtors.     . 2:26 p.m.
 6   . . . . . . . . . . . . . . . . . . Volume 8.  Pages 849-986

 7                         TRANSCRIPT OF
       TRIAL RE:  MOTION TO AUTHORIZE/MOTION OF MSR RESORT GOLF
 8    COURSE LLC, ET AL, FOR ENTRY OF AN ORDER ESTIMATING DAMAGES
     RESULTING FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS
 9    AND AN ORDER AUTHORIZING REJECTION OF THE HILTON MANAGEMENT
                             AGREEMENTS
10           BEFORE THE HONORABLE SEAN H. LANE
                UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtors:          Chad J. Husnick, Esq.
13                             KIRKLAND & ELLIS, LLP
                               300 North LaSalle
14                             Chicago, Illinois 60654

15                             Atif Khawaja, Esq.
                               Maura M. Klugman, Esq.
16                             Paul Basta, Esq.
                               Eric F. Leon, Esq.
17                             KIRKLAND & ELLIS, LLP
                               601 Lexington Avenue
18                             New York, New York 10022

19   (Appearances Continued)

20   Audio Operator:           Electronically Recorded
                               by Emmanuel, ECRO
21
                         AudioEdge Transcription, LLC
22                425 Eagle Rock Avenue - Suite 201
                      Roseland, New Jersey 07068
23                       (973) 618-2310
                    www.audioedgetranscription.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by certified transcription service.
```

Cline - Cross                                924

1   Q    And if the Grand Wailea expansion ever happens, Hilton is

2   not going to be paying for it, correct?

3   A    No.  But it's going to be benefitting from it.

4   Q    I understand.

5        But the owners are going to be paying for it, right?

6   A    Absolutely.

7   Q    Okay.  Let's turn our attention to group services.

8        And I think there were two components of your group

9   services analyses.  One was the lost payments to Hilton for

10  group services as a result of termination, right?

11  A    Correct.

12  Q    And the other was the key money that you think Hilton will

13  have to pay to replace the lost group service payments,

14  correct?

15  A    Correct.

16  Q    Let's talk about the first prong, the lost payments to

17  Hilton for group services.

18       Do you know what dollar amount you placed on this?

19  A    I would have to look at the report.  Do you have -- let's

20  see ...

21  Q    Is it about 17 million?

22  A    (Witness reviews exhibits.)

23           THE COURT:  Do we have a page if the report we can

24  look at.

25           MR. LEON:  I believe it's at 49, but I want to check

1    that.

2        (Pause in proceedings.)

3            MR. LEON:  Yes.  It's at 49 --

4            THE COURT:  Looks like 49 and 50.

5            MR. LEON:  -- but you have to reverse-engineer it a

6    little bit.

7    BY MR. LEON:

8    Q    Are you at 49?

9    A    Yeah.  Page 49, yep.

10   Q    Okay.  You're -- just so I'm clear, the total damages you

11   attribute to group services is 38.9 million, correct?

12   A    Correct.

13   Q    And of that, 21.7 million is for the key money that we'll

14   get to, correct?

15   A    Correct.

16   Q    So the loss future payments you valued at about 17 million.

17   Is that right?

18   A    (Witness reviews exhibit.)

19        For the five years leading up to the payment of the -- of

20   the key money, yes.

21   Q    Okay.  And in your report, you assume that it would take

22   five years for Hilton to fully replace the lost group service

23   payments it would have received under these management

24   agreement, correct?

25   A    Correct.

Cline - Cross                                926

1   Q    And that assumption is based on your experience, right?

2   A    Yes, that's correct.

3   Q    And I believe you testified in deposition that you did an

4   internal mental analysis, where you considered two years and

5   four years and six years and eight years; decided that five

6   years was the appropriate number, right?

7   A    I'm not sure about the two, four, six, eight, but I arrived

8   ultimately at a five-year time span, which, on the basis of my

9   review of all of the facts and my experience, I thought was

10  appropriate.

11  Q    And your internal mental analysis, correct?

12  A    Most of my analysis is internal, and it's mental, yes.

13  Q    Okay.  Now you talked earlier about Joint Exhibit 5?

14  A    Yes.

15  Q    Do you recall that?

16  A    Which one is that?

17       (Witness reviews exhibits.)

18  Q    Let me know when you can find it.  It's called

19  "Waldorf=Astoria Forecast of Brand Sources and Uses of Funds."

20  A    Yes.

21  Q    Let me know when you're there, sir.

