UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | . |
| | . Chapter 11 |
| IN RE: | . |
| | . Case No. 11-10372 (SHL) |
| MSR RESORT GOLF COURSE, LLC, | . |
| et al, | . New York, New York |
| | . Tuesday, July 31, 2012 |
| Debtors. | . 4:09 p.m. |

. . . . . . . . . . . . . . .

BENCH RULING RE: TRIAL ON MOTION OF MSR RESORT GOLF COURSE,
LLC, ET AL, FOR ENTRY OF AN ORDER ESTIMATING DAMAGES
RESULTING FROM REJECTION OF THE HILTON MANAGEMENT AGREEMENTS
AND AN ORDER AUTHORIZING REJECTION OF THE HILTON MANAGEMENT
AGREEMENTS

**BEFORE THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE**

APPEARANCES:

For the Debtors:          Chad J. Husnick, Esq.
                          KIRKLAND & ELLIS, LLP
                          300 North LaSalle
                          Chicago, Illinois 60654

                          Atif Khawaja, Esq.
                          Eric F. Leon, Esq.
                          KIRKLAND & ELLIS, LLP
                          601 Lexington Avenue
                          New York, New York 10022


(Appearances Continued)

Audio Operator:           Electronically Recorded
                          by Matthew, ECRO

AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey 07068
(973) 618-2310
www.audioedgetranscription.com

Proceedings recorded by electronic sound recording,
transcript produced by certified transcription service.

APPEARANCES:   (Continued)

For GIC RE:                    Brian E. Greer, Esq.
                               DECHERT, LLP
                               1095 Avenue of the Americas
                               New York, New York 10036

Also Appearing:                Michelle J. Vladimirsky, Esq.
                               KASOWITZ, BENSON, TORRES
                                & FRIEDMAN, LLP
                               1633 Broadway
                               New York, New York 10019


APPEARANCES VIA TELEPHONE:

For Waldorf=Astoria
Management, LLC:               David M. Neff, Esq.
                               Brian Audette, Esq.
                               PERKINS COIE, LLP
                               131 S. Dearborn Street, Suite 1700
                               Chicago, Illinois 60603

1      (Proceedings commence at 4:09 p.m.)

2          THE COURT:  Good afternoon.

3          MR. LEON:  Good afternoon, Your Honor.

4          THE COURT:  All right.  We are here this afternoon for

5    the purpose of reading a bench decision in the estimation trial

6    that we had earlier this month.

7          And I will apologize for subjecting to you all to a

8    lengthy, dramatic reading.  As we discussed, my preference

9    probably would have been to prepare a written opinion in a case

10   like this, but timing is sensitive in this case; I want to get

11   the parties a decision quickly.

12         Let me just make sure everybody who's on the phone can

13   hear me.  I suppose that most folks are listen-only, but I'm

14   particularly concerned with Hilton's counsel, Mr. Neff.

15         MR. NEFF:  (Via telephone) Yes, Judge.  This is Mr.

16   Neff.  I can hear you well.  Thank you.

17         THE COURT:  All right.  This matter comes before the

18   Court on the April 24, 2012 motion of MSR Resort Golf Course,

19   LLC, et al., for entry of an order estimating damages resulting

20   from rejection of the Hilton Management Agreements, and an

21   order authorizing rejection of the Hilton Management

22   Agreements, which I'm going to refer to as "the motion."

23         In the motion, the debtors seek estimation of the

24   damages Hilton would sustain if the debtors reject three

25   management agreements.

1          The management agreements relate to three properties:

2     one, the Arizona Biltmore Resort & Spa in Phoenix, Arizona;

3     two, the La Quinta Resort and Club PGA West in La Quinta,

4     California; and three, the Grand Wailea Resort Hotel & Spa in

5     Maui, Hawaii.

6          The Court conducted a trial on this matter over the

7     course of five days:  June 27th, 29th, July 2nd, 3rd, and July

8     13th.  The Court at trial heard from five fact witnesses and two

9     experts on behalf of Hilton and one fact witness and one expert

10    witness on behalf of the debtors, in addition to materials

11    submitted by the debtors as part of their motion.

12         In connection with acquiring these three management

13    agreements, Hilton prepared a November 2005 investment

14    memorandum.  That memorandum contained Hilton's then present

15    value of the future revenues from the three agreements at

16    roughly $260 million.  That valuation of the three management

17    agreements was "predicated on realizing incentive fees," fees

18    that are provided for under certain circumstances in the three

19    management agreements.

20         Hilton assumed it would achieve incentive fees

21    starting in 2006, and would achieve the maximum contractual

22    incentive fee starting in 2010.  At that time, in 2005, it

23    further assumed it would continue to receive the three percent

24    maximum incentive fee stream until the end of the contractual

25    term.

1          For a variety of reasons that were discussed on and

2     off at the trial, Hilton did not receive the incentive fee

3     stream it anticipated.  It has not, in fact, received any

4     incentive fees under these management agreements since 2007.

5     It does not seek the payment of incentive fees as part of the

6     damages sought in this proceeding.

7          Hilton's 2005 valuation was based on the full thirty-

8     year term, including the seven years from 2006 to 2012, for

9     which it has already received payment; and to date, it's

10    received $79 million in fees under the management agreements.

11         Turning to the three management agreements here, they

12    contemplate certain payments to the hotel manager.  For

13    purposes of the Court's inquiry, these provisions regarding

14    payment are the same for the three agreements.

15         The first category of payments under the management

16    agreements is the management fee, set forth in Article 5.1 of

17    the management agreements.  Under Article 5.1, the management

18    fee includes a base fee and an incentive fee that we've already

19    discussed.  The management agreement defines the "base fee" for

20    management services as:

21         "An amount equal to two percent (2%) of gross

22              revenues."

23         The incentive fee, as mentioned earlier, is triggered

24    only if Hilton satisfies certain performance thresholds, which

25    are not at issue in this proceeding.

1        The second category of payments contemplated by the

2    management agreements is something called the "corporate

3    overhead fee."  Pursuant to Article 5.3 of the agreements, a

4    manager will receive a corporate overhead fee for corporate

5    overhead expenses that it incurs in connection with managing

6    the resorts.  In the words of Article 5.3, the manager is

7    "reimbursed" for corporate overhead in the amounts equal to one

8    percent of gross revenues.

9        The third category of payments contemplated by the

10   management agreements is the so-called "group services

11   expense."  Article 5.2 of the management agreements provides

12   for the manager to receive reimbursement for group services

13   expense in the amount of up to two percent for each of the

14   resorts' revenues.  Group services expense is used to fund

15   marketing, advertising, reservations, and other promotional

16   services that the manager provides in managing the resorts.

17       Several other provisions of the management agreements

18   are relevant to this dispute, although they are not payments

19   that Hilton seeks as part of the proceedings.

