UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: . Chapter 11
. Case No. 11-10372 (SHL)
MSR RESORT GOLF COURSE, LLC, et al,
. New York, New York
Debtors. . Thursday, August 16, 2010
. 4:20 p.m.

SUPPLEMENTAL BENCH RULING REGARDING DEBTORS' MOTION FOR AN ORDER ESTIMATING THE DAMAGES FROM REJECTION OF HILTON'S MANAGEMENT AGREEMENTS

**BEFORE THE HONORABLE SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

APPEARANCES:

For the Debtors: Eric F. Leon, Esq.
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

For Midland Loan Services, Inc.: Steven Z. Szanzer, Esq.
MILBANK, TWEED, HADLEY & MCCLOY, LLP
One Chase Manhattan Plaza
New York, New York 10005

(Appearances Continued)

Audio Operator: Electronically Recorded by T. Brown, ECRO

AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey 07068
(973) 618-2310
www.audioedgetranscription.com

Proceedings recorded by electronic sound recording, transcript produced by certified transcription service.

APPEARANCES: (Continued)

VIA TELEPHONE:

For the Debtors: Paul Basta, Esq.
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

For Waldorf=Astoria Management, LLC: David M. Neff, Esq.
Brian Audette, Esq.
PERKINS COIE, LLP
131 S. Dearborn Street, Suite 1700
Chicago, Illinois 60603

For the Official Committee of Unsecured Creditors: Craig E. Freeman, Esq.
ALSTON & BIRD, LLP
90 Park Avenue
New York, New York 10016

GIC RE: Brian E. Greer, Esq.
DECHERT, LLP
1095 Avenue of the Americas
New York, New York 10036

Before the Court is a request of the parties for clarification of the Court's bench ruling of July 31, 2012, on the motion of debtors for entry of an order estimating the damages that would result from rejection of Hilton’s Management Agreements relating to three properties: The Grand Wailea, the Arizona Biltmore, and the La Quinta Resort.

There was a transcript made of that ruling, and after review and amendment by the Court, the bench ruling was placed on the docket at Docket No. 1397.

The parties then subsequently filed letters seeking clarification on two issues discussed in the bench ruling. The debtors’ letter was docketed at Docket No. 1384, and Hilton's letter was docketed at 1389.

The two letters address the same two issues.

First, the letters addressed the question of the appropriate discount rate for the Court's determination on damages for lost profits relating to Hilton’s three management agreements. The bench ruling held that Hilton was entitled to certain lost profits. The Court found these profits were subject to a discount rate of 11.6 for the Arizona Biltmore and La Quinta Resort, and a discount rate of 12.6 for the Grand Wailea.

The parties dispute in their letters whether the damage award should also be subject to an additional discount, based on the expert report of Roger Cline, who was

one of Hilton's witnesses. Mr. Cline suggested that a discount rate of eight percent generally should be used, but that there should be a reduction based on the likelihood that Hilton will be terminated in the final ten-year term of the agreements.

Debtors urge that the Court factor in Mr. Cline's reduction for this possibility of termination in the final ten years into the damages as an additional calculation. Hilton argues that the Court should not, and that the Court has already taken all of the issues regarding the discount rate into consideration in making its ruling and arriving at the 11.6 and 12.6 percentages.

In looking at my ruling, I understand it could be read to be unclear on this issue, so I think that this issue actually is an appropriate one for clarification. I conclude that Mr. Cline's likelihood of termination in the final ten years should not be a separate factor for reduction of the award of damages.

As I stated in my ruling, I rejected the discount rate proposed by both parties in favor of my own rate, based on the evidence at trial. That rate started with Hilton's weighted average cost of capital and then factored in specific risks identified during the evidence at trial. It was my intention that the discount rate I arrived at in the bench ruling, 11.6 for two properties, and 12.6 for the

third, be inclusive of all of the risks that were identified at trial.

Relatedly, I note that Mr. Cline identified this risk of probability of termination in the context of urging the Court to otherwise apply a discount rate of eight percent. I rejected his approach of eight percent and, again, came up with my own approach that was intended to identify the discount rate for the management agreements as a whole. So on this first issue, I will use Hilton's calculation that does not factor in this additional reduction.

