**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                                              Chapter 11

MSR RESORT GOLF COURSE LLC, *et al.,*                  Case No. 11-10372 (SHL)

                                                                                    (Jointly Administered)


                              Debtors.

----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**APPEARANCES**:

KIRKLAND & ELLIS LLP
Attorneys for MSR Resort Golf Course LLC, *et al.*
153 East 53rd Street
New York, New York 10022
By:    Eric F. Leon, Esq.
        Hunter Murdock, Esq.

GORDON & REES, LLP
Attorneys for The Conlon Group Arizona, LLC
111 West Monroe Street, Suite 1600
Phoenix, Arizona 85003
By:    Stephen W. Tully, Esq.


**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

        Before the Court are cross-motions for summary judgment by MSR Resort Golf Course

LLC, *et al.* (the "Debtors") and The Conlon Group Arizona, LLC ("Conlon").  (ECF Nos. 1750,

1753 (the "MSR MSJ" and "Conlon MSJ," respectively)).  The parties dispute what, if any, cure

amounts are due to Conlon by virtue of the Debtors' assumption of the Arizona Biltmore Rental

Pool Agreements.  *See* ECF No. 1114 (the "Assumption Motion"); *see also* ECF No. 1227

(Conlon's Limited Objection to Assumption Motion, the "Ltd. Obj.").  At issue in the motions is

whether any or all of Conlon's present claims for cure damages—including the so-called

Revenue Claims and 17 Percent Claims—are barred by prior litigation in federal district court in

Arizona. For the reasons that follow, the Court agrees with the Debtors that Conlon's Revenue

Claims are barred by the doctrine of res judicata, but concludes that some—but not all—of

Conlon's 17 Percent Claims are precluded by collateral estoppel.

## BACKGROUND

### A. The Hotel

The material facts are not in dispute.[1] Debtor MSR Biltmore Resort, LP ("MSR

Biltmore"), owned the Arizona Biltmore Hotel (the "Hotel"). Kamensky Decl., Ex. B (ECF No.

3).[2] Immediately adjacent to the Hotel was a development of seventy-eight villa-style

condominiums. MSR 7056 ¶ 1; Conlon Reply to MSR 7056 ¶ 1. Each villa owner had the

option to enter into a rental pool agreement ("RPA")[3] with the Hotel whereby the villa units were

made available as part of the Hotel's room inventory in exchange for villa owners receiving a

portion of the revenue generated by the villas. *See* MSR 7056 ¶ 1; Conlon Reply to MSR 7056 ¶

1; Ltd. Obj. at 86; s*ee also* Kamensky Decl. ¶ 23. The RPAs set forth how the villa owners were

to be compensated. First, revenues earned from renting out the villa units would be pooled

amongst all units that participated in the rental pool on a particular day (the "Rental Pool"), and

---

[1]        The Debtors filed a statement of material facts pursuant to Local Rule 7056-1 on November 9, 2012. (the "MSR 7056") (ECF No. 1755). Conlon responded to the Debtors' statement on November 21, 2012. ("Conlon Reply to MSR 7056") (ECF No. 1796). Conlon filed its own 7056-1 statement (the "Conlon 7056") (ECF No. 1750), to which the Debtors responded on November 21, 2012. (the "MSR Reply to Conlon 7056") (ECF No. 1799).

[2]        This hotel was one of five properties owned and operated by the Debtors when these bankruptcy cases were first filed. *See* Kamensky Decl. ¶ 5. All of the properties were sold during the bankruptcy cases, which ultimately culminated in confirmation of a plan of reorganization. *See* Order Confirming the Second Amended Plan of Reorganization of MSR Resort Golf Course, LLC, *et al.* (the "Conf. Order") (ECF No. 2071).

[3]        KSL Biltmore Resort, Inc. ("KSL") entered into the RPAs with Conlon, and KSL's "rights and responsibilities under the RPAs were subsequently assigned to CNL Resort Biltmore Real Estate, Inc." *See* Order, dated May 21, 2007 at 1. Murdock Decl. Ex. C. It appears that CNL Resort Biltmore Real Estate was a predecessor to Debtor MSR Biltmore, which used a variety of names in the years prior to the filing of the bankruptcy petition. *See* Voluntary Petition, Case No: 11-10383 (ECF No. 1).

then allocated pro-rata to each unit on a daily basis. RPA ¶ 8 (Murdock Decl. Ex. C) (ECF No.

1525). The Hotel would receive 50 percent of those revenues; the villa owners would receive the

rest.[4] RPA ¶ 9. Distributions to villa owners were to be made on a quarterly basis, accompanied

by a statement detailing the various calculations and allocation amounts. RPA ¶ 12.

Sixty-five villas participated in the Rental Pool as of November 2012. MSR 7056 ¶ 2;

Conlon Reply to MSR 7056 ¶ 2. In 2003, Conlon purchased six villa units and entered into

individual RPAs for each unit. MSR 7056 ¶ 4; Conlon Reply to MSR 7056 ¶ 4; *see also* Ltd.

Obj., Ex. C (collecting relevant RPAs). Conlon is owned and operated by Mr. Mark Finney, who

is also the president of the villa owners' condominium association. Ltd. Obj. at 2, n.1.

### B. The Conlon Lawsuits in Arizona

Conlon contends that the Debtors did not properly compensate Conlon for the use of its

villas under the RPAs. The present dispute is only the latest litigation on this subject, which has

been addressed in several prior lawsuits. Two of these lawsuits are particularly relevant here. In

June 2006, Conlon first sued the Debtors' corporate predecessors in the United States District

Court for the District of Arizona (Case No. CV06-2065-PHX-FJM) ("Conlon I"). MSR 7056 ¶

5; Conlon Reply to MSR 7056 ¶ 5; *see also* Order, dated May 21, 2007, at 2; Murdock Suppl.