22  A    Yes, I have it.

23  Q    Okay.  Now your analysis of the lost group services

24  payments was premised, as you said, on the assumption that it

25  would take five years to replace the group service payments

# EXHIBIT 5

David M. Neff (*admitted pro hac vice*)
Brian A. Audette (*admitted pro hac vice*)
PERKINS COIE LLP
131 S. Dearborn St., Ste. 1700
Chicago, Illinois 60603
Telephone:    (312) 324-8400
Facsimile:    (312) 324-9400

- and -

Schuyler Carroll
PERKINS COIE LLP
30 Rockefeller Plaza, 25th Floor
New York, New York  10112
Telephone:    (212) 262-6905
Facsimile:    (212) 977-1636

*Counsel to Waldorf=Astoria Management LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MSR RESORT GOLF COURSE LLC, *et al.*,[1] | ) | Case No. 11-10372 (SHL) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |

**WALDORF=ASTORIA MANAGEMENT LLC'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING
TO THE MOTION OF MSR RESORT GOLF COURSE LLC, *ET AL.*,
FOR ENTRY OF AN ORDER ESTIMATING DAMAGES RESULTING
FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include:  MSR Resort Golf Course LLC (7388); MSR Biltmore Resort, LP (5736); MSR Claremont Resort, LP (5787); MSR Desert Resort, LP (5850); MSR Grand Wailea Resort, LP (5708); MSR Resort Ancillary Tenant, LLC (9698); MSR Resort Biltmore Real Estate, Inc. (8464); MSR Resort Desert Real Estate, Inc. (9265); MSR Resort Hotel, LP (5558); MSR Resort Intermediate Mezz GP, LLC (3864); MSR Resort Intermediate Mezz LLC (7342); MSR Resort Intermediate Mezz, LP (3865); MSR Resort Intermediate MREP, LLC (9703); MSR Resort Lodging Tenant, LLC (9699); MSR Resort REP, LLC (9708); MSR Resort Senior Mezz GP, LLC (9969); MSR Resort Senior Mezz LLC (7348); MSR Resort Senior Mezz, LP (9971); MSR Resort Senior MREP, LLC (9707); MSR Resort Silver Properties, LP (5674); MSR Resort SPE GP II LLC (5611); MSR Resort SPE GP LLC (7349); MSR Resort Sub Intermediate Mezz GP, LLC (1186); MSR Resort Sub Intermediate Mezz LLC (7341); MSR Resort Sub Intermediate Mezz, LP (1187); MSR Resort Sub Intermediate MREP, LLC (9701); MSR Resort Sub Senior Mezz GP, LLC (9966); MSR Resort Sub Senior Mezz LLC (7347); MSR Resort Sub Senior Mezz, LP (9968); and MSR Resort Sub Senior MREP, LLC (9705).  The location of the Debtors' service address is:  c/o CNL-AB LLC, 1251 Avenue of the Americas, New York, New York 10020.

fees is derived from a hotel's total revenues, the receipt of such fees is far less risky than if the

fees were a function of the hotel's profitability, as is the case with incentive fees.  *See* W-A Tr.

Ex. 23 at p. 2.  The reason for this is that like the Base Fee and the Corporate Overhead Fee

under the HMAs, base management fees are typically paid first from a hotel's total revenues, as

opposed to payments to equity, which can only made after accounting for all of a hotel's

expenses.  *See id.*  Indeed, a hotel's total revenue stream is typically 30% to 50% less volatile

than that of its income before fixed charges, which itself is less volatile than a hotel's net

operating income.  *See id.* at p. 3.

81.     The Debtors suggest that the Court should consider that Hilton used a 23%

discount rate for the incentive fees it expected to earn from the contracts.  Although Hilton

expected the payment of Incentive Fees at the time it acquired the HMAs and applied a 23%

discount rate to value such fees, *see* Joint Ex. 1 at p. 3, Ex. 4, those facts are irrelevant because

Hilton is not seeking payment for any foregone Incentive Fees.  Moreover, Hilton has never used

a "blended" rate (combining the discount rate for base and incentive fees) to analyze a deal;

rather it applies different discount rates to different income streams.  *See* Trial Tr. at 393:10-25,

394:1-3; 553:17-25, 554:1-7.  Because Hilton does not seek damages for lost Incentive Fees and

expects to receive only the Base Fee and the Corporate Overhead Fee, the 8% discount rate is the

only appropriate rate to measure the damages Hilton would suffer if the MSR Tenants reject the

HMAs.

82.     The Debtors criticize Hennessey's analysis because the data from PKF Consulting

("PKF") upon which he partially relied in concluding that a hotel's total revenues are typically

less risky than a hotel's income before fixed charges is not applicable to the Hilton Resorts.  The

Debtors suggest that this data is useless because it is derived from smaller hotels throughout the

-43-

company, a time period going back for many years.  *See* Trial Tr. at 209:20-25, 301:4-6, 401:15-19.  The Court also notes that there was no special risk at the time these HMAs were entered into in 2006, a time both sides agree was robust for the hotel industry.  *See id*. at 119:3-15, 1146:20-23.  These considerations suggest lower risk, and here, a lower discount rate.

96.      In sum, the Court accepts testimony of Hilton's fact witnesses and experts that the revenues of the Hilton Resorts, and Hilton's corresponding fees based on such revenues, are actually less risky than those of Hilton's typical management agreements.  *See* Trial Tr. at 390:13-25, 391:1-5, 497:3-10; *see also* W-A Tr. Ex. 23 at p. 4.

97.      As set forth above, the Court finds Hilton's analysis particularly reliable and unbiased and accepts it.  Indeed, Hennessey testified that:

> [Morone's discount] rates are clearly rates of return that are much more proximate to, either to the property's overall discount rate or the even [sic] equity yield rate; much more risky investment positions that the position that Hilton had for its fees under the HMAs.  An it's a -- it's a -- from an investment point of view, it's a very significant differential, and it's inconsistent with how I've seen other hotel companies valuing HMAs over the years.

*See* Trial Tr. at 551:24-25, 552:1-6.

98.      The Court also accepts Cline's discount rate analysis for the Extension Term of the HMAs.  Indeed, Cline argues convincingly that two approaches should be applied and reconciled in arriving at an appropriate discount to the fees Hilton would receive during the Extension Term.  *See* W-A Tr. Ex. 25 at pp. 45-46.  First, Cline applied a 12% discount rate to account for the heightened risk of termination during the Extension Term.[37]  Second, Cline assumed a probability of sale for each of the first five years of the Extension Term with the associated liquidated damages to Hilton built into an "expected value."  *See id*. at p. 45.  The discount rate for this second approach is 8% because the risk of sale is considered in the

---

[37]  The MSR Tenants may terminate the HMAs during the Extension Term upon a sale of the Hilton Resorts, which would trigger Hilton's right to receive liquidated damages under the HMAs.  *See* Joint Ex. 2 at §§ 3.4.1 – 3.4.3.