20       The first of these is the Article 6 provision for

21   capital expenditures.  Under that provision, the debtors --

22   that is, the owners -- are obligated to contribute four percent

23   of gross resort revenue to fund necessary capital expenditures

24   at each resort.  To the extent the manager believes funding of

25   additional capital expenditures is required beyond the four

1    percent, the management agreements require the manager to seek

2    approval from the debtors.  If there is a disagreement over the

3    amount of capital expenditures needed, the manager may pursue

4    that dispute by putting the debtors on formal notice of a

5    contractual conflict and pursue a dispute resolution procedure

6    to resolve the matter.

7            Other relevant provisions in the management agreements

8    include a provision regarding the terms of the agreements, with

9    the term to run through 2024, with a ten-year option out to

10   2034.

11           The management agreements also have a provision

12   addressing termination.  In that provision, the debtors have

13   the right to terminate the agreements without the payment of

14   any additional fee or premium if the manager fails to satisfy

15   certain performance requirements.  Specifically, the debtors

16   may terminate the management agreements without penalty if,

17   after 2010 and for two consecutive operating years:

18           "(i) the GOP (gross operating profits) achieved by the

19   Hotel for each Operating Year is less than ninety percent (90%)

20   of the GOP set forth in the approved Annual Operating Plan for

21   such Operating Year."  And this has been referred to as the

22   gross operating profit test."

23           "(ii) the Annualized RevPAR (revenue per available

24   room) for the Hotel for each of such Operating Years is less

25   than ninety-five percent of the Annualized RevPAR of the

1    Competitive Set for each respective Operating Year."  And

2    that's been referred to as the "RevPAR performance test."

3        If the manager, here Hilton, fails to satisfy the

4    performance tests, and thus faces termination, it can make a

5    cure payment to the debtors to avoid termination and continue

6    managing the resorts.

7        The final provision that is relevant in the management

8    agreements for our purposes is a liquidated damages provision.

9    And that provides that if, after 2024, the debtors sell the

10   resorts and terminate Hilton as manager, Hilton is entitled to

11   a specified termination fee in the amount equal to the product

12   of the total management fee paid or payable by the manager for

13   the twelve-month period prior to the effective date of

14   termination, multiplied by a specified multiplier that varies

15   under the circumstances, and which we don't need to address in

16   this proceeding.

17       Turning now to the governing legal standard for this

18   dispute, the Court observes that each of the management

19   agreements is governed by the laws of the state in which the

20   subject resort is located.  Accordingly, the laws of Arizona,

21   California, and Hawaii will govern the calculation of damages

22   to which Hilton will be entitled upon the rejection of each

23   respective management agreement.

24       These three states generally agree that, in a breach

25   of contract action, a plaintiff may recover the amount of

1    damages necessary to place it in the same position it would

2    have occupied had the breach not occurred.  The usual recovery

3    for the breach of a contract is the contract price or the lost

4    profits therefrom.

5         To calculate lost profits, expenses are subtracted

6    from revenue.  Only net profits, not gross profits, are

7    recoverable for breach of contract.  These depend on the

8    particular transaction at issue, which dictates what expenses

9    need to be deducted from the gross profits to determine the

10   appropriate figure.

11        Arizona Courts have recognized that compensatory

12   contract damages will be awarded for the net amount of losses

13   caused and gains prevented.  See Biltmore Evaluation &

14   Treatment Services v. RTS NOW, LLC, 2009 WL 223293, at *2

15   (Ariz. Ct. App. Jan. 29, 2009).  Similarly, California Courts

16   have observed that damages are based on net profits, which they

17   have consistently defined as gains made after deducting the

18   value of labor, materials, rents, and all expenses, together

19   with the interest of the capital employed.  See Electronic

20   Funds Solutions v. Murphy, 36 Cal. Rptr. 3d 663, 676 (Cal Ct.

21   App. 2005).  Finally, Hawaii has recognized that a non-

22   breaching party may recover damages that arise naturally from

23   the breach, or that were in the contemplation of the parties at

24   the time of contracting.  See Jones v. Johnson, 41 Haw. 389,

25   1956 WL 10315, at *3 (Haw. 1956).

1          The Court notes that the parties do not disagree about

2     what the applicable law is, although they strongly disagree

3     with how it should be applied in this case.   Applying the

4     applicable law and relevant provisions of the management

5     agreements, the parties reach very different conclusions about

6     the proper measure of damages.

7          The Court notes that both parties use an expert to

8     provide a breakdown of the respective numbers on damages, as

9     well as an explanation of how each component is calculated.

10    Hilton's expert for this purpose was Roger Cline, and the

11    debtors' expert for this purpose was Thomas Morone.

12         On the one hand, Hilton contends it is entitled to

13    $334 million for rejection of these three management

14    agreements.   Hilton's requested $334 million is broken into

15    four general categories:

16         First, it seeks damages of some $165 million for fees

17    under the three management agreements.   These fees include a

18    base fee and the corporate overhead fee but do not, as

19    previously mentioned, include any damages for an incentive fee.

20         A large difference between the parties' calculation of

21    damages results from their use of different discount rates to

22    provide a current valuation for the worth of the payments that

23    Hilton would receive in the future.   Hilton uses an eight

24    percent discount rate.

25         The second component of damages that Hilton seeks is

1    for group services expenses of approximately $38.9 million.

2         Third, Hilton seeks damages of approximately $120

3    million for so-called "brand damages."  It describes "brand

4    damages" as the impact of the rejection of these three

5    management agreements on its Waldorf=Astoria brand.

6         Fourth and finally, Hilton seeks approximately $9.8

7    million in damages for losses relating to what it alleged to be

8    debtors' plan to expand the Grand Wailea Resort by some 300

9    rooms in the near future, thus purportedly expanding the

10   profits that Hilton would receive under that particular

11   management agreement.

12        Debtors, on the other hand, see things far

13   differently.  They argue that Hilton is only entitled to

14   approximately $46 million in damages.  Of the three categories

15   of damages sought by Hilton, debtors claim that Hilton is

16   entitled only to the first, the management fee, and that the

17   management fee should consist solely of the base fee.  Thus, in

18   debtors' view, Hilton should get no damages for the corporate

19   overhead fee, group services expense, brand damages, and the

20   Grand Wailea expansion.

21        Moreover, debtors arrive at their figure of $46

22   million only after subtracting certain money for cure payments

23   that debtors contend Hilton will have to make for failing to

24   meet the performance test in the future at the Grand Wailea

25   Resort.

1          I turn first to the issue of the management fees.  And

2     in looking in that, the Court must first project the fees per

3     year that Hilton would earn under the management agreements and

4     reduce these profits by the expenses that Hilton would incur to

5     arrive at a profit margin.  In doing that, one looks to the

6     total projected revenues at the Resorts as these revenues are

7     used to calculate the fees.

8          Mr. Morone and Mr. Cline's projections for the resorts

9     as, one witness put it, "quite close."  Roger Cline, Hilton's

10    expert, projects approximately $14.6 billion in revenue.