The second issue identified in the letters is the amount of group services expense that should be awarded. In the bench ruling, the Court denied in part Hilton's request for group services expense, to the extent it sought so-called "key money," a claim that was calculated by Hilton to be approximately $21 million of a total of $38 million that was requested by Hilton for group services expense. Both the $38 million and the $21 million were figures that were provided to the Court by Hilton.

While the Court denied the request as to key money, the Court granted the request for group services expense that was consistent with the terms of the agreement, as capped at two percent of resort revenue for a five-year period, consistent with Hilton's obligation to mitigate damages.

Hilton placed a figure at trial on this part of group services expense at $17 million.

In my bench ruling, I wondered whether the $17 million figure was correct in light of my decision to use a higher discount rate than had been proposed by Hilton's expert Mr. Cline. I asked the parties to reach an appropriate calculation of the group services expense damage figure, in light of my ruling on the discount rate. I asked for this figure so that I could include it in an order to be entered on the motion. As a higher discount rate will result in a lower figure, I presumed at the time of my bench ruling that the damage figure of $17 million would either decrease or remain the same.

The parties now dispute the amount of group services expense that should be awarded. Hilton now seeks group services expense in the amount of $33.6 million, a figure essentially double what had been previously sought. The debtors object, arguing that the number of $17 million should now go down to $11.39 million.

Based on my review of the papers and the trial evidence - particularly, the reports and testimony of Mr. Cline, as well as the presentations of counsel - it appears that the basis for Hilton's new figure is to correct a miscalculation made by Mr. Cline. That miscalculation appears to be that Mr. Cline took the base amount of group

services expense and applied the appropriate discount rate to reach a figure, but then subsequently applied the discount rate again to that figure. Essentially, the error that appears to have occurred is that the damages number appears to have been subject to the discount rate twice, which would reduce the figure, not surprisingly, by half.

Unlike my first ruling, I don't think this second issue calls for a clarification on the bench ruling. Instead, I view Hilton's $33 million figure to be based on a new argument about the evidence at trial and how that evidence should be understood. Therefore, I conclude that Hilton is really requesting that the Court amend its bench ruling, a request that is governed by Rule 60(b) of the Federal Rules of Civil Procedure. That rule, 60(b), is made applicable to bankruptcy proceedings by virtue of Bankruptcy Rule 9024.

In setting out the standard generally, I rely on a Southern District case from New York, Williams v. New York City Department of Corrections, 219 F.R.D. 78 (S.D.N.Y. 2003), which has an extensive discussion of the standard for a Rule 60(b) motion.

As noted in the Williams decision, Rule 60(b) allows the Court to revisit an order or judgment and provides relief based on any of six criteria. The first criteria addresses mistake, inadvertent surprise, or excusable neglect. The

second criteria includes newly discovered evidence; the third includes fraud, misrepresentation, or other misconduct. The other criteria list a number of other factors that do not apply to this proceeding.

To prevail on a Rule 60(b) motion, the moving party must demonstrate that one of the criteria outlined in the rule applies. "A motion under Rule 60(b) is addressed at the sound discretion of the Court." Velez v. Vasallo, 203 F.Supp. 2d 312, 333 (S.D.N.Y. 2002)(citing Mendell In Behalf of Viacom, Inc. v. Gollust, 909 F.2d 724, 731 (2d Cir. 1990)). "Rule 60(b) provides an opportunity for courts to balance fairness considerations present in a particular case against the policy favoring the finality of judgments." Broadway v. City of New York, 2003 WL 21209635, at *3 (S.D.N.Y., May 21, 2003). "Rule 60(b) motions, however, are generally granted only upon a showing of exceptional circumstances." Mendell, 909 F.2d at 731.

The Second Circuit has imposed a three-pronged test in order for a Rule 60(b) motion to be granted:

First, there must be highly convincing evidence supporting the motion. Second, the moving party must show good cause for failing to act sooner. And third, the moving party must show that granting the motion will not impose an undue hardship on the other party.

And that is taken from another case from the

Southern District, 2003 WL 21209635.

"The burden of demonstrating the motion is justified rests on the moving party." State Street Bank and Trust Co. v. Iversiones, 246 F.Supp 2d 231, 248 (S.D.N.Y. 2002).