Decl., Ex. C (ECF No. 1798). Conlon I was a dispute "between the parties over the proper

allocation of expenses and revenue under the [RPA]. Accordingly, Conlon sought to inspect the

books and records maintained by defendants in order to conduct an audit." Order, dated May 21,

2007, at 2. Conlon also sought "judgment for any funds owed" to it under the RPA pursuant to

the requested accounting. *See* Conlon I Pl.'s Trial Mem. at 2 (Murdock Suppl. Decl., Ex. D).

The Arizona court granted Conlon's request for access to books and records. Order, dated May

---

[4]    The percentage kept by the Hotel would rise to 65 percent if the unit generated more than $100,000. *See* RPA ¶ 9

21, 2007, at 4:3–8 (Murdock Decl., Ex. E).  Prior to a trial on damages, the Hotel agreed to pay

Conlon $41,726 plus pre-judgment interest for a variety of items, including overcharging Conlon

for travel agent and credit card fees, and giving complimentary villa rooms to employees for

more than one week.  Judg't, dated June 4, 2008, at 2 (Klest. Decl., Ex. F) (ECF No. 1750-3); *see*

*also* MSR 7056 ¶ 6; Conlon 7056 ¶ 9.  The only claim that went to trial was Conlon's allegation

that the Hotel provided complimentary villa rooms to guests at a disproportionately high rate,

thus improperly depriving Conlon of income.  Order, dated April 11, 2008, at 1:18–22; 1:24–2:2

(Murdock Decl., Ex. G); *see also* MSR 7056 ¶ 6.  The Arizona court dismissed that claim with

prejudice, finding that Conlon failed to prove that the hotel abused its discretion in offering

complimentary rooms to guests.  Judg't, dated June 4, 2008, at 2; Order, dated April 11, 2008, at

4:3–11.

More litigation about the RPAs ensued in 2008.  At that time, Conlon and some other

villa unit owners sued the owners of the Hotel[5] for an accounting, breach of contract, and breach

of implied covenant of good faith and fair dealing (Case No. CV08-00965-PHX-FJM) ("Conlon

III").[6]  Conlon III Third Am. Compl. at 4–6 (Murdock Suppl. Decl., Ex. F); *see also* MSR 7056

¶ 7; Conlon 7056 ¶ 15.  In Conlon III, Conlon acted as assignee of the rights of other villa

owners.  MSR 7056 ¶ 7; *see also* Order, dated July 27, 2009, at 2:20 - 21 (Murdock Decl., Ex. I)

---

[5]     The named defendants in this litigation were CNL Resort Biltmore Real Estate, Inc. and KSL Biltmore Resort, Inc.  The caption of that case notes that CNL and KSL are "n/k/a" ("now known as") MSR Biltmore Resort, LP and MSR Hotels & Resorts, Inc.

[6]     There was a second lawsuit, known as "Conlon II" (Case No. 09-01163-FJM), also in the United States District Court for the District of Arizona.  In Conlon II, Conlon sought a preliminary injunction to restrain the Hotel from unilaterally terminating the RPAs.  The Arizona court treated the preliminary injunction motion as one for summary judgment, and entered judgment in favor of Conlon, ruling that the Hotel did not have the right to terminate the RPAs.  *See* Conlon 7056 St ¶¶ 12–13; MSR Reply to Conlon 7056 ¶¶ 12–13.  However, the Conlon II case is not relevant for the purposes of this decision.  As the parties have identified the two relevant prior lawsuits as Conlon I and Conlon III, the Court adopts that naming convention for the sake of consistency.

("On February 26, 2008 . . . Conlon filed the present action against the Hotel as agent of the
other villa owners.").

The Arizona court characterized Conlon III as "a re-do of Conlon I" as other villa owners
sought damages on many of the same items that Conlon pursued in Conlon I.  Order, dated Nov.
4, 2009, at 2:6 (Murdock Decl., Ex. D); *see* Conlon III Third Amended Compl. ¶¶ 20–23, 26, 31,
34.  The Conlon III case included the same allegations as Conlon I regarding overcharges,
complimentary rooms, and undercharging for villa units.  The Arizona court permitted these
duplicate claims to go forward because the plaintiffs in Conlon III included villa unit owners
who were not previously represented in Conlon I.  *See* Order, dated July 27, 2009, at 5:14–26;
MSR 7056 ¶ 7; Conlon 7056 ¶ 15.  There was one new claim raised in Conlon III, however,
which was "[the] claim that the Hotel's practice of capping revenue [to villa owners] at 17
[percent of total hotel revenues] breache[d] the rental pool agreement . . . ."  Order, dated July
27, 2009, at 2:23–26.

Just like in Conlon I, the defendants in Conlon III conceded liability for the claims for
travel agent and credit card overcharges, and complimentary employee rooms.  *See* Order, dated
Nov. 4, 2009, at 2:12–14.  The Arizona court rejected both parties' proposed damages amount on
these conceded items, instead determining that a damage award of $525,000 was appropriate for
these claims.  *Id.* at 3:3–6.  The Arizona court then found in favor of the Hotel on the claims
related to complimentary rooms to guests, and villa unit undercharging.  *Id.* at 3:27; 4:17–18.
Lastly, the Arizona court rejected Conlon's argument about the capping of revenue at 17 percent,
instead finding that the Hotel's methodology was not arbitrary or an abuse of discretion.  Order,
dated Nov. 4, 2009, at 5:20–27.

5

## C.  The MSR Bankruptcy, Assumption Motion, and the Limited Objection

The Debtors commenced their Chapter 11 cases in February 2011.  Kamensky Decl. ¶ 6.

A little more than one year later, the Debtors sought to assume the RPAs for the Arizona

Biltmore, together with some related relief.  *See generally* Assumption Motion.  Conlon

objected.  Several months later, the Debtors filed a Disclosure Statement and Proposed Second

Amended Joint Plan of Reorganization (the "Plan").  *See* Discl. St. (ECF No. 1849); Proposed

Second Amended Joint Plan (ECF No. 1848) (both filed Dec. 13, 2012).  On February 22, 2013,

the Court approved the Plan, which provided for the sale of substantially all of the Debtors'

assets and the subsequent creation of a liquidating trust to administer the remaining assets.  *See*

Order Confirming the Second Amended Joint Plan (the "Confirmation Order") (ECF No. 2071).