probability of sale analysis and the projected fee income is then discounted the same rate as that used for the Base Term. *See id.*; *see also* Trial Tr. at 811:2-25, 812:1-4.

**F.    Cline Versus Morone Comparisons**

99.    The Court notes that Cline provides a sliding-scale chart showing adjustments to Morone's damages calculations that the Court finds instructive. *See* W-A Tr. Ex. at p. 30.

100.    In addition, if the Court applied differing discount rates ranging from 8% to 13% to Cline's financial projections to calculate the present value of Hilton's lost Base Fee and Corporate Overhead Fee, Hilton's damages for the loss of all three HMAs would be as follows:

| Discount Rate | Loss (in 000's) |
|---|---|
| 8.0% | $165,408 |
| 9.0% | $152,168 |
| 10.0% | $140,472 |
| 11.0% | $130,104 |
| 12.0% | $120,882 |
| 13.0% | $112,650 |

**G.    Group Services Expenses**

101.    The HMAs provide for the payment of a Group Services Expense to Hilton, which shall not exceed 2% of gross revenues. *See* Joint Ex. 2 at § 5.2; *see also* Trial Tr. at 180:8-14. The Group Services Expense represents a reimbursement to Hilton for the costs incurred in providing Group Services to the Waldorf Astoria brand generally, including advertising, marketing, group services, reservation services and other brand support. *See* Joint Ex. 2 at §§ 2.6, 5.2; *see also* Trial Tr. at 179:17-25, 180:1-14. All Waldorf Astoria owners pay group services or similar expenses into a fund that Hilton uses to market and promote the brand and employ individuals dedicated to the brand.[38] *See* Trial Tr. at 283:17-25, 284:1-12. The Group Services for the Waldorf Astoria brand are not allocated or attributable to any one or more

---

[38]   Morone errantly speculates that Hilton is contractually obligated to pass these group services expenses along to its owners. *See* Debtors' Ex. 2 at p. 19. Rather, it is a percentage of revenue agreed to be paid by an owner as part of its contract with Hilton.

resorts are actually paying *less* than 4% of room revenue for 2012-2014.  This is not surprising as a number of witnesses testified that the resorts obtain a large percentage of their overall revenue from non-room sources.  *See e.g.* Trial Tr. at 995:2-15, 996:11-25, 997:23-25, 998:1-11.

108.    Lastly, Morone decreases Hilton's future profits under this "subsidy" theory for Grand Wailea and Arizona Biltmore, but, without explanation, does not do likewise for La Quinta.  *See* Debtors' Ex. 3.  As the three Hilton Resorts are similarly situated because they all pay the Group Services Expenses, one would expect Morone's "subsidy" theory would apply to all three resorts.  That Morone omitted any reference to this theory in his report for La Quinta and did not explain its absence further reduces Morone's credibility in the Court's view.

109.    The Court also accepts Cline's analysis and conclusion that it will take Hilton at least five years to replace the Group Services Expenses that it would lose if the MSR Tenants reject the HMAs.  *See* W-A Tr. Ex. 24 at p. 49.  Indeed, the Court finds that Cline's five-year projection is conservative because Hilton's testimony at trial suggested that it would be a tremendously difficult and lengthier process for Hilton to replace the HMAs.  *See* Trial Tr. at 108:16-25, 109:1-3, 130:17-25, 131:1-18, 305:11-25, 306:1-12, 404:10-25.  In addition, during those five years, Hilton will fund out of pocket the amount of Group Services Expenses that the Hilton Resorts would have otherwise contributed, which Cline estimates have a net present value of $17,190,000.  *See* W-A Tr. Ex. at pp. 49-50.  In addition, the Court accepts Cline's conclusion that Hilton would have to pay "key" money totaling $21,736,000 to obtain additional management agreements for the Waldorf Astoria brand to replace the foregone Group Services Expenses.  *See id.*  Key money represents funds that a management company may be required to pay to a hotel owner to obtain management rights, and the payment of key money is typical to obtain management rights for hotels and resorts suitable to be converted to the Waldorf Astoria

-57-

brand. *See* Trial Tr. at 403:16-25, 404:1-25. The unrefuted testimony at trial, which the Court

accepts, is that Hilton will have to pay considerable key money to replace resorts of the three

Hilton Resorts' stature. *See id.* at 305:11-25, 306:1-4, 404:10-25.

110. The net present value of the foregone Groups Services Expenses (*i.e.*,

$17,190,000 plus the $21,736,000 in key money) totals $38,926,000, which Cline allocates to the

Hilton Resorts as follows: (a) Grand Wailea ($18,193,000); (b) Arizona Biltmore ($9,507,000);

and (c) La Quinta ($11,227,000). The Court accepts Cline's analysis and conclusions.

## H.    **The Grand Wailea Expansion**

111. In April 2012, the County of Maui granted final approval for a $250 million

expansion at Grand Wailea (the "Expansion"), which would add approximately 310 additional

rooms, increasing the size of the resort from 780 to 1,090 rooms and thereby increasing the

resort's total revenues and Hilton's corresponding Base Fee and Corporate Overhead Fee. *See*

W-A Tr. Ex. 25 at p. 74; *see also* Trial Tr. at 608:6-25, 609:1-24. Bailey testified that the plan

for the Expansion was in the works since 2007. *See id.*; *see also* Trial Tr. at 672:1-4. Hilton's

Senior Vice President of Development for the Caribbean and Latin America and Timeshare

Development in Hawaii, Ted Middleton, testified that he knew about the Expansion possibilities

back in 2005 when Hilton was looking at acquiring the HMAs. *See id.* at 132:13-25, 133:1-8.