11    Thomas Morone, an expert for the debtors, opines that the

12    projected revenue for purposes of the management agreements is

13    approximately $13 billion.

14         There are only two real differences between these two

15    different predictions of revenue.  The first is the inflation

16    rate, where Mr. Cline uses three percent and Mr. Morone uses

17    2.5.

18         The Court concludes that the appropriate inflation

19    rate is 2.5.  The Court finds that Mr. Morone reasonably relied

20    on historical data from the Bureau of Labor and Statistics.

21    That data shows the inflation rate for the past ten years at

22    2.4 percent.  And he adjusted upwards to account for the

23    slightly higher twenty-year historical average of 2.6 percent,

24    resulting in his inflation rate of 2.5.

25         The Court rejects Mr. Cline's figure, which he has

1    adopted from an appraisal firm HVS, which is a standard

2    inflation rate that they use for hotel appraisals.  Mr. Cline

3    also relies on a website called "forecastchart.com" to conclude

4    the appropriate rate is three percent.  But he has not

5    submitted any evidence that forecastchart.com is a reliable

6    industry standard website.  In any event, his reliance on

7    inflation rate used by another company without proffering any

8    evidence as to how it was determined or why it is appropriate

9    is insufficient to refute Mr. Morone's proposed inflation rate

10   based on historical data.

11        The second difference between the parties' predictions

12   is the level of capital expenditures to be made by the debtors

13   in the resorts.  Mr. Cline assumes an eight percent

14   contribution by the debtors.  In support of this number, Diane

15   Jaskulske, Hilton's witness, testified that Hilton averages

16   eight to ten percent of revenue annually for properties similar

17   in size and complexity as the resort.  Matthew Bailey, Managing

18   Director of Grand Wailea, testified that four percent is simply

19   too low to maintain the operating standards under Hilton's

20   management agreement.

21        On the other hand, Mr. Morone utilizes a four percent

22   capital expenditure assumption, as per Article 6 of the

23   management agreements.  Article 6 obligates the debtors to

24   contribute four percent of resort revenue to fund necessary

25   capital expenditures.  Debtors argue that they have never

1    agreed to anything beyond the four percent, and that Hilton has

2    never formally requested any increase.

3        The Court finds that six percent is the appropriate

4    figure to use.  The six percent, in fact, is derived from Mr.

5    Morone's testimony that the debtors have consistently spent six

6    percent, on average, on capital expenditures.  The Court

7    rejects Hilton's eight percent as too high, given that Hilton

8    must follow certain procedures outlined in Article 6, in order

9    to receive additional capital expenditures funding beyond the

10   four percent reserve fund.  And Hilton has never commenced the

11   dispute resolution procedure set forth in that article.

12       Hilton's position about the need for eight percent is

13   further undercut by the fact that Hilton, in its 2005 memo,

14   viewed the resorts to be in excellent shape before purchasing

15   these management contracts.  And Mr. Bailey testified that, in

16   his view, the resort was in better shape today than it was at

17   the time of the purchase.

18       Moving on to the second component of damages, we turn

19   to the corporate overhead fee.  The debtors' expert Mr. Morone

20   deducted the corporate overhead fee as a reimbursed expense,

21   while Hilton's expert Mr. Cline included the full one percent

22   of the corporate overhead fee in his calculation of lost

23   profits and deducted no expense incurred by Hilton in managing

24   the resorts.

25       In contending that the corporate overhead fee is a

1  reimbursement, rather than profit, debtors rely, among other

2  things, upon the language in Article 5.1 of the management

3  agreement, which expressly states that the corporate overhead

4  fee is to be reimbursed to the manager.  They also note that

5  Section 1 of the management agreement states that the

6  management fee includes only the base and incentive fees, and

7  that the corporate overhead fee is never described as

8  "consideration" for Hilton's performance under the management

9  agreements.  Debtors finally note that the liquidated damages

10  and termination provisions do not contemplate corporate

11  overhead fees being incorporated as liquidated damages in the

12  event of termination.

13        For Hilton's part, its expert Mr. Cline assumed no

14  expense for corporate overhead and payment of the full one

15  percent of profit.  His conclusions were echoed by Hilton's

16  witness Diane Jaskulske, who testified that she was ninety-nine

17  percent certain that losing the resorts will not change "one

18  iota of what [is done in the] corporate office."  Hilton's

19  corporate offices, she said, rarely assist directly in

20  providing services to the resort.

21        Instead, Hilton views corporate overhead fee as merely

22  a term that Hilton inherited when it acquired the management

23  agreements from the resorts' former manager KSL.  As Hilton's

24  witness Ted Middleton explained, the corporate overhead fee is

25  simply viewed by Hilton to be analogous -- that is, the same --

1   as the two percent base fee.

2         Based on all the evidence before the Court and the

3   applicable law, the Court concludes that Hilton is entitled to

4   the corporate overhead fee, provided that appropriate

5   deductions are made for expenses.  Even though the management

6   agreements do not include the corporate overhead fee as part of

7   the management fee, there is no dispute that the fee would have

8   been earned had the debtors not rejected the Hilton Management

9   Agreements.

10         Further, Section 5.3 does not state that the corporate

11   overhead fee is reimbursable or subject to a cap like

12   reimbursable expenses.  The management agreements only provide

13   that Hilton is to receive one percent of gross revenues.

14         While the debtors argue that the termination provision

15   is persuasive, the termination provision reflects an agreement

16   between the parties as to the amount that the debtors would

17   have to pay at a much later date to terminate the agreements,

18   as opposed to proof of actual damages.  And those items are not

19   necessarily the same.  See, e.g., Vrgora v. Los Angeles Unified

20   School Dist., 200 Cal. Rptr. 130, 135 (Cal. Ct. App. 1984),

21   explaining that liquidated damages are not necessarily a

22   proximation of actual damages suffered.  See also Pima Sav. and

23   Loan. Ass'n v. Rampello, 812 P.2d 1115, 1118 (Ariz. Ct. App.

24   1991), explaining liquidated damages need not approximate

25   actual loss.

1    However, the Court finds that Hilton's 2006 10-K form

2    is persuasive in suggesting that Hilton does incur additional

3    annual overhead expenses when adding new properties to the

4    portfolio.  Indeed, the Court rejects as incredible the

5    testimony of various witnesses that there is no corporate

6    overhead associated with these resorts, which all parties

7    describe as "iconic," and indisputably far more complex than a

8    typical hotel managed by Hilton.

9    As to the exact measure of these corporate overhead

10   expenses, the Court will use Hilton's own estimate of such

11   expenses in its 2005 internal memorandum, which was prepared

12   before purchasing these management agreements.  That memorandum

13   calculates its expected cost of managing the resorts at .25 of

14   revenues, or 8.33 percent of a three percent base management

15   fee.