Hilton has not met the standard for Rule 60(b) here. The $17 million figure that the Court adopted in its bench ruling was a figure advocated by Hilton in every part of this proceeding until Hilton raised this issue for the first time in its letter after the trial. In fact, Mr. Cline's expert report consistently uses the figure of $38.9 million to describe group services expense as a whole, including the $21 million of key money. These numbers are included in his expert report. Hilton's pretrial brief uses that number, as well.

During trial, the opening statement of Hilton is found at the transcript of the hearing from June 27th, at Page 31 and states that:

"-- foregone payments of group services expense. Those Mr. Cline has calculated at about $38 million."

During Mr. Cline's cross, there is extensive testimony explaining how that $38 million is broken out. I reference Mr. Cline's cross-examination at transcript of hearing on July 3rd, at 925. From Lines 8 through Line 20 of that page, the colloquy goes as follows:

"Question: Okay. Just so I'm clear, the total damages you attribute to group services is 38.9 million, correct?

"Answer: Correct.

"Question: And of that, 21.7 million is for the key money that we'll get to, correct?

"Answer: Correct.

"Question: So the lost future payments you valued at about 17 million. Is that right?

"Answer: (Witness reviews exhibit). For the five years leading up to the payment of the key money, yes."

This is also confirmed by cross-examination on July 3rd, Page 933, Lines 10 through 16.

Similarly, post-trial briefing presented the same numbers. Hilton's post-trial brief at Paragraph 109 references that Hilton will fund, out of pocket, the amount of group services expense that the Hilton resorts would have otherwise contributed, which Cline estimates have a net present value of $17 million. The post trial brief references Hilton’s trial exhibit 24 on Pages 49 and 50.

Similarly, Hilton's post-trial brief further breaks it out on Paragraph 109, talking about key money constituting $21 million of a total of $38 million; and Paragraph 110 again breaking out group services expense of $17 million, plus $21 million in key money.

Hilton has not shown good cause for not acting earlier to correct a calculation that was entirely within its power and was a number advocated by Hilton to this Court. There is clear prejudice to the other side in the form of a proposed increase in damages of some $17 million, an increase which might have affected debtors' litigation strategy if it had been discussed during discovery. It might have affected what issues were pursued in discovery. It also might have affected what questions were asked at trial.

Thus, I conclude that the evidence in support of the motion is not the kind of highly convincing evidence that is required to grant a Rule 60(b) motion, and Hilton has not shown good cause for its failure to act sooner. I also find there has been a showing of undue hardship to be imposed on other parties, that is, granting the proposed relief would impose hardship on the debtors here.

Moreover, I note that it is well settled in this circuit that three situations warrant reconsideration of previous court decisions:

One, an intervening change in controlling law; Two, the availability of new evidence; And three, the need to correct clear error or prevent manifest injustice. Palaimo v. Lutz, 837 F.Supp. 55 (N.D.N.Y. 1993).

I note that other courts have commented upon the fact that ignorance or carelessness on the part of a litigant

or an attorney will not provide grounds for Rule 60(b) relief. See Bershad v. McDonough, 469 F.2d 1333, 1337 (7th Cir. 1972); see also Hoffman, Farmers Co-operative Elevator Association v. Strand, 382 F.2d 224, 232 (8th Cir.), cert. denied, 389 U.S. 1014 (1967).

For all those reasons, I side with Hilton on the first issue; namely, that the damages award should not be further reduced for risk of termination identified by Mr. Cline. But I side with the debtors on the second issue; namely that the $17 million, having been repeatedly advocated to this Court by Hilton as the proper damages amount, cannot now be changed after the trial has been concluded and the Court has issued its ruling.

So again, I conclude that the appropriate way to approach the damages figure for group services expense is to take the $17 million; and, to the extent an eight percent calculation of a discount rate has been applied to reach that figure, that an appropriate discount rate of 11.6 or 12.6, as the case may be, should be applied, so that the number appropriately reflects my ruling on the discount rate.

So I would ask that all this be reflected in the order to be provided on the motion, and that the parties order a copy of this transcript, which I will review and put on the docket as a supplement to my earlier bench ruling.

*****

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

________________________________________ August 17, 2012

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

AudioEdge Transcription, LLC