The Plan also provided for the assumption of all executory contracts, including the RPAs, and

for a mechanism to address cure amounts owed under these executory contracts.  *See* Plan Art. V

§§ A, D.  The Confirmation Order also explicitly preserved the parties' rights to litigate the

matters arising out of the assumption of the RPAs.  Conf. Order ¶ 146; *see* Revised Plan

Supplement for the Second Amended Joint Plan of Reorganization Ex. B (ECF No. 2090).

The heart of Conlon's current objection is the Debtors' alleged "omission and non-

proportional allocation of certain Room Revenue categories . . .  [and] the overcharging of Rental

Pool participants for certain items . . ." Ltd. Obj. ¶ 47.  In sum, Conlon seeks

> an unbiased, impartial interpretation of the Rental Pool
> Agreements requir[ing] that the MSR Biltmore pay Rental Pool
> Participants a portion of the lucrative fees it assesses guests.
> Accordingly, Conlon respectfully requests that this Court interpret
> the Rental Pool Agreements consistent with the foregoing and
> determine that the fees and charges are earned . . . .

*Id*. at 16.

6

The majority of Conlon's claims fall into two broad categories: "Revenue Claims" and "17 [Percent]" Claims.  *See* MSR 7056 ¶ 14; Conlon Reply to MSR 7056 ¶ 14.[7]  The Revenue Claims relate to guest charges that the Hotel does not include in the pool of funds used to calculate the allocations to the rental pool participants. *Id*. ¶¶ 22–28. These charges are for resort fees, cancellations, guaranteed no-shows, early departure, telephone revenue, and other rooms revenue (including use of putting green and wireless internet). MSR 7056 ¶ 15; Conlon Reply to MSR 7056 ¶ 15. Conlon contends that these fees should be included in the Rental Pool.  Ltd. Obj. ¶ 28.[8]

---

[7]    Conlon raises a few other claims, alleging that the Hotel has overcharged it for various items, similar to the claims related to overcharges in Conlon I and Conlon III.  The Debtors agree that those claims would survive summary judgment and are not the subject of this decision.  Briefly, those items include:

> (1)  Improper adjustments (Ltd. Obj. ¶¶ 31–34): With respect to the claim that the owners were double charged for certain items, the Debtors concede that "[t]he Resort made a good-faith accounting oversight in this regard, and has agreed to pay that $16,212 back to the Villa unit owners."  MSR Reply ¶ 22 (ECF No. 1524).

> (2)  Credit card & travel agent commissions: (Ltd. Obj. ¶ 35): As counsel for the Debtors noted, "We actually think that they've received a windfall on that, but we believe that survives.  And the reason that survives is that's the one area where the [Hotel's] methodology has changed since Conlon III.  It's the only area."  Hr'g. Tr. at 24:19–25; *see also* MSR Reply ¶ 22.

> (3)  Bad Debt Expense (Ltd. Obj. ¶¶ 37–38):  As counsel for Debtors stated, "The other thing that would survive is their claim for $8,000 in bad-debt expense, because this is a one-time item that occurred after the filing of Conlon III . . . ."  Hr'g. Tr. at 25:17–19.

[8]    Conlon also alleges that the Hotel charges the villa owners too much for telephone service, but that claim appears to be the flip-side of Conlon's complaint that the Hotel does not share its telephone revenues with villa owners.  For example, Conlon argues that the telephone revenue should be included in the Rental Pool and that the villa unit owners are being charged more than their proportional share of telephone access costs. As Conlon described in the Limited Objection:

> Even though the Hotel charges each condominium owner for telephone service, the Hotel does not share any telephone revenues paid by guests staying in a Condominium. . . . Conlon submits that this is fundamentally unfair.  If the Hotel is not to share revenue earned for telephone service, then it should not charge Rental Pool participants for the overhead.

> Alternatively, Conlon believes that the Hotel overcharges rental pool participants for telephone service. . . . The [RPA] is silent as to how much the Hotel can charge for

The 17 Percent Claims allege that the Hotel improperly departed from the proportional allocation benchmark that it previously used, which was based on the number of rental pool units relative to the overall Hotel room inventory.  *Id.* ¶¶ 44, 45.  More specifically, Conlon contends that the Debtors have an obligation to ensure that the percentage of the Hotel's overall room revenue allocated to the Rental Pool equals or exceeds the percentage of the Hotel's room inventory represented by the Rental Pool Units.  *See* MSR 7056 ¶ 16; Conlon Reply to MSR 7056 ¶ 16.[9]

After the filing of the Limited Objection, the parties filed cross motions for summary judgment regarding the preclusive effect, if any, of the prior Arizona court litigation on Conlon's current claims.  In those motions, the parties disputed whether Conlon's Revenue Claims could have been raised in the prior litigation and thus are now barred by res judicata.  As for the 17 Percent Claims, the parties disagreed about whether that issue was previously decided by the Arizona court and is thus barred by collateral estoppel.

---

telephone access, but it strains credulity to believe that this sunk infrastructure costs what the Hotel charges the Rental Pool participants. . . . At most, the participants in the Rental Pool should be charged an amount equal to the pro rata amount of the Hotel's cost proportionate to the number of Condominiums and the total number of rooms available for guests.

*See* Ltd. Obj. ¶¶ 29- 30.

[9]    In filing the Limited Objection, Conlon contends that it is acting on behalf of the other villa owners:

Although Conlon is the party filing this Limited Objection, the ambiguity in the RPA's, and the proper amount to be distributed to the [villa owners participating in the rental pool] under the RPAs, implicates the rights of many others who participate in the Rental Pool.  As such, it is not just "one Villa owner" that the Debtor needs to address.