112. That the Expansion has substantial value is beyond dispute. Middleton described

the Expansion as "low hanging fruit," *see id.* at 132:22-25, and Cline opined that the Expansion's

approval is "literally golden", *see id* at 835:15-18, and that he could not "imagine any reasonable

investor . . . not pursuing [the Expansion]", *see id.* at 837:3-7. Shumaker, too, acknowledged the

value of the Expansion rights. *See id.* at 1029:17-24, 1044:2-4.

-58-

# EXHIBIT 6

## Klugman, Maura M

| | |
|---|---|
| **From:** | Neff, David M. (Perkins Coie) [dneff@perkinscoie.com] |
| **Sent:** | Wednesday, August 01, 2012 3:01 PM |
| **To:** | Basta, Paul M; Leon, Eric F.; Khawaja, Atif; Klugman, Maura M; Husnick, Chad J. |
| **Cc:** | Audette, Brian  (Perkins Coie) |
| **Subject:** | MSR Hilton Claim Analysis |
| **Attachments:** | MSR damages calc - draft - 07_31_12 v2.xlsx |

I have attached Hilton's analysis of its claims, in accordance with the judge's oral ruling
yesterday.


David M. Neff
Perkins Coie LLP
131 S. Dearborn St.
Suite 1700
Chicago, IL 60603-5559
(312) 324-8689 (phone)
(312) 324-9689 (fax)
(312) 317-5542 (cell)
dneff@perkinscoie.com

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department and IRS
regulations, we inform you that, unless expressly indicated otherwise, any federal tax advice
contained in this communication (including any attachments) is not intended or written by
Perkins Coie LLP to be used, and cannot be used by the taxpayer, for the purpose of (i)
avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code or
(ii) promoting, marketing or recommending to another party any transaction or matter
addressed herein (or any attachments).

* * * * * * * * * *

NOTICE:  This communication may contain privileged or other confidential information. If you
have received it in error, please advise the sender by reply email and immediately delete the
message and any attachments without copying or disclosing the contents. Thank you.

**MSR Hilton Damages Summary**

|  | Mgmt Fees | Group Svcs Fees | Total |
|---|---|---|---|
| Grand Wailea | 50,441 | 15,516 | 65,956 |
| Arizona Biltmore | 28,178 | 8,259 | 36,437 |
| La Quinta Resort | 33,761 | 9,855 | 43,616 |
| **Totals** | **112,380** | **33,630** | **146,010** |

**Grand Wailea**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 12.6% |

| | | Projection Period (1) | | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Marone | | 191,231 | 199,205 | 210,287 | 217,359 | | | | | | | | | | | | | | | | | | | |
| Cline | | 181,575 | 197,827 | 214,147 | 233,097 | | | | | | | | | | | | | | | | | | | |
| Average | | 186,403 | 198,516 | 212,217 | 225,228 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 186,403 | 198,516 | 212,217 | 225,228 | 230,859 | 236,630 | 242,546 | 248,610 | 254,825 | 261,196 | 267,725 | 274,419 | 281,279 | 288,311 | 295,519 | 302,907 | 310,479 | 318,241 | 326,197 | 334,352 | 342,711 | 351,279 | 360,061 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| Management Fee @ | 3.0% | 5,592 | 5,955 | 6,367 | 6,757 | 6,926 | 7,099 | 7,276 | 7,458 | 7,645 | 7,836 | 8,032 | 8,233 | 8,438 | 8,649 | 8,866 | 9,087 | 9,314 | 9,547 | 9,786 | 10,031 | 10,281 | 10,538 | 10,802 |
| less: Cost of Management @ | 8.3% | (466) | (496) | (531) | (563) | (577) | (592) | (606) | (622) | (637) | (653) | (669) | (686) | (703) | (721) | (739) | (757) | (776) | (796) | (815) | (836) | (857) | (878) | (900) |
| Hilton Projected Profit | | 5,126 | 5,459 | 5,836 | 6,194 | 6,349 | 6,507 | 6,670 | 6,837 | 7,008 | 7,183 | 7,362 | 7,547 | 7,735 | 7,929 | 8,127 | 8,330 | 8,538 | 8,752 | 8,970 | 9,195 | 9,425 | 9,660 | 9,902 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| Hilton Profit Realized (3) | | 0 | 5,459 | 5,836 | 6,194 | 6,349 | 6,507 | 6,670 | 6,837 | 7,008 | 7,183 | 7,362 | 7,547 | 7,735 | 7,929 | 8,127 | 8,330 | 8,538 | 8,752 | 8,970 | 9,195 | 9,425 | 9,660 | 9,902 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 12.6% | 0 | 4,848 | 4,603 | 4,339 | 3,953 | 3,594 | 3,272 | 2,978 | 2,717 | 2,467 | 2,246 | 2,044 | 1,868 | 1,693 | 1,542 | 1,403 | 1,284 | 1,162 | 1,058 | 963 | 882 | 798 | 726 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| NPV - Management Fees | 50,441 | | | | | | | | | | | | | | | | | | | | | | | |

**Group Services Fees**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| Projected Adj. Total Revenue | | 186,403 | 198,516 | 212,217 | 225,228 | 230,859 | 236,630 |
| Group Services Fee @ | 2.0% | 3,728 | 3,970 | 4,244 | 4,505 | 4,617 | 4,733 |
| Hilton Projected Profit | | 3,728 | 3,970 | 4,244 | 4,505 | 4,617 | 4,733 |
| | | | | | | | |
| Hilton Profit Realized (3) | | 0 | 3,970 | 4,244 | 4,505 | 4,617 | 4,733 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 |
| PV @ | 12.6% | 0 | 3,526 | 3,348 | 3,155 | 2,872 | 2,615 |
| | | | | | | | |
| NPV - Group Services Fees | 15,516 | | | | | | |

| Total NPV | 65,956 |
|---|---|

(1)  Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.