16   The Court rejects as self-serving the only other

17   evidence of the actual amount of corporate overhead, which was

18   an estimate prepared by Hilton's treasurer solely for the

19   purpose of this litigation.

20   The Court now turns to the applicable discount rate.

21   A discount rate must be applied to calculate the present value

22   of future payments owed to Hilton under the management

23   agreements, to account for the time value of money and the

24   financial risk of the fee stream.  See In re Chemtura Corp.,

25   448 B.R. 635, 673 (Bankr. S.D.N.Y. 2011).

1    In <u>Chemtura</u>, Judge Gerber noted that the discount rate

2    should be calculated at the time the contract was entered into.

3    <u>Chemtura</u>, at 677.

4         "Existing case law and common sense require that the

5         discounting to fix the damages award must reflect the

6         same payment risk insofar as the Court can accomplish

7         that as the original contract did."

8         <u>Id</u>. at 673.

9    The choice of an appropriate rate does not need to be

10   exact.  <u>See</u> <u>Jones & Laughlin Steel Corp. v. Pfeifer</u>, 462 U.S.

11   523, 552-553 (1983), where the Court notes:

12        "We do not suggest that a trial judge should embark on

13        the search for delusive exactness."

14   The Court may choose a discount rate not proposed by

15   the parties.  <u>See</u> <u>In re 785 Partners, LLC</u>, 2012 WL 959364, at

16   *5 (Bankr. S.D.N.Y. Mar. 20, 2012), holding that, since the

17   experts did not thoroughly explain their determinations of the

18   discount rate, the Court treated their opinions as the range

19   and selected an intermediate rate.

20        Although the weighted average cost of capital -- which

21   we'll discuss a bit more in a moment -- or the "WACC," is a

22   reasonable starting point in determining the proper discount

23   rate, the WACC must be adjusted to account for risk.  <u>See</u> <u>In re</u>

24   <u>M Waikiki, LLC</u>, 2012 WL 2062421, at *4 (Bankr. D. Haw. June 7,

25   2012).

1          Here, Hilton argues for an eight percent discount

2     rate.  It contends that the risk of the management agreements

3     at the time they acquired them were de minimis.  It contends

4     that eight percent is the industry standard, and it's what

5     Hilton uses to value its own management fees contracts.  It

6     notes that the base management fee here is less risky than

7     other revenue streams because it is paid first from the hotel

8     revenue and, thus, far less risky than fees that are a function

9     of hotel profitability.

10          One Hilton expert, Mr. Hennessey, testified that the

11    proper discount rate was 7.5 percent, based among a variety of

12    things, including: mortgage rates for full service hotels as of

13    April 2006; and the rate generally utilized for hotel

14    investments as of April 2006.  He also considered the WACC at

15    the time Hilton acquired the resorts and adjusted it downward

16    to, in his view, achieves a discount rate applicable to the

17    hotel company's reliable income stream derived from base

18    management fees.  In his report, he referenced a report by Bear

19    Stearns, which gave Hilton's WACC at 8.1 percent.  He also

20    testified he looked at Bloomberg, which reported Hilton's WACC

21    at 8.7 percent as of December 31st, 2005, and 8.2 percent in

22    the first quarter of 2006.

23          Debtors again have a different view.  Their expert,

24    Mr. Morone, applied a 13.6 percent discount rate to the Arizona

25    Biltmore and the hotel in California, and a 14.6 percent

1    discount rate to the Grand Wailea.  He calculated Hilton's

2    overall weighted average cost of capital; the WACC, as of the

3    beginning of 2006, to be 10.6 percent.  He noted that Mr.

4    Hennessey testified that Bloomberg's reported WACC of 8.7

5    percent relied on what's called a "beta" that was a default of

6    one percent; or, as Mr. Morone used, a beta of 1.29.

7         Beta is one of the components in calculating the WACC

8    for any company and measures that company risk in relation to

9    the rest of the market.  Mr. Morone testified that the 1.29

10   beta is appropriate because Hilton stock was riskier than the

11   market as a whole, and for that he cited debtors' expert Derek

12   Pitts, who submitted an affidavit with the debtors' motion.

13        Mr. Morone adjusted Hilton's WACC to account for

14   property-specific risks, as the WACC reflects aggregate risk of

15   Hilton's entire diversified portfolio of management agreements,

16   relying on something called the "Ibbotson's Size-Risk Premium,"

17   Mr. Morone adjusted the WACC to reflect specific risks, such as

18   the size of the resorts, the brand, and the volatility as to

19   the Grand Wailea.  He noted the Grand Wailea's additional risk,

20   in his view, included the remote location, the dependency on

21   air travel, the dependency on group travelers, and natural

22   conditions.

23        Based on the credible evidence and the applicable law,

24   the Court starts off by adopting the WACC used by Mr. Morone.

25        The difference between Bloomberg's WACC of 8.7 percent

1    and Mr. Morone's determination is that Mr. Morone used a beta

2    of 1.29, as opposed to a beta of one.  The affidavit of

3    debtors' expert Derek Pitts provides support for the assertion

4    of using a beta of 1.29; and in fact, Mr. Pitts' affidavit

5    provides the only real analysis of beta in this case.

6         Using that beta and information from Hilton's own 10-

7    K, I reach the conclusion that Hilton's WACC at the time of

8    entering these management agreements was 10.6.

9         Mr. Hennessey opined that Hilton's WACC was 8.1, but

10   based his finding upon an internal Bear Stearns estimate

11   published in December 2006, almost a year after Hilton acquired

12   the resorts.

13        I also note that Hilton's expert makes reference to

14   Bloomberg's WACC.  There was discussion at trial that Bloomberg

15   apparently uses a default beta of one.  It was unclear from the

16   testimony -- indeed, no one seemed to know -- if that default

17   of one was used by Bloomberg in all instances for Hilton or

18   even in all instances for all companies.  And as no party has

19   provided any explanation of the basis for using that default of

20   one here, the Court instead relies on the 1.29 beta, for which

21   analysis has been provided by Mr. Pitts.

22        On the one hand, Hilton has failed to establish that

23   the management agreements lack any risk, and that its eight

24   percent rate that it applies to all acquired management

25   agreements is sufficient to discount its future fees upon

1   rejection.  Indeed, credible evidence has been presented

2   showing that these iconic resorts are exposed to unique risks

3   that make their revenue streams more volatile than a typical

4   Hilton property, supporting an upward adjustment of the WACC,

5   which represents the riskiness to Hilton's business as a whole.

6   Thus, the Court rejects the notion that the same risks apply to

7   these resorts as apply to the operation of one of Hilton's

8   Hampton Inns.

9          On the other hand, the debtors have failed to persuade

10  the Court that the attendant risks are as high as they claim.

11  There is credible evidence that the management fees here, taken

12  from gross revenues, rather than profits, are a less risky

13  source of revenue for Hilton than many of Hilton's other

14  revenue streams and other revenue streams at the resort.