*Id.* ¶ 50.  Notwithstanding this statement, however, no other villa owners at the Arizona Biltmore objected to the Assumption Motion.  Accordingly, the Court addresses only Conlon's situation.

## DISCUSSION

I.   **Applicable Law**

To prevail on a motion for summary judgment, the moving party must establish that there

is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56; s*ee also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986); *Mark IV*

*Indus. v. N.M. Envtl. Dep't* (*In re Mark IV Indus.*), 438 B.R. 460, 464–65 (Bankr. S.D.N.Y.

2010).[10]  A material fact is one that "might affect the outcome of the suit under governing law."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and

quotations omitted).  After the movant has made its initial showing, the opposing party must

present competent evidence that a genuine issue of fact exists.  *See Matsushita Elec. Indus. Co.*,

*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (after the moving party has met its

burden under Rule 56(c), opposing party must "do more than simply show that there is some

metaphysical doubt as to the material facts").  If the nonmoving party fails to establish the

existence of an element essential to its case on which it will bear the burden of proof at trial,

summary judgment should be granted in favor of the movant.  *Celotex*, 477 U.S. at 322–23.

When parties submit cross-motions for summary judgment on the same claim or issues,

each motion must be considered on its own merits and analyzed under Rule 56.  *Law Debenture*

*Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (citing *Morales v. Quintel*

*Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).  "In each case, all reasonable inferences must be

drawn against the party whose motion is under consideration." *Morales v. Quintel*, 249 F.3d at

121.  However, the court may decline to enter judgment for either party if it finds that neither has

---

[10]     For the summary judgment standard, Debtors cite to Bankruptcy Rule 7056 that incorporates Rule 56 of the
Federal Rules of Civil Procedure, ECF No. 1753 ¶25, whereas Conlon cites applicable Arizona state procedural
rules, ECF No. 1750 ¶ 2.  As the procedural rules of the Bankruptcy Court apply regardless of the applicable
substantive law, the Court applies applicable federal procedural law.

satisfied its respective burden.  *Id*. ("[E]ven when both parties move for summary judgment . . . a court need not enter judgment for either party.").

Res judicata and collateral estoppel generally "protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (citations omitted).  The parties here agree that the Court should apply Arizona state law of res judicata and collateral estoppel.  *See* Debtors' Reply Brief at 14, n. 15 (ECF No. 1524); Conlon MSJ ¶ 31 (ECF No. 1750); *Semtek Int'l Inc. v. Lockheed Martin Corp*., 531 U.S. 497, 508, (2001) (the preclusive effect of a federal court judgment rendered on the basis of diversity should be governed by the preclusion law of the state in which the federal court sits); *see also Rafter v. Liddle,* 704 F. Supp. 2d 370, 375 (S.D.N.Y. 2010).   "The party seeking to assert res judicata bears the burden of proving that it applies."  *Douglass v. Martin*, 2012 U.S. Dist. LEXIS 127167, at *5 (D. Ariz. Sept. 7, 2012) (citing *State Comp. Fund v. Yellow Cab Co.*, 197 Ariz. 120, 124 (Ariz. Ct. App. 1999)).   The same is true for collateral estoppel.  *Kajander v. City of Phoenix*, 2010 U.S. Dist. LEXIS 61496, at *5 (D. Ariz. June 22, 2010) (citing *State Comp. Fund*, 197 Ariz. at 124).

## II.    Res Judicata and the Revenue Claims

Res judicata prevents parties from relitigating a cause of action that has been reduced to final judgment.

> Under the doctrine of res judicata, a judgment on the merits in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. This doctrine binds the same party standing in the same capacity in subsequent litigation on the same cause of action, not only upon facts actually litigated but also upon those points which might have been litigated.

*Pettit v. Pettit*, 189 P.2d 1102, 1106 (Ariz. Ct. App. 2008) (citations omitted); *see also Sharpe v. Select Portfolio Servs.*, 2013 U.S Dist. LEXIS 14269, at *6 (D. Ariz. Feb. 1, 2013). A party asserting res judicata must prove: "(1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the two suits." *Peterson v. Newton*, 307 P.3d 1020, 1022 (Ariz. Ct. App. 2013) (citing *In re Gen. Adjudication of All Rights to Use Water in Gila River Sys. and Source*, 127 P.3d 882, 887–888 (Ariz. 2006)); *see also In re Residential Capital, LLC*, 2013 Bankr. LEXIS 5027, at *18 (Bankr. S.D.N.Y. Nov. 27, 2013) (stating elements of res judicata under Arizona law) (citing *Beseder, Inc. v. Osten Art, Inc.*, 2006 U.S. Dist. LEXIS 68989, at *5 (D. Ariz. Sept. 26, 2006)).

In Arizona, the doctrine of res judicata rests on the long-accepted principle that "[i]t is against public policy to split a cause of action and to make two or more suits of it when one is sufficient." *Williams v. Williams*, 256 P. 356, 357 (Ariz. 1927); *see also Phoenix Newspapers, Inc. v. Dep't of Corr., State of Ariz.*, 934 P.2d 801, 805 (Ariz. Ct. App. 1997) (noting that one purpose of claim preclusion is "barring the splitting of claims"). To this end, res judicata bars not only claims that were actually litigated, but also those that could have been litigated. *Wojtunik v. Carolina Cas. Inc. Co.*, 2007 U.S. Dist. LEXIS 69963, at *6 (citing *Western Systems, Inc. v. Ulloa,* 958 F.2d 864, 868 (9th Cir. 1992)).

The second and third requirements have been satisfied here for reasons that can be explained fairly simply. As to the second requirement, a final judgment is "the opposite of dismissal without prejudice." *Long v. TRW Vehicle Safety Sys.*, 2010 U.S. Dist. LEXIS 17613, at *10 (D. Ariz. Feb. 26, 2010) (citing *Semtek Int'l. Inc. v. Lockheed Martin Corp.*, 531 U.S. at 505). A judgment which "can be, but is not appealed, is final under Arizona law." *Piatt v.*

11

*MacDougall*, 773 F.2d 1032, 1034 (9th Cir. 1985). When examining an alleged breach of a

contract that was the subject of prior litigation, Arizona courts look to whether there was an

intent to reserve matters for future litigation:

> part or all of the claim subsists as a possible basis for a second
> action by plaintiff against the defendant [when] (a) the parties have
> agreed in terms or in effect that the plaintiff may split his claim, or
> the defendant acquiesced therein, or (b) the court in the first action
> has expressly reserved the plaintiff's right to maintain the second
> action.