(2)  Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).

(3)  Projected Hilton profit as adjusted to account for the assumed date of contract rejection; model will calculate the result for any assumed date through 12/31/13 by entering the date in Excel date/time convention in cell D6.

(4)  Adjusts discounting to account for assume rejection date.

**Arizona Biltmore**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 11.6% |

| | | Projection Period (1) | | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Marone | | 90,887 | 98,083 | 106,743 | 112,263 | | | | | | | | | | | | | | | | | | | |
| Cline | | 93,947 | 106,884 | 113,836 | 121,803 | | | | | | | | | | | | | | | | | | | |
| Average | | 92,417 | 102,484 | 110,290 | 117,033 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 92,417 | 102,484 | 110,290 | 117,033 | 119,959 | 122,958 | 126,032 | 129,183 | 132,412 | 135,722 | 139,115 | 142,593 | 146,158 | 149,812 | 153,557 | 157,396 | 161,331 | 165,365 | 169,499 | 173,736 | 178,080 | 182,532 | 187,095 |
| Management Fee @ | 3.0% | 2,773 | 3,075 | 3,309 | 3,511 | 3,599 | 3,689 | 3,781 | 3,875 | 3,972 | 4,072 | 4,173 | 4,278 | 4,385 | 4,494 | 4,607 | 4,722 | 4,840 | 4,961 | 5,085 | 5,212 | 5,342 | 5,476 | 5,613 |
| less: Cost of Management @ | 8.3% | (231) | (256) | (276) | (293) | (300) | (307) | (315) | (323) | (331) | (339) | (348) | (356) | (365) | (375) | (384) | (393) | (403) | (413) | (424) | (434) | (445) | (456) | (468) |
| Hilton Projected Profit | | 2,541 | 2,818 | 3,033 | 3,218 | 3,299 | 3,381 | 3,466 | 3,553 | 3,641 | 3,732 | 3,826 | 3,921 | 4,019 | 4,120 | 4,223 | 4,328 | 4,437 | 4,548 | 4,661 | 4,778 | 4,897 | 5,020 | 5,145 |
| Hilton Profit Realized (3) | | 0 | 2,818 | 3,033 | 3,218 | 3,299 | 3,381 | 3,466 | 3,553 | 3,641 | 3,732 | 3,826 | 3,921 | 4,019 | 4,120 | 4,223 | 4,328 | 4,437 | 4,548 | 4,661 | 4,778 | 4,897 | 5,020 | 5,145 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 11.6% | 0 | 2,525 | 2,435 | 2,316 | 2,129 | 1,953 | 1,793 | 1,647 | 1,516 | 1,389 | 1,276 | 1,172 | 1,080 | 988 | 908 | 834 | 769 | 703 | 646 | 593 | 548 | 500 | 459 |

| NPV - Management Fees | 28,178 |
|---|---|

**Group Services Fees**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| Projected Adj. Total Revenue | | 92,417 | 102,484 | 110,290 | 117,033 | 119,959 | 122,958 |
| Group Services Fee @ | 2.0% | 1,848 | 2,050 | 2,206 | 2,341 | 2,399 | 2,459 |
| Hilton Projected Profit | | 1,848 | 2,050 | 2,206 | 2,341 | 2,399 | 2,459 |
| Hilton Profit Realized (3) | | 0 | 2,050 | 2,206 | 2,341 | 2,399 | 2,459 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 |
| PV @ | 11.6% | 0 | 1,837 | 1,771 | 1,684 | 1,547 | 1,421 |

| NPV - Group Services Fees | 8,259 |
|---|---|

| **Total NPV** | **36,437** |
|---|---|

(1)  Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.
(2)  Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).
(3)  Projected Hilton profit as adjusted to account for the assumed date of contract rejection; model will calculate the result for any assumed date through 12/31/13 by entering the date in Excel date/time convention in cell D6.
(4)  Adjusts discounting to account for assume rejection date.