15         For all these reasons, the Court will adjust the WACC

16  for the Arizona Biltmore and the La Quinta upward by one

17  percent, to arrive at a discount rate of 11.6.  And this is to

18  account for the attendant risks identified by Mr. Morone and

19  discussed by Mr. Pitts.

20         The Court will adjust the WACC for the Grand Wailea by

21  two percent upwards, rather than one percent, to reach a

22  discount rate of 12.6, based on the aforementioned attendant

23  risks, plus additional risks unique to the Grand Wailea that

24  were discussed at the trial, and that have been mentioned

25  previously, including its location.

1           The one additional percent increase is also

2    appropriate to account for the possibility that the Grand

3    Wailea may fail the performance tests over the life of these

4    agreements.  The credible evidence was that there have been

5    real economic struggles in the recent performance of the Grand

6    Wailea, which is perhaps the most iconic, and thus most unique

7    of these three resorts.  These struggles have been evidenced by

8    various metrics that Hilton itself prepared, rating performance

9    at the resort.  These difficulties no doubt have been

10   influenced by the current economic downturn and Grand Wailea's

11   location and unusual dependence on group bookings for success,

12   bookings that are incredibly sensitive to the economy.

13          Such an adjustment for risk of termination has been

14   recognized by the courts.  See M Waikiki, 2012 WL 2062421, at

15   *4-5, adjusting the WACC upwards to account for performance-

16   based termination risk.  See also Pet Food Express Ltd. v.

17   Royal Canin USA, Inc., 2011 WL 1464874, at *12 (N.D. Cal.

18   2011), noting that the failure to reduce damages due to

19   uncertainty of lost profits towards the end of an agreement

20   ignores the contingency in the agreement that would have

21   allowed a defendant to terminate the agreement prior to the end

22   of the term for plaintiff's failure to perform its contractual

23   duties and obligations.

24          The Court now turns to the related issue of cure

25   payments.  Debtors' expert Mr. Morone deducted some $7 million

1    in cure payments because he contends that Hilton will fail the

2    performance test and will need to make cure payments on two

3    occasions.  First, in his view, it will fail in 2013 and '14,

4    and because the debtors can terminate the contract, Hilton will

5    need to make a cure payment of some $6 million.  As to the

6    second instance, based on a so-called "Monte Carlo Analysis,"

7    Mr. Morone concludes that Hilton will again fail the

8    performance test as to the Grand Wailea in 2031, prompting a

9    second cure payment of almost a million.

10          Mr. Morone believes that both these cure payments

11   should be deducted from Hilton's profits.

12          The Court rejects the debtors' arguments as unduly

13   speculative for several reasons.  First, while the Court agrees

14   there is a risk that Hilton will fail the performance test at

15   the Grand Wailea, that failure has not been shown to the degree

16   of certainty so as to make it appropriate to deduct cure

17   payments from Hilton's profits.  As already discussed, this

18   risk of failure should instead be accounted for in application

19   of the discount rate for the Grand Wailea.

20          Indeed, in reaching that conclusion, the Court notes

21   that the performance test here has been described as fairly

22   easy to satisfy by some observers.  And while I won't go that

23   far, I do note that Hilton's operating requirements are based

24   in part on Hilton Resorts' annual operating plan that it itself

25   prepares.

1      Additionally, the Court notes that the Monte Carlo

2   Analysis is unduly speculative.  Mr. Morone himself conceded

3   that he was unaware of its use in projecting future failure in

4   hotel management contracts.  Indeed, the Court notes that the

5   prediction that Hilton will fail in 2031 seems to be at odds

6   with Mr. Morone's approach of only estimating revenues out for

7   ten years because he found predictions after ten years not to

8   be sufficiently reliable.  I turn next to group services

9   expenses.  Hilton seeks some $38 million, almost $39 million,

10   in damages stemming from lost group services expenses in the

11   event the management agreements are rejected.  This figure is

12   comprised of two components.  The first is some $17 million in

13   the net present value of lost group services expense, and the

14   second is some $21.7 million in so-called "key money."

15      The management agreements define group services

16   expenses as each hotel's:

17          "cost for participation in the group services

18          (including reasonable corporate overhead related

19          thereto) as determined in accordance with Section 5.2,

20          excluding reimbursable expenses which shall be charged

21          separately."

22      Group services includes services and facilities

23   relating to advertising, marketing, promotion, publicity,

24   public relations, and group sales services, for all

25   Waldorf=Astoria Hotels and Resorts, as well as any additional

1    program or group benefit such as the Hilton HHonors program,

2    that are provided to all managed hotels.  Group services

3    expense are capped at two percent of resort revenue and are

4    distinct from the corporate overhead fee.

5          Hilton argues that the group services expense was

6    expressly provided for in the management agreements; and thus,

7    damages relating to them were foreseeable at the time of

8    contracting.  Hilton states that the brand fund that

9    Waldorf=Astoria is currently operating operates at a loss, and

10   that Hilton subsidizes it already, and that Hilton would have

11   to self-fund the amounts formerly contributed to maintain the

12   same level of brand support and marketing for the

13   Waldorf=Astoria brand.  Hilton believes that this funding will

14   have to continue until Hilton completely replaces the amount of

15   group services expenses previously contributed by the Hilton

16   Resorts, which its primary expert estimates will take at least

17   five years.

18         In addition to the group services expense itself,

19   Hilton seeks to recover over $21 million in so-called "key

20   money," which it alleges are payments that it will need to make

21   to obtain additional management agreements to replace the ones

22   that it would lose and therefore, to replace the lost group

23   services expense.  Key money represents funds that a management

24   company may be required to pay a hotel owner to obtain those

25   management rights.

1          For their part, the debtors argue that the group

2     services expenses exceed the cap established in the management

3     agreements, and accordingly should be reduced to the amount

4     actually expended, so that Hilton is no longer subsidizing the

5     difference.  The debtors further argue that Hilton is also not

6     entitled to the approximately $17 million in group services

7     expense damages because the management agreements don't permit

8     recovery of such expenses, and that Hilton will replace any

9     lost group services by 2014, and that Hilton can simply elect

10    to avoid incurring any such damages.  Finally, the debtors

11    assert there is no basis for Hilton's request for the $21

12    million in key money.

13         Given the facts and applicable law, the Court grants

14    in part and denies in part Hilton's request for damages in

15    connection with group services expense.  The language of the

16    management agreements contemplates the payment of group

17    services expenses for the costs incurred in providing group

18    services to the Waldorf=Astoria brand generally.

19         The evidence established that Hilton has used such

20    funds for their intended purpose.  The mere fact that Hilton

21    may spend more than is required for that purpose for its own

22    business reasons is irrelevant.  All that matters is that

23    Hilton seeks only to recover the fee provided for under the

24    management agreements, not any extra costs beyond that.

25    Moreover, there was no evidence at trial that Hilton intended

1   in the future to spend less on group services for the

2   Waldorf=Astoria brand than is contemplated by the management

3   agreements.