*Heine v. Sagebrush Solutions, LLC,* 2007 U.S. Dist. LEXIS 20136, at *8 (D. Ariz. Mar. 19,

2007) (citing Rst. 2d Judgments § 26 (1982)).

The undisputed facts demonstrate that the requirements for a final judgment are satisfied

here. The judgment in Conlon III memorializes the $525,000 awarded by Judge Martone in his

prior order of November 4, 2009. Judg't, dated Nov. 5, 2009 (Klest. Decl., Ex. L). That order

provides the final determination of all claims made in Conlon III, including the damages award

determined by the Arizona court. Order, dated Nov. 4, 2009. Moreover, there is no evidence

here of any agreement to split claims or reserve any rights on behalf of Conlon and, in fact, the

judgment is silent as to its application or relevance in future litigation.[11]

As to the third element of res judicata, one cannot be bound by a judgment unless he is a

party to that litigation.[12] *Taylor v. Sturgell,* 553 U.S. 880, 893 (2008) ("[O]ne is not bound by a

---

[11]    Conlon did not dispute that the final judgment element for res judicata was satisfied as to the Revenue
Claims. But it did raise arguments that these Revenue Claims were not barred by collateral estoppel. *See* Conlon
MSJ at 21-23 (stating that issue preclusion (ie collateral estoppel) does not bar Revenue Claims because they were
not actually litigated in prior litigation); *see also* Conlon Reply Brief at 3. But Debtors have not invoked collateral
estoppel as to the Revenue Claims and, indeed, it is hard to see how it would apply here. But it is unnecessary for
the Court to address this issue given the conclusion that the Revenue Claims could have been litigated and thus are
barred by res judicata (i.e. claim preclusion).

[12]    Conlon's papers did not raise any dispute regarding the requirement that there be an identity of parties.
*See, e.g.,* Hr'g Tr. at 68–74; *see also* ECF Nos. 2223, 2224 (letters submitted pursuant to the Court's request at the
hearing, regarding whether and where the issue of privity was raised by Conlon). At the hearing, Conlon argued the
issue. *See generally* Hr'g. Tr. 32–39. But such arguments are improper where the issue was not raised in the
summary judgment papers. *See Handschu v. Police Dep't of N.Y.*, 905 F. Supp. 2d 555, 561 (S.D.N.Y. 2012)

judgment *in personam* in a litigation in which he is not designated as a party or to which he has

not been made a party by service of process.") (citations omitted)).  "The concept of privity in

the res judicata context is a 'legal conclusion designating a person so identified in interest with a

party to former litigations that he represents precisely the same right in respect to the subject

matter involved.'" *Normandeau v. City of Phoenix*, 516 F. Supp. 2d 1054, 1069–70 (D. Ariz.

2006) (citing *In re Schimmels,* 127 F.3d 875, 881 (9th Cir. 1997)).  "One who prosecutes or

defends a suit in the name of another to establish and protect his own rights, or assists in the

prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as

he would be if he had been a party to the record." *Schimmels*, 127 F.3d at 880 (quoting *Montana

v. United States*, 440 U.S. 147, 154 (1979)).

Under Arizona law, "finding privity between a party and a non-party requires both a

substantial identity of interests and a working or functional relationship in which the interests of

the non-party are presented and protected by the party in the litigation." *Hall v. Lalli,* 977 P.2d

776, 779 (Ariz. 1999).  Two parties who have merely similar objectives may not be in privity;

rather, the court should examine the relationship of the parties to the action and the commonality

of their interests.  *Id.* at 780.  As the court in *Hall v. Lalli* observed:

> Parties with common objectives but disparate interests might
> pursue an action with varying degrees of diligence. Even when the
> interests of the parties apparently overlap, a court should determine
> if there are additional, separate interests that would prevent a
> finding of privity.

*Id.*

The undisputed facts here demonstrate that there is an identity of the parties.  The

plaintiff in Conlon I is the same party that filed the Limited Objection in this Court.  Conlon also

---

(explaining that "a party asserting a claim for the first time during post-briefing oral argument deprives the other
party of the opportunity to challenge the merits of the claim in an orderly fashion.").  In any event, the Court finds
that the requirement of identity of the parties has been satisfied for the reasons stated above.

was a party to and controlled the litigation in Conlon III, and took an individual recovery as a result of that litigation.  *See* Application for Attorney's Fees in Conlon III (Murdock Decl., Ex. M); Order Denying Request for Attorney's Fees in Conlon III at 3:4–13 (Murdock Suppl. Decl., Ex. R); *see also* Order, dated July 27, 2009, at 7:14–8:2.[13]  Indeed, the caption of pleadings from Conlon III clearly identify "[t]he Conlon Group of Arizona, LLC" as the plaintiff.