**La Quinta Resort**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 11.6% |

| | | Projection Period (1) | | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Marone | | 112,059 | 117,444 | 128,977 | 137,364 | | | | | | | | | | | | | | | | | | | |
| Cline | | 109,368 | 122,476 | 134,694 | 143,845 | | | | | | | | | | | | | | | | | | | |
| Average | | 110,713 | 119,960 | 131,836 | 140,604 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 110,713 | 119,960 | 131,836 | 140,604 | 144,120 | 147,723 | 151,416 | 155,201 | 159,081 | 163,058 | 167,135 | 171,313 | 175,596 | 179,986 | 184,485 | 189,097 | 193,825 | 198,670 | 203,637 | 208,728 | 213,946 | 219,295 | 224,777 |
| Management Fee @ | 3.0% | 3,321 | 3,599 | 3,955 | 4,218 | 4,324 | 4,432 | 4,542 | 4,656 | 4,772 | 4,892 | 5,014 | 5,139 | 5,268 | 5,400 | 5,535 | 5,673 | 5,815 | 5,960 | 6,109 | 6,262 | 6,418 | 6,579 | 6,743 |
| less: Cost of Management @ | 8.3% | (277) | (300) | (330) | (352) | (360) | (369) | (379) | (388) | (398) | (408) | (418) | (428) | (439) | (450) | (461) | (473) | (485) | (497) | (509) | (522) | (535) | (548) | (562) |
| Hilton Projected Profit | | 3,045 | 3,299 | 3,625 | 3,867 | 3,963 | 4,062 | 4,164 | 4,268 | 4,375 | 4,484 | 4,596 | 4,711 | 4,829 | 4,950 | 5,073 | 5,200 | 5,330 | 5,463 | 5,600 | 5,740 | 5,884 | 6,031 | 6,181 |
| Hilton Profit Realized (3) | | 0 | 3,299 | 3,625 | 3,867 | 3,963 | 4,062 | 4,164 | 4,268 | 4,375 | 4,484 | 4,596 | 4,711 | 4,829 | 4,950 | 5,073 | 5,200 | 5,330 | 5,463 | 5,600 | 5,740 | 5,884 | 6,031 | 6,181 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 11.6% | 0 | 2,956 | 2,911 | 2,782 | 2,557 | 2,346 | 2,155 | 1,979 | 1,821 | 1,669 | 1,533 | 1,408 | 1,297 | 1,187 | 1,090 | 1,002 | 924 | 845 | 776 | 712 | 658 | 601 | 552 |
| NPV - Management Fees | 33,761 | | | | | | | | | | | | | | | | | | | | | | | |

**Group Services Fees**

| | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|
| Projected Adj. Total Revenue | | 110,713 | 119,960 | 131,836 | 140,604 | 144,120 | 147,723 |
| Group Services Fee @ | 2.0% | 2,214 | 2,399 | 2,637 | 2,812 | 2,882 | 2,954 |
| Hilton Projected Profit | | 2,214 | 2,399 | 2,637 | 2,812 | 2,882 | 2,954 |
| Hilton Profit Realized (3) | | 0 | 2,399 | 2,637 | 2,812 | 2,882 | 2,954 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 |
| PV @ | 11.6% | 0 | 2,150 | 2,117 | 2,023 | 1,858 | 1,707 |
| NPV - Group Services Fees | 9,855 | | | | | | |
| **Total NPV** | **43,616** | | | | | | |

(1)  Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.
(2)  Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).
(3)  Projected Hilton profit as adjusted to account for the assumed date of contract rejection; model will calculate the result for any assumed date through 12/31/13 by entering the date in Excel date/time convention in cell D6.
(4)  Adjusts discounting to account for assume rejection date.

# EXHIBIT 7

**Summary of Hilton's Damages**

|  | Mgmt Fees | Group Svcs Fees | Total |
|---|---|---|---|
| Grand Wailea | 46,916 | 5,326 | 52,243 |
| Arizona Biltmore | 25,974 | 2,783 | 28,758 |
| La Quinta Resort | 31,113 | 3,287 | 34,400 |
| **Totals** | **104,004** | **11,396** | **115,400** |

**Grand Wailea**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 12.6% |

| | | Projection Period (1) | | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Morone | | 191,231 | 199,205 | 210,287 | 217,359 | | | | | | | | | | | | | | | | | | | |
| Cline | | 181,575 | 197,827 | 214,147 | 233,097 | | | | | | | | | | | | | | | | | | | |
| Average | | 186,403 | 198,516 | 212,217 | 225,228 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 186,403 | 198,516 | 212,217 | 225,228 | 230,859 | 236,630 | 242,546 | 248,610 | 254,825 | 261,196 | 267,725 | 274,419 | 281,279 | 288,311 | 295,519 | 302,907 | 310,479 | 318,241 | 326,197 | 334,352 | 342,711 | 351,279 | 360,061 |
| Management Fee @ | 3.0% | 5,592 | 5,955 | 6,367 | 6,757 | 6,926 | 7,099 | 7,276 | 7,458 | 7,645 | 7,836 | 8,032 | 8,233 | 8,438 | 8,649 | 8,866 | 9,087 | 9,314 | 9,547 | 9,786 | 10,031 | 10,281 | 10,538 | 10,802 |
| less: Cost of Management @ | 8.3% | (466) | (496) | (531) | (563) | (577) | (592) | (606) | (622) | (637) | (653) | (669) | (686) | (703) | (721) | (739) | (757) | (776) | (796) | (815) | (836) | (857) | (878) | (900) |
| Hilton Projected Profit | | 5,126 | 5,459 | 5,836 | 6,194 | 6,349 | 6,507 | 6,670 | 6,837 | 7,008 | 7,183 | 7,362 | 7,547 | 7,735 | 7,929 | 8,127 | 8,330 | 8,538 | 8,752 | 8,970 | 9,195 | 9,425 | 9,660 | 9,902 |
| Multiplied by: % Chance not Terminated (Per Cline) | | | | | | | | | | | | | | | 75.0% | 55.0% | 40.0% | 30.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| Hilton Projected Profit (prob weighted) | | 5,126 | 5,459 | 5,836 | 6,194 | 6,349 | 6,507 | 6,670 | 6,837 | 7,008 | 7,183 | 7,362 | 7,547 | 7,735 | 5,946 | 4,470 | 3,332 | 2,561 | 2,188 | 2,243 | 2,299 | 2,356 | 2,415 | 2,475 |
| Liquidated Damages (multiple of prior year's Base Mgmt Fee) | | | | | | | | | | | | | | | 28,128 | 25,948 | 23,642 | 21,203 | 18,629 | 15,912 | 13,048 | 10,031 | 6,854 | 7,026 |
| Multiplied by: % Terminated in that Year (Per Cline) | | | | | | | | | | | | | | | 25.0% | 20.0% | 15.0% | 10.0% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Liquidated Damages (prob weighted) | | | | | | | | | | | | | | | 7,032 | 5,190 | 3,546 | 2,120 | 931 | 0 | 0 | 0 | 0 | 0 |
| Hilton Profit Realized (3) | | 0 | 5,459 | 5,836 | 6,194 | 6,349 | 6,507 | 6,670 | 6,837 | 7,008 | 7,183 | 7,362 | 7,547 | 7,735 | 12,978 | 9,659 | 6,878 | 4,682 | 3,119 | 2,243 | 2,299 | 2,356 | 2,415 | 2,475 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 12.6% | 0 | 4,848 | 4,603 | 4,339 | 3,953 | 3,594 | 3,272 | 2,978 | 2,717 | 2,467 | 2,246 | 2,044 | 1,868 | 2,772 | 1,832 | 1,159 | 704 | 414 | 265 | 241 | 221 | 199 | 182 |
| **NPV - Management Fees** | | **46,916** | | | | | | | | | | | | | | | | | | | | | | |

(1) Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.