4         Relatedly, the Court concludes that Hilton's request

5   for payments of these fees for a five-year period represents an

6   appropriate exercise of its duty to mitigate its damages.  See,

7   e.g., Shaffer v. Debbas, 21 Cal. Rptr. 2d 110, 114 (Cal. Ct.

8   App. 1993), as well as Shahata v. W Steak Waikiki, LLC, 721

9   F.Supp. 2d 968, 988 (D. Haw. 2010).

10         The Court notes that Hilton has sought some $17

11   million in group services expense, a number that has been

12   described to me as having been discounted to net present value.

13   While the Court awards group services expense, it notes that

14   the correct number may be different than the $17 million.

15   While the parties do not address this issue, the Court's prior

16   ruling on the discount rate presumably applies to this

17   component of damages; therefore, this number presumably should

18   be adjusted accordingly consistent with this Court's earlier

19   ruling on the discount rate.

20         Moving on to the second aspect of Hilton's group

21   services claim, the Court rejects Hilton's request for the

22   payment of so-called "key money" for several reasons.

23         As an initial matter, the provision to pay key money

24   is nowhere mentioned in the management agreements, in stark

25   contrast to the group services expense itself.  So it is very

1    hard to say the key money was within the parties' contemplation

2    at the time of contract formation as an appropriate measure of

3    damages, and these requested damages are particularly troubling

4    given that the amount of key money sought is in fact greater

5    than the amount of damages actually sought for group services

6    expense under the contract itself.

7         In any event, the evidence at trial was insufficient

8    to support Hilton's claim for key money damages.  Hilton cannot

9    identify which hotel agreements this key money will be used to

10   acquire.  Instead, Hilton's claim for recovery of key money is

11   not grounded on any specific facts, but rather on Mr. Cline's

12   professional judgment.

13        But Mr. Cline based his analysis, specifically the

14   twenty-five percent ratio assumption he used for calculating

15   key money, upon conversations with Ted Middleton, Hilton's Vice

16   President of Development.  Middleton, however, later testified

17   that he had done no analysis of the amount of key money that

18   Hilton would be required to pay to replace the group services

19   expense payments, and was not aware of anyone else at Hilton

20   who performed such analysis.

21        Finally, the Court notes that Hilton itself concedes

22   that whatever management agreements it may one day acquire

23   could very well be management agreements that Hilton would seek

24   to acquire regardless of whether these management agreements

25   are actually rejected.

1          So for all those reasons and the lack of evidence

2     supporting the necessity of key money payments, the Court

3     rejects that component of damages.

4          I now turn to Hilton's request for so-called "brand

5     damages."  Hilton seeks approximately $120 million in damages

6     stemming from its alleged damage to Hilton's Waldorf=Astoria

7     brand.  These damages purport to stem from the debtors'

8     termination of the management agreements and flow from the

9     theory that these properties are "iconic and irreplaceable,"

10    which is a phrase that has been used often in this trial and

11    seems not to be in dispute.

12         Hilton argues that such damages were contemplated by

13    the parties when Hilton acquired the agreements in 2006, as

14    part of an effort to launch the Waldorf=Astoria brand.  Hilton

15    believed the acquisition of these management agreements for

16    these three resorts would enable Hilton to generate additional

17    business, as well as credibility among investors and within the

18    real estate development community.

19         Hilton further alleges that the loss of the resorts

20    would contribute to tension among other Waldorf=Astoria owners

21    who have already been pressuring Hilton to expand and grow the

22    brand, particularly given that the resorts collectively account

23    for some twenty-five percent of the rooms comprising that

24    brand.

25         Hilton's determination of the amount in brand damages

1   is based on two separate analyses that focus on the time period

2   spanning from 2012 to 2034.  The first estimate provides for

3   losses to the existing pipeline of Waldorf=Astoria properties

4   and any impact to the brand's future development program.

5   Utilizing this approach, Hilton estimates brand damages

6   totaling a hundred-and-twelve-some-odd million dollars.  The

7   second methodology estimates the overall value of the

8   Waldorf=Astoria brand and determines that the brand will lose

9   56.5 percent of its value.  Under that analysis, Hilton

10   estimates damages in the total amount of $128 million.  Taking

11   the midpoint between these two figures, Hilton seeks damages

12   for brand loss in the total amount of $120 million.

13        The Court denies Hilton's request for brand damages.

14   Like the request for key money, the notion for brand damages is

15   nowhere contained in the management agreements.  Instead, the

16   notion of protecting and growing the brand is covered by the

17   management agreements' group services expense, which are

18   damages that have been requested by Hilton and granted by the

19   Court.

20        Moreover, Hilton's request for brand damages is

21   fatally undercut by lack of evidence.  Hilton's expert Roger

22   Cline set forth his proposed calculation of damages, presuming

23   that there will be damage to the Waldorf=Astoria name.  But

24   other than Mr. Cline's opinion, Hilton has offered no hard

25   evidence of damage to its business or business opportunities,

1    including growth and expansion.

2            For example, Hilton has not provided evidence that a

3    current hotel owner, potential hotel owner, or Hilton HHonors

4    client has presented any concerns about the impact of rejection

5    on the brand.  Thus, there is no evidence that any current or

6    future owner would refuse to engage in business with Hilton,

7    would back out of a deal, or would even seek to receive reduced

8    rates.

9            In fact, Hilton's own witnesses testified that no

10   owner has made any indication to Hilton that they would pull

11   their property from Hilton if these three resorts were lost;

12   nor could Hilton's witnesses identify any perspective

13   Waldorf=Astoria properties that would refuse to join the brand

14   as a result of rejection of these management agreements, or any

15   co-branding opportunities that will be lost.  Indeed, none of

16   the hotel management agreements contain provisions that would

17   enable a hotel owner a right to terminate its own agreement

18   with Hilton by virtue of the loss of these three management

19   agreements, or at least no witness was aware of any such

20   provision.  Hilton has not offered any evidence establishing

21   that any new hotel will elect not to join the Waldorf=Astoria

22   brand because of the management agreement rejections.

23           Accordingly, the Court concludes that Hilton has not

24   shown such brand damage will occur with the reasonable

25   certainty required for being awarded by this Court.

1          The Court recognizes that rejection here has not yet

2     occurred; and thus, this case is different than a normal breach

3     of contract case, where the parties can look back historically

4     at events.  This inevitably may mean that it is harder for

5     Hilton to provide evidence of brand damages.

6          But the Court notes that this bankruptcy and rejection

7     proceeding have been the subject of media coverage, and the

8     debtors have made it very clear from the beginning of this case

9     more than a year ago that rejection of these management

10    agreements was a real possibility, and evaluating the

11    management agreements in this case for rejection was one of the

12    three cornerstones of the debtors' restructuring efforts.