The Court turns now to the final element for res judicata:  whether the Revenue Claims could have been litigated during Conlon III.  MSR MSJ ¶¶ 54–56; s*ee also* Hr'g Tr. 6:25-7:7. Res judicata will only bar a subsequent claim if the new claim shares an identity with the prior claim, and is based on the same cause of action asserted in the prior proceeding.  *Norriega v. Machado*, 878 P.2d 1386, 1389 (Ariz. 1994).  Any claims that were brought or could have been brought in the prior litigation are barred by res judicata.  *See Wojtunik*, 2007 U.S. Dist. LEXIS 69963, at *6.  Arizona applies the "same evidence" test, *Phoenix Newspapers, Inc.*, 934 P.2d at 804, which precludes a party from "maintaining a second action based upon the same transaction, if the evidence needed to sustain the second action would have sustained the first action." *Pettit*, 189 P.3d at 1105 (citing Restatement of Judgments § 61 (1942)); *see also Sharpe v. Select Portfolio Servs.*, 2013 U.S. Dist. LEXIS 14269, at *6 (D. Ariz. Feb. 1, 2013); *Five Points Hotel P'ship v. Pinsonneault*, 835 F. Supp. 2d 753, 760 (D. Ariz. 2011).  "Similar but

---

[13]     The Order dated July 27, 2009 provides as follows:

> . . . the Hotel issued refund checks to all rental pool participants, including the assignor villa owners . . . The Hotel informed the assignor villa owners that if they had assigned their claims to Conlon, they could transfer their refund to Conlon. . . .  Several of the villa owners nevertheless accepted the refund checks.  The Hotel now argues that Conlon's damages should be reduced by the amount of the refund payments. . . . It is undisputed that the Hotel had notice of the assignments [to Conlon] . . . when the parties stipulated to the substitution of Conlon as the sole party plaintiff due to the assignment agreements between the plaintiff villa owners and Conlon. . . . [the Hotel's] payments to the assignor villa owners does not relieve its liability to Conlon . . . ."

Order, dated July 27, 2009 7:14-8:2.

14

distinct claims, or those based on different factual elements, are not precluded in a second

action." *Rand v. City of Glendale*, 2008 Ariz. App. LEXIS 232, at *15 (Ariz. Ct. App. Dec. 26,

2008) (citing *Phoenix Newspapers, Inc.*, 934 P.2d at 805-06). "These facts may be gleaned from

evidence in the two cases as well as from the pleadings." *See Beseder, Inc.*, 2006 U.S Dist.

LEXIS 68989, at *16.

Applying all of those principles here, the Court finds that the Revenue Claims could have

been litigated in the Conlon III lawsuit, which addressed compensation of villa owners under the

RPAs. Conlon disagrees, arguing that "the financial records available at the time of Conlon I . . .

were those from October 2003 through September 2006 . . . [and] the financial records available

at the time of Conlon III were . . . those from 2002 to 2009." Conlon MSJ ¶ 41; *see* Conlon

Reply Brief ¶ 26 ("even though the financial statements Conlon received in Conlon I and

Conlon III are in the same format as they are today, they were for a time period different than

those relied upon in the Limited Objection . . ."). But the Revenue Claims here share the same

DNA with the prior litigation. Conlon III alleged claims breach of contract and breach of

implied covenant of good faith and fair dealing, claiming that the Hotel was not properly

allocating revenue to the Rental Pool. *See* Conlon III Compl. (Murdock Decl., Ex. H). More

specifically, Conlon alleged that "condo owners did not suspect and had no reason to suspect that

the defendants were not paying all the revenues owed under the [RPAs]." Conlon III Compl. at

3. In that litigation, Conlon further complained that the Debtors "overcharge[d] credit card and

travel agent fees, miscalculate[d] rental revenues, undercharge[d] for the condos and excessively

comp[ed] the condo units . . . ." *Id.* The Arizona court characterized the claims in both Conlon I

and Conlon III as "the improper calculation of credit card and travel agent expenses, and

excessive comping of rooms." Order, dated July 27, 2009, at 2. In a later decision, Judge

Martone described the Conlon III action as "assert[ing] four separate breach of contract claims.

Each claim involved a distinct breach resulting in distinct damages. . . . Conlon was awarded

$525,000 on one claim only—credit card and travel agent fee overcharges."  Order, dated Feb.

23, 2010 (Murdock Suppl. Decl., Ex. R).

　　　　In this case, Conlon again alleges problems with the allocation methodology for

revenues.  The Limited Objection alleges "the Hotel's omission and non-proportional allocation

of certain Room Revenue categories to the Rental Pool participants, and the overcharging of

Rental Pool participants for certain items . . . results in amounts being due Rental Pool

participants." Ltd. Obj. ¶ 47.  Conlon further alleges in its objection that "the Hotel has

overcharged the participants in the rental pool for various items, such as adjustments, travel

agent commissions, and bad debt expenses." *Id.* ¶ 21.  Conlon's overcharges claim relies upon

an "ambiguity in the Rental Pool Agreements," *Id.* ¶ 25, and in turn, Conlon "requests that the

Court . . . determine that the Resort Fees, Cancellation Fees, Guaranteed No-Show Fees, Early

Departure Fees, and Other Room Revenue be shared with the Rental Pool Participants." *Id.* ¶ 28.

　　　　There is no allegation that the Hotel changed its practices as to the items in dispute here

from the time of the Conlon III lawsuit to the present day.  Thus, Conlon could have pursued

these claims regarding allocation of revenue in Conlon III.  *See Riesland v. Indus. Comm'n. of

Ariz.*, 2012 Ariz. Unpub. LEXIS 1246 (Ariz. Ct. App. July 3, 2012) (res judicata bars issues "that

were or could have been decided" in prior litigation).  Permitting Conlon to raise these claims

now would essentially bless a strategy whereby a litigant can bring a new challenge every year

based on the same contract even though none of the facts have changed.  *See Turtle Island

Restoration Network v. U.S Dep't of State,* 673 F.3d 914, 919 (9th Cir. 2012) ("following

[plaintiff's] logic, there would be nothing stopping it from bringing a new general challenge to

the certification process based on next year's certification decision, and every year from now on.
That's exactly the kind of piecemeal litigation res judicata aims to prevent."); *cf. TechnoMarine
SA v. Giftports, Inc.*, 2014 U.S. App. LEXIS 13487, at *15 (2d Cir. July 15, 2014) (in analyzing
whether post-judgment conduct constitutes a new claim, one looks to whether there are legally
significant acts that occurred after the filing of the prior lawsuit).