(2) Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).

**Arizona Biltmore**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 11.6% |

| | | Projection Period (1) | | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | |

| Year | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Morone | | 90,887 | 98,083 | 106,743 | 112,263 | | | | | | | | | | | | | | | | | | | |
| Cline | | 93,947 | 106,884 | 113,836 | 121,803 | | | | | | | | | | | | | | | | | | | |
| Average | | 92,417 | 102,484 | 110,290 | 117,033 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 92,417 | 102,484 | 110,290 | 117,033 | 119,959 | 122,958 | 126,032 | 129,183 | 132,412 | 135,722 | 139,115 | 142,593 | 146,158 | 149,812 | 153,557 | 157,396 | 161,331 | 165,365 | 169,499 | 173,736 | 178,080 | 182,532 | 187,095 |
| Management Fee @ | 3.0% | 2,773 | 3,075 | 3,309 | 3,511 | 3,599 | 3,689 | 3,781 | 3,875 | 3,972 | 4,072 | 4,173 | 4,278 | 4,385 | 4,494 | 4,607 | 4,722 | 4,840 | 4,961 | 5,085 | 5,212 | 5,342 | 5,476 | 5,613 |
| less: Cost of Management @ | 8.3% | (231) | (256) | (276) | (293) | (300) | (307) | (315) | (323) | (331) | (339) | (348) | (356) | (365) | (375) | (384) | (393) | (403) | (413) | (424) | (434) | (445) | (456) | (468) |
| Hilton Projected Profit | | 2,541 | 2,818 | 3,033 | 3,218 | 3,299 | 3,381 | 3,466 | 3,553 | 3,641 | 3,732 | 3,826 | 3,921 | 4,019 | 4,120 | 4,223 | 4,328 | 4,437 | 4,548 | 4,661 | 4,778 | 4,897 | 5,020 | 5,145 |
| Multiplied by: % Chance not Terminated (Per Cline) | | | | | | | | | | | | | | | 75.0% | 55.0% | 40.0% | 30.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| Hilton Projected Profit (prob weighted) | | 2,541 | 2,818 | 3,033 | 3,218 | 3,299 | 3,381 | 3,466 | 3,553 | 3,641 | 3,732 | 3,826 | 3,921 | 4,019 | 3,090 | 2,323 | 1,731 | 1,331 | 1,137 | 1,165 | 1,194 | 1,224 | 1,255 | 1,286 |
| Liquidated Damages (multiple of prior year's Base Mgmt Fee) | | | | | | | | | | | | | | | 14,616 | 13,483 | 12,285 | 11,018 | 9,680 | 8,268 | 6,780 | 5,212 | 3,562 | 3,651 |
| Multiplied by: % Terminated in that Year (Per Cline) | | | | | | | | | | | | | | | 25.0% | 20.0% | 15.0% | 10.0% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Liquidated Damages (prob weighted) | | | | | | | | | | | | | | | 3,654 | 2,697 | 1,843 | 1,102 | 484 | 0 | 0 | 0 | 0 | 0 |
| Hilton Profit Realized (3) | | 0 | 2,818 | 3,033 | 3,218 | 3,299 | 3,381 | 3,466 | 3,553 | 3,641 | 3,732 | 3,826 | 3,921 | 4,019 | 6,744 | 5,019 | 3,574 | 2,433 | 1,621 | 1,165 | 1,194 | 1,224 | 1,255 | 1,286 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 11.6% | 0 | 2,525 | 2,435 | 2,316 | 2,129 | 1,953 | 1,793 | 1,647 | 1,516 | 1,389 | 1,276 | 1,172 | 1,080 | 1,618 | 1,079 | 688 | 422 | 251 | 161 | 148 | 137 | 125 | 115 |

| NPV - Management Fees | 25,974 |
|---|---|

(1) Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.
(2) Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).