13    Given the well publicized nature of these proceedings, the

14    Court cannot grant the very substantial brand damages sought by

15    Hilton without some real-world evidence of damage to the brand.

16    And relatedly, the Court notes that the brand damages sought

17    are more than thirty-five percent of the total damages

18    requested in this case.

19         In addition to the lack of concrete evidence from

20    Hilton's fact witnesses, there are difficulties with some of

21    the assumptions underlying the brand damages calculation.  For

22    example, the brand damages sought assume a valuation of the

23    Waldorf=Astoria brand at some 2.265 billion, but that value is

24    contradicted by some of Hilton's own documents and public

25    filings, which set forth a different valuation.

1       Furthermore, Mr. Cline's lost opportunities damages

2   calculation is based on an estimation that, notwithstanding the

3   rejection, Waldorf=Astoria will increase its number of hotels

4   by twenty-two in the near future, an aggressive assumption that

5   appears fundamentally at odds with Hilton's claim that the

6   Waldorf=Astoria brand would be harmed by rejection.  And

7   indeed, his projection as to the brand's performance going

8   forward is similarly aggressive into the future, undercutting

9   the argument of brand damage.

10      Finally, Mr. Cline's measure of calculating damages is

11  premised upon the notion that the measure of damages is

12  directly correlated to the number of rooms lost.  But that

13  notion is undercut by evidence at trial that there will be

14  times when a brand might lose a hotel from its group, and that

15  loss may not inflict any damage whatsoever to the brand.  Mr.

16  Cline did not offer any limiting principle regarding his theory

17  of brand damages to reflect this fact.

18      The rejection of Hilton's brand damage claim is

19  consistent with the applicable case law.  Applicable state law

20  generally holds that speculative contract damages cannot serve

21  as a proper legal basis for recovery.  See Scott v. Pacific Gas

22  & Electric Company, 904 P.2d 834, 845 (Cal. 1995); that case

23  noting that it was a fundamental principle of contract law that

24  speculative, remote, imaginary, contingent, or merely possible

25  contract damages cannot serve as a legal basis for recovery,

and absent any definable loss, a party is entitled only to nominal damages. See also McDevitt v. Guenther, 522 F.Supp. 2d 1272, 1287 (D. Haw. 2007); that case highlighting that, under Hawaiian law, speculative damages are not recoverable on actions arising under contract or in tort. See also Southern Union Co. v. Southwest Gas Corp., 180 F.Supp 2d 1021 (D. Ariz. 2002); that case holding that a party cannot recover for lost profit damages on the grounds it is too speculative to support recovery.

Moreover, the Court notes that the States of Arizona, California, and Hawaii recognize that damages must be proven with reasonable certainty. Walter v. Simmons, 818 P.2d 214 (Ariz. Ct. App. 1991); that case putting the burden on the plaintiff to prove damages stemming from a breach of contract with reasonable certainty. See also Maggio, Inc. v. United Farm Workers of America, 278 Cal. Rptr. 250, 264 (Cal. Ct. App. 1991); that case noting that damages for loss of profits may be denied as "unestablished" or as being too uncertain or speculative if they cannot be calculated with reasonable certainty. See also Omura v. American River Investors, 894 P.2d 113, 116 (Haw. Ct. App. 1995), stating that the extent of loss must be shown with reasonable certainty and cannot be based on mere speculation or guesswork.

These principles about certainty are applicable to situations where parties assert claims for lost profits

resulting from damage to plaintiff's reputation, and case law from all three states reflect this.  See, e.g., Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc., 2010 WL 1691869, at *5 (N.D. Cal. 2010); that case holding that there was insufficient evidence to support any award of damages for lost profits or reputation restoration, and that lost profits must be proven to be certain as to their occurrence and their extent.  See also Hi-Pac Ltd. v. Avoset Corp., 26 F.Supp. 2d 1230, 1237 (D. Haw. 1997); that case holding that plaintiffs cannot recover on a claim that a defendant's breach of contract damaged the plaintiff's reputation, and thereby resulting in lost profits, because the plaintiffs were unable to identify or reasonably calculate any specific lost sales or profits, and accordingly failed to meet their burden.

       Also instructive are this jurisdiction's decisions relating to claims on reputation damages.  Generally, the standard to show loss of good will or reputation damages is high.  In ESPN, Inc. v. Office of Comm'r of Baseball, 76 F.Supp. 2d 416 (S.D.N.Y. 1999), for example, the Court held that under New York law, in order to recover damages for loss of good will, business reputation, or future profits, the claimant must prove the fact of loss with certainty, and the loss must be reasonably certain in amount.

       The Second Circuit in Toltec Fabrics, Inc. v. August, Inc., 29 F.3d 778, 781 (2d Cir. 1994), presented a three-part

1   test for recovery:

2        The first being that the claimant must show that there

3   was in fact a loss of good will that must be proved with

4   reasonable certainty.

5        The second being that claimant must present objective

6   proof of that loss.

7        And third, that the claimant must show that the loss

8   was caused by the opposing party's breach.

9        These two cases, while outside the jurisdictions at

10  issue in this proceeding, are instructive in how to value and

11  approach the issue of brand damages here.

12       Hilton relies particularly on two cases in support of

13  its contention that it is entitled to brand damage, but neither

14  case supports its position.

15       In Woolley v. Embassy Suites, Inc., 278 Cal. Rptr. 719

16  (Cal. Ct. App. 1991), the Court considered a request by a hotel

17  branding and management company for a preliminary injunction to

18  prevent a hotel owner from terminating the hotel management

19  agreements.  The Court there declined to grant the injunction,

20  noting that computation of a damage award for the loss to

21  Embassy's reputation as a result of wrongful termination could

22  be adequately addressed through expert testimony.

23       Nothing in this case mandates or counsels the award of

24  brand damages here, however.

25       Second, Hilton cites to In re M Waikiki, LLC, 2012 WL

1    2062421 (Bankr. D. Haw. June 7, 2012).  In that case, the Court

2    denied Marriott's request for damages to its reputation and

3    good will associated with the hotel owner's alleged breach of

4    Marriott's management agreement.  The Court's holding was based

5    on its finding that Marriott presented no evidence of any

6    damage to the brand reputation.

7         Hilton argues that this case supports its position

8    because the Hawaiian Court stated that its holding was without

9    prejudice to the ultimate allowance of Marriott's claims.

10   However, this case does nothing more than support the Court's

11   conclusion that Hilton cannot recover such damages without

12   proof.

13        Finally, I turn to the last item of damages sought,

14   those relating to the potential expansion of the Grand Wailea.

15   Hilton argues that it will incur losses in the amount of some

16   $9 million in connection with the proposed expansion at the

17   Grand Wailea in the event the debtors reject the management

18   agreement.

19        In April 2012, the County of Maui granted approval of

20   a two-hundred-and-fifty-million-dollar expansion at the Grand

21   Wailea, which would add approximately 310 additional rooms and

22   increase the size of the resort from 780 to 1,090 rooms.  Such

23   expansion has been contemplated as far back as 2005.

24        Hilton argues that this expansion, which could be

25   completed by 2017, would add tremendous value to the resort,

1   with Hilton estimating such value at over $255 million.

2   Specifically, Hilton believes that expansion will result in a

3   significant increase in gross revenues; and accordingly, base

4   management fee income to Hilton, once expansion is completed.

5   Termination of the management agreements would prevent Hilton

6   from reaping the benefits of expansion in the form of increased

7   fees.  Hilton opines that, using a thirteen percent discount

8   rate, the net present value of Hilton's foregone base fees and

9   corporate overhead fees total some $9.8 million.

10          But the Court rejects Hilton's claim for damages

11  associated with a possible expansion of the Grand Wailea.

12  While the debtors have the right to expand the Grand Wailea,

13  the debtors presented testimony at trial that they have no

14  obligation, contractual or otherwise, to undertake the

15  expansion; they also assert that they presently have no plans

16  to expand the Grand Wailea; and third, that they have made no

17  commitment to do so.  None of these assertions can credibly be

18  disputed.

19          I parenthetically note that one of Hilton's witnesses

20  briefly suggested that the debtors were contractually obliged

21  to maximize operations at the resort, and that this meant the

22  debtors were obligated somehow to move forward with this

23  possible expansion.  That position, I conclude, is a wild over-

24  reach, based on the contract language at issue.

25          But in any event, turning back to the debtors'

1    position here, it's not surprising, given the facts.  As

2    previously discussed, the trial was full of evidence regarding

3    the poor performance of the Grand Wailea.  The debtors' witness

4    Thomas Shumaker described the approval here obtained by the

5    debtors as a right to expand and conceded that this right was

6    enormously valuable.  But he credibly testified that any

7    potential expansion of the Grand Wailea must be viewed in the

8    context of the future performance of the resort, and that the

9    current performance of the resort was a real concern.  He also

10   credibly testified that the approval here could be extended

11   out, so as to preserve the debtors' options and this valuable

12   right, while not committing to going forward with any

13   expansion.  He and other witnesses noted that the debtors have

14   actually had a right to expand a smaller number of rooms on the

15   same property for some time and have not proceeded to go

16   forward with that expansion.

17        In sum, the debtors' mere consideration of expansion

18   is insufficient to entitle Hilton to damages here.  See, e.g.,

19   Greenwich S.F., LLC v. Wong, 118 Cal. Rptr. 3d 531, 553 (Cal.

20   Ct. App. 2010); that case concluding that:

21        "The existence of plans for development does not

22        supply substantial evidence that the development is

23        reasonably certain to be built, much less that it is

24        reasonably certain to produce profits."

25        And that any reliance on a real estate project that

1    may not occur in order to claim lost profits is "inherently

2    uncertain, contingent, unforeseeable, and speculative."

3        See also Vestar Development II, LLC v. General

4    Dynamics Corp., 249 F.3d 958, 962 (9th Cir. 2001); that case

5    holding that there is no way to evaluate, other than through

6    speculation, the profits of a prospective land purchaser on a

7    shopping center it would have built, had the purchaser been

8    permitted to purchase the parcel of land.

9        The Court also notes that Mr. Cline's damages

10   calculation as to the Grand Wailea expansion is somewhat

11   defective because it fails to account for the fact that such

12   expansion would negatively impact the Grand Wailea's

13   performance.  It would do so by causing considerable disruption

14   to the resort for the period during which construction was

15   underway, and could result in potential lost business, required

16   discounting, and loss of good will among affected guests.  The

17   debtors anticipate that the adverse effect on revenue and

18   earnings could last as long as two years.

19       Relatedly, the Court notes the evidence at trial that

20   group bookings typically have a provision that permits them to

21   cancel their reservation if there's ongoing construction, and

22   that such group bookings are crucial to the Grand Wailea's

23   economic success.

24       That concludes the Court's rulings on the motion to

25   estimate damages from rejection of these three management

1    agreements.  Again, as I noted earlier, it's my normal

2    preference to provide a written decision to the parties, but

3    debtors explained the need for a quick resolution of this

4    dispute and requested a decision, if at all possible, by August

5    1st, 2012, which is tomorrow.  The need for such an expedited

6    decision relates to the existing deadlines for an exit strategy

7    in this Chapter 11 case, either by plan or sale or some

8    combination of both.  And those deadlines for an exit strategy

9    were the result of hotly contested hearings on exclusivity in

10   this case, a dispute that was resolved by agreement of the

11   parties on the timing for an exit strategy.  And so I

12   understand the quandary faced by the debtors; and therefore

13   prepared this bench ruling.

14          However, this being a bench ruling and transcription

15   being what it is, I plan to review the transcript to ensure

16   that it accurately reflects my ruling; and therefore reserve

17   the right to amend it accordingly.  So I'd ask the debtors to

18   order the transcript on an expedited basis, and I'll take a

19   look at it.  And I also request that the debtors prepare an

20   order memorializing my ruling, and obviously consult with

21   Hilton's counsel on the appropriate language to do so.

22          So that didn't take quite an hour and a half; it was a

23   little shorter than my estimate, but that concludes my business

24   for the day.

25          Is there anything that any party needs to raise?

1          MR. LEON:  No.  I just wanted to take the opportunity

2     to once again thank Your Honor and your staff for accommodating

3     the parties, our schedule, and in particular the debtors' short

4     time constraints.  It's very much appreciated on all sides.

5     And we also appreciate Your Honor's attention to this matter.

6          THE COURT:  Absolutely.

7          Mr. Neff, is there anything you need to raise at this

8     time?

9          MR. NEFF:  Your Honor, did you want the parties to

10    attempt to come up and try to quantify what the amount is?

11         THE COURT:  Well, that actually was going to be the

12    next thing I was going to mention.  If you noted, there is no

13    ultimate bottom-line quantification.  That's because there are

14    many components to this that I was trying to get right, and I

15    was going to leave you all to do the math, particularly as to

16    the discount rate.

17         So yes, I think, it would be the appropriate subject

18    of discussion among the parties, in terms of memorializing the

19    ruling in an order.

20         MR. NEFF:  Very good.

21         THE COURT:  All right.  Thank you.

22         Anything else?  All right.

23         MR. LEON:  Nothing for debtors.

24         THE COURT:  Thank you.  Have a good evening.

25         MR. LEON:  Thank you, Your Honor.  You, too.

1              MR. NEFF:  Thank you, Judge.

2         (Proceedings concluded at 5:15 p.m.)

3                              * * * * *

4

<u>CERTIFICATION</u>

1

2        I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter.

5

6

7

8    <u>  S/ Coleen Rand                </u>         <u>August 1, 2012</u>

9   Coleen Rand, AAERT Cert. No. 341        DATE

10

11  Certified Court Transcriptionist

12

13  AudioEdge Transcription, LLC