The result here is confirmed by a review of the evidence relevant to the claims in Conlon
III and in the Limited Objection.  In Conlon III, an expert was engaged to analyze the following:

> (1) the Hotel's accounting system for the rental pool; (2) the
> Hotel's calculation of credit card expenses and travel agency
> commissions; (3) the lack of documentation supporting the Hotel's
> 17% practice; (4) the Hotel's practice regarding complimentary
> rooms; (5) the Hotel's group rate practices; and (6) the Hotel's
> villa rate practices.

Order, dated July 27, 2009, at 2.  In Conlon III, the plaintiff's expert relied on the Debtors'
financial statements to reach his conclusions.  *See* MSR 7056 ¶ 8;[14] Conlon Reply to MSR 7056
¶ 8; s*ee also* Murdock Suppl. Decl., Ex. H at 3 (engagement letter for Conlon's expert, noting
testing procedures for the period 1995 to 2008).

In support of its claims here, Conlon's expert has once again reviewed the Debtors'
financial statements, including room revenue categories and various alleged overcharges, to
reach his conclusion that the villa unit owners in the rental pool are owed $1,991,262.   Martin

---

[14]    Conlon's expert conducted an extensive review of the records:

> . . . [Conlon's expert on damages in Conlon III] produced an index of materials
> that she purportedly relied upon in the preparation of her expert report . . . . she
> had reviewed nearly 79,000 documents containing the [Hotel's] financial
> records . . . . Included in those materials was an operating statement from the
> Resort for the period ending December 31, 2006.

MSR 7056 Statement ¶ 8; Conlon Reply to MSR 7056 ¶ 8.

Decl. ¶¶ 1, 5, 7(C).[15]   It is undisputed that the format of the financial statements at issue in

Conlon III and the Limited Objection is the same.   *Compare* Martin Decl., Ex. 1 at 1 (operating

statements as of December 31, 2011), *with* Murdock Decl., Ex. U (operating statements as of

December 31, 2006); *see also* Murdock Decl., Ex. W (index of materials used by Conlon's

expert in Conlon III, reflecting review of 2006 operating statements); *see also* Hr'g Tr. 14:13–

16.[16]   It is also undisputed that, at the time of Conlon III, the Hotel was excluding from the

Rental Pool the same fees that Conlon now seeks through its Revenue Claims.   *See* Pruitt Decl.

¶ 10 (ECF No. 1526) (explaining that resort fees, cancellation fees, telephone revenue and other

fees were excluded); *see* Martin Decl. ¶ 9 (Conlon learned of these claims by reviewing the

Debtors' financial statements).[17]   Applying the same evidence standard, therefore, the Court

finds that the Revenue Claims could have been brought in the prior Conlon lawsuits and are thus

barred by res judicata.

## III.   Collateral Estoppel and the 17 Percent Claims

Collateral estoppel precludes "relitigation of issues actually litigated regardless of

whether the prior action is based upon the same claim as the second suit." *Smith v. Cigna*

*HealthPlan*, 52 P.3d 205, 212 (Ariz. Ct. App. 2002) (citing *Matusik v. Ariz. Pub. Serv. Co.*, 684

---

[15]      Other Room Revenue Categories included resort fees, cancellation fees, room telephone charges, other
rooms revenue, guaranteed no-show revenue, and early departure revenue.  The Overcharges included inappropriate
adjustments, double charges for adjustments, overcharged travel agent commissions, undercharged credit card fees,
and charges for bad debts.  Martin Decl. at ¶ 7A, B.

[16]      *See also* Hr'g Tr. 14:13-16, July 2, 2013 (Counsel for Debtors: "The Conlon Group admits — and this is at
Paragraph 26 of their reply brief: "the financial statements Conlon received in Conlon I and Conlon III are in the
same format as they are today."  It's an undisputed fact.  Mr. Pruitt said it in his declaration; they admit it in their
brief.").

[17]      Indeed, Conlon did not dispute that the only change since Conlon III in the allocation method of Debtors'
financial statements relates to credit card fees and travel agent commissions, changes which took place to remedy
the defects identified in the Conlon I and Conlon III lawsuits. *See* Pruitt Depo. Tr. 16:19-17:10 (Murdock Suppl.
Decl., Ex. A) (ECF No. 1798); Hr'g Tr. 24:22-25:2; 71:25-72:4, July 2, 2013 (Counsel for the Debtors and the
Court confirming that there have been no changes in allocation methodology except for credit card charges and
travel agent commissions).

P.2d 882, 884 (Ariz. Ct. App. 1984)).  The party raising collateral estoppel must ordinarily

demonstrate (1) the issue was actually litigated in the prior proceeding, (2) there was full and fair

opportunity to litigate the issue, (3) the resolution of such issue was essential to the decision, (4)

there was a final decision on the merits, and (5) common identity of the parties.  *Chaney Bldg.*

*Co.,* 716 P.2d at 30.[18]  The parties' dispute here centers on the first requirement: whether the 17

Percent Claims were actually litigated.

     Collateral estoppel "bars a party from relitigating an issue identical to the one he has

previously litigated to a determination on the merits in another action."  *State ex rel. Winkleman*

*v. Ariz. Navigable Stream Adjudication Comm'n*, 229 P.3d 242, 256 (Ariz. Ct. App. 2010).

Arizona courts have held that a party can establish that an issue was litigated by demonstrating

three elements.  *Chaney Bldg. Co.*, 716 P.2d at 30.  "When an issue is properly raised by the

pleadings or otherwise, and is submitted for determination, and is determined, the issue is

actually litigated."  *Id.*

     The Debtors argue that the 17 Percent Claims were raised, litigated, and finally

determined in Conlon III.  *See* MSR MSJ  ¶¶ 40–48.  Conlon disagrees, arguing that neither the

departure from the 17 percent convention nor the accuracy of that metric were litigated to final

determination in Conlon I or Conlon III.  Conlon MSJ ¶ 52.  Conlon maintains that "the issues

raised by the Limited Objection were either stipulated to or settled by the parties . . . "  Conlon

MSJ ¶ 53.  For the reasons stated below, the Court finds collateral estoppel bars some but not all

---

[18]     In Arizona, defensive use of collateral estoppel is permitted when the first four elements are present, without a requirement of proving the common identity of the parties. *Garcia v. Gen. Motors Corp.,* 195 990 P.2d 1069, 1073(Ariz. Ct. App. 1999).  Common identity of the parties is only required when collateral estoppel is being used offensively such as when a plaintiff seeks to prevent a defendant from relitigating an issue that the defendant previously litigated unsuccessfully in an action with another party. *Campbell v. SZL Properties Ltd.,* 62 P.3d 966, 968 (Ariz. Ct. App., 2003).  As the Debtors here are essentially defending against Conlon's claims, this is a defensive use of collateral estoppel, and the fifth element need not be satisfied.

of the 17 Percent Claims because only part of these claims were actually determined by the Arizona court.

In this case, Conlon contends that there is a long standing convention to pay the villa owners 17 percent of the room revenues generated by the Hotel and rental units, a figure based on the approximate ratio of the number of villa units to the number of total rooms available. *See* Ltd. Obj. at 12. Conlon complains that it was improper for the Debtors to depart from the 17 percent standard. *Id.* at 12–13. The court in Conlon III was required to address the relevance of the 17 percent convention. In that case, Conlon's expert had argued that "the Villa Owners were simply never allocated a share of revenues equal to their percentage share of the property room revenue." Murdock Suppl. Decl., Ex. H at RMJ0419 (ECF 1754). The Arizona court rejected that argument, observing that the contract itself mandated only a fifty-fifty split of rental pool revenues, and that the 17 percent convention was not part of the parties' contract. Order, dated Nov. 4, 2009, at 4–5. Moreover, the Arizona court noted that the agreement did not even address the extent to which rental pool units would be used at all, a fact that seriously undermined Conlon's position. *Id.* at 5 (concluding that failure to address the extent of use of the villa units was a "major defect" in the agreement). Given all these facts, the Arizona court in Conlon III concluded that it could not "say that the Hotel's method of using the villa units was arbitrary, capricious, or an abuse of its discretion which, under the contracts, is complete." *Id.* Thus, the Arizona court would not strike down the Hotel's use of 17 percent as a general benchmark for payment to the villa owners. *Id.* at 4–5. Given this ruling, the Court agrees with the Debtors that Conlon is precluded in this litigation from revisiting the same arguments rejected in Conlon III, including any attempt to advocate for allocations higher than the 17 percent or the use of a larger

20

pool of revenue when calculating the 17 percent share.[19]  Such claims were rejected in the
Arizona court's conclusion that the 17 percent metric as applied was not unreasonable and thus
the owners were not entitled to an exact pro rata share of revenue.  *See Chaney Bldg Co*., 716
P.2d at 30 (issue is actually litigated where raised in the pleadings or otherwise, submitted for
determination, and determined).[20]

Given the litigation and decision on the issue in Conlon III, the undisputed facts establish
that this portion of the 17 Percent Claims also satisfies the remaining collateral estoppel
requirements, including that there was a full and fair opportunity to litigate, *see Baier v. Mayer
Unified Sch. Dist.*, 232 P.2d 747, 754 (Ariz. Ct. App. 2010), that the resolution was essential to
the decision, *Garcia v. GMC*, 990 P.2d 1069, 1073-74 (Ariz. Ct. App. 1999), and that there was a
final decision on the merits.  *Ariz. Navigable Stream Adjudication Comm'n*, 229 P.3d at 256.

But the Arizona court in Conlon III was never confronted with the question of whether it
was permissible for the Hotel to pay villa owners less than 17 percent.  That is because the Hotel
had, in fact, always paid Conlon an amount in excess of 17 percent up to that point in time.  *See*
MSR MSJ Ex. A (reflecting payment of 17 percent or more from 2004 to 2008).  Thus, the
propriety of paying Conlon less than 17 percent was never specifically decided by the Arizona
court in Conlon III and cannot be the subject of collateral estoppel because it was not necessarily
decided by that court.  *Circle K Corp. v. Industrial Comm'n.*, 880 P.2d 642, 647 (Ariz. 1993)
(finding that issue preclusion did not apply because an element of plaintiff's claim was not
litigated in a prior lawsuit).  Of course, the merits of that argument are in serious doubt given the

---

[19]     *See, e.g*., Martin Decl. Ex B at 23 (calculating that the villa unit owners would be entitled to $198,978 if allocated the exact pro-rata share of revenues).

[20]     Indeed, Conlon concedes that these 17 Percent Claims were actually litigated in stating that "Conlon is satisfied with the determination of the Arizona [court] that the 17 [Percent Claims] was not an abuse of discretion." Conlon Reply at  6, ¶ 17.

ruling in Conlon III that the 17 percent metric is nowhere contained in the contract, which provides only for payment to the villa owners based on the fifty-fifty split of Rental Pool revenues.  But the merits of this 64 thousand dollar question[21] are not yet before the Court and thus the ultimate decision on this issue awaits another day.[22]

## CONCLUSION

For the reasons set forth above, the Court (1) grants the Debtors' motion for summary judgment as to the Revenue Claims, holding that they are barred by the doctrine of res judicata; (2) grants in part and denies in part the Debtors' Motion as to the 17 Percent Claims, concluding that some but not all those claims are barred by collateral estoppel; and (3) denies Conlon's motion for summary judgment except as to a limited portion of the 17 Percent Claims specifically identified in this decision.  Debtors should settle an order on five days notice.


Dated: New York, New York
       August 7, 2014



                                        /s/ Sean H. Lane_____
                                        UNITED STATES BANKRUPTCY JUDGE

---

[21]    The amount of a claim based on failure to meet the 17% benchmark was calculated at $64,310.  *See* Martin Decl. Ex B at 22.

[22]    The Court also notes that principles of res judicata would not bar the 17 Percent Claims because they could not have been brought prior to the Arizona court lawsuits.