**La Quinta Resort**

| Assumptions | |
|---|---|
| Assumed Rejection Date | 12/31/2012 |
| Inflation Rate | 2.5% |
| Management Fee | 3.0% |
| Cost of Management | 8.3% |
| Group Services Fee | 2.0% |
| Discount Rate | 11.6% |

| | | Projection Period (1) | | | Inflation Period (2) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Year** | | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
| **Adjusted Total Revenues** | | | | | | | | | | | | | | | | | | | | | | | | |
| Morone | | 112,059 | 117,444 | 128,977 | 137,364 | | | | | | | | | | | | | | | | | | | |
| Cline | | 109,368 | 122,476 | 134,694 | 143,845 | | | | | | | | | | | | | | | | | | | |
| Average | | 110,713 | 119,960 | 131,836 | 140,604 | | | | | | | | | | | | | | | | | | | |
| Inflation Rate | | --- | --- | --- | --- | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Projected Adj. Total Revenue | | 110,713 | 119,960 | 131,836 | 140,604 | 144,120 | 147,723 | 151,416 | 155,201 | 159,081 | 163,058 | 167,135 | 171,313 | 175,596 | 179,986 | 184,485 | 189,097 | 193,825 | 198,670 | 203,637 | 208,728 | 213,946 | 219,295 | 224,777 |
| Management Fee @ | 3.0% | 3,321 | 3,599 | 3,955 | 4,218 | 4,324 | 4,432 | 4,542 | 4,656 | 4,772 | 4,892 | 5,014 | 5,139 | 5,268 | 5,400 | 5,535 | 5,673 | 5,815 | 5,960 | 6,109 | 6,262 | 6,418 | 6,579 | 6,743 |
| less: Cost of Management @ | 8.3% | (277) | (300) | (330) | (352) | (360) | (369) | (379) | (388) | (398) | (408) | (418) | (428) | (439) | (450) | (461) | (473) | (485) | (497) | (509) | (522) | (535) | (548) | (562) |
| Hilton Projected Profit | | 3,045 | 3,299 | 3,625 | 3,867 | 3,963 | 4,062 | 4,164 | 4,268 | 4,375 | 4,484 | 4,596 | 4,711 | 4,829 | 4,950 | 5,073 | 5,200 | 5,330 | 5,463 | 5,600 | 5,740 | 5,884 | 6,031 | 6,181 |
| Multiplied by: % Chance not Terminated (Per Cline) | | | | | | | | | | | | | | | 75.0% | 55.0% | 40.0% | 30.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| Hilton Projected Profit (prob weighted) | | 3,045 | 3,299 | 3,625 | 3,867 | 3,963 | 4,062 | 4,164 | 4,268 | 4,375 | 4,484 | 4,596 | 4,711 | 4,829 | 3,712 | 2,790 | 2,080 | 1,599 | 1,366 | 1,400 | 1,435 | 1,471 | 1,508 | 1,545 |
| Liquidated Damages (multiple of prior year's Base Mgmt Fee) | | | | | | | | | | | | | | | 17,560 | 16,199 | 14,759 | 13,237 | 11,629 | 9,934 | 8,145 | 6,262 | 4,279 | 4,386 |
| Multiplied by: % Termination in that Year (Per Cline) | | | | | | | | | | | | | | | 25.0% | 20.0% | 15.0% | 10.0% | 5.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Liquidated Damages (prob weighted) | | | | | | | | | | | | | | | 4,390 | 3,240 | 2,214 | 1,324 | 581 | 0 | 0 | 0 | 0 | 0 |
| Hilton Profit Realized (3) | | 0 | 3,299 | 3,625 | 3,867 | 3,963 | 4,062 | 4,164 | 4,268 | 4,375 | 4,484 | 4,596 | 4,711 | 4,829 | 8,102 | 6,030 | 4,294 | 2,923 | 1,947 | 1,400 | 1,435 | 1,471 | 1,508 | 1,545 |
| PV Years (4) | | 0.0 | 1.0 | 2.0 | 3.0 | 4.0 | 5.0 | 6.0 | 7.0 | 8.0 | 9.0 | 10.0 | 11.0 | 12.0 | 13.0 | 14.0 | 15.0 | 16.0 | 17.0 | 18.0 | 19.0 | 20.0 | 21.0 | 22.0 |
| PV @ | 11.6% | 0 | 2,956 | 2,911 | 2,782 | 2,557 | 2,346 | 2,155 | 1,979 | 1,821 | 1,669 | 1,533 | 1,408 | 1,297 | 1,943 | 1,296 | 827 | 507 | 301 | 194 | 178 | 165 | 150 | 138 |
| NPV - Management Fees | | 31,113 | | | | | | | | | | | | | | | | | | | | | | |

(1) Adjusted Total Revenues in the projection period assumed to be the average between the two experts' projections to account for the 6% ruling on assumed capital investment; Cline projections only run through 2015 and use inflationary growth thereafter.
(2) Adjusted Total Revenues are grown as the resolved inflation rate of 2.5% after the last year that both experts projected operating results (2015).

**MSR Resort Golf Course LLC**                                                          8/7/2012
*Blended Discount Rate Calculation*

($ in 000s)

## Blended Discount Rate

|  |  | 2013 - 2017<br>Total Revenues |
|---|---|---|
| **Revenue** | Grand Wailea | $1,103,450 |
|  | Arizona Biltmore | $572,723 |
|  | La Quinta | $684,242 |
| **Weighting of Revenues** | Grand Wailea | 46.75% |
|  | Arizona Biltmore | 24.26% |
|  | La Quinta | 28.99% |
| **Discount Rate** | Grand Wailea | 12.60% |
|  | Arizona Biltmore | 11.60% |
|  | La Quinta | 11.60% |

| **Blended Discount Rate, Weighted by Revenue** | **12.07%** |
|---|---|

## Adjusted Group Services Fees

| Hilton's Lost Group Services Fees at 8% | $17,190 |
|---|---|
| Hilton Discount Rate | 8.00% |
| Blended Discount Rate | 12.07% |
| Ratio of Hilton Discount Rate to Blended Discount Rate | 66.29% |
| **Adjusted Group Services Fees** | **$11,396** |

| 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| 198,516 | 212,217 | 225,228 | 230,859 | 236,630 |
| 102,484 | 110,290 | 117,033 | 119,959 | 122,958 |
| 119,960 | 131,836 | 140,604 | 144,120 | 147,